**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
ALEX M. OUTWATER (CA 259062)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
aoutwater@scott-scott.com

*Attorneys for Plaintiff Police and Fire Retirement System of the City of Detroit*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, on Behalf of Itself and Derivatively on Behalf of ALPHABET, Inc., <br><br> Plaintiff, <br><br> v. <br><br> LARRY PAGE, SERGEY BRIN, ERIC E. SCHMIDT, SUNDAR PICHAI, JOHN L. HENNESSY, FRANCES H. ARNOLD, L. JOHN DOERR, ROGER W. FERGUSON, JR., ANN MATHER, ALAN R. MULALLY, K. RAM SHRIRAM, and ROBIN L. WASHINGTON, <br><br> Defendants, <br><br> -and- <br><br> ALPHABET, Inc., <br><br> Nominal Defendant. | Case Number: <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT <br><br> [REDACTED] <br><br> <u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ......................................................................3

III.  PARTIES ......................................................................................................4

    A.    Plaintiff ..............................................................................................4

    B.    Nominal Defendant.............................................................................4

    C.    Individual Defendants ........................................................................5

IV.   SUBSTANTIVE ALLEGATIONS ...............................................................10

    A.    Alphabet's Broad Pattern of Anticompetitive Business Plans............10

        1.    General Search Services, General Search Text Advertising, and General Search Advertising..............................................................10

            a.    General Search Services Market....................................11

            b.    General Search Text Advertising Market .......................13

            c.    General Search Advertising Market................................15

        2.    Google Maintains Monopolies in the General Search Services, General Search Text Advertising, and General Search Advertising Markets .........17

            a.    General Search Services Monopoly...............................17

            b.    General Search Text Advertising and General Search Advertising Monopolies ...........................................19

        3.    Google's Anticompetitive Conduct Entrenches Its Monopoly Search Positions...................................................................21

            a.    Google's Exclusionary Contracts Bar the Entry of General Search Services Competitors from the Market .........................21

                i.    Contracts with Apple .........................................22

                ii.    Web Browsers....................................................23

                iii.    Android Mobile Ecosystem ...............................23

                iv.    Anti-Forking Agreements ..................................25

                v.    Mobile Application Distribution Agreements ...................26

                vi.    Revenue-Share Agreements...............................28

                vii.    Voice Assistants.................................................29

i

viii.    Automobiles ........................................................................31

b.    Google Degrades Interoperability in Its Search Advertising Placement Tool, Limiting Advertisers' Ability to Evaluate Advertising Options ........................................................................32

i.    Data Asymmetry ........................................................34

ii.    Other Exclusionary Conduct.....................................36

c.    Google Controls Consumer Traffic, Harming Competition from Vertical Search Providers .............................................................37

4.    Android Mobile Operating System and App Distribution........................43

a.    Technical Barriers to Prevent Android App Distribution Outside of the Google Play Store ....................................................................43

b.    Google's Contracts Further Prevent OEMs from Circumventing Google's Technical Barriers .........................................................45

c.    Google's Contracts Also Block Competing App Stores from Distribution on the Play Store ........................................................46

d.    Google Unlawfully Ties Advertising Offerings to the Google Play Store ............................................................................................47

e.    Google's Exclusionary Contracts Further Prevent the Development of a Competing App Distribution Platform on Android ...............48

f.    Google Bought off Samsung and Used Additional Restrictive Contracts to Further Prevent Development of a Competing App Store ............................................................................................50

g.    Google Bought off Key App Developers to Further Stifle Competition for Android App Distribution ..................................53

5.    Android in-App Payment Processing........................................................55

a.    Google Unlawfully Ties in-App Billing to the Google Play Store 55

b.    Google's Monopoly over the IAP Processing Market ..................57

c.    Google Sets IAP Processing Commissions at Will.......................59

6.    Third Party Online Display Advertising .................................................60

a.    Ad Servers Market ........................................................................61

b.    Exchange Markets for Display Advertising Market .....................64

c.    Market for Ad Purchase Tools......................................................66

d.    Google Forces Publishers into Its Ad Server and Ad Exchange ...68

ii

|  |  | e. | Google Uses Its Control over Inventory to Block Competition on Exchanges .................................................................................70 |
|  |  | f. | Header Bidding Evolves to Promote Exchange Competition........74 |
|  |  | g. | Google Re-Routes Trading to Defeat Header Bidding .................75 |
|  | 7. |  | Anticompetitive Agreement with Facebook to Destroy Header Bidding..80 |
|  | 8. |  | Unified Pricing Rules.........................................................................83 |
|  | 9. |  | Google Forces Advertisers to Use Google's Ad Buying Tools.................85 |
|  | 10. |  | Alphabet's Market Dominance ..................................................................86 |
|  |  | a. | Market Dominance over General Online Search Engine Services, General Search Text Advertising, and General Search Advertising86 |
|  |  | b. | Market Dominance over the Android Mobile Operating System and App Distribution....................................................................90 |
|  |  | c. | Market Dominance over IAP Processing......................................93 |
|  |  | d. | Market Dominance over Display Advertising on Third-Party Sites94 |
|  |  | e. | Market Dominance over Instream Online Video Advertising.......99 |
| B. | Anticompetitive Effects ...............................................................................99 |
|  | 1. |  | General Search Services, General Search Text Advertising, and General Search Advertising.......................................................................99 |
|  | 2. |  | Android App Distribution ......................................................................101 |
|  | 3. |  | IAP Processing......................................................................................103 |
|  | 4. |  | Third-Party Advertising.........................................................................109 |
|  |  | a. | Anticompetitive Effects in the Publisher Ad Server Market .......111 |
|  |  | b. | Anticompetitive Effects in the Exchange Market........................111 |
|  |  | c. | Anticompetitive Effects in the Network Market..........................113 |
|  |  | d. | Anticompetitive Effects in the Markets for Ad Buying Tools for Small Advertisers and Display Ad Buying Tools for Large Advertisers ................................................................................113 |
|  |  | e. | Harm to Innovation ....................................................................115 |
| C. | Google Also Engages in Unfair and Deceptive Conduct that Harms Consumers115 |
|  | 1. |  | False and Misleading Statements About Sideloading Apps ....................115 |

2.      False and Misleading Statements About "Openness" ............................ 117

3.      False and Misleading Statements and Deceptive Conduct Regarding Google Play Billing .................................................................................. 120

D.      The Individual Defendants Breached Their Fiduciary Duties by Utterly Failing to Institute an Appropriate Reporting System and Consciously Failing to Act to Prevent an Illegal Business Plan ........................................................................ 122

1.      The Board's Failure to Institute a System of Internal Controls to Monitor the Company's Illegal Business Plans ................................................... 122

2.      The Audit Committee's Failure to Act in the Face of Numerous Red Flags Indicating that the Company Was Carrying Out Illegal Business Plans Violative of U.S. Antitrust Law ............................................................ 127

E.      The Department of Justice and State Attorneys General Bring Antitrust Enforcement Claims Against the Company; Private Suits Follow ..................... 129

V.      DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .................................... 130

VI.     CONTROL ALLEGATIONS ........................................................................ 134

A.      Alphabet Is Controlled by Brin, Page, and Schmidt ............................................ 134

B.      Brin, Page, and Schmidt Directed and Oversaw the Company's Anticompetitive Business Practices ............................................................................................ 136

C.      The Board Fails to Challenge the Anticompetitive Conduct Orchestrated by Brin, Page, and Schmidt ....................................................................................... 138

VII.    DAMAGES TO THE COMPANY ................................................................. 138

VIII.   CLAIMS FOR RELIEF .............................................................................. 139

COUNT I      Breach of Fiduciary Duty (Against the Individual Defendants in Their Capacity as Directors) .................................................................................. 139

COUNT II     Breach of Fiduciary Duty (Against Brin, Page, Schmidt, and Pichai in Their Capacity as Officers) ..................................................................................... 140

COUNT III    Breach of Fiduciary Duty (Against Brin, Page, and Schmidt in Their Capacity as Controlling Stockholders) .................................................................. 140

COUNT IV     Unjust Enrichment (Against the Individual Defendants) .................................... 141

COUNT V      Corporate Waste (Against the Individual Defendants) ....................................... 142

IX.     PRAYER FOR RELIEF .............................................................................. 143

X.      JURY DEMAND ....................................................................................... 145

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff the Police and Fire Retirement System of the City of Detroit, by and through its undersigned attorneys, respectfully submits this action in the name of, and on behalf of, Nominal Defendant Alphabet, Inc. ("Alphabet" or the "Company"), formerly named Google, Inc. (converted in 2017 into Google LLC) ("Google"), against the Company's Board of Directors (the "Board," defined below) and certain executive officers named herein (the "Officer Defendants," defined below, and together with the Board, the "Individual Defendants").

The allegations in this Verified Stockholder Derivative Complaint (the "Complaint") are based upon Plaintiff's personal knowledge with regard to its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon the investigation conducted by Plaintiff's counsel, including, *inter alia*, review of: (i) documents received pursuant to a books and record demand made under §220 of the Delaware General Corporation Law (the "220 Documents"); (ii) public filings made by the Company with the U.S. Securities and Exchange Commission (the "SEC"); (iii) news articles, analysts' reports, press releases, and other publicly available information concerning Alphabet, the Individual Defendants, and the misconduct described herein; (iv) public filings made in the following actions against Google: *U.S. v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. 2020) (the "DOJ Action"); *Utah v. Google LLC*, Case No. 3:21-cv-05227 (N.D. Cal. 2021) (the "Utah AG Action"); *Texas v. Google LLC*, Case No. 4:20-cv-00957 (E.D. Tex. 2021) (the "Texas AG Action"); and *Colorado v. Google LLC*, Case No. 1:20-cv-03715 (D.D.C. 2020) (the "Colorado AG Action"); and (v) other publicly available information.

## I.    SUMMARY OF THE ACTION

1.    This is a stockholder derivative action arising out of the prolonged and ongoing monopolistic and anticompetitive business practices, which the Individual Defendants (defined below) caused Alphabet[1] to adopt and maintain. Specifically, under the Individual Defendants' management and

---

[1]    Google is the predecessor company to Alphabet. In October 2015, Google re-organized and Alphabet came into existence as the holding company for Google. All of Google's directors and officers

oversight, Alphabet systematically engaged in anticompetitive acts, including: (i) leveraging its dominant position in general search to expand to other markets and eliminate competition in vertical search; (ii) forcing anticompetitive tying agreements on manufacturers and mobile carriers for its Android mobile devices in order to secure a monopolistic applications store charging supracompetitive fees; (iii) monopolizing in-application payment processing on Android; (iv) unfairly leveraging in ad servers, exchanges, and markets, resulting in supracompetitive fees for publishers, advertisers, and consumers, among other anticompetitive conduct in those business segments; (v) unfairly extracting supracompetitive fees from small publishers and the destruction of the competitive header bidding that arose in response to Alphabet's original anticompetitive conduct in the ad purchase tools market, among other anticompetitive conduct in this segment; (vi) locking competitors out of voice-assisted search access points and future search access points to maintain general search monopoly; and (vii) unlawfully acquiring and agreeing with competitors to destroy competition and prevent nascent competitors from gaining market share.

2.     These acts have resulted in significant enforcement actions being brought against the Company by the U.S. Department of Justice ("DOJ") and 48 State Attorneys General.  The House of Representatives has also called the Company to account, requesting testimony and releasing a report detailing Alphabet's monopolistic conduct.

3.     Defendants Brin, Page, and Schmidt asserted dominance and control over Alphabet.  Under their leadership, and with the blessing of the Board, Alphabet pursued a vast array of illegal and anticompetitive business plans, including leveraging dominance in certain business markets to capture and monopolize others. ██████████████████████████████

████████████████████████████████████████████

---

remained the same.  Google's stockholders' interests were maintained in Alphabet, which does not have its own operations.  "Alphabet" is defined herein to include Google and its subsidiaries.

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████

9      4.     As a result of the anticompetitive practices described herein, Alphabet has suffered

10 substantial harm and faces potential fines in the billions of dollars.  It has spent tens of millions of dollars

11 on investigations and civil actions.  And Alphabet's reputation has suffered immense harm.

12      5.     This litigation seeks to hold the Individual Defendants, who are the controlling

13 stockholders, senior executives, and Board of Directors of Alphabet – accountable for the Company's

14 anticompetitive and monopolistic business practices.

15

16 **II.      JURISDICTION AND VENUE**

17      6.     The Court has original jurisdiction over this action under 28 U.S.C. §1332(a)(1) because

18 the matter in controversy, exclusive of interests and costs, exceeds the sum or value of $75,000 and is

19 between citizens of different States.  This Court also has jurisdiction over the causes of action asserted

20 herein pursuant to the California Constitution, Article VI, §10, and C.C.P. §410.10, because this case is

21 not a cause given by statute to other courts, as this derivative action is brought pursuant to Cal. Corp. §800

22 to remedy the Defendants' violations of law.

23

24      7.     This Court has jurisdiction over each Defendant.  Alphabet maintains its headquarters in

25 California, and because the allegations contained herein are brought derivatively on behalf of Alphabet,

26 Defendants' conduct was purposefully directed at California.  This Court retains general jurisdiction over

27 each named Defendant who is a resident of California.  Additionally, this Court has personal jurisdiction

28

over each named non-resident Defendant because their affiliations with California are so continuous and systematic as to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Moreover, the locus of the conduct at issue in this action occurred substantially in California, where Alphabet maintains its headquarters.  Exercising jurisdiction over any non-resident Defendant is reasonable under these circumstances.

8.    Venue is proper in this Court pursuant to C.C.P. §395(a), because the conduct at issue took place and had an effect in this County where Alphabet maintains its headquarters.

9.    **Division Assignment**: This action should be assigned to the San Jose Division of this Court, as the Company is headquartered in Santa Clara County, California, under Local Rule 3-2(e).

III.    **PARTIES**

A.    **Plaintiff**

10.    Plaintiff Police and Fire Retirement System of the City of Detroit ("Plaintiff") has continuously held Alphabet common stock since December 2005.

B.    **Nominal Defendant**

11.    Nominal Defendant Alphabet is a Delaware corporation with principal executive offices at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Alphabet, formerly Google, underwent corporate restructuring on October 2, 2015, by which Alphabet became the holding company of Google and its subsidiaries.  Alphabet is an information technology company that markets a variety of online and cloud-based programs, such as Google Search, Android, Google Maps, Chrome, YouTube, Google Play, and Gmail.  According to the Company's Annual Report on Form 10-K for Fiscal Year 2020, Alphabet recognized total segment revenues of $182.5 billion, of which approximately 80% is attributable to advertisements.  Revenue attributable to Google made up more than 99% of Alphabet's consolidated revenues in 2020.

### C.    Individual Defendants

12.    Defendant Larry Page ("Page") is a co-founder of Google, served as Google's Chief Executive Officer ("CEO") from September 1998 to July 2001, and from April 2011 until July 2015. From July 2015, Page served as CEO of Google's parent company, Alphabet, until December 2019.  Page has also served as a director of the Company since its inception in September 1998.  Page is also Chair of the Company's Executive Committee, for which a formal charter was adopted in 2004.  From July 2001 to April 2011, Page served as Google's President, Products.  In addition, from September 1998 to July 2002, Page served as Google's Chief Financial Officer ("CFO").  According to the Schedule 14A the Company filed with the SEC on April 23, 2021, Page is a beneficial owner of approximately 26.3% of Alphabet's voting stock and holds 19,952,558 shares of Alphabet Class B Common Stock.

13.    Defendant Sergey Brin ("Brin") is a co-founder of Google, and has served as the Company's President since October 2015.  Brin has also served as a director of the Company since its inception in September 1998.  Brin is a member of the Board's Executive Committee, for which a formal charter was adopted in 2004.  From July 2001 to April 2011, Brin served as Google's President, Technology.  From September 1998 to July 2001, Brin served as the Company's President and Chair. According to the Schedule 14A the Company filed with the SEC on April 23, 2021, Brin is a beneficial owner of approximately 25.3% of Alphabet's voting stock, and holds 19,168,466 shares of Alphabet Class B Common Stock.

14.    Defendant Eric E. Schmidt ("Schmidt") served as the Executive Chairman of the Board from April 2011 to January 2018, and as a member of the Board from March 2001 until June 2019. Schmidt was a member of the Board's Executive Committee, for which a formal charter was adopted by the Company in 2004.  Schmidt is also a member of the Company's Operating Committee ("OC"). Schmidt has also served as Google's CEO from July 2001 to April 2011.  According to the Schedule 14A the Company filed with the SEC on April 23, 2021, Schmidt is a beneficial owner of approximately 4.5%

of Alphabet's voting stock and holds 15,956 shares of Alphabet Class A Common Stock, and 3,385,149 shares of Alphabet Class B Common Stock. The same Schedule 14A notes that Schmidt owns and controls an additional 2,739,273 shares of Alphabet Class B Common Stock through a living trust and partnership under his control. Alphabet paid Schmidt the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|---------------------------|------------------------|-------|
| 2019 | $0 | $0 | $0 | $0 | $0 | $3,414,224 | $3,414,224 |
| 2018 | $1,250,000 | $0 | $0 | $0 | $0 | $362,016 | $1,612,016 |
| 2017 | $1,250,000 | $0 | $0 | $0 | $0 | $3,476,592 | $4,726,592 |
| 2016 | $1,250,000 | $0 | $0 | $0 | $0 | $3,059,791 | $4,309,791 |
| 2015 | $1,254,808 | $6,000,000 | $0 | $0 | $0 | $783,370 | $8,038,178 |
| 2014 | $1,250,000 | $6,000,000 | $100,443,838 | $0 | $0 | $996,934 | $108,690,772 |
| 2013 | $1,250,000 | $6,000,000 | $11,365,184 | $0 | $0 | $708,196 | $19,323,380 |
| 2012 | $1,250,000 | $6,000,000 | $0 | $0 | $0 | $378,624 | $7,628,624 |
| 2011 | $937,500 | $0 | $55,643,040 | $38,136,040 | $6,000,000 | $263,682 | $100,980,262 |
| 2010 | $1 | $1,785 | $0 | $0 | $0 | $311,433 | $313,219 |
| 2009 | $1 | $1,660 | $0 | $0 | $0 | $243,661 | $245,322 |
| 2008 | $1 | $0 | $0 | $0 | $0 | $508,763 | $508,764 |
| 2007 | $1 | $1,898 | $0 | $0 | $0 | $478,662 | $480,561 |
| 2006 | $1 | $1,723 | $0 | $0 | $0 | $555,742 | $557,466 |

15.    Defendant Sundar Pichai ("Pichai") has been the CEO of Google since August 2015. Pichai also became the CEO of Google's parent company, Alphabet, in December 2019, replacing Page. Pichai has also served as a member of the Board since July 2017. He was a member of the OC (Google's executive-level Operating Committee). In August 2014, Defendant Pichai was awarded 353,939 restricted stock units, which fully vested in April 2018 with a market value on that date of $370,361,770. In addition, between 2015 to the end of 2020, the Company paid Pichai the following compensation:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|---------------------------|------------------------|-------|
| 2020 | $2,015,385 | $0 | $0 | $0 | $0 | $5,410,162 | $7,425,547 |
| 2019 | $650,000 | $0 | $276,612,072 | $0 | $0 | $3,359,480 | $280,621,552 |
| 2018 | $650,000 | $0 | $0 | $0 | $0 | $1,231,066 | $1,881,066 |
| 2017 | $650,000 | $0 | $0 | $0 | $0 | $683,557 | $1,333,557 |
| 2016 | $650,000 | $0 | $198,695,790 | $0 | $0 | $372,410 | $199,718,200 |
| 2015 | $652,500 | $0 | $99,829,142 | $0 | $0 | $150,460 | $100,632,102 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

16.    Defendant John L. Hennessy ("Hennessy") has served as a member of the Board since April 2004 and as Lead Independent Director from April 2007 to January 2018.  In January 2018, Hennessy was appointed to serve as Alphabet's Chair of the Board.  Between 2007 to the end of 2020, the Company paid Hennessy the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2020 | $100,000 | $503,314 | $0 | $603,314 |
| 2019 | $100,000 | $504,711 | $0 | $604,711 |
| 2018 | $83,717 | $402,711 | $0 | $486,428 |
| 2017 | $75,000 | $355,567 | $0 | $430,567 |
| 2016 | $75,000 | $351,676 | $0 | $426,676 |
| 2015 | $75,000 | $351,198 | $0 | $426,198 |
| 2014 | $75,000 | $350,216 | $0 | $425,216 |
| 2013 | $75,000 | $351,913 | $0 | $426,913 |
| 2012 | $75,000 | $343,856 | $0 | $418,856 |
| 2011 | $75,000 | $352,267 | $0 | $427,267 |
| 2010 | $75,000 | $358,187 | $0 | $433,187 |
| 2009 | $0 | $497,156 | $0 | $497,156 |
| 2008 | $0 | $0 | $196,285 | $196,285 |
| 2007 | $0 | $0 | $432,334 | $432,334 |

17.    Defendant Frances Arnold ("Arnold") has served as a member of the Board since December 2019.  In 2020, the Company paid Arnold the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2020 | $38,248 | $1,188,057 | $0 | $1,226,305 |

18.    Defendant L. John Doerr ("Doerr") has served as a member of the Board since May 1999.  Doerr has also served as a member of the Board's Audit Committee from May 2007 to January 2012, and from December 2015 to June 2016.  According to the Schedule 14A the Company filed with the SEC on April 23, 2021, Doerr is a beneficial owner of approximately 1.5% of Alphabet's voting stock and holds 145,594 shares of Alphabet Class A common stock and 1,117,447 shares of Alphabet Class B Common Stock.  Between 2009 to the end of 2020, the Company paid Doerr the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2020 | $75,000 | $352,320 | $0 | $427,320 |
| 2019 | $75,000 | $353,298 | $0 | $428,298 |
| 2018 | $75,000 | $350,786 | $0 | $425,786 |
| 2017 | $75,000 | $355,567 | $0 | $430,567 |
| 2016 | $75,000 | $351,676 | $0 | $426,676 |
| 2015 | $75,000 | $351,198 | $0 | $426,198 |
| 2014 | $75,000 | $350,216 | $0 | $425,216 |
| 2013 | $75,000 | $351,913 | $1,221,776 | $1,648,689 |
| 2012 | $75,000 | $343,856 | $0 | $418,856 |
| 2011 | $75,000 | $352,267 | $0 | $427,267 |
| 2010 | $75,000 | $358,187 | $0 | $433,187 |
| 2009 | $0 | $497,156 | $0 | $497,156 |

19.    Defendant Roger W. Ferguson, Jr., ("Ferguson") has served as a member of the Board since June 2016.  Ferguson has also served on the Board's Audit Committee since June 2016.  Between June 2016 to the end of 2020, the Company paid Ferguson the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2020 | $75,000 | $352,320 | $0 | $427,320 |
| 2019 | $75,000 | $353,298 | $0 | $428,298 |
| 2018 | $75,000 | $350,786 | $0 | $425,786 |
| 2017 | $71,552 | $339,156 | $0 | $410,708 |
| 2016 | $0 | $1,004,789 | $0 | $1,004,789 |

20.    Defendant Ann Mather ("Mather") has served as a member of the Board since November 2005.  Mather has also served as Chair of the Audit Committee since November 2005.  Between 2007 to the end of 2020, the Company paid Mather the following compensation:

8

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2020 | $100,000 | $352,320 | $0 | $452,320 |
| 2019 | $100,000 | $353,298 | $0 | $453,298 |
| 2018 | $100,000 | $350,786 | $0 | $450,786 |
| 2017 | $100,000 | $355,567 | $0 | $455,567 |
| 2016 | $100,000 | $351,676 | $0 | $451,676 |
| 2015 | $100,000 | $351,198 | $0 | $451,198 |
| 2014 | $100,000 | $350,216 | $0 | $450,216 |
| 2013 | $100,000 | $351,913 | $0 | $451,913 |
| 2012 | $100,000 | $343,856 | $0 | $443,856 |
| 2011 | $100,000 | $352,267 | $0 | $452,267 |
| 2010 | $0 | $507,915 | $0 | $507,915 |
| 2009 | $0 | $0 | $0 | $0 |
| 2008 | $0 | $257,415 | $157,104 | $414,519 |
| 2007 | $0 | $435,973 | $268,296 | $704,269 |

21.     Defendant Alan R. Mulally ("Mulally") has served as a member of the Board since July 2014.  Mulally has also served as a member of the Audit Committee since July 2014.  Between 2014 to the end of 2020, the Company paid Mulally the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2020 | $75,000 | $352,320 | $0 | $427,320 |
| 2019 | $75,000 | $353,298 | $0 | $428,298 |
| 2018 | $75,000 | $350,786 | $0 | $425,786 |
| 2017 | $75,000 | $355,567 | $0 | $430,567 |
| 2016 | $75,000 | $351,676 | $0 | $426,676 |
| 2015 | $64,674 | $302,667 | $0 | $367,341 |
| 2014 | $0 | $1,002,475 | $0 | $1,002,475 |

22.     Defendant K. Ram Shriram ("Shriram") has served as a member of the Board since September 1998.  Shriram has also served as a member of the Audit Committee from November 2005 to July 2014.  Between 2011 to the end of 2020, the Company paid Shriram the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2020 | $75,000 | $352,320 | $0 | $427,320 |
| 2019 | $75,000 | $353,298 | $0 | $428,298 |
| 2018 | $75,000 | $350,786 | $0 | $425,786 |
| 2017 | $75,000 | $355,567 | $0 | $430,567 |
| 2016 | $75,000 | $351,676 | $0 | $426,676 |
| 2015 | $75,000 | $351,198 | $0 | $426,198 |
| 2014 | $75,000 | $350,216 | $0 | $425,216 |
| 2013 | $75,000 | $351,913 | $283,670 | $710,583 |
| 2012 | $75,000 | $343,856 | $0 | $418,856 |
| 2011 | $75,000 | $352,267 | $0 | $427,267 |

23.     Defendant Robin L. Washington ("Washington") has served as a member of the Board since April 2019.  Between April 2019 to the end of 2020, the Company paid Washington the following compensation:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2020 | $75,000 | $352,320 | $0 | $427,320 |
| 2019 | $11,071 | $1,036,238 | $0 | $1,047,309 |

24.     Collectively, Defendants Page, Brin, Pichai, Hennessy, Arnold, Doerr, Ferguson, Mather, Mulally, Shriram, and Washington are referred to herein as the "Director Defendants."

25.     Collectively, Defendants Page, Brin, Schmidt, and Pichai constitute the above-referenced Officer Defendants, and together with the Director Defendants, constitute the above-referenced Individual Defendants.

26.     Collectively, Defendants Doerr, Ferguson, Mather, Mulally, and Shriram are referred to herein as the "Audit Committee Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Alphabet's Broad Pattern of Anticompetitive Business Plans

#### 1.     General Search Services, General Search Text Advertising, and General Search Advertising

27.     Google holds monopoly power in three related, but separate, search markets in the United States: (i) general search services; (ii) general search text advertising; and (iii) general search advertising.  The relevant geographic market for each of the foregoing search markets is the United States, and

competitive harm described herein is targeted to consumers, developers, and other counterparties within the United States.

### a.    General Search Services Market

28.    General search engines enable consumers to instantaneously search the vast contents of the Internet through consumer queries.  A general search service provides results in response to specific user-input queries, and in order to be accurate and efficient, must find a way to catalogue the vast number of websites of the ever-expanding internet.  General search engines perform three primary actions to perform this function: (i) collecting data from all corners of the Internet and from proprietary sources; (ii) indexing data to make it searchable; and (iii) ranking results for relevance.

29.    In order to perform the function of collecting data from across the Internet, general search engines resort to use of "web crawlers."  Web crawlers are algorithms that retrieve data from hundreds of billions of webpages by following web links and storing the data on the servers of general search engines.  Many websites also send data to general search engines, and many general search engines augment web-based results with results derived from proprietary data sets provided to them.

30.    General search engines next index the data retrieved, akin to an index in a book.  But the web index is orders of magnitudes larger, as it includes every word on the hundreds of billions of pages crawled and contains millions of gigabytes of data.

31.    General search engines then use a series of algorithms against the index to retrieve, rank, and display information relevant to a consumer's query.  The algorithm will then nearly instantaneously interpret the query, any other data known about the consumer, relevant results, and the order to display those results to the consumer.

32.    Other forms of information discovery are not reasonable substitutes for general search services for consumers.  Offline resources and other digital information discovery tools do not provide

consumers with the breadth of information, convenience, or speed at which information is available through a general search engine.

33.     General search engines are distinct from specialized vertical search providers.  General search engines act as a tool for navigating the web, searching across a variety of sources and pulling together relevant results to present a wide range of information in response to a consumer query.  General search engines are designed to provide a broad response to a user search query, ranking results by relevance.  By contrast, specialized vertical search engines focus on a specific, narrow range of queries, often confined to a single commercial segment (*e.g.*, vacation rentals or airline tickets).  Specialized vertical search providers often focus on a relatively finite set of content from proprietary sources and build out tools to sort these results in a more granular manner, rather than crawling and indexing the entire internet.  Vertical search providers offer specific information discovery and/or purchasing options only in their respective fields, offering search tools not possible in a general search across many kinds of websites and data.  Vertical search providers do not usually provide answers to queries outside of their commercial segment.

34.     General search services are also different than vertical search providers in that vertical searches are often siloed onto a single website, and vertical search providers rely on general search providers to steer consumers to their websites.  Consumers turn to general search engines to find specialized vertical providers, because it is far easier to enter a query into the prominent mobile search app or browser search bar than it is to remember the name of, and navigate to, specialized vertical providers.  Many consumers therefore navigate to specialized vertical search providers after running a general search.  Vertical search services are not a substitute for general search services because vertical search services cannot provide the convenience, speed, or breadth of information offered by a general search service provider.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**b.    General Search Text Advertising Market**

35.    General search text advertising is used to attract prospective consumers to make a purchasing choice.  General search text advertisements are often aimed at consumers who have already formed some specific interest and/or are actively comparing options and weighing purchases, because these consumers have signaled an interest in a product or service through a general search query.  These consumers have taken concrete action indicating that they are in the market for an advertiser's goods or services in submitting a search query.

36.    A general search text advertisement includes a headline, display URL, and text description.  General search text advertisements have a similar appearance to the normal search results returned by general search services, but are demarcated with a small symbol indicating that the result is an "Ad."

37.    General search engine providers sell general search text advertisements through an auction process, whereby advertisers that want to appear on search results pages in response to a particular consumer query bid on keywords or phrases.  Advertisers pay on a cost-per-click basis.

38.    General search text advertising is a distinct market, for which other forms of advertising (*e.g.*, direct marketing, offline advertising, display, or social media advertising) are not reasonable substitutes.  For advertisers, a consumer query makes general search text advertising uniquely valuable because it indicates a consumer's immediate and specific interest in the query searched.  As a result, advertisers do not typically shift significant amounts of their budget between general search text advertising and other forms of advertising.

39.    Offline advertising – like direct marketing, television, print, radio, or outdoor advertisements – is not a feasible substitute for general search text advertising because it does not provide the same targeted audience and lacks the critical signal of consumer interest provided by the fact that a consumer is entering search queries relevant to the advertised good(s) or service(s).  Display advertising and social media advertising are further not substitutes for general search text advertising, because both

are commonly used to promote brand awareness and are shown to consumers when they are consuming other, usually unrelated, content (*e.g.*, reading an article or watching a video). Display advertising and social media advertising are generally not triggered by a query, but rather are presented to a consumer based on data known about the consumer and the context of where it is displayed. Display advertising and social media advertising focus on suggesting products and services a consumer could like; general search text advertising, by contrast, targets products and services for which a consumer has already indicated an interest by entering the search query. As such, general search text advertising tends to cost double that of other advertising methods per-click.

40.     Display and social media advertising are triggered based on the data known about the consumer and the context in which it is displayed, leading advertisers to think of display and social media advertising as bidding for a specific consumer's attention based on general interests, as opposed to bidding based on demonstrated specific interests and queries in the case of general search text advertising. Display and social media advertising are therefore not adequate substitutes for general search text advertising and do not fall within the general search text advertising market.

41.     General search text advertising is also distinct in that it provides advertisers with additional specialized offerings compared to other forms of advertising. For instance, with text advertisement, advertisers have some flexibility and space to market their brand and can choose the webpage to which a consumer will visit. This allows advertisers to promote additional products and services, or their brands themselves, after a consumer clicks the general search text advertisement. Although both general search text advertisements and specialized advertisements offered by general search engines are part of a larger general search advertising market, general search text advertisements form a distinct product market.

42.     Too few advertisers would substitute away from general search text advertising in the event of a price increase or quality decline to make it unprofitable for a general search text advertising

monopolist to maintain prices above, or quality below, the level that would prevail in a more competitive marketplace.

### c.     General Search Advertising Market

43.     The general search advertising market includes all paid placements supplied by a general search engine in connection with a general search query.  General search advertising includes two main types of paid placements: (i) general search text advertisements; and (ii) specialized advertisements provided by general search engines.  General search advertising is distinctly valuable to advertisers because it provides the only efficient means of reaching a large base of consumers who have already revealed their purchasing interest by entering a query into a general search engine.  Because of this demonstrated interest, specialized vertical search providers often purchase advertisements in general search results.

44.     General search advertising is a distinct market from other forms of advertising, including direct marketing, offline advertising generally, and display and social media advertisements.  None of these other forms of advertising are reasonable substitutes for general search advertising, which is uniquely valuable to advertisers for its ability to respond directly to consumer queries, giving the advertiser a strong indication that the consumer is actively seeking information about items related to the products or services being advertised.  Other forms of advertising cannot offer this level of insight into consumer preferences, and are not able to directly target such an engaged group of consumers.  Advertisers typically do not shift significant amounts of their budgets between general search advertising and other forms of advertising.

45.     General search advertising does not have good substitutes, as other forms of advertising lack core features that make general search advertising attractive to buyers.  Offline advertising, such as direct marketing, print, television, or radio, is not a reasonable substitute for general search advertising because it does not provide the same level of audience targeting and cannot provide the same audience of

consumers who have demonstrated a signal of interest and intent by entering a specific search query. Display advertising and social media advertising are also not substitutes for the same reason: they cannot provide the same targeted group of consumers who have demonstrated an interest in a relevant search topic. Display advertising and social media advertising, instead of being triggered by a specific search query, are instead often used to promote brand awareness while consumers are consuming other content, triggered based on the context of the content being consumed. Display advertising and social advertising attempt to display products and services that a consumer could like based on data known about the consumer and the type of content being consumed; general search advertising suggests products and services for which a consumer has already demonstrated an interest. As a result, general search advertising costs roughly two times more in terms of cost-per-click.

46.     General search advertising is typically sold through a set of auctions, in which advertisers bid for advertisements to appear on the search result pages for specific queries. Google and Microsoft Bing ("Bing") both operate general search engines and are sellers in this market, while vertical search providers are typical buyers in this market. General search advertising is distinct from vertical search advertising because general search advertising is designed to bring a consumer away from the general search website to make a purchase, whereas advertising sold by vertical search providers aims to complete a sale while the consumer remains on the specialized vertical provider's website. Vertical search provider advertising is often called "click-in" advertisements as a result, because the intent is for consumers to remain "in" the vertical search provider's website while making the purchase. For instance, an online travel website can allow a consumer to book flights and hotel rooms directly from the vertical search site itself, without having to visit the websites of the hotelier and airline separately. By contrast, general search engine advertisements are often called "click-out" advertisements because they take consumers to a third-party site to complete the purchase. Even in instances where a general search advertisement may direct the consumer to another page operated by the general search engine, consumers are still normally required

16

to navigate away from the general search engine results page into a more focused shopping location to complete their transaction.

47.    The advertisements specialized vertical search providers offer to advertisers are unlikely to reach consumers unless they are searching within their specialized product categories where they can compare pricing and other options, and complete the transaction.  Vertical search providers also often buy general search advertisements, further demonstrating that advertising on the respective platforms is done for separate purposes and not substitutable.  Consumers generally begin their research on topics on general search services, meaning that general search advertisements have become a critical means through which specialized vertical search providers obtain customers.

48.    Too few advertisers would substitute general search advertising with other advertising methods in the event of a price increase or quality decrease.  As a result, monopolists in the general search advertising market are able to maintain prices above, or quality below, the level that would prevail in more competitive markets.

    **2.    Google Maintains Monopolies in the General Search Services, General Search Text Advertising, and General Search Advertising Markets**

    **a.    General Search Services Monopoly**

49.    Google has a durable monopoly in general search services.  Google Search – Google's product offering in general search services – is accessible on personal computers, mobile, and tablet devices, and has a collective market share among consumers of general search services of over 85% in the United States.  Its next closest competitor, Bing, has a 7% market share.

50.    Google's general search services monopoly is protected by a set of barriers to expansion and entry that would exist even in a competitive market.  General search engines require a large, diverse array of search queries and other consumer data, such as location data and past search history, to develop and refine the search results page.  This is especially true for uncommon queries.  Google's monopoly share of the market allows it to accumulate a significantly greater volume of data, giving it a large-scale

17

advantage over new entrants and its existing, substantially smaller, competitors. A general search service also requires a high level of financial investment to create the necessary technological infrastructure, distribution, and scale to compete.

51. Google is unrivaled in terms of the data it can gather from consumers, including from its dominant Chrome web browser, more than 100 million U.S. Android mobile users, through Google Assistant, and more than one billion Google account holders from across the globe, including in the United States. Because of the unique amount and types of information Google is able to collect through its conglomerate of integrated products and anticompetitive contracts, Google can accurately track a consumer as they switch among devices, move between software applications (interchangeably referred to herein as "apps") and web browsers, and travel in the physical world. Google's mobile presence also gives Google a tremendous advantage in achieving scale and is another significant entry barrier. Google obtains much more data than other general search engines, including through its Android ecosystem, navigational services, and restrictive search default contract with Apple, Inc. ("Apple").

52. Google has largely shut out competition for general search engines through its exclusionary contracts on mobile devices and elsewhere. In addition to the barriers to entry which would exist absent anticompetitive conduct, Google has pursued a course of exclusionary conduct against general search engine competitors, raising additional barriers to entry and expansion beyond what would have occurred in a more competitive marketplace. Aided by its exclusionary conduct, Google has access to a captive set of consumers, drawing upon the impact of the placement of its search engine as the default option and amplifying its advantages of scale. Google has excluded general search competitors through a variety of conduct, including management of its Android ecosystem and the restrictive default search contract it maintains with Apple. Google thereby maintains an enormous advantage in terms of the scale of information and number of search results returned which allow it to further cement its position, and which would not have occurred in a more competitive marketplace.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

53.    The foregoing artificially high barriers to expansion and entry orchestrated by Google's anticompetitive conduct forecloses competition from Google's general search competitors.  Google's data advantages, sheer scale, and artificial barriers to entry hinder its competitors' ability to compete.

**b.    General Search Text Advertising and General Search Advertising Monopolies**

54.    Google also maintains durable search-related monopolies over general search text advertising and general search advertising.  These advertising monopolies are reinforced by Google's general search services monopoly because advertisers allocate their general search advertising budgets based upon where consumers conduct searches.  Google's over 85% market share for general search services translates to a similar share of the general search text advertising and general search advertising markets.  These search-related advertising monopolies are protected by the same set of barriers to expansion and entry that exist in the market for general search services.  Advertising in the search-related markets requires entry into a search market monopolized by Google and with artificial barriers to entry preventing any nascent competitors from offering general search services to a customer base large enough to develop competitive scale.

55.    Google protects its barriers to entry through exclusionary conduct, allowing it to achieve even greater scale.  One critical barrier it establishes is a large set of information-gathering technology which it employs on a large set of consumers often locked into the Google ecosystem and who interact with advertising on its services.  No competitor can rival Google's advertising monopolies without amassing a substantial audience, and Google protects its monopolies by enforcing a set of barriers to expansion and entry that prevent competitors from amassing such an audience.  Google also harms consumers by collecting more personal data about consumers than it would in a more competitive market as a result of its exclusionary conduct, and uses that information to artificially increase barriers to expansion and entry.

56.    Google harvests a broad swath of consumer data from across the Internet and its mobile applications by using a vast network of "tags" and other tracking technology to monitor how consumes act after viewing advertisements.  The Orwellian amount of information Google collects is used to support and further enforce Google's search-related advertising monopolies.  Google's tags are ubiquitous because advertisers rely on Google's advertising products, which are present on 81% of the top 1 million visited websites, and which far outstrip the next most prevalent (Facebook, Inc.'s ("Facebook") tags, present on 44%), according to one study.   Google's next closest competitor, by contrast, Microsoft Corp. ("Microsoft") with Bing, has a Universal Event Tracker tag present on fewer than 1% of websites.

57.    Google's consumer-facing products, including the Google Search engine, Android, Chrome, Google Maps, and YouTube, all provide Google with consumer tracking data that provide strikingly detailed profiles of individual consumers by collating these tags and tracking technologies across devices and domains.  Google constructs consumer profiles which encompass demographics like gender, age, and parental status; "personae" like "frequent traveler"; life stages such as "college student" and "getting married"; specific interests like a particular celebrity or hobby; preferences for brands or types of cuisine; routines like "cooking dinner almost every day"; and even "predicted states" like "traveling for business to New York tomorrow."

58.    Google's data collection is so vast that it is able to include in its detailed consumer profiles users' location history, which it obtains based on Android GPS and Wi-Fi data, combined with data gleaned from other sources, such as Google Chrome and Google Maps on Android devices, to determine whether a consumer has visited a particular store.  This data allows Google to demonstrate whether an ad led to an offline, in-store purchase.  This data is only available to Google because of its exclusionary conduct across multiple markets, artificially hindering the ability of competitors to match Google's data-gathering.

59.    These artificial barriers drastically limit the ability of general search advertising competitors to reach the scale necessary in terms of consumer attention and data to compete with Google.

### 3.    Google's Anticompetitive Conduct Entrenches Its Monopoly Search Positions

60.    Google has solidified its monopoly positions in three main ways, harming competition. First, Google uses exclusionary contracts that guarantee its products are the only ones available in the vast majority of distribution channels (*e.g.*, web browsers, mobile search apps), denying consumers the opportunity to reach Google's general search competitors through common access points. Second, Google operates its search advertising tool in a manner that denies interoperability for important features, harming even the limited choice still available to advertisers in the wake of Google's exclusionary distribution contracts. Third, Google discriminates in its search results to the detriment of specialized vertical search providers and general search competitors alike, making it harder for consumers to reach Google's competitors.

### a.    Google's Exclusionary Contracts Bar the Entry of General Search Services Competitors from the Market

61.    As is typical with the sale of products, Google distributes its search engine through channels, or access points, to reach consumers. Search engines are distributed to, and reach consumers through, access points – the places where a consumer may enter a general search text or verbal query. These locations include web browsers, mobile search apps, voice search assistants, and other access points.

62.    Google forecloses competition by closing off access to the various channels of distribution and search access points on devices through exclusionary contracts. These exclusionary contracts are pervasive: Google's counterparties include device manufacturers, mobile carriers, app developers, and developers or manufacturers of emerging technologies. Google uses two primary mechanisms to protect its monopoly over general search: (i) securing default position on search access points; and (ii) securing exclusivity across search access points distributed on an Internet-connected device. Google understands

21

that consumers rarely change the apps and settings that are set as factory default when the consumer begins using the device, meaning that pre-installation, default settings, and premium placement of apps and services are all essential to maintaining Google's dominant market share, above what would exist absent these exclusionary contracts requiring Google to be preset as the default and most prominent search engine service.

63.    Google pays billions of dollars per year to maintain its dominance through revenue sharing agreements with Apple, web browsers, and mobile carriers.  Google also maintains a set of interlocking agreements with mobile phone manufacturers, home device manufacturers, and car makers to capture and lock up all significant distribution channels and access points.  Through its exclusionary agreements, Google has significantly impeded competition by rival search providers by denying them the scale, data, product placement and recognition, and consumer base needed to sell advertising, which has further expanded and entrenched Google's search-related monopolies by raising artificial barriers to expansion and entry.

### i.    Contracts with Apple

64.    Beginning in 2005, Google and Apple entered into a series of multi-year distribution agreements.  Google agreed to pay Apple a significant percentage of the Google search advertising revenue generated on Apple computers in exchange for Apple's agreement to set Google's general search services as the default general search engine on the Safari web browser, which is Apple's default browser on Apple computers.  The agreement was extended in 2007 to also include Apple's iPhones.  In 2016, the agreement was further extended to include Siri, Apple's voice assistant, and Spotlight, Apple's integrated system for searching within its operating system (interchangeably referred to herein as "OS").  Today, Google is the preset default general search engine on all significant search access points for Apple personal computers and mobile devices.

65.    Google pays Apple between $8 billion and $12 billion annually under the arrangement, using the revenues it extracts through its monopolistic control of advertising to maintain its monopoly over general search services.  These payments make up approximately 15% to 20% of Apple's worldwide net income.  The agreements Google has entered into with Apple harm competition by foreclosing competition and preventing Google's search competitors from the use of vital search access points and distribution channels on all Apple devices for nearly 15 years.

### ii.    Web Browsers

66.    Google Chrome is the leading computer web browser in the United States, with approximately 60% of the market share.  Google's general search engine is the preset default general search engine on its Google Chrome browser.  Google also pays a number of other U.S. web browsers, including Apple Safari, Mozilla Firefox and the Opera web browser, to preset Google Search as the default general search engine on their products.  Through Google's own browser and the agreements it maintains with alternative browsers, Google is the preset default general search engine for over 80% of the browser market.

67.    Google pays these browsers through revenue share agreements.  Under Google's revenue share agreements, Google pays its counterparty a certain percentage of the search advertising revenue generated by the consumer's use of the search access point in question, on the condition that Google's general search engine is the preset general search service on the search access point.  Google's Chrome browser's market share, in combination with Google's exclusivity agreements over the vast majority of remaining search access points, have harmed competition because they have foreclosed rival general search engines from accessing vital distribution channels for more than a decade.

### iii.    Android Mobile Ecosystem

68.    Nearly all mobile devices with general search capabilities in the United States run on one of two mobile operating systems: Apple's iOS or Google's Android OS.  Google licenses its Android OS

to device manufacturers for use on their devices, while Apple's iOS is not licensed by Apple, but runs exclusively on Apple devices.  Android OS is currently the operating system for roughly 40% of mobile devices.

69.    Google has used its control over Android OS to require that mobile manufacturers set Google's general search engine as the default option on all major search access points on Android devices, including on the browsers, search widgets, and voice assistants for any mobile device running Android OS.  Google controls the distribution channels and access points on the Android platform through a trio of interlocking agreements with mobile manufacturers.  These three types of agreements are: (i) anti-forking agreements; (ii) preinstallation agreements; and (iii) revenue share agreements.  Google exercises its control over Android distribution channels in order to protect its lucrative general search and search-related monopolies, to insulate itself from competition, and to protect its monopoly profits.  The below flow chart, submitted by the DOJ in its complaint filed against Google in the following action: *U.S. v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. Oct. 20, 2020), describes the relationship among these interlocking agreements:



#### iv.    Anti-Forking Agreements

70.    Google institutes anti-forking agreements on mobile device manufacturers, forbidding them from developing or distributing versions of Android that do not comply with Google-controlled technical standards.  If a mobile manufacturer wishes to develop a new mobile operating system based on the Android source code, known as an "Android Fork," the mobile device manufacturer would lose access to all Google apps and proprietary Android products.  Google requires manufacturers to agree to anti-forking contracts as a prerequisite to obtain Google proprietary applications, including Google Play, Google Maps, Google Search, and YouTube, in addition to accepting Google Android branding on all mobile devices.  Through these agreements, Google prevents mobile device manufacturers from "forking" their own versions of Android and opening up new channels of search engine distribution outside Google's control.

71.    Anti-forking agreements prevent competition by closing avenues to the greater distribution of rival general search services.  All leading mobile manufacturers have entered into anti-forking

agreements (more recently titled, "Android Compatibility Commitments") with Google, including Samsung, LG, and Motorola. The anti-forking agreements allow Google to severely limit the number of devices that run on Android forks outside of Google's control, allowing Google to foreclose access to its general search rivals. Google also has successfully prevented its partners from working with Android fork developers. For instance, in 2012, Google successfully threatened Acer, an Android manufacturer, which led it to abandon its intent to launch a mobile device with a "forked" version of the Android operating system.

72.     The foregoing agreements have prevented any Android forks from being adopted to challenge Google's dominance for Android installations on mobile devices. As a result, there is no meaningful operating system alternative for manufacturers and carriers, since Apple's iOS is not available for license.

### v.     Mobile Application Distribution Agreements

73.     Mobile Application Distribution Agreements ("MADAs," also known as "preinstallation agreements"), are a second type of three agreements that Google enters into with mobile manufacturers. Under the MADAs, mobile manufacturers must first agree to be bound by an anti-forking agreement. In exchange, Google grants the mobile manufacturers a license to use the Android name brand and logo, and to distribute Google's must-have proprietary apps on their mobile devices (*e.g.*, Google Play, Google Search, YouTube, and Google Maps). Google also allows the mobile device manufacturers to install the critical application programming interfaces ("APIs") that allow application developers to develop apps that are able to use the key features of the manufacturer's mobile devices. Google calls this suite of proprietary apps and essential APIs its "Google Mobile Services," or "GMS."

74.     In addition to the requirement that mobile device manufacturers enter into an anti-forking agreement, the MADAs also require that Android devices display a certain appearance, pre-load Google's proprietary applications onto the device, and display those proprietary apps prominently. Google thereby

ensures that Google's GMS, and Google search services, are the default and most easily accessible general search engine on Android mobile devices.

75.     The proprietary applications Google licenses out through its MADAs includes the Google Play Store.  This agreement is a contractual tie that offers mobile device manufacturers an all-or-nothing choice: either preinstall and give premium placement to all of the apps in Google's GMS bundle and Google search services, and gain access to Google's Play Store, or accept none of Google's services.

76.     The Google Play Store is a "must-have" application for mobile manufacturers.  It allows consumers to download compatible third-party content and applications onto their devices beyond the pre-installed applications installed by the mobile device manufacturer.  The Google Play Store thereby allows consumers to customize the functionality and capabilities of their devices by allowing for the installation of third-party software.  The Google Play store offers a library of roughly three million apps (far more than any competing mobile application store (interchangeably referred to herein as "app store") available on Android OS), accounting for more than 90% of app downloads on Android devices.  And because Google has made "sideloading," or the use of other app stores, prohibitive for the average consumer, the Google Play Store for years has been the only commercially significant app store option for Android device manufacturers.

77.     Google uses the foregoing contracts to tie Google's general search services, which are the preset default for proprietary applications bundled in its MADA contracts, to the Google Play Store. Mobile device manufacturers are required to make Google's general search services the default on all of the most prominent search access points on their devices in order to receive the Google Play Store, an application with a library that is unrivaled and with no competitive substitutes for mobile manufacturers to consider.

### vi.     Revenue-Share Agreements

78.     In addition to anti-forking agreements and preinstallation agreements, Google enforces a third type of contract in order to obtain exclusivity for general search on Android devices and further disadvantage its general search rivals.  Google offers the leading mobile carriers (AT&T, Verizon, and T-Mobile) and mobile device manufacturers (Samsung, LG, and Motorola) revenue share agreements, providing them a portion of Google's advertising revenue.  In exchange, Google requires counterparties to its revenue sharing agreements to preload GMS, including Google's general search services and Google Assistant, and preload Google as default on all relevant search access points across the manufacturer's or carrier's Android devices.  The agreements also generally prohibit pre-installation of other search browsers, such as DuckDuckGo or Bing, or voice assistants that use rival search engines.

79.     Google uses these revenue share agreements to further incentivize mobile carriers and mobile device manufacturers to allow Google to control the search access points for general search services.  It thereby controls the distribution of general search services, general search advertising, and general search text advertising on Android devices.  Google's monopoly position allows it to entrench itself further through its offer of revenue share, which is not available at scale to its competitors.  Bing and other large companies are not able to offer similar levels of revenue share due to Google's sheer scale and monopolization.  As a result, Google has secured the preset default search status for almost all access points on Android devices over the last decade, with virtually no default status set for Google's competitors.

80.     The foregoing contracts have secured Google a status as the default search provider for nearly all mobile devices not already covered by its contracts with Apple.  These contracts in the Android ecosystem have had a cumulative effect of restraining trade and harming competition.

### vii.    Voice Assistants

81.    A voice assistant is an app or software element built into an operating system which allows a user to make queries by talking to a device or applications loaded on the device. Voice assistants commonly integrate with a general search engine to return results to users using information from the internet. They can also return results from specialized vertical search services to provide specific information to users for certain domains, like providing information for concert tickets or shopping options. Voice assistants thus present a new set of access points through which general search engines may provide their services.

82.    Voice assistants are a relatively new access point for general search engines, used on mobile devices, in homes, and in automobiles. Google has sought to expand its anticompetitive and exclusionary conduct to obtain exclusive domain over these access points and limit the reach of other voice assistants, further protecting its dominance in general search services and related advertising. As with other search access points, Google uses exclusionary contracts to enforce the distribution of its Google Assistant service on mobile and home devices and in automobiles.

83.    Even in instances where Google does not own the voice assistant that users operate, such as with Apple's Siri or Samsung's Bixby, Google has contracted to ensure that these counterparties use Google's general search services for general search queries. Google has also entered into partnerships with the manufacturers of mobile devices, home appliances, and automobiles to ensure that all access points presented by voice assistants are licensed to ensure Google's general search engine is used to return information. Google's partnerships impose requirements that effectively exclude voice assistant rival Amazon.com, Inc.'s ("Amazon") Alexa and any future voice assistant providers from entering the market on a wide variety of new Internet-connected devices capable of running voice assistants. Google has effectively locked down an emerging market by excluding competitors from existing and potential voice

assistant access points, increasing its own search traffic, and positioning itself to become the only general search provider for these new devices.

84.    Some new home devices, including home smart speakers, incorporate voice assistant technology which are able to load and draw from multiple voice assistants simultaneously.  This technology, called "concurrency," allows multiple different voice assistants to be activated by different voice commands on the same device.  Google has prohibited concurrency, locking rival voice assistants like Amazon's Alexa out of the emerging search access points presented by voice assistants and limiting the usefulness of concurrency technology.  Google thereby prevents consumers from using competing voice assistant search services.

85.    Google limits the threat of competition posed by concurrency by requiring home device makers to sign restrictive contracts, including the anti-forking agreements and other restrictive contracts described above.  The agreements in effect prevent home device manufacturers from creating Internet-connected home devices capable of concurrency.  In exchange, Google grants a no-cost, non-exclusive license for distributing Google Assistant on the device and prohibits the running of more than one voice assistant concurrently on the device.  While a consumer may change the default on these home devices, this would require the consumer to enter into a multi-step process involving settings located on a separate mobile app, which consumers rarely will change once set.

86.    The practical effect of these measures is to severely limit the access points available to any competing voice assistant apps on internet-enabled home devices.  Hardware manufacturers cannot implement an interchangeable voice assistant experience for consumers and resort to Google Assistant, creating an artificial barrier to entry for new competitors that could otherwise enter with potentially innovative voice assistants and general search services.

### viii.    Automobiles

87.    Internet-enabled automobiles provide yet another developing market for general search services by opening up a new avenue of search access points.  Internet-connected automobiles, like mobile devices or home computers, have Internet-enabled screens that display applications to consumers.  Voice assistant technology is especially salient to internet-enabled automobiles, as voice-activated functions allow users to better focus on the road while completing tasks – without having to pay as much attention to a screen in the automobile.  Google also works to foreclose the search access points presented by Internet-connected automobiles, further foreclosing avenues for competitors to gain access to connected automobiles and their users.

88.    Google's auto strategy mirrors that of its mobile strategy.  Instead of GMS, Google's suite of proprietary applications is known as Google Automotive Services, or "GAS."  The GAS suite includes Google Assistant, the Google Play Store, and Google Maps.  Carmakers agree to restrictive and exclusionary terms in exchange for GAS, protecting Google from competition in general search services for automobiles.  Rival entrants, such as Amazon's Alexa, have been deprived of the ability to compete, new entrants are unable to innovate, and further innovations, such as allowing for multiple concurrent types of search, have been foreclosed by Google.

89.    In 2017, Google entered the automotive operating system market by officially releasing Android Auto, a variation of the Android operating system for mobile devices integrated into automobiles.  Android Auto provides an interface through built-in automobile dashboards that connect to smartphones with vehicle-specific features such as adjusting the air conditioning, and more traditional mobile-style apps such as music, navigation, and voice assistants.

90.    Google's open-source licensing of Android Auto to carmakers is substantially similar to its licensing of Android OS to mobile manufacturers.  Google requires automobile manufacturers to sign anti-forking agreements before receiving license to use Android Auto, including many of the same

restrictions imposed on mobile manufacturers. Almost all carmakers have pre-existing anti-forking agreements with Google to allow consumers to connect their Android-based mobile phones to their automobile entertainment systems. Automobile manufacturers are thereby foreclosed from producing their own "fork" for vehicle entertainment systems, much the same way that mobile device manufacturers are prevented from creating their own version, or fork, of Android OS.

91. Automobile manufacturers are also denied access to Google's proprietary bundle of apps, GAS, unless they agree to additional contractual restrictions. The terms require the automobile manufacturers to, *inter alia*, set Google's voice assistant as the preset default voice assistant. This interlocking contractual scheme closely mirrors Google's activity in the mobile space. Google has achieved exclusivity for these future-facing search access points by implementing a revenue share agreement with automobile manufacturers, the same way that Google entices mobile manufacturers – in exchange for revenue share, the automobile manufacturer is restricted from pre-loading any alternative voice assist service in vehicles qualifying for the revenue share.

92. Google effectively prevents automobile manufacturers from modifying the Android Auto operating system, foreclosing competition, and ensuring that a single infotainment platform emerges as the monopoly choice – Google's. Automobile manufacturers must choose to accept Google's GAS bundle in its entirety, together with an agreement not to compete by offering other contemporaneous voice assistants or competing themselves to provide voice assistance to automobile purchasers. Automobile manufacturers are thereby prevented from responding to consumer demand and customization, instead forced to "buy in" to Google's Android Auto ecosystem.

        **b.**      **Google Degrades Interoperability in Its Search Advertising Placement Tool, Limiting Advertisers' Ability to Evaluate Advertising Options**

93. In addition to the anticompetitive conduct Google commits with respect to general search, Google also prevents competition in search *advertising* by limiting the interoperability of its search advertising tool, which in turn degrades advertisers' ability to evaluate and purchase search advertising as

32

appropriate.  While Microsoft's Bing, Google's only remaining competitor in general search services, remains in single-digit market share, it nevertheless continues to crawl and index the web and sell general search advertising.  Advertisers may therefore choose to supplement their advertising with Google by also advertising with Bing.  Google has leveraged its monopoly position to make such supplemental advertising more difficult.

94.     Google's search engine marketing ("SEM") tool is called SA360.  Advertisers rely on SA360 to place general search advertising and some non-search digital ads across Google and its general search competitors.  SEM tools, including SA360, allow sophisticated, high-volume advertisers to purchase and evaluate search advertising from multiple search engines using a single tool and interface.  SEM tools also allow for the automation of complex tasks, such as bidding on thousands of keyword auctions, that would be burdensome to perform manually.  SEM tools should promote competition in general search-related advertising markets by allowing for the easy comparison of general search advertising offers.  However, SA360 limits advertisers' choices and harms their ability to effectively compare search advertisers and choose the best one to fit their needs.

95.     Around 50% of all U.S. general search advertising dollars today are spent using a SEM tool, comprising roughly $25 billion per year.  The remaining searches are overwhelmingly made directly through general search engines without use of a SEM tool.  Direct purchases from general search engines are called "native tools," for instance, Google Ads (formerly AdWords) and Microsoft Advertising (formerly Bing Ads).  Although purchases can be made without SEM tools, because advertisers typically purchase both with and without SEM tools, access to both types of purchases are usually made within a single interface.  Direct purchases and interoperability between SEM and non-SEM purchases were thus part of the native tools' product functionality.

96.     By 2003, Google had identified the potential for advertisers to use neutral SEM tools to compare the relative benefits of advertising on Google against other general search engines as a

competitive threat to its general search services advertising revenues.  Google employed SA360 to stamp out any remaining competition in general search advertising.  Google used SA360, which general search advertisers use to purchase more advertising than all other SEM tools combined, to funnel the largest direct advertisers and advertising agencies to its own general search service advertising markets and away from its competitors' advertising (called advertising "channels").

97.     Google promised to keep SA360 neutral, but instead operated it in an exclusionary manner, causing advertisers to buy more adds through Google's general search advertising markets than they would have in a competitive marketplace.  In order to get advertisers to adopt SA360 as a space to compare and purchase advertising, Google promised those advertisers that SA360 would remain neutral so they could make well-informed decisions to purchase from Bing or any other rival search engine competitor.

98.     Following pitches Google made in 2011, which included the promise to remain neutral, SA360 grew to comprise roughly 60% of all advertising dollars spent using a SEM tool.  However, Google secured several anticompetitive advantages through its SA360, which belied such promises:

### i.     Data Asymmetry

99.     Google has made SA360 interoperable with auction-time bidding for Google's search advertising, while withholding that same interoperability from Microsoft (and Bing), Google's only true remaining competitor.  Auction-time bidding is a useful automated bidding technology allowing parties to optimize bidding on keywords in search advertising auctions by bidding in real time rather than on a delay.  This is useful because auctions for keywords can run continuously, allowing bidding and prices to constantly adjust, rather than having to wait for a period to see auction results.  Delayed bidding, or intraday bidding, receives search engine data much more slowly and can only adjust to optimize bids for keywords periodically, usually only four times per day.  In addition to the more frequent updates, auction-day bidding has additional benefits like additional data and feedback provided to advertisers.  Google

itself estimates that auction-time bidding improves the performance of general search advertising by 15% to 30%.

100.    SA360 provides only intraday bidding to Google's search competitors, while offering auction-time bidding for Google general search advertising products.  Both Google and Microsoft offer auction-time bidding technology through their native tools.  Google could make SA360 interoperable with both Google's and Bing's similar platforms – there is no technological barrier to allowing auction-time bidding for Google's competitors.  And Microsoft has requested this functionality from Google on SA360, but Google has refused to do so.  Google's decision has thereby degraded the quality of Bing's offerings on SA360, presented advertisers with an unequal comparison in evaluating advertising options, and reneged on Google's original promise to make SA360 a neutral platform for providing search advertisers with the most comprehensive and neutral platform to compare advertising spend.

101.    SA360, by not offering auction-time bidding for Google's competitor, Bing, steers ad spend away from Bing and towards Google.  Over time, auction-time bidding will tend to spend more of an advertiser's money as auction results return at a faster, more accurate and efficient pace compared to the less precise and slower bidding opportunities presented for Bing on the SA360 platform.  Google has thereby ensured that an apples-to-apples comparison will not occur and that its Google search advertising will be favored by advertisers on SA360.

102.    Google's conduct harms competition by hampering the relative performance of Bing's advertisements and causing advertisers to shift their advertising spending from Bing to Google without regard to the quality of competing offerings.  In fact, Google prevents advertisers from even making a fair comparison between competing offerings by allowing only its own offerings to be offered in auction-time bidding on the SA360 platform.  Advertisers shift spending to Google not because of its inherent superiority, but because Google has erected a barrier to equal competition on the SA360 platform.  Google's degradation of Bing's parity over time would not be present in a more competitive market.  To

35

the extent advertisers pay more than they would pay in a competitive market, some portion of those higher prices would be expected to flow through to consumers.

### ii.    Other Exclusionary Conduct

103.    Built into SA360 are further parity gaps where Google offers better interoperability between SA360 and Google-owned products as compared to features offered for Bing products.  These feature gaps create an artificial advantage for Google.  For example, advertisements can have a "call extension" feature integrated whereby the user viewing an ad may simply click or tap on a number rather than having to dial the number separately from the advertisement.  SA360 supports the call extension feature for Google advertisements, but not for Bing in SA360, although the feature has been available for at least five years.  As a result of this lack of parity, many SA360 advertisers now forego purchasing Bing search advertising altogether – a predictable result of not being able to compare Google and Bing campaigns in a true apples-to-apples comparison.

104.    By violating its promise to neutrality, Google has imposed unnecessary friction on advertisers trying to choose their advertising placement.  Advertisers are no longer able to easily run Bing ad campaigns designed around advertising features because of the artificial feature parity gap created by Google in the SA360 tool.  Google thereby creates substantial obstacles and difficulties preventing advertisers from making informed, competitive choices.

105.    As a result of Google's management of the SA360 tool and its favorable support for its own general search advertising, advertising dollars are steered to Google's general search advertising products, harming Google's rivals, raising prices for advertisers, and enabling Google to reap supracompetitive products.  Google itself has estimated that advertisers spend between 2.5% and 14% more on Google Search ads after adopting SA360, and that SA360 is responsible for 3% of Google's total global growth.

106.    Advertisers are not likely to substitute for Google's SA360 tool.  It is costly in terms of time, effort, training, and downtime for an advertiser to switch SEM tools.  An advertiser's choice of SEM tool is therefore sticky, and an advertiser is unlikely to recognize Google is not supporting features for Bing appropriately, stop using SA360 because of those lack of features, and switch to an alternative tool in order to receive better interoperability with Bing advertising.

107.    Google also requires Microsoft to demonstrate "consumer demand" for products that it wants SA360 to support for Bing.  And even though advertisers have informed Google that missing features related to Bing would assist them, Google has ignored evidence of demand and refused to support those features.  Moreover, by imposing an arbitrary "demand" threshold on Microsoft, Google has artificially deprived Bing of scale and kept demand for Bing search advertising artificially low.

108.    Google's SA360 conduct works together with its unlawful restraints on general search engine distribution to prevent any competition from forming and maintain Google's monopoly over general search and related search advertising markets.  Google has moved away from offering neutrality on SA360, so that advertisers and consumers bear the brunt of the artificially higher costs and prices than a competitive market would provide.  Google's barriers to expansion and entry also serve to prevent competition from occurring in the future.

### c.    Google Controls Consumer Traffic, Harming Competition from Vertical Search Providers

109.    As a monopolist in the general search market, Google has become a gatekeeper controlling who gains access to exposure across the internet, charging supracompetitive prices along the way.  Because of its position, Google effectively maintains the power to control the flow of consumer traffic to determine the business fate of specialized vertical search providers.

110.    Specialized vertical search providers must rely on Google's general search services as a critical means to reach users, because Google's general search does not have a competitive alternative.  Many users start their internet search at a general search service (overwhelmingly, Google's), and seek to

37

click through to vertical search providers to complete specific transactions, such as booking a flight or hotel. Vertical search providers rely on click-through from Google's general search for roughly 30% to 40% of their traffic, although the number can be considerably higher depending on the vertical search market. Because of the centrality of Google's general search to generate business, vertical search providers increasingly must purchase general search and general search text advertising in addition to appearing in normal search results returned from Google's search algorithms.

111.   While vertical search providers do not compete in the general search market and general search text advertising markets, they nevertheless threaten Google's monopoly position in those markets. This is because, should vertical search providers become too successful, Google's general search would become a mere landing page only for situations where finding information had sufficiently low monetization potential so that no niche vertical search provider would build a space with a better alternative. If vertical search providers became the primary means through which users interacted with the Internet, Google would lose its general search position as a gatekeeper for the rest of the Internet. Google has recognized that vertical search providers have specialized, rich information concerning specific topics, which could draw users away from Google's general search – in effect, the user would choose a vertical search provider through which to search the Internet rather than starting with Google.

112.   If significant numbers of users chose to forego Google's general search and instead went straight to vertical search providers, Google's monopoly over general search would be less relevant, barriers to entry would weaken, and other general search engines might enter the market. With more options in general search, vertical search providers would in turn have meaningful choice over which general search engine to prioritize for advertising and user acquisition, incentivizing greater competition between Google and other general search providers to attract vertical search providers and provide a better experience for users.

113.    In response to this threat, Google entered into the vertical search space by embarking on exclusionary campaign.  Google selected particular commercial segments it saw as profitable, and denied specialized vertical search providers from purchasing advertisements for these segments or appearing on the Google search results page in Google's "OneBox," a feature that typically provides listings for a relevant commercial segment responsive to a user's keyword search (for example, in response to a search for "hotels," Google would provide a OneBox of local hotels with a map and associated listings).  Google's decision to exclude vertical search rivals has no legitimate business justification and is designed to, and has had the effect of, excluding its rivals.

114.    While Google willingly sells advertisements to vertical search providers on behalf of their local service providers, Google injures competition through the exclusionary terms it attaches to these transactions with vertical search providers.  For example, Google does not allow vertical search providers to prominently display their names, but rather requires that local service providers be displayed alongside advertising.  The vertical search provider may have significantly wider brand recognition than a local service provider, and Google's restriction limits the ability for a vertical service provider to obtain wider notoriety such that a large consumer base would begin to bypass Google's general search as a starting point to look for the vertical search service.  Instead, Google only allows the vertical search provider paying for the advertisement to appear in subtext below other information, including the service provider's name, consumer reviews, and the "Google Guaranteed" mark, obfuscating the vertical search provider's role in vetting or guaranteeing the local service provider.

115.    Google's policies significantly harm vertical search providers by preventing them from directly advertising the fact that they provide more granular comparison services than Google.  Instead, consumers who receive the ads bought by the vertical search providers are only relegated to subordinate text below Google's green checkmark, despite the fact that the vertical service provider has recommended the local service and has the deeper relationship that led to the recommendation.  Further, a user being

served the vertical search provider's ad, who clicks on the ad, is taken to a Google page instead of the vertical search provider's own website.  As a result, the vertical search provider does not establish a typical business relationship with the user but is instead intermediated through Google's own site.  In this way, Google prevents vertical search providers from making consumers aware of the value provided by the vertical search providers, harming competition, consumers, and advertisers.  Google thereby degrades access to vertical search provider services, inserting itself as an intermediary to specialized search services that it could not otherwise match and eliminating them as a competitive threat.

116.    Google also restricts vertical search providers by favoring its own products in its OneBox. The advertising Google provides to vertical search providers in its OneBox is limited to text; but Google's own vertical search products appear on a map and with further relevant information, like price, that does not require a consumer to click through to see the offerings.  Similarly, for local services, Google does not allow providers of local service information to appear in unpaid local listings in its OneBox.  Additionally, vertical search providers are not able to purchase advertisements in their own name with direct links to their own websites for advertisements placed near Google's map.  However, Google permits vertical search providers to have a similar location on search results pages in other commercial segments where it does not compete.

117.    Google discriminates in its OneBox policies in order to exclude vertical search providers that present a threat to its monopoly power.  Google allows users to directly connect to vertical search providers where revenue is small or not an otherwise important business segment for Google (*e.g.*, books, educational courses, movies, events, or recipes).  However, Google does not offer the same opportunities for vertical search providers whose business segments directly compete with Google.  Internally, Google's own organizational structure recognizes this distinction: for the segments in which Google does not compete, vertical search advertising is handled by the general search team, while the specialized vertical search segments that Google does compete in oversee their own specific, more lucrative vertical segments.

118.    Google's differential treatment of vertical search providers in its OneBox and in its treatment of their advertisements demonstrates that vertical search providers' presence presents a competitive threat to Google.  Google's degradation of the vertical search providers' access is part of an anticompetitive response by Google to eliminate any threat to its dominance.  There are no offsetting competitive benefits to this exclusionary conduct.

119.    Google further limits competition by denigrating the effectiveness of "organic" search results – the results that are displayed as a result of search, organically as a result of an algorithm returning results based on relevance.  As a result of Google's elevation of advertising above general organic search results, vertical search providers will need to purchase additional advertising from Google in its monopoly position in order to continue to attract customers.  The advertising Google provides, which appears above organic search results, is also provided at higher prices and lower quality than would be available in a more competitive market, subject to conditions that unfairly disadvantage vertical search provider advertisers.

120.    Google over time has increased the space devoted to advertisements, pushing organic search results further and further down its search results pages.  Google search users are significantly more likely to view the ads that appear above organic search results and ignore content "below the fold."  By limiting the presence of visible organic results, Google has limited the avenues for vertical search providers to acquire customers – requiring them to buy advertising space in order to gain visibility.

121.    In addition, Google has inordinate control over organic search results by virtue of its monopoly position: Google decides the content to include in the text of organic search results, and to which third-party webpage any click-through traffic will flow.  For example, a vertical search provider that features ratings and review on its own website could find that Google does not include those features in its organic search results or link to them.  By contrast, on the same search results page provided by Google, it will include features such as ratings and reviews for its own content.

122.    Google further harms competition by requiring certain of its business partners to provide it valuable and proprietary data, which Google then combines with its own data to gain an artificial advantage over companies that pose a competitive threat to it.  Counterparties have no choice but to accept Google's terms and share their proprietary data, because they depend on Google for search traffic.  For example, Google's "Hotel Unit" (the name it gives to its OneBox for hotel results) include price, star rating, and review count, based on an automatically populated date for a one-night stay and the ability to change the date within the search results.  Hotel results provided by vertical search providers are not allowed to pay to appear in the Hotel Unit OneBox that appears on the Google search results page.  Instead, the prices listed alongside the Hotel Units results come in part from Google's "partners" – vertical search providers that are required to provide their proprietary information to Google for use in the Hotel Unit.

123.    Google also obtains additional proprietary data from vertical search providers by forcing them to supply it in exchange for permission to appear in the second page of Google's Hotel Unit click-through page.  Google collects much more data than is necessary to carry out a transaction for a user seeking to book a hotel stay.  Google displays prices, ratings, and other information available from vertical search providers in tis Hotel Unit results – the same information that Google does not allow vertical search providers to display in Google's general search results advertisements.

124.    In sum, Google entrenches and protects its monopoly power by: (i) favoring its own products in specific segments by elevating its own results above those of vertical search providers; (ii) disallowing the display of useful information in the general search text advertisement that Google does allow to vertical search providers (which Google itself displays for its own results on the same page); (iii) displaying additional information in Google's own OneBox with map and unpaid listings made unavailable to vertical search providers for segments in which Google competes; and (iv) requiring vertical search providers to provide proprietary information to Google as a condition of allowing them to advertise in Google's general search.

125.    Google's conduct undermines competition, harms advertisers by placing limitations on general search advertising, and hurts consumers by placing Google's own content in a superior position, making it more difficult for consumers to find relevant results and information provided by vertical search providers.  Google's conduct also ultimately increases prices by forcing consumers to assume the higher advertising costs vertical search providers must pay as a result of Google's monopoly.

### 4.    Android Mobile Operating System and App Distribution

126.    Apps on mobile devices are akin to software applications on a personal computer.  As on a personal computer, some software may be pre-installed by the original equipment manufacturer ("OEM"), but consumers can obtain additional apps to meet their specific use cases and preferences.  On personal computers, app distribution occurs from a variety of competitive sources, including downloads from developer websites, storefront applications installed on an operating system such as the Windows Store or Steam app, or on store websites provided by companies such as Amazon, Apple, Google, or Microsoft.  However, on Android devices, Google has foreclosed potential competition by eliminating alternative means to download apps, effectively eliminating the consumers' choice.

127.    Google owns the Android OS, which is used in 99% of U.S. mobile devices that run a licensable mobile OS.  The Google Play Store is the only practical means to obtain apps for the vast majority of Android mobile devices.  While Google claims that consumers are able to install additional app stores on Android devices, in reality, Google imposes a series of technological challenges and pretextual warnings designed to prevent users from directly downloading ("sideloading") these app stores and apps.

### a.    Technical Barriers to Prevent Android App Distribution Outside of the Google Play Store

128.    Google presents ominous warnings to consumers who try to sideload apps, warning that installation of a competing app store "can harm your device."  Google alternately simply blocks the download of competing app stores, with a message stating, "your phone is not allowed to install unknown

43

apps from this source," and options to either "Cancel" the download or proceed to "Settings," with no indication that installation is possible through the "Settings" option. Google has also responded to the sideloading of app stores by having a message displayed on Android phones warning that the user's "phone and personal data are more vulnerable to attack" and requiring users to actively agree that they are "responsible for any damage" to the phone "or loss of data that may result" from the installation. Internally, Google acknowledges the hurdles it has erected to sideloading, noting that there are "15+ steps to get app vs 2 steps with Play or on iOS," in a 2018 presentation to senior executives.

129.    In reality, "sideloading" apps on a mobile device is not materially different from downloading an application on a personal computer – a task millions of computer users perform safely and easily every day. Google's warnings to users grossly exaggerate the risks of sideloading. Google itself claims that it "analyzes every app that it can find on the internet," and categorizes a subset of them as "Potentially Harmful Applications," or PHAs. Yet it provides dire user warnings falsely describing even highly popular apps from well-known developers, including a competitor such as Amazon, as "unknown apps." This gives consumers the false impression that even apps that Google has analyzed and determined not to be PHAs nevertheless present an appreciable risk of "damage" to a user's phone, including loss of data or exposure of sensitive user information. Google touts Android's built-in security measures as scanning "more than 100 billion apps every day," and directs users to take action against PHAs it does find on their devices, or automatically disables them. Yet Google chooses to provide inaccurate information to users regarding the sideloading of such apps on their Android devices.

130.    Moreover, even if a user overcomes Google's obstacles to downloading an app directly, the user faces continuous additional difficulties in keeping the sideloaded app store or app up to date. This is because Google prevents such apps from updating in the background, requiring users to manually approve every update via a multistep process, including: (1) opening the app store you used to install the app on your device; (2) searching for the app and opening the details page for the app; and (3) finding the

update option that displays, if available.  This multi-step process further discourages consumers from using alternatives to the Google Play Store.

131.    Google created sideloading in order to project an image of "openness" while it gained scale and market share.  After achieving dominance, however, Google increasingly saw sideloading as a threat to the Google Play Store and erected additional barriers to prevent it from competing on Google's Android operating system.  For example, when Epic Games, Inc. ("Epic Games") began discussing the possibility of launching its highly touted videogame, *Fortnite*, as a direct download, Google responded in internal communications that the technical difficulties it had implemented to prevent sideloading had created "install friction" that would "drastically limit [*Fortnite*'s] reach."  Google internally also predicted that, among other difficulties with sideloading an app like *Fortnite*, "[t]he approach will create significant user confusion, since [Google Play] will attract [billions] of users who will search for Fortnite and run into dead ends that aren't clear how to resolve."  (Brackets in original).

132.    Google has also acknowledged that the security settings and warnings associated with sideloading limit even mainstream, non-malicious apps and app stores from reaching Android users.  Even secure, highly curated Android apps and app stores like *Fortnite* and the Amazon Appstore are subject to such warnings.  When *Fortnite* decided to have users install its Android distribution through sideloading, Google noted internally that Epic Games' reach without the Play Store would be significantly lower as only 15% of Android users in the United States had "unknown sources" enabled in their Android operating system.  Google also itself internally discussed that the security warnings and barriers affected the viability of Amazon's app store, noting that, "users need[] to understand unknown sources" in order for such an app store to even be installed on an Android device.

          **b.**      **Google's Contracts Further Prevent OEMs from Circumventing Google's Technical Barriers**

133.    In addition to the technical friction Google implements in the Android operating system to prevent the sideloading of competing app stores, Google also imposes contractual restraints on OEMs.

45

An OEM that wishes to market an Android device with Google's proprietary apps and services must first sign, *inter alia*, an Anti-Fragmentation Agreement ("AFA") or Android Compatibility Commitment ("ACC"). The AFAs and ACCs have two key provisions pertinent to Android app distribution: Google requires signatories to: (1) refrain from any actions that may cause or result in the fragmentation of Android; and (2) agree to restrictions on the manufacture and sale of devices running forked versions of Android.

134. The AFA and ACC compatibility standards require OEMs to implement Google's restrictions and warnings about sideloading. As a result, these agreements foreclose OEMs from modifying Android to offer frictionless sideloading of competing app stores, which Google would consider an impermissible "Android fork."

### c. Google's Contracts Also Block Competing App Stores from Distribution on the Play Store

135. Google forces app developers, as a condition of having their app listed on the Google Play Store, to sign a non-negotiable Developer Distribution Agreement ("DDA"). The DDA prohibits developers from using Google Play to distribute or make available any product that facilitates the distribution of software applications and games for use on Android devices outside of Google Play. The DDA thereby prevents any app on the Google Play Store from competing in distributing apps on the Android ecosystem. The DDA also grants Google the right to remove and disable any Android app that Google determines has violated the agreement.

136. Google has imposed the DDA and its Google Play Store restrictions since at least 2009, when the section of the agreement was labeled "Non-Compete." Over time, Google has only tightened the anticompetitive restrictions in the DDA in response to specific threats posed by app distribution competitors, such as Amazon. For example, the original language in Google's DDA was limited to apps that had a "primary purpose" of facilitating distribution of apps outside the Google Play Store, which allowed some flexibility for developers to use the Play Store to distribute Android apps that also linked to

apps that could be downloaded outside Google's Play Store. In 2012, however, when Amazon attempted to distribute its app store to consumers directly through its Amazon Store app (which was itself distributed on the Play Store), Google took swift action. Google alleged that Amazon had violated the DDA agreement and threatened to remove Amazon from the app store just days before Black Friday.

137.    Amazon used a browser within its app to direct users to download Android application files directly, circumventing the Google Play Store and effectively allowing customers to download Amazon apps without going through the Play Store. Google also changed its DDA provisions in response to Amazon's app packaging. In September 2014, Google updated its DDA to "provide additional clarity around the distribution of third-party apps on Google Play to maintain a secure ecosystem." Eventually, Amazon was forced to disable this functionality, and its app store was only available via sideloading, making it significantly harder to reach Android users.

    **d.**   **Google Unlawfully Ties Advertising Offerings to the Google Play Store**

138.    Google also prevents app developers from advertising alternative app distribution channels on advertising spaces owned and controlled by Google. Google's requirement that app developers not advertise competing app platforms unreasonably restricts advertising of competing app distribution channels and further secures Google's dominance.

139.    Google's App Campaigns program allows developers to promote apps through ad placement on key online advertising channels, including, *inter alia*, Google Search, YouTube, Discover on Google Search, and the Google Display network. These placements are optimized for the advertising of mobile apps. Because Google Search is the overwhelmingly dominant search engine in the United States, it is a vital channel for app developers to reach customers. Google's YouTube is likewise a key means for developers to reach consumers. But none of these channels are open to Android app developers unless they list their apps on the Google Play Store, and Google will not allow any developer to advertise alternative Android app distributions.

1

2

**e.    Google's Exclusionary Contracts Further Prevent the Development of a Competing App Distribution Platform on Android**

3

4    140.    Google imposes contractual restraints on mobile device manufacturers by requiring them

5    to enter into MADAs and revenue share agreements ("RSAs") in order to receive a share of Google's

6    advertising revenues.  In exchange, Google maintains control over general search access points.  Google's

7    MADAs and RSAs also contain additional restrictions to prevent the development of competition when it

comes to the distribution of apps on the Android operating system.

8

9    141.    Google, through its MADAs, bundles the Android trademark, the core functionality

10    provided by Google Play Services, the Google Play Store, and its proprietary apps – requiring device

11    manufacturers and consumers to accept all those pieces that they demand, along with those they do not –

12    in a single package, without any legitimate justification.

13    142.    Google's MADAs prevent mobile device manufacturers from promoting competing app

14    stores through pre-installation.  First, Google's MADAs and RSAs require mobile device manufacturers

15    to preinstall and place the Google Play Store icon on the home screen of Android devices, and also require

16    that no competing app store be any more prominent.  Second, Google's MADAs require mobile device

17    manufacturers to preinstall a suite of Google proprietary apps, to make it impossible to delete or remove

18    many of these Google apps, and to provide all of them preferential placement on device home screens.

19

20    143.    Google's MADAs prevent mobile device manufacturers from distributing Android devices

21    without the Google Play Store or opting to instead preinstall only third-party app stores (such as the

22    Samsung Galaxy Store or the Amazon Appstore).  But because Google Play Services is bundled with the

23    Play Store, most of the top apps in third-party stores would not work because Google would withhold

24    essential APIs, causing the competing app stores to work incorrectly on Android devices.  For example,

25    without Google Play Services, any app using location and mapping functionality (such as a ride-share app

26    or real estate app), push notifications (any app that creates a reminder, a personalized notification, or

27    handles e-mails or other messaging), or Google's AdMob (any app that monetizes through in-app

28

48

advertising) would not properly function.  Google Play Services also provides security updates and related services for Android devices, meaning that devices lacking the bundled Play Store would not receive such updates.  By bundling Google Play Services with the Google Play Store, Google ensures that the Google Play Store *must* be on every Android mobile device for apps to function correctly.

144.    Google also prevents the development of competing Android app stores by resorting to its RSAs.  The RSAs serve as an inducement to enter into Google's restrictive AFAs, ACCs, and MADAs, offering revenue share in exchange for complete domination by Google.  The agreements require Google's counterparties to refrain from competing against Google, and refrain from any act that Google may deem a violation of its deliberately vague and frequently changing web of contractual requirements.

145.    In 2009, shortly after the launch of Android, Google began discussing using RSAs to address the "challenge" of mobile device manufacturers and mobile carriers looking to create their own app stores.  Google's goal was to discourage device manufacturers and mobile carriers from creating competing app stores and incentivize the use and development of the Google Play Store.

146.    Google's RSAs allowed it to secure the Android market by splitting revenue with certain mobile device manufacturers and mobile carriers.  Google knew at the time that mobile carriers would not allow Google to corner the market unless it shared its advertising revenue.  In 2009, Google entered into revenue share agreements with several mobile carriers, splitting Android revenue share among app developers, mobile carriers, and Google.  These agreements allowed Google to penetrate the market, providing an incentive for mobile carriers to give up their own siloed app distribution channels in favor of the Google Play Store.  Google ultimately provided revenue share to both device manufacturers and mobile carriers in order to secure its dominant position and ensure widespread adoption of Android and the Google Play Store.

147.    Google's revenue share agreements with device manufacturers have prohibited the preloading of competing app stores, apart from the manufacturers' or mobile carriers' own branded stores

49

in some limited cases.  Google knew that the incentive of revenue share, combined with the restrictions of its MADAs (including default placement requirements) would ensure that any manufacturer or carrier or app store would pose no real competitive threat to the Play Store, completely foreclose all third-party app stores from the vital distribution channel of coming preloaded on any Android device, and give the Play Store effective exclusivity.

148.    By 2019, Google implemented even more restrictive agreements in order to secure its Play Store monopoly.  Google (1) offered substantially higher revenue share through a new tier called "Google Forward," which required Google Play Store exclusivity and completely barred manufacturer or carrier stores on Android devices; (2) entered a separate, even more costly and restrictive agreement with Samsung (Google's primary app store competitor), further ensuring Google's app distribution monopoly (called Project "Banyan"); and (3) made additional payments to key app developers that would have otherwise worked with Samsung, or other app distributor competitors, to ensure that they continued to exclusively develop for the Google Play Store (called Project "Hug").

### f.    Google Bought off Samsung and Used Additional Restrictive Contracts to Further Prevent Development of a Competing App Store

149.    Google protects its monopoly profits from app distribution by maintaining the dominance of the Google Play Store and preventing any competitors from attaining any semblance of scale for distribution.  Even though Google's exclusionary conduct covers all of the dominant device manufacturers and mobile carriers that build or distribute Android devices, in recent years, Google has recognized that only one mobile device manufacturer, Samsung, had enough market share to plausibly build its own mobile app store to rival the Google Play Store in key markets.  Google internally, through a March 2019 presentation on Google Play, identified "incorporat[ing] Play protections into OEM rev share contracts (primarily Samsung)" as a solution to risks posed by alternate stores to the Google Play Store's business.

150.    Samsung's Android devices are quite popular, making up approximately 60% of Android devices in the United States.  Samsung began to revamp its own app store, the Samsung Galaxy Store,

beginning in 2018.  The Samsung Galaxy Store had historically performed poorly, so that Samsung had to resort to seeking out deeper integrations with the Google Play Store to distribute Samsung-specific apps.  Google itself estimated that users spent only 3% of the time on the Samsung Galaxy Store that they spent on the Google Play Store, and that the Galaxy Store did not cannibalize the Play Store's revenue.  However, Google feared Samsung's ability to add certain popular apps on its Galaxy Store – for example, exclusive popular game titles – which would allow Samsung to break into the app distribution market.

151.    In 2018, Samsung partnered directly with *Fortnite* developer Epic Games to launch the mobile version of Epic Games' popular *Fortnite* game, exclusively on the Samsung Galaxy Store.  By bypassing the Google Play Store, Epic Games was able to bypass an estimated $300 million of revenues that otherwise would have been lost to Google's gatekeeping.  The Samsung-Epic Games exclusive agreement threatened Google by: (1) presenting a cheaper, more developer-friendly alternative to the Google Play Store because Samsung allowed more generous terms for app developers on its Galaxy Store; and (2) allowing apps on the Galaxy Store to link to separate app installers outside of any app store, which would directly connect consumers and app developers, allowing consumers to "sideload" content and allowing Epic Games and other app developers to offer content directly to consumers, further bypassing the Google Play Store.

152.    Samsung also pursued exclusive rights with other popular game developers such as Riot Games, Inc., Activision Blizzard, Inc., and Blizzard Entertainment, Inc.  Samsung further indicated to Google its intent to place the Samsung Galaxy Store on the home screen of its next generation of devices, threatening the Google Play Store's status as exclusive app store with prime placement advantage.

153.    Google preemptively squashed Samsung's nascent Galaxy Store app before it had a chance to become a legitimate competitor to the Google Play Store.  Google immediately launched multiple coordinated initiatives designed to block the Galaxy Store by interrupting Samsung's relationships with developers and consumers, including: (1) Project "Hug," an initiative focused on tying popular mobile

51

games directly into the Google Play Store ecosystem to discourage developers from dealing with Samsung; and (2) Project "Banyan," a second set of initiatives aimed at convincing Samsung itself to abandon its plans to form independent relationships with app developers.  Project Banyan (also subsequently known as Project "Agave") was a direct attempt to pay Samsung to abandon its fledgling relationships with top developers and eliminate the competition represented by the Samsung Galaxy Store. This was an integrated approach Google took to eliminate the threat of more developers following Epic Games' lead by either partnering with Samsung or distributing directly to consumers through sideloading. Project Hug and Project Banyan/Agave were complementary, self-reinforcing, and calculated to eliminate competition in the most cost-effective manner possible.  Google, for instance, assessed which project would provide the "best ROI."

154.    Google's concessions to Samsung in order to stave off competition from the Galaxy Store were multiple.  While Samsung was initially interested in speaking with Google about how the stores could collaborate, Google, through its Project Banyan initiative, proposed to pay Samsung a large, undisclosed sum to give up its direct commercial relationships with consumers and developers – to essentially give up the development of its Galaxy Store.  Google also secured Google Play Store exclusivity on all Samsung devices on the default home screen and the adoption of Google-defined Android game device standards devised by Google.

155.    Project Banyan was scheduled to be implemented between 2019 and early 2020, when Samsung's 2017 RSA was due for renewal.  However, when Google initially approached Samsung in June 2019, Samsung indicated that Google's money offer was too low and that it would prefer a more favorable revenue sharing arrangement.  Google, in turn, knew that it was most important to prevent Samsung from seeing its actual Google Play Store-related revenues, because if Samsung knew Google's revenues it would be much harder to buy their agreement not to compete.

156.    Google employees repeatedly emphasized the need to avoid divulging to Samsung (and other device manufacturers) Google's Play Store business economics and year-over-year growth.  Google prefers to negotiate a fixed dollar amount with device manufacturers for the same reason – to avoid adverse financial impacts related to small percentage changes in revenue numbers, as well as to avoid disclosure that their revenue share offers are such a small percentage of total revenues from the Play Store.  However, Samsung desired a Play Store revenue percentage as opposed to a lump sum.  As a counteroffer, Google prepared to combine Samsung's Google Search revenue share with its Play Store revenue share into a single number in order to obfuscate its Play Store business margins – allowing Google to make a revenue share offer when it presented its offer to Samsung without divulging its Play Store margins.  Further underlining Google's dominance and the asymmetry in bargaining positions between Google and Samsung, Samsung has to rely entirely on Google's declaration of its Play Store revenues to calculate the revenue share that it is entitled to pursuant to Google's RSAs.

157.    Project Banyan negotiations between Samsung and Google came to a halt by July 2019, when Google's business team terminated Project Banyan and embarked on a new effort, Project Agave. Agave was merely a different implementation of the same anticompetitive goal: a proposal to offer to pay Samsung a percentage of Play Store revenues to prevent Samsung from developing relationships directly with consumers and app developers through its Galaxy Store.  Google also offered, through additional undisclosed terms, a proposal that would combine the Galaxy Store and Google Play Store through a co-branding arrangement, which would essentially make the Samsung Galaxy Store a white label for Google's app distribution services, eliminating a nascent app store competitor.

g.    **Google Bought off Key App Developers to Further Stifle Competition for Android App Distribution**

158.    In addition to the Project Banyan and Agave efforts to eliminate competition from the Samsung mobile device manufacturer app storefront side, Google also bought off key app developers to prevent them from making their apps available outside of the Google Play Store, either through direct

53

distribution or through competing app stores.  Google shared its monopoly profits with these app developers through additional agreements, adding additional distribution restrictions through addenda to its existing agreements with app developers.  Google called this strategy Project Hug – derived from "bear hug," aptly named considering its crushing effect on competition.

159.    Internally, Google saw its buy-offs of Samsung and certain app developers as two sides of the same overarching scheme, with project documents stating: "Hug reduces the risk of the Samsung scenario, but [without Projects Banyan and Agave] significant risk remains."  (Brackets in original.) Google feared that key app developers might have strong enough relationships with customers, and enough brand recognition, to distribute their apps outside the Google Play Store, either directly through sideloading, or through app stores other than the Google Play Store.  If these larger developers were successful, smaller developers might follow suit, and consumer interest and comfort in alternative app stores, or direct downloads, could increase as a result – a potential disaster for Google's maintenance of its app store monopoly.

160.    In response to Epic Games' decision to bypass the Google Play Store with its *Fortnite* mobile launch in 2018, Google anticipated as a threat that other developers could follow suit – a process where the Google Play Store was cut out as middleman, internally called "disintermediation."  Google quantified Epic Games' decision as a potential $3.6 billion revenue loss if Epic Games' decision were to see "broad contagion to other developers."  Google's worst-case scenario was that "Fortnite may legitimize 'Samsung' store & 3rd party stores; fragmenting app distribution on Android."

161.    Google also understood that their monopolistic practices were illegal and could draw the ire of regulators, so that Google's only chance was to make sure that regulators never heard complaints about Google's anticompetitive conduct.  Google staff wrote: "[r]egulatory wise: the only way to shore up our business is to be CONSISTENT …If no one complains (ie [sic] we don't make a change) there's a chance regulators will poke at inconsistencies, but it's made more likely when developers complain, which

will be more likely if we make a change(?)"  Google viewed its projects Banyan, Agave, and Hug as an extension of its other anticompetitive agreements, as part of a unified strategy to lock key app developers into the Google Play Store while also eliminating the possibility that Google's potential competitors (most prominently, Samsung) would never enter into the market with competing app stores.

162.    As Google itself stated, the Hug program successfully prevented another major app developer, Riot Games, Inc., from following Epic Games' decision to launch apps to be distributed outside of the Google Play Store.  Google saw Project Hug's overarching purpose as an "insurance policy" to protect Play Store revenues by taking the fangs out of competing app stores while allowing Google to hold its 30% cut of all app store revenues.

163.    By the end of 2020, Google had paid off approximately 20 top app developers in order to maintain its monopoly.

### 5.    Android in-App Payment Processing

164.    In addition to its anticompetitive conduct concerning Android app distribution, Google coerces developers into using its services exclusively for the separate market of in-app payment processing for Android digital content (the in-app payment processing market, or "IAP Processing Market").

### a.    Google Unlawfully Ties in-App Billing to the Google Play Store

165.    Google requires app developers to exclusively use its Google Play Billing, an in-app payment processor, for all in-app purchases of digital content for apps placed on the Google Play Store. Digital content includes all products and services consumed in a developer's app, as opposed to tangible goods and services outside the digital environment, which must use a payment processor other than Google Play Billing.

166.    Google further requires app developers to enter into a standardized DDA, which is a contract of adhesion controlled by Google, as a condition of having the developer's apps distributed through the Google Play Store.  The DDA unlawfully ties distribution of apps in the Google Play Store to

Google's in-app payment processor.  It is further unlawful in that it constitutes an exclusive-dealing arrangement.  Under the DDA, developers are required to enter into a separate agreement with Google Payment, a subsidiary that is not part of Google's Play Store business unit, to use Google Play Billing for all digital content sold in apps downloaded through the Play Store.  Further, the DDA requires that app developers comply with Google's Developer Program Policies.  Those policies require that: "1. Developers charging for apps and downloads from Google Play must use Google [Play Billing] as the method of payment.  2. Play-distributed apps must use Google [Play Billing] as the method of payment if they require or accept payment for access to features or services, including any app functionality, digital content or goods."  (Brackets in original).  By contrast, Google's policies require that developers not use Google Play Billing to process payments "for the purchase or rental of physical goods (such as groceries, clothing, housewares, electronics); for the purchase of physical services (such as transportation services, cleaning services, airfare, gym memberships, food delivery, tickets for live events); or a remittance in respect of a credit card bill or utility bill (such as cable and telecommunications services)."  "[F]or physical products and services," Google's policies require a payment processor other than Google Play Billing.

167.    For payments subject to Google's requirement to use Google Play Billing, developers are further prohibited from "lead[ing] users to a payment method other than Google [Play Billing]."  This provision bars developers from linking to a website or other service that would compete with Google Play Billing and process payments more cheaply.  The restrictions are comprehensive: "Within an app, developers may not lead users to a payment method other than Google Play's billing system.  This includes directly linking to a webpage that could lead to an alternate payment method or using language that encourages a user to purchase the digital item outside of the app."

168.    The foregoing provisions, when taken together, constitute an intensive exclusionary system whereby Google Play Billing has become the only payment processor that an Android developer may use for digital content within Android apps.

### b.    Google's Monopoly over the IAP Processing Market

169.    Google's contractual tie of Google Play Billing to the Google Play Store illegally secured and maintains its monopoly in the IAP Processing Market.  Google maintains this monopoly over a discrete market for in-app payment processing services for digital content within Android apps.  This market includes payment processing services for all digital content within Android apps.

170.    Payment processing services consist of software employed by merchants that performs the necessary steps to verify and accept, or decline, a customer's purchase (or attempted purchase).  Payment processing services frequently provide additional customer-facing functionalities, including invoicing, payment history, and refund processing.

171.    The IAP Processing Market comprises: (i) Google Play Billing; and (ii) alternative payment processing services that, absent Google's tie, Android developers could employ to process payments for in-app digital content.  Google's competitors or potential competitors include PayPal, Braintree, Adyen, WorldPay, Chase Limited, and software developers who write proprietary payment processing software.  These alternatives cannot enter the IAP Processing Market because of Google's anticompetitive tie.

172.    The ease and speed of in-app purchases are critical to both the consumer experience and the likelihood of a sale: too much friction ensures that a consumer will not make an in-app purchase.  Requiring a consumer to purchase digital content outside of a mobile app to process payments elsewhere could result in the user simply abandoning the purchase or ceasing interaction with the app altogether.

173.    In-app purchases represent substantially greater revenue than that received by developers for pay-to-download apps, so in-app purchases are critical to app developers.  Accordingly, app developers focus on making their in-app purchases as frictionless as possible.  Consumers also seek to have their purchases as seamless as possible, insomuch as any interruptions to their use of the app is likely to cause a consumer to fail to complete the transaction.  Developers and consumers alike benefit from a payment

processor that supports in-app payment, such that payment processing which relies on a process forcing a consumer to interact outside of an app would not be reasonably interchangeable.  Purchasing through a link in an app to a developer's website, for example, is not reasonably interchangeable because it forces a user to exit the app – which is also prohibited by Google's policies because Google forces developers to sign contracts prohibiting them from referring or directing users to websites for payment outside the app environment.

174.    Google's tie of these two distinct services (app distribution and in-app payment processing) is not technologically necessary.  Third-party payment companies operate in other digital and real-world ecosystems, including, for example, desktop computers and in-app purchases of physical goods.  Companies like PayPal and Braintree, for instance, offer payment processing at a significantly lower price than Google Play Billing.  These companies offer payment processing at the same fee (to the cent) of 2.9% of the sale plus 30 cents, which is 10 times lower than Google Play Billing's 30% supracompetitive commission.  Payment processing providers also compete on dimensions of convenience, speed, security, privacy, and customer service.  Google faces no competitive pressure to provide consumers quality customer service or meaningful privacy protections from its own data harvesting, because it has locked all competitors out of the market.

175.    In addition, payment and distribution services are routinely sold separately in other digital ecosystems.  For instance, Google already allows Android app developers to use a third-party payment processor such as Adyen, PayPal, or Braintree for in-app purchases of physical products and out-of-app services such as those offered by Amazon, Airbnb, or Uber.  For in-app purchases of digital content, however, app developers are required to use Google Play Billing as their exclusive payment processor if they wish to distribute their apps through the Google Play Store.

176.    Android developers often choose to use a competitor for payment processing services where Google's restrictive enforcement practices permit, such as for in-app purchases of streaming

services.  Google's competitors typically offer far lower costs, more favorable terms of service, more timely payment to merchants, more payment method options (*e.g.*, Apple Pay, Venmo, bank transfer), and more freedom to set prices than Google offers.  These practices could be readily adapted to the IAP Processing Market, but for Google's unlawful restrictions.  Google's unlawful contracts and policies prevent competitors from currently having more than a negligible share of the market; its illegal tying arrangements prevent other third-party payment processors from entering the market.

177.    Consumers are largely unaware of Google's tie, face high information costs in learning about it, and do not provide informed consent to it when purchasing an Android device.  Further, consumers who purchased Android devices prior to Google's September 2020 announcement to developers that streaming services would be forced to use Google Play Billing could not have possibly known that Google's tie would affect their future purchases of streaming service subscriptions and content from Google Play apps.  Moreover, Google never released a forthright disclosure to consumers of Google's monopolistic practices of foreclosing competition and taking supracompetitive commissions.

### c.    Google Sets IAP Processing Commissions at Will

178.    Google's power in the marketplace allows it to set supracompetitive commissions on all Android in-app purchases for digital goods.  The commission rate Google charges on IAP processing is not the result of the technical interdependence of Android app distribution and in-app payments, competitive pressure, or any other commercial consideration.

179.    Google is able to set the price for its IAP processing services at will, independent from competitive forces.  According to internal meeting minutes from the Company subsequently made public, when Google employees contemplated the Company's supracompetitive 30% commission, one employee asked, "[w]here does the 30% rev share number come from," to which another responded, "pretty sure Steve Jobs just made it up for itunes."  Other internal documents reveal Google employees are

uncomfortable with the Company's exploitative commission: "We want to feel good about the rev share that we charge – have it make sense to us.  And it feels like there's discomfort with what we are charging."

180.    By contrast, in the Google Chrome Web Store, Google's app store for the Chrome web browser used on personal computers, Google charges a 5% commission per transaction for consumer purchases of digital content, because Google is subject to market competition in this market.  Similarly, for Google's payment processing for subscription streaming services accessed not through Android apps, but through Google Search, Google staff suggested a 5% commission as appropriate, because they noted that payment platforms like Stripe were currently charging commissions between 2%-4%.  Google even discussed branding its billing services differently ("GPay" instead of "Google Play") in order to limit "contagion" – *i.e.*, in order to enable Google to continue to charge a supracompetitive 30% fee for Android IAP processing services.

181.    In its payment policies, Google offers no rationale for why the payment services it provides for digital content justify its supracompetitive 30% fee, nor any rationale for why sales of physical content are exempt from its supracompetitive fee.

### 6.    Third Party Online Display Advertising

182.    Image-based ads on the internet (called "display ads"), as well as audio and video ads in the online world, have largely supplanted their traditional print, radio, and television counterparts.  For online publishers and advertisers alike, the different online advertising formats are not interchangeable: online media companies that operate websites and mobile apps ("online publishers") are restricted in the format of advertising they are able to sell.  A news site, for example, may only be able to sell display ads alongside its news articles, and cannot generally sell search or audio ads to monetize its content.  Advertisers, for their part, typically purchase one format or another to achieve a specific advertising objective: search ads, for example, generally reach consumers who are already actively looking to make a purchase, while display ads are used to increase brand awareness.

183.    As with the forms of general search advertising discussed herein, online publishers sell their web display advertising inventory to advertisers through ad marketplaces.  Online publishers and advertisers depend on several distinct and non-interchangeable products to sell their web display inventory.  These products include: (i) ad servers, which act as the publisher's inventory management system and help the publisher sell its inventory; (ii) marketplaces, which match buyers and sellers of display ads; and (iii) ad buying tools, which advertisers must use as their middlemen to buy display inventory from exchanges.  These products work together to price, clear, execute, and settle billions of display impressions every month in the United States.

184.    Google possesses monopoly power in the markets for each of these three products.  Under the current paradigm of third-party online display advertising, Google is allowed to trade and influence these markets to benefit itself in the other markets, monopolizing online display advertising markets as a whole.  Using the financial sector as an analogue, Google would be the largest banking company, which also is allowed to act as the largest financial exchange, and then trade on that exchange to advantage itself, eliminate competition, and charge a monopoly tax on billions of daily transactions.

### a.    Ad Servers Market

185.    Online publishers, including newspapers, media outlets, and other sources, depend on a sophisticated system to manage their inventory of advertisements, called an ad server.  Ad servers keep track of publishers' ad inventory (which is not interchangeable because it must be served in specific contexts), and help publishers sell that inventory through exchanges, with the goal of maximizing advertising revenue.  Publishers typically use a single ad server to manage all of their web display inventory – using multiple ad servers would undermine holistic management of inventory and frustrate effective optimization of advertising inventory.

186.    Online publishers relinquish control over inventory management and revenue maximization when they resort to the use of an ad server.  While there are some variables which an online

publisher may adjust with respect to the management and sale of ad inventory, an ad server ultimately limits the publisher's control.  Ad servers in turn provide specialized knowledge to help the online publisher navigate the complexities of electronic trading, including ad server account analysts who individually advise online publishers on how to adjust the ad server's settings to increase revenue.

187.    Ad servers perform three critical tasks related to selling ad space.  First, the ad server identifies the users visiting the publisher's webpage in order to manage ad inventory and maximize yield.  The ad server utilizes information provided by a web browser or mobile application to help identify the user, and "tags" users with a unique user ID in order to identify the characteristics of the users associated with each ad space available.  By uniquely identifying an individual, the ad server can find additional information about the user, which in turn allows an advertiser to better target advertising and place a value on the ad space each individual user will see.  Unique user IDs are also used for "frequency capping," which limits the number of times a specific user will see any single advertisement.  User IDs also allow advertisers to track the effectiveness of their advertisements, by allowing them to track whether any individual user responded to an advertisement with specific actions (*e.g.*, clicking on an ad or following through and purchasing a product based on an ad).

188.    Second, ad servers manage how publishers sell ad space indirectly through advertising marketplaces, such as ad exchanges.  Publisher ad servers connect with marketplaces and let publishers automatically route their inventory for sale as the users load the publishers' webpages.  Ad servers effectively act as a middleman between a publisher and the marketplaces where advertisements are bought and sold.  As such, the ad server controls how the different marketplaces can access and compete for a publisher's inventory.

189.    Third, ad servers act as a mediator routing inventory correctly between a publisher's direct and indirect sales channels.  Because publishers make almost all of their revenue from just a small portion of their impressions, it is exceedingly important to them to direct their most valuable inventory to high-

value users – those identified as having a deep interest in a topic or a propensity to buy merchandise for a related topic, based on tracking information gained about the user.  The ad server must allocate ad sales between indirect purchases on an exchange and direct sales to large advertisers.

190.    An ad server is able to obstruct competition for a publisher's indirect sales due to its intermediary position between the publisher and the various exchanges competing for publishers' impressions.  The ad server may, for example, interfere with the publisher's ability to share full information about its impressions with the exchanges.  Or the ad server might prevent publishers from understanding how their inventory performs comparatively across exchanges.  Without transparent information, a publisher cannot reward better-performing exchanges with more business, and the market cannot be truly competitive, as marketplaces have no incentive to maximize value for publishers in the absence of such information.

191.    Despite the informational issues, prior to Google's entry into the publisher ad server market, ad servers neutrally routed publishers' inventory to exchanges, helping publishers maximize their inventory yield while charging a simple, low per-impression rate or monthly subscription fee.  Google substantially changed this market by monopolizing the publisher ad server market for display inventory with Google Ad Manager ("GAM").  Google originally acquired its publisher ad server in 2008 from DoubleClick.  In 2011, Google acquired and integrated AdMeld, a yield optimization technology that further helped publishers efficiently route inventory to exchanges and networks.  Today, GAM controls over 90% of the product market in the United States, with essentially every major website using GAM.  GAM has thereby become a monopoly middleman between publishers and exchanges, having the power to foreclose competition in the exchange market.

### b.     Exchange Markets for Display Advertising Market

192.    Almost all online publishers in the United States today sell at least some inventory to advertisers through marketplaces (advertising exchanges and networks).  Larger publishers tend to use ad exchanges, whereas smaller publishers typically use ad networks.

193.    Ad exchanges for display ads are marketplaces conducting auctions in real-time.  They match multiple buyers and sellers on an individual impression basis.  An ad server routes the publisher's inventory to exchanges in real time as users load webpages, and the exchange then connects with advertisers through ad buying tools to "bid" on ad space by impression.  Exchanges do not bear inventory risk; they are merely an intermediary, connecting publishers' inventory with willing buyers in real time.

194.    Ad exchanges are primarily aimed toward large online publishers, and institute minimum impression and spend requirements.

195.    Google owns and operates the largest display ad exchange in the United States, called the Google Ad Exchange, or "AdX."  Google's AdX exchange, for example, is only open to publishers that have 5 million page views or over 10 million impressions per month.  For many small online publishers, such as local newspapers and blogs, ad exchanges are completely out of reach.  Google compares its ad exchange to financial exchanges like the NYSE and the Nasdaq.  However, AdX is not an open exchange and is different from the financial exchanges in several important respects.

196.    Ad exchanges charge publishers a share of transaction value (usually between 5% and 20%) of the inventory's clearing price.  Google's exchange, by contrast, charges publishers double to quadruple the prices of some of its nearest exchange competitors.  Google thereby takes a dramatically higher share of total sales on its exchange, reflecting Google's substantial market power.  Google's exchange fees are also exponentially higher than exchange fees on a stock exchange, where fees are low and set by volume instead of as a percentage of transaction value.  An analogous transaction on a stock exchange would have the exchange charge a double-digit percentage of the value of an overall stock

transaction – an unsustainable fee in a competitive market. Google is able to charge these fees for one reason alone: because it uses its monopoly power over publishers' ad servers to unlawfully foreclose competition in the exchange market.

197.    Google is inherently conflicted in controlling publishers' inventory through its ad server while simultaneously operating the largest exchange. Google charges a low cost for acting as publishers' sell-side intermediary, but makes substantially higher fees when selling those publishers' inventory in its exchange. Google accordingly incentivizes itself to steer publishers' inventory toward its exchange, where it can extract twice to four times the rate of some of its nearest exchange competitors.

198.    Google also operates an ad display network (which small publishers use instead of exchanges). Unlike exchanges, networks do not require publishers to meet high monthly minimum impression or spend requirements. Rather, networks obscure prices within auctions, which enables them to capture undisclosed margins. Neither the buyer nor the seller knows the percentage that the network takes from matches trades. Networks are also different from exchanges in that they carry inventory risk: they purchase (and then sell) impressions on their own behalf, as opposed to purchasing on behalf of an advertiser or ad buyer.

199.    Google's display advertising network is known as the Google Display Network ("GDN"). GDN operates as a closed marketplace accessible only by advertisers who use one of Google's products to buy publisher ad inventory. Google again charges a percentage fee on its GDN, charging even higher fees to small publishers and advertisers through GDN than it does to larger publishers on AdX.

200.    Google also owns AdMob, the largest ad network for selling mobile app ad inventory on behalf of mobile app developers. Google's closest competitor in the mobile app advertising network market is Facebook's Audience Network ("FAN"). In the discrete market for mobile app networks competing to sell third-party publishers' impressions to advertisers, Google and Facebook compete head-to-head.

201.    Because of its dominant position as a middleman that serves display ads on exchanges, Google is the primary bottleneck between publishers and advertisers for third-party display advertising.

### c.    Market for Ad Purchase Tools

202.    As publishers rely on tools to sell their ad space inventory in exchanges, advertisers also use specialized middlemen, ad buying tools, to assist them and help them navigate the display ad market. Large advertisers use ad buying tools called demand-side platforms ("DSPs"), while small businesses use pared-down versions of the same tools.  Just as publishers typically use only a single ad server, small advertisers tend to use just one intermediary at a time to optimize buying across multiple exchanges or networks.  Ad buying tools let advertisers set parameters essential to their purchasing decisions, including the types of users to target and the maximum bids they are willing to submit for different types of display ad inventory.  The ad buying tool uses the parameters set by the advertiser to automatically bid on ad space in exchanges and networks in an effort to minimize costs.

203.    DSPs, ad buying tools for large advertisers, offer robust and complex bidding options often too complex for smaller and less sophisticated advertisers.  DSPs are often so complex that large advertisers resort to a specialized ad buying team to manage them.  Some DSPs also have monthly spend commitments, which can range into the tens of thousands of dollars.

204.    Ads are served when a user visits a publisher's website, through the ad server which routes the publisher's available impressions to exchanges, along with information about the impression, including information about the user, the ad slot's parameters, and any rules about pricing.  The exchanges then send a "bid request" to the ad buying tools who have a "seat" to bid in the exchange and act on behalf of advertisers.  The bid requests also contain information about the impression and have a "timeout" period within which time a bid must be submitted, usually fractions of a second.  Ad buying tools must therefore parse the information sent in the bid request, including personal information about the user, determine the appropriate price to bid on behalf of the advertiser, and return a bid response to the exchange within that

time. When time expires, the auction is closed, and the highest bidder is selected. The publisher's ad server then selects the advertisement for the highest bid on the exchange and serves it on the user's page. This process occurs before the user's page has finished loading, and the user only sees a display ad located near the content they are reading or viewing.

205. To compete effectively in exchange auctions, ad buying tools must return bids to exchanges before the timeout expires. Perhaps more importantly, they must also be able to leverage user information associated with each impression to serve relevant advertising. A large exchange such as Google's can exclude and harm competition between bidders in an auction by giving a subset of bidders an advantage over information (providing more information about a user for more targeted ads) or speed (allowing for a longer timeout period, which gives more time to calculate and return a bid).

206. Google operates the largest ad buying tools for both large and small advertisers. Google's DSP is called DV360 and arose from Google's acquisition of DSP Invite Media. Google's ad buying tool for small advertisers is called "Google Ads." While the exact percentages Google charges for DV360 and Google Ads are undisclosed, Google apparently charges a much higher commission on small advertisers purchasing inventory through Google Ads than it does large advertisers through DV360.

207. Google, through its DV360 exchange, gives Google Ads and DV360 information and speed advantages when bidding on behalf of advertisers. This preferred access helps explain why Google's ad buying tools win the overwhelming majority of the auctions hosted on Google's own dominant ad exchange, AdX.

208. Google's ad buying intermediaries are also predatory and do not act in the best interests of their clients. Google often manipulates or adjusts bids, especially with smaller or less sophisticated advertisers who do not understand the complicated auction process. Google also processes their bids through two auctions, keeps a spread between the two for itself, and does not disclose to advertisers that the ad space actually cleared at a different price on Google's exchange.

1

**d.    Google Forces Publishers into Its Ad Server and Ad Exchange**

2

209.    When Google entered the ad exchange market in 2009, exchanges had already existed for

3

publishers and advertisers to trade on for some time.  Google was late to the market and faced significant

4

competition from large and well-funded companies like Microsoft and Yahoo!.  At the time, Google also

5

faced significant competition in the publisher ad server market.  While Google acquired DoubleClick in

6

2008, companies such as 24/7 Real Media (owned by WPP PLC), aQuantive (owned by Microsoft), and

7

ValueClick (publicly traded) provided competition to Google.

8

9

210.    Google then pursued an unlawful strategy to foreclose competition in the ad exchange and

10

ad server markets.  Google operated an ad buying tool for small advertisers and already had significant

11

power there – with a large majority of small advertisers, including restaurants, clothing stores, doctors,

12

and electricians – using Google's ad buying tool to bid on display ad space.  Immediately after acquiring

13

a publisher ad server and launching its exchange in 2009, Google began to require that the small

14

advertisers bidding through Google Ads transact in both Google's ad network and Google's ad exchange.

15

16

Google also required any large publisher wishing to receive bids from the small advertisers in Google's

17

networks and exchanges to license Google's ad server.  Google essentially demanded that it represent the

18

sell-side and the buy-side simultaneously, where it extracted fees from both sides, and forced transactions

19

to clear in its own exchange, where it received yet another, third fee.

20

211.    Google forced publishers and advertisers to accept this triple-dipping by leveraging its ad

21

22

buying tool for small advertisers, over which it had substantial market power in the United States for at

23

least a decade.  Google originally called this product for small advertisers AdWords, but later changed the

24

branding to Google Ads.  In 2009, some 250,000 small and medium advertisers in the United States used

25

this ad buying tool to purchase search and display ads.  Since then, the number of advertisers using this

26

tool to purchase display inventory on exchanges has rapidly increased: by 2013, the number of advertisers

27

using Google Ads was two million, while today millions of small- to medium-sized advertisers use Google

28

68

Ads to bid on display ad space in Google's AdX exchange, with no alternative tools to use. Other ad buying tools reach far fewer advertisers, and many have exited the market, with few alternatives to Google's dominance.

212. Google's monopoly over ad buying tools for small advertisers sprang in part from its monopoly in the display ad network market and its concurrent scale in search advertising. By 2009, Google's ad network, GDN, was the leader in "reach" (unique visitors on publishers' sites). Google leveraged its reach by requiring advertisers to use Google Ads if they wished to purchase ad space through GDN. Google's large search advertising scale also contributed to allow it to lock down relationships with small advertisers seeking to purchase display advertising. The relationship with small advertisers based on the sale of search advertising allowed Google to sell display advertising to those same small advertisers with a negligible additional cost. Google's competitors do not have that same advantage, as reaching a similar number of small advertisers would be cost-prohibitive long before they could reach the scale to offer buying tools to compete with Google Ads.

213. Google's monopoly over ad buying tools was also secured because small advertisers almost always used just one ad buying tool at a time. Most chose Google's because Google tied its ad buying tool to Google Search ads and display ads on Google's leading display network, GDN – no competitor could offer ads on these platforms.

214. Google further monopolized the exchange and ad server markets by forcing publishers to license Google's ad server and trade in Google's exchange in order to receive bids on Google's buying tool, Google Ads, representing millions of advertisers. Google automatically routed small advertisers' ad network bids to Google's exchange, and refused to route advertisers' bids to non-Google exchanges in a form of technological tying. Then, Google programmed its exchange to return real-time bids only to publishers using Google's new publisher ad server, a critical favoritism in a market where the bidding process is typically measured in fractions of a second. Google thereby favored the interests of small

69

advertisers over the small businesses selling ads in its Google Ads platform. Instead of routing buy bids to exchanges which offered the lowest prices for identical inventory, Google routed to its own properties instead. Ad tools competing with Google at that time had no such preferential treatment, but abused its interlocking market power. In a competitive market, advertisers prefer to buy across multiple exchanges in order to reach the largest possible pool of supply at the best prices, fostering competition between exchanges.

215.    Google's choice to supply only real-time bids for its own exchange effectively forced publishers to use its ad server in order to work with its exchange. Many publishers only use a single ad server at a time to manage inventory, so Google's choice to limit real-time bids effectively meant that publishers would either have to forego the use of any competing ad server, or be cut off from access to the enormous pool of advertisers using Google Ads and bidding into Google's exchange.

216.    Google also ties its ad server to its exchanges on the publisher side. Google requires large advertisers' bids to trade in Google's exchange (paying Google's exchange fees) and to license Google's ad server (and pay Google's ad server license fees). Its anticompetitive conduct in this area includes mandatory price floors; auction manipulation to force publishers to transact with DV360 advertisers in Google's exchange; and forced incompatibility with features of DV360 to make Google-involved offerings unattractive or otherwise incompatible to advertisers who participate in Google's ad servers and exchange ecosystems. As a result, many advertisers use Google's exchange even though they would not do so in a competitive market without these barriers erected.

### e.    Google Uses Its Control Over Inventory to Block Competition on Exchanges

217.    Google also took advantage of its control over publishers' inventory, combined with its status as publishers' agent, to eliminate competition on exchanges through a host of additional anticompetitive conduct. Google restricted publishers from selling inventory in more than one exchange at a time, blocked competition from non-Google exchanges, and blocked publishers from accessing and

sharing information about their inventory with non-Google exchanges. Google's anticompetitive activity allowed it to charge exorbitantly high fees that could not be supported in a competitive market.

218.    In about 2009-2010, advertising exchanges began moving to real-time bidding in order to compete for bids for publishers' inventory. Google used its control over publishers' inventory through its ad server to thwart competition between marketplaces by forcing publishers to route their ad space to a single exchange serially, rather than all at once. This conduct foreclosed competition on exchanges from 2009-2016, by a practice referred to by the industry as "waterfalling."

219.    Waterfalling effectively blocked competition between exchanges by preventing the listing of any ad space on multiple exchanges at the same time. Absent the serial listing Google required, publishers could have listed their ad spaces on multiple exchanges and had the opportunity to accept higher bids.

220.    Waterfalling also interfered with competition between exchanges to reduce publishers' yields. Because simultaneous offerings on different exchanges would increase the pool of advertisers available, thus increasing demand and prices, Google's requirement that listings not be entered simultaneously among exchanges deprives publishers of the opportunity to reach a wider pool of advertisers and receive higher bids.

221.    Google, through its ad servers, also preferentially routed publishers' inventory to Google's new exchange through a process it called "Dynamic Allocation." Google essentially granted itself a right of first refusal on all impressions a publisher made available to exchanges. It accomplished this by having its ad server pass live bid information to Google's exchange, while feeding only static, non-live bids to the competitions' exchanges. Static bids were usually set to the historical overall price yielded by similar impressions, allowing Google to outbid competitors' purchase prices by just one penny. Google thereby used its position via ownership of its ad server to allow its exchange to preview prices and outbid rival static settings by a single cent.

222.     The adoption of Dynamic Allocation in 2010 ended DoubleClick's neutrality as a seller's agent.  DoubleClick, under Google's control, ceased to route impressions to exchanges in a neutral manner and instead favored Google's own exchanges.  Taken together alongside Google's waterfalling practice, Google's ad server destroyed competition in the exchange market.  After waterfalling and Dynamic Allocation were implemented, competitors could not simultaneously compete for the inventory of ad impressions, and were left only with low-value impressions passed over by Google's exchange.

223.     Google also harmed publishers through Dynamic Allocation, representing that DV360 would maximize their revenues.  In truth, according to Google's own study, actual competition between exchanges increased publishers' clearing prices by an average of 40% – meaning that Google's use of Dynamic Allocation had permitted Google's exchange to clear publishers' inventory for depressed prices.

224.     Google later foreclosed exchange competition through a program called Enhanced Dynamic Allocation ("EDA").  Publishers historically sold their best impressions to advertisers directly for premium prices.  But with EDA, Google's ad server let Google's exchange compete for and purchase valuable impressions that the ad server would previously allocate to publishers' premium direct deals.  Google blocked non-Google exchanges from competing for those same impressions.

225.     Before EDA, Google's ad server prioritized allocating impressions to direct deals between publishers and advertisers, which allowed for publishers to collect premium prices.  But with EDA, Google instead evaluated each impression's value and then, based on that value, decided whether to allocate the impression toward meeting a direct deal's reservation goal, or whether to instead re-direct it to an exchange auction.  EDA, in effect, made it so only Google's exchange could trade publishers' most valuable inventory.  By blocking non-Google exchanges from competing against Google's exchange, Google foreclosed competition in the exchange market and shielded Google's exchange from competition.

226.     Google's EDA practices also caused Google's exchange to purchase publishers' impressions for depressed prices.  Google's ad server permitted its exchange to purchase impressions for

72

one penny more than the reserve price floor it instituted –allowing Google's exchange to acquire publishers' impression at depressed and non-competitive prices.

227.    EDA also excluded competition form publishers' direct sales channel.  Google's ad server let its exchange cherry-pick the valuable impressions and then funnel lower-value impressions to publishers' direct deals.  Advertisers who paid high prices for premium inventory through direct deals unknowingly received publishers' lower quality inventory in return.  Over time, the value of direct-sold inventory declined, and advertisers reallocated spending toward Google's exchange (where Google could extract its supracompetitive exchange fees).

228.    Similar to Google's strategy with Dynamic Allocation, Google started EDA by misrepresenting to publishers that the practice was in their own best interests.  Google falsely told publishers that EDA maximized yield, but internally understood that the EDA program allowed Google to instead monopolize the best advertising impressions for its own markets and exchanges.

229.    Google further has foreclosed competition in the exchange and ad buying tool markets by blocking publishers' ability to access information about their own inventory.  Google's ad server assigns individual IDs when it identifies a site visitor associated with its publishers' inventory.  Google withheld those server user IDs from publishers, prohibiting them from sharing the IDs with non-Google exchanges and ad buying tools.  Google thereby strategically created an additional barrier to entry, preventing publishers from moving to other exchanges and ad buying tools.

230.    Specifically, in 2009, Google started restricting publishers' ability to access and share their ad server user IDs.  Google accomplished this by encrypting (or "hashing") user IDs separately for each publisher using Google's ad server, as well as for each advertiser bidding through Google's ad buying tools.  This change interfered with publishers' ability to share consistent user IDs with non-Google exchanges and networks.  As a result, publishers were deprived of the ability to easily identify user IDs to complete transactions in exchanges other than Google's.

231.    While Google blocked publishers from accessing raw user IDs to share them with non-Google exchanges and networks, Google internally kept and shared those raw IDs amongst its own network and exchange, as well as its own ad buying tools, Google Ads and DV360.  Google thereby made it impossible for publishers to know whether two different user IDs actually related to the same individual unless they used Google's ad buying tools and traded in Google's exchange.

f.    **Header Bidding Evolves to Promote Exchange Competition**

232.    In 2014, publishers adopted a technological innovation called "header bidding" that permitted them to route inventory to multiple exchanges simultaneously.  Publishers, advertisers, and exchanges quickly adopted the method to facilitate exchange competition.  Header bidding involved the insertion of specific code into the header sections of webpages in order to facilitate competition between exchanges.  When a user visited a page, the code enabled publishers to direct a user's browser to solicit real-time bids from multiple exchanges, before Google's ad server could prevent them from doing so.

233.    Header bidding shifted routing through an ad server to the web browser, creating a technical workaround for publishers to circumvent Google's efforts to foreclose competition in the exchange market.  Header bidding became quite popular, and by 2016, approximately 70% of major publishers in the United States had adopted header bidding to route their inventory through multiple exchanges.

234.    Publishers adopted header bidding because they realized that Google's waterfalling, dynamic allocation, and enhanced dynamic allocation did not maximize their revenues, but instead padded Google's own bottom line.  The switch to header bidding was incredibly advantageous to publishers: they saw their ad revenue jump overnight as competition between exchanges allowed market forces to take over.  Some publishers' revenue purportedly jumped by anywhere from 40% to 100%.

235.    Consumers and advertisers also benefitted from header bidding.  Advertisers used header bidding to transact through an exchange of their choosing, including exchanges which did not charge

74

Google's monopolistic fees.  Consumers benefitted by virtue of the increased revenues realized by publishers and fees saved by advertisers.  Because Google was not taking a supracompetitive share of fees, publishers had more ad revenue to produce more and better content.  Lower exchange fees also allowed for lower costs to advertisers, which ultimately are passed on to consumers.

### g.     Google Re-Routes Trading to Defeat Header Bidding

236.     Google wanted to destroy header bidding for three basic reasons: to (i) avoid competition on price; (ii) find a way to continue to use information gathered from its ad servers and other products to unfairly advantage itself; and (iii) prevent competition for its publisher ad server monopoly.

237.     First and foremost, Google wanted to eliminate header bidding in order to protect its high exchange fees from competition.  Header bidding represented a growing risk to Google's monopoly power as bidders started routing around exchanges to use information from website headers themselves to form new bidding markets.  Second, Google wanted to protect the monopoly on information from ad servers that header bidding threatened.  Google's ad servers shared competing bids on publishers' inventory with Google's ad buying tools (DV360 and Google Ads), leveraging Google's control over information in ad servers to eliminate competition in ad buying tools.  Header bidding threatened this informational advantage by circumventing ad servers.  Third, Google wanted to eliminate header biding to foreclose competition within its publisher ad server monopoly.  Google previously held a monopoly position through its ad server, routing publishers' inventory to exchanges.  Without control over publishers' inventory, Google could not unfairly favor its own exchanges and block competition in the exchange market.

238.     In order to eliminate the competitive threat represented by header bidding, Google created an alternative to allow it to continue routing inventory in a way that maintained its monopolies.  Google's ad server began routing publisher inventory to more than one exchange at a time with a program Google

called "Exchange Bidding," and later, "Open Bidding."  However, Google intentionally engineered the program in a way to continue to foreclose competition on exchanges.

239.    Google's Exchange Bidding was designed to exclude competition from rival exchanges in at least four ways.  First, Google diminished the ability of non-Google exchanges to return competitive bids by further decreasing their ability to identify users associated with publishers' ad space in auctions. Header bidding allowed each exchange to access a user's cookies related to the websites the user visited, which permitted those exchanges to capture enough information about the user to give them a unique identity.  Google's Exchange Bidding prohibited exchanges from directly accessing the user's page, causing them to identify users in auctions less often, resulting in less bidding and less winning bids.

240.    Second, Exchange Bidding foreclosed exchange competition by charging publishers an additional 5% to 10% penalty fee for selling inventory in a non-Google exchange.  As a result, advertisers' bids made on rival exchanges were less competitive than advertisers' bids on Google's exchange, because Google's exchange did not require the additional fee.  Google knew that publishers and advertisers measure an exchange's performance in part based on its fees, giving Google an advantage when competing against other exchanges.

241.    Third, Google forced its publisher ad server customers to use Exchange Bidding instead of header bidding.  A publisher that chose to route its ad space from Google's ad server directly to multiple exchanges at the same time would have to route inventory through Google's exchange, even if it did not want to do so.

242.    Fourth, Google eliminated competition through its Exchange Bidding program by simply rigging the bidding process to let Google win.  Google made it so its own AdX exchange won publishers' inventory even over another exchange's higher bid.

243.    Google also excluded competition from header bidding by trading ahead of bid orders submitted by header bidding exchanges.  When a publisher would route their inventory through header

bidding, the winning exchange bid would be then routed through Google's ad server. Google programmed its ad server to let its exchange displace the winning header bidding exchange bid by paying one penny more. In other words, Google's ad server allowed Google's exchange to review the winning header bidding exchange bid, then displace that trade – a practice that industry insiders called Google's "Last Look." In other industries, this same practice is known as "insider trading" or "front running."

244. Google's opportunity to outbid the competition through Last Look, combined with the fact that it has absolute monopoly power in the ad server market, allowed Google to successfully foreclose competition in the exchange market. Google reserved the best impressions for its exchange, always prevailing on bids and leaving rival exchanges the low-value impressions Google regarded as offal.

245. Google's Last Look ensured that header bidding exchanges lost to Google's exchange. The only exception was when a publisher set a higher floor for Google's exchange, which Google made technologically impossible in an update that removed this setting from publishers' control.

246. Google also induced non-Google exchanges to switch over from header bidding to Exchange Bidding by falsely representing that it would stop its "Last Look" auction advantage. But Google never actually stopped trading ahead of exchanges. Instead, Google replaced one version of Last Look for another, adopting a new technique whereby Google would continue to short-circuit the bidding process through a bid optimization scheme based on predictive modeling. With its new bid optimization techniques, Google abandoned its more traditional Last Look practices while maintaining the same anticompetitive advantages it previously enjoyed. Non-Google exchanges were unable to compete with similar bid optimization schemes because Google's ad server restricts publishers from accessing and sharing their user IDs.

247. Starting in 2018, Google also started redacting various data fields from the consolidated auction records it shared with publishers. The redactions make it nearly impossible for publishers to compare relative performance of exchanges for header bidding versus going through Google's ad server.

Google thereby has destroyed the benefit that caused the adoption of header bidding in the first place – the ability to measure and compare yields on exchanges and choose the more competitive offering.

248.    Google further interfered with the use of header bidding by capping the number of permissible "line items" in header bidding – effectively limiting the number of bids publishers could receive from exchanges in header bidding. Google consistently rejected publishers' requests that it increase the number of line items available for header bidding. In a competitive market, an ad server would do the exact opposite: facilitate bidding to allow publishers to better optimize yield. Google's ad server instead undermines its own clients' revenue streams.

249.    Google employed further technological limitations to strongarm publishers and advertisers to stop using header bidding and re-route traffic into Google's ad server. Google created something called "Accelerated Mobile Pages," or "AMP," a framework for developing mobile web pages, and made AMP essentially incompatible with header bidding by not supporting the programming language required for header bidding to run (JavaScript).

250.    AMP is a Google-controlled initiative. While Google transferred control of AMP to a foundation, Google controls the foundation's board and maintains effective control of its development and implementation. Google ad server employees met with AMP employees to strategize about developing AMP in a manner to impede header bidding. Google restricted AMP code to prohibit publishers from routing bids to, or sharing data with, more than a few exchanges, severely limiting AMP's compatibility with header bidding. AMP was, however, fully compatible with routing to exchanges through Google's ad server. Google also designed AMP to allow it to continue to get a look at their bids and trade on that inside information. Finally, Google designed AMP so that users loading AMP web pages would directly communicate with Google's cache servers rather than publishers', granting Google access to more publisher data.

251.    AMP is further anticompetitive because it limits the number of ads on a page, the types of ads publishers can sell, and the variety of enriched content that publishers can have on their pages.  Google marketed its AMP restrictions as justified by faster page load times, but faster load times for Google-cached AMP versions of webpages were not guaranteed.  Moreover, the speed benefits from AMP were at least partly the result of Google's own throttling, giving non-AMP ads an artificial one-second delay in order to give Google's AMP a comparatively faster load time.

252.    Google's ad server also excludes competition in the exchange market by withholding additional, critical server ad data, called "minimum bid to win," from exchanged in header bidding.  Google's ad server shares this data with exchanges in Google's Open Bidding program at the conclusion of each auction, allowing these exchanges to use this data to adjust their bidding strategy in order to beat exchanges returning bids through header bidding.  With this information asymmetry, exchanges in header bidding are disadvantaged and will lose more than those bidding in Open Bidding.

253.    Google further excludes competition by purposefully keeping auction mechanics, terms, and pricing opaque and non-transparent.  This lack of transparency in turns allow Google to obfuscate the percentage fees that publishers and advertisers pay Google.  For instance, Google tells the small advertisers who use Google Ads to bid the price they pay Google for ad space, but not the price the inventory actually cleared for in Google's exchange, the revenue the publisher received, or the markup Google kept.  Google also obfuscates price transparency for publishers, with overall evidence suggesting that publishers selling inventory through Google receive only approximately 70% of advertising revenue paid by advertisers, with in some cases the amount being as low as 58%.  Google's take rate for publishers is therefore approximately 30%, and in some cases as high as 42%.

254.    Google's lack of transparency opens opportunities for rent-seeking.  It also forecloses competition because it impedes competitors from assessing possible returns on investment in order to invest and compete.

### 7.    Anticompetitive Agreement with Facebook to Destroy Header Bidding

255.    Google's largest competitor in the mobile ad space is (Facebook's Audience Network) FAN.  However, Google's market share is eight times larger than FAN's.  Nevertheless, Google further destroyed header bidding as an alternative by entering an agreement with Facebook executives to give Facebook certain advantages in return for the latter entering Google's Exchange or Open Bidding program and withdrawing its support for header bidding.

256.    In an October 5, 2016, presentation to senior Google executives cited by the Texas AG Action, a Google employee stated that Google had to "stop" Amazon, Criterio, and Facebook "from doing [header bidding]" and "consider something more aggressive" as a countermeasure.  The presentation stated that Google's "goal/mandate" was to "[f]orestall major industry investment in HB & HB wrapper infrastructure."

257.    Google executives' concerns crystalized when, in March 2017, Facebook publicly announced that it would support header bidding, which would enable web and mobile app publishers to bypass the fees associated with bidding through Google's ad server, since Google's Open or Exchange Bidding program through its ad servers bid into Google's exchanges.  Google's exchange fees were high, about 19%-22% of the value of a transaction, while header bidding could cost nothing.

258.    Google met Facebook's header bidding support with trepidation.  According to the Texas AG Action, a Google executive listed, among the "top priorities" for 2017, "Need to fight off the existential threat posed by Header Bidding and FAN.  This is my personal #1 priority.  If we do nothing else, this need[s] to [be] an all hand[s] on deck approach."  (Brackets in Texas AG's complaint).  The wider industry also understood that Facebook's announcement was meant to challenge Google's monopoly.

259.    As a result, Google began to monitor Facebook's initiative in header bidding.  Google executives circulated a Facebook blog post where the latter stated that it was helping publishers and

80

advertisers match two to three times more users in auctions and increase publishers' revenue by 10%-30%.

260.    Early on, Google executives thought the best way to stifle header bidding would be to reach an agreement with Facebook.  The Company used a code phrase, "Jedi Blue," to refer to the attempts to reach an agreement, and kept that code phrase secret and non-public.  By contrast, Google does not use code words to refer to other Open Bidding or Network Bidding agreements.

261.    Google's internal documents, cited by the Texas AG Action, showed that its executives were well aware that the purpose of an agreement was to prevent competition.  A November 2017 presentation in Google, cited by the Texas AG Action, discussed having Facebook in Google's "Top Partner Council" and to "collaborate when necessary to maintain [the] status quo."  Facebook executives understood that Google wanted to do a "deal to kill header bidding."  Thus, Google and Facebook executives began to negotiate a deal from 2017 to 2018.  An August 9, 2018, presentation in Google stated that if Google could not "avoid competing with FAN," it would instead seek to work with Facebook to "build a moat."

262.    In September 2018, Philipp Schindler, the head of Google's advertising sales and operations, signed an agreement with a Facebook executive.  According to news reporting, that executive was Sheryl Sandberg, the second most senior executive at Facebook and a member of its Board of Directors.  An internal Google memo noted that "FAN requires special deal terms, but it is worth it to cement our value."

263.    One of the major "special deal terms" was that Google allowed Facebook to circumvent Google's exchanges and bid directly into Google's ad server.  This cut Facebook's fee to 5%-10%.  But Google also prohibited Facebook from speaking publicly about its special lower pricing terms, and thus was able to continue charging higher fees against other publishers and advertisers.

264.    Another major "special" provision was that Google gave Facebook a speed advantage in auctions.  Google generally subjects other marketplaces competing for publishers' inventory in Open Bidding to a 160-millisecond timeout.  But Google gave Facebook a 300-millisecond timeout; this extra time allowed FAN to win more auctions.

265.    Furthermore, Google allowed Facebook to have direct billing and contractual relationships with publishers, while prohibiting other exchanges and networks in Open Bidding from having such direct relationships or even from discussing pricing.

266.    Furthermore, Google gave Facebook an informational advantage, by informing it of what impressions were likely to be targeted to bots rather than humans, and waived Facebook's requirement to pay for those impressions.  And Google promised to use "commercially reasonable efforts" to help Facebook recognize the identity of users in publishers' auctions, including promising Facebook an 80% "match rate" (*i.e.*, users that could be identified in auctions versus the percent of bid requests received) for mobile inventory and 60% for non-Safari web inventory.  This gave FAN an advantage in bidding because bidders generally only bid when they recognize the identity of the user.

267.    Furthermore, Google committed to stop using Facebook's own information to beat Facebook at auctions.  This was an important concession that Dan Rose, Facebook's Vice President of Partnerships, acknowledged in an e-mail to Facebook CEO Mark Zuckerberg.  Google continues to use inside information against other auction participants.

268.    Moreover, Google limited its "head-to-head" competition against FAN in bidding for publishers' inventory, thus colluding with the second largest market player to divide the market.  In fact, Google gave Facebook a "Win Rate" (the number of auctions Facebook wins divided by the number of auctions in which Facebook bids) of at least 10%.  In return, Google extracted a specific amount of business from Facebook: "commercially reasonable efforts" to bid on at least 90% of auctions where

Facebook recognizes the end user, and in the fourth year of the agreement, at least $500 million of spending in Google's auctions per year.

269.    Google keeps its arrangement with Facebook secret.  Publicly, Google states: "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis."

270.    Google was keenly aware that its agreement with Facebook violated antitrust laws.  Thus, Google and Facebook executives had the agreement provide that the parties could terminate it if there are regulatory inquiries, material document requests, a formal antitrust investigation, or an antitrust action. The agreement also requires the parties to coordinate on antitrust defenses.  In fact, the Agreement specifically provides that each party will inform the other "of any Government Communication relating to the Agreement[,]" "allow the other Party a reasonable time to review and consider in good faith the views of the other with respect to any Government Communication[,]" and "not advance any arguments over the objection of the other Party that would reasonably be likely to have a substantial adverse effect on that other Party[]" and "consult with the other Party in advance, and give the other Party and its counsel reasonable notice and . . . an opportunity to attend and participate in any meeting or discussion with any Governmental Authority relating to any Antitrust Action[.]"  "Antitrust" is a term that recurs no fewer than 20 times in the agreement.

### 8.    Unified Pricing Rules

271.    Google also began an additional anticompetitive practice in June 2019, when Google manipulated its core search algorithm to punish publishers utilizing higher price floors on AdX compared to other exchanges.  Publishers sought to apply higher price floors to Google's AdX exchange in order to make up for the informational and other disadvantages Google creates through its anticompetitive conduct. In response, Google manipulated its core search algorithm to punish publishers utilizing higher price floors, causing their search traffic to plummet.  Google originally misrepresented to publishers that it was

not manipulating search traffic, but then directly imposed "Unified Pricing" rules, eliminating differential price floors altogether. Instead, Google used its ad server monopoly to exclude competition in the exchange market.

272.    In 2019, Google's ad server started prohibiting publishers from setting different price floors for different exchanges and ad buying tools. As a result, publishers using Google's ad server can no longer choose differing price floors when they route ad space to competing exchanges and/or Google's exchange, a server restriction Google calls "Unified Pricing."

273.    Unified Pricing prevents publishers from setting different price floors for Google in order to generate competition from non-Google exchanges and ad buying tools. Because Google began restricting user ID information outside of its own ad server and exchange, non-Google intermediaries' information disadvantage caused them to bid comparatively lower for impressions – causing them to, at times, make a "blind" bid, unable to adequately valuate the impression. To create competition in bidding in auctions for non-Google ad buying tools, publishers responded by setting price floors higher for Google. But the Unified Pricing rules Google set blocked, and now block, publishers from charging Google a rational information risk premium, and preclude publishers from setting their own price floors to engender competition from bidders who have been deprived of Google's User ID information.

274.    Google's Unified Price rules have resulted in Google's exchange and buy-side winning an increasing portion of publishers' impressions, even though publishers are paid lower prices. Unified Price rules have been extremely effective at blocking and reducing competition when combined with Google's user ID restrictions. Not only does Unified Pricing prohibit publishers from discriminating between exchanges and bidders based on price and yield, but also on non-price criteria like ad quality, because publishers cannot favor exchanges and ad buying tools that return higher quality ads. In removing publishers' ability to set price floors, Google has, in effect, removed competition between exchanges.

275.    Unified Pricing has also had the effect of coercing publishers to transact with Google ad buying tools *within* Google's exchange.  Google requires publishers to use Google's exchange to do business with Google's ad buying tools.  Previously, publishers could choose to transact with DV360 only in non-Google exchanges by increasing DV360's price floors in Google's exchange.  Unified Pricing ended this practice, so that publishers are now forced to transact with DV360 and Google Ads within Google's exchange.  This tying arrangement was one of Google's main aims with Unified Pricing.

### 9.    Google Forces Advertisers to Use Google's Ad Buying Tools

276.    Google also leveraged the artificial information disadvantages it had created to foreclose competition in the ad buying tool markets.  Google's Unified Pricing, Last Look, and other misconduct distorting and destroying competition through its ad server and exchange products foreclose competition in the ad buying tool markets for the same reasons that they foreclose competition for publishers attempting to sell those ads.

277.    Google unlawfully maintains monopoly power in the ad buying tool markets additionally by disallowing competing ad buying tools from accessing YouTube inventory.  As a result, advertisers may only buy ads shown on YouTube through Google's ad buying tools.  Cutting off access to YouTube forces advertisers to use Google's ad buying tools because YouTube, as the leading provider of video inventory in the United States, is a requisite source of online instream video inventory for advertisers.

278.    Advertisers previously were able to purchase YouTube inventory through many non-Google ad buying tools.  But, in 2013, Google noticed that its ad buying tool for large advertisers, DV360, was falling behind the competition.  Google responded by considering whether to withhold YouTube inventory from non-Google ad buying tools for the purpose of pressuring advertisers to use DV360 and Google Ads, a course that Google internally debated through 2014.

279.    Google also recognized that withholding YouTube from competing ad buying tools would give DV360 and Google Ads power as buyers' agents to steer advertisers' spending back to Google's

properties (including Google Search).  Google thereby created self-reinforcing monopolies, realizing that if YouTube inventory were available exclusively through Google's ad buying tools, advertisers would have to use those tools, which Google could then use to steer budgets back to Google properties, including Google Search and YouTube.

280.    Instead of competing on the merits, Google decided instead to completely withhold all YouTube inventory from non-Google ad buying tools, so that advertisers were forced into using Google's tools.  While restricting non-Google ad buying tools from selling YouTube inventory was not in YouTube's best interest (it lowered demand and revenue for YouTube content creators), it allowed Google to capture the ad buying market.

281.    The harm to competing ad buying tools is great because advertisers prefer to minimize the number of ad buying tools they use in order to streamline ad buying and minimize costs and inefficiencies.  Using multiple tools would, for example, increase the rate at which advertisers could inadvertently bid against themselves on exchanges, and require the maintenance of more than one ad buying tool.

### 10.    Alphabet's Market Dominance

#### a.    Market Dominance over General Online Search Engine Services, General Search Text Advertising, and General Search Advertising

282.    Online search engines allow users to find relevant websites through use of a search query, which returns a list of result webpages relevant to the search term entered.

283.    There are two types of search engines: general and vertical.  General search engines are designed to retrieve a comprehensive list of general search results from across the Internet.  Vertical search engines are designed to retrieve a narrower category of content, such as specifically looking only for photo images or for airplane tickets.  Horizontal, or "general," search engines overwhelmingly monetize the service through the sale of advertisements rather than by charging their users a fee.

284.    Alphabet's Google is overwhelmingly dominant in general online search, which captures roughly 81% of all general search queries in the U.S. on desktop, and 94% on mobile.  Google's largest

competitors include Bing, which captures 6% of the market, Yahoo! with 3% of the market, and DuckDuckGo with 1%.

285.    Mobile devices today represent roughly 60% of general searches and have been the fastest-growing search distribution channel for at least the past five years.  In the United States, Apple iOS devices, running on Apple's proprietary mobile operating system, account for roughly 6% of mobile-device usage.  Another roughly 40% of mobile-device usage are for mobile devices that run on Android, a mobile operating system controlled by Google.  Android is licensable, which means third-party mobile device manufacturers can also use it as the operating system for their devices.  All other mobile operating systems, combined, constitute less than 1% of mobile device usage in the United States.

286.    Google has preset default status for an overwhelming share of the search access points on all mobile devices sold in the United States.  For mobile browsers, Google is the default search providers for both Apple's Safari (approximately 55% share) and Google's Chrome (over a 35% share), which together account for over 90% of browser usage on all mobile devices in the United States.

287.    In the United States, Google Chrome is also the leading computer web browser, with almost a 60% market share.  Apple's Safari browser has approximately a 16% share on computers. Mozilla's Firefox has approximately a 7% share, and Microsoft's Edge and Internet Explorer together have an approximate 15% share.  Other small browsers have a combined share of less than 4%.  With the exception of Microsoft, most browser developers have agreed with Google to preset its search engine as the default search provider – meaning that Google's default general search engine share for computer web browsers is roughly 85% of all browsers.

288.    In the United States, roughly 60% of all search queries are covered by Google's exclusionary agreements.  For U.S. mobile devices, roughly 80% of all search queries are covered by Google's exclusionary agreements.   Of the remaining search queries not covered by Google's exclusionary contracts, almost half take place on search access points owned by Google.

87

289.    Google also is vertically integrated in that it distributes Google search in part through several of its own properties, including, for example, its browser (Chrome) and phone (Pixel).  Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80% of the general search queries in the United States.

290.    Google's combined desktop and mobile market share is further demonstrated in the below chart:[2]



**U.S. Desktop and Mobile Search Market Share**

291.    In addition, Google dominates the "indexing" function that almost all general/horizontal online search engines use.  "Indexing" is a process of identifying webpages and placing them into a

---

2    From MAJORITY STAFF OF H. COMM. ON THE JUDICIARY, 116TH CONG., REP. AND REC. ON INVESTIGATION OF COMPETITION IN DIGITAL MARKETS (Oct. 6, 2020), https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.    Based on data from: *Desktop & Mobile Search Engine Market Share United States of America January 2009 to September 2020*, STATCOUNTER, https://gs.statcounter.com/search-engine-market-share/desktop-mobile/united-states-of-america/#monthly-200901-202009 (last visited Oct. 25, 2021).

directory.  When a user searches for a term, the search service employs an algorithm that searches through the directory to pull a list of websites responsive to the search.

292.    Today, several major webpage owners block all indexing attempts except for a select few indexers (including Google), in part because receiving traffic from a large number of indexing bots can increase costs for website owners and cause their websites to crash.  The one indexing service that nearly all webpages will allow is Google's "Googlebot," as disappearing from Google's index would lead most webpages to suffer dramatic losses in traffic and revenue.  Any competitor's indexing bots would, by contrast, likely be blocked by major webpages.

293.    The high cost of maintaining a fresh index, as well as the decision by many webpage owners to block most indexing services, significantly limits new entrants into the horizontal search space and solidifies Google's monopoly.  The only English-language search engines that maintain their own comprehensive webpage indexes today are Google and Bing.  All other search engines must purchase access to the index from Google or Bing.

294.    Another barrier to competition in general online search is that Google has established extensive default positions across both web browsers and mobile devices.  Among desktop browsers, Google enjoys default placement in Chrome (which captures 51% of the U.S. market), Safari (31%), and Firefox (5%) – or 87% of the total browser market.  The nearest competitor, Bing, captures 4% of the browser market through Microsoft's Edge.  In mobile, Google is the default on all Android devices and on Apple's iOS mobile operating system – together accounting for over 99% of smartphones in the United States.

295.    In addition to the online search market, Google is dominant in the "search advertising" market, as well.  "Search advertising" refers to digital ads on desktop or mobile search engines, such as the Google.com home page, displayed via "search ad tech" alongside search engine results.  Search

advertising is often bought and sold via a real-time auction among advertisers, where advertisers set the prices they are willing to pay for a specific keyword in a query.

        **b.**     **Market Dominance over the Android Mobile Operating System and App Distribution**

296.    A mobile operating system provides a mobile device with its underlying functionality, including a user interface and control interaction, and facilitates the operation of the device's features, such as the microphone, camera, and GPS. The mobile OS is the interface between mobile device hardware and the applications that run on the device, such as e-mail or video conferencing. A mobile OS is pre-installed on mobile devices; an alternative mobile OS cannot be installed or substituted.

297.    Google's Android and Apple's iOS are the two dominant mobile operating systems. Combined, they run on more than 99% of all smartphones in the U.S. Apple's mobile devices run on Apple's proprietary iOS operating system, while other leading handset manufacturers, including Samsung, LG, and Motorola, run on Android. Over the past decade, competitors have exited the mobile OS market and Google and Apple have built dominant positions that are durable and persistent. Historical market share for the U.S. mobile OS market is reflected in the following graph:[3]

---

[3]    From Majority Staff of H. Comm. on the Judiciary, 116th Cong., Rep. and Rec. on Investigation of Competition in Digital Markets (Oct. 6, 2020), https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf. Based on data from S. O'Dea, *Market Share of Mobile Operating Systems in the United States from January 2012 to December 2019*, Statista (Feb. 27, 2020), https://www.statista.com/statistics/272700/market-share-held-by-mobile-operating-systems-in-the-us-since-2009/.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15     298.    Although Google's Android and Apple's iOS both hold dominant positions in the mobile

16 OS market, high switching costs and a lack of on-device competition mean that neither firm's market

17 power is disciplined by the presence of the other.  Because iOS is not available on non-Apple devices, it

18 cannot constrain Google's dominance in the mobile OS market.  Consumers rarely switch mobile

19 operating systems, with roughly 90% of users with an iOS or Android device choosing to replace their

20 current device with a device operating on the same operating system.

21     299.    Mobile application stores are digital stores enabling software developers to distribute

22 software applications to mobile device users.  Users can install apps to access digital content or services,

23 share content, play games, or make transactions for physical goods and services.  Apps may be pre-

24 installed on a mobile device as a component of the operating system or by the device manufacturer, or

25 downloaded and installed from an app store by a mobile device user.

26
27
28

300.     Apps have become the dominant way that users access content on their mobile devices.  In the U.S., nearly 90% of time users spend online on mobile devices occurs in apps.  Software distribution via web apps or through a website accessible on a browser is not a competitively significant alternative to distributing apps through the dominant app store on a mobile device.

301.     The mobile operating system on a device determines which app stores are available for users.  The Google Play Store is the primary app store installed on all Android devices.  Google does permit users to "sideload" alternative app stores, but the Google Play Store is the dominant app store on Android devices.  Almost all mobile app downloads (well over 90%) are made through the Google Play Store on Android devices.  Google also determines the terms and conditions app developers must agree to in order to distribute software through the Play Store.  Alternative app distribution through third-party app stores, or "sideloading," is largely irrelevant to the mobile app market.

302.     Google has created significant friction for sideloading apps to Android devices to compete with the Google Play Store.  Sideloading on Android now typically entails a complicated 20-step process, and users encounter multiple security warnings throughout designed to dissuade them from sideloading.

303.     Google has no competitive constraint on the software distribution marketplace on Android.  The Android app distribution market is separate from Apple's iOS, because Android apps are incompatible with other operating systems, including iOS.  Google, a monopolist app distributor on Android mobile devices, is not constrained from raising prices, reducing quality, or stifling innovation, by app distribution on Apple's devices as a result of market imperfections such as high switching and information costs preventing consumers from switching between the iOS and Android operating systems.  Consumers are also unlikely to switch to an Apple device from an Android device due to the significant financial investment made in previously purchasing apps for the Android mobile device ecosystem – an investment often in the hundreds of dollars – as well as the loss of digital content only consumable through Android apps.

304.    The core benefit of mobile app stores – centralizing and curating software distribution – also gives Google control over which apps users discover and install.  Google thus acts as a gatekeeper to the primary way users access content and services on mobile Android devices.  This dominance allows Google to establish terms and conditions app developers have to comply with, leaving developers with the choice of complying or losing access to consumers.

305.    Google also develops and distributes apps that directly compete against third-party developers in its Google Play Store.

### c.    Market Dominance over IAP Processing

306.    Google ties Android app distribution to IAP Processing in the United States market.  Because the Google Play Store and Google Play Billing both operate across all states and involve transactions between consumers and developers in different states, this illegal tying substantially affects interstate commerce in the tied market.

307.    Google possesses monopoly power in the IAP Processing Market.  It enjoys a market share exceeding 90% (consistent with Google's market share for Android app distribution), and it can set prices and exclude competitors at will.  Google's monopoly power in the IAP Processing Market is a result of its monopoly power over Android app distribution combined with its unlawful contractual requirement that Android app developers distributing on the Play Store must use Google Play Billing to process payments for digital content.  By its nature, this monopoly power is durable, because Google's unlawful tie of Google Play Billing to the Google Play Store, and its monopoly power over Android app distribution, deter any significant entry into the market.  The barriers erected by Google together form insurmountable barriers to entry.

308.    Android app developers and consumers have no meaningful alternative to the Google Play Store, and Google's unlawful tie of the Google Play Store to Google Play Billing means they have no meaningful alternative to Google Play Billing either.  App developers and consumers thus have no choices

in the Android App Distribution Market to discipline Google's misconduct and overreach in the IAP Processing Market.

309.    App developers cannot feasibly use proprietary payment processing solutions as they have no workarounds to Google's policies.  Developers that have attempted to compete with Google Play Billing by offering their own payment services for in-app payment processing have been removed from the Google Play Store (as was Epic Games' app, *Fortnite*).  The threat of removal from the Google Play Store prevents other app developers from attempting the same.  Any developer that wishes to distribute an app to Android users is therefore forced to use Google's app distribution and in-app payment services, or it will lose efficient access to nearly all the users of approximately 130 million Android devices in the United States.

### d.    Market Dominance over Display Advertising on Third-Party Sites

310.    "Display advertising" refers to the delivery of digital ad content to ad space on websites and mobile apps.  Display advertising is generally divided into two separate "ad tech" markets: first-party and third-party.  First-party ad platforms refer to companies such as Facebook and Twitter, which sell ad space on their own platforms directly to advertisers.  Third-party display ad tech platforms are run by intermediary vendors that facilitate transactions between third-party advertisers (those wanting to place ads, such as a local restaurant) and third-party publishers (those running websites who want to place ads alongside the content on their websites, such as a newspaper or blog).  Third-party ad tech providers include Google, Flashtalking, Sizmek (owned by Amazon), and the Trade Desk, among others.

311.    Google's third-party display advertising is "programmatic," meaning that specialized software automates the buying, selling, and placement of digital ads, without the details being disclosed to any party but Google as the middleman.  As Google has explained, it "does not disclose to the publishers on the other ends of these trades what their space ultimately sold for and how much Google keeps as its share."

312.    Over the last decade, the digital advertising market has experienced double-digit year-over-year growth.  At the same time, the market has become increasingly concentrated since the advent of programmatic advertising.  In 2017, for instance, *Business Insider* reported that Google and Facebook accounted for 99% of year-over-year growth in U.S. digital advertising revenue.[4]  Google and Facebook both have a significant lead in the market due to their significant collection of behavioral data online, which can be used in targeted advertising.  In addition, Google and Facebook do not provide access to this data to their advertising partners – advertisers' only access to this information is indirect, through engagement with Google's and Facebook's ad tech.

313.    Google has monopoly power in the publisher ad server market in the United States.  More than 90% of large publishers use Google's publisher ad server, Google Ad Manager.  Google serves the vast majority of all online display ad impressions in the United States.

314.    Google has held a consistent monopoly position in the publisher ad server market for at least a decade.  By 2012, four years after Google had acquired DoubleClick, Google was already the dominant ad server for large online publishers in the United States.   Since then, Google's closest competitors have either exited the market entirely or been relegated to negligible market shares.  Google previously urged the Federal Trade Commission to permit its acquisition of DoubleClick by pointing to competing publisher ad servers – 24/7 Real Media and Atlas/aQuantive – as viable alternatives for customers if Google were to increase DoubleClick for Publishers' ("DFP") prices.  Those competitors have since exited the market.

315.    Google's monopolistic power is also evidenced by the fact that its publisher ad server is impervious to competitive market constraints.  Google has degraded quality and charged supracompetitive

---

[4]    Alex Heath, *Facebook and Google Completely Dominate the Digital Ad Industry*, BUSINESS INSIDER (Apr. 26, 2017), https://www.businessinsider.com/facebook-and-google-dominate-ad-industry-with-a-combined-99-of-growth-2017-4.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

fees in the publisher ad server market. It now charges publishers for routing their inventory to exchanges and networks, without regard to the fees that a market would bear. Google also charges a percentage fee of gross transactions for routing publishers' inventory to non-Google ad networks. When publishers route their inventory to exchanges and networks using a non-Google routing service, publishers pay no fee for routing to exchanges and networks. Google's unilateral ability to extract non-competitive fees for its ad servers demonstrates monopoly power. Several other Google product changes degraded quality, including Google's prohibition on publishers setting different price floors for different ad exchanges and ad buying tools. Despite widespread publisher dissatisfaction over the price and quality of Google's ad server, Google has not suffered any loss to its ad server market share or dominance.

316. Google's market power is also protected by significant barriers to entry and expansion, including high switching costs. For publishers, switching ad servers is both risky and resource intensive. Some publishers have inventory in the hundreds of thousands, or even millions, of webpages, making switching ad servers prohibitively expensive and difficult. Moreover, the prospect of switching to a new ad server presents significant revenue risk, as even minor setbacks during transition can result in significant losses and disruptions in advertising campaigns. Because switching costs are high, making it impractical to switch ad servers, publishers are effectively locked in.

317. Google similarly has a monopoly in the exchange market for web display inventory. Exchanges are markets in which publishers' display inventory is auctioned off to advertisers on an impression-by-impression basis in real time. Exchanges generally interface with publishers through publishers' ad servers on the sell side, and with advertisers through ad-buying tools on the buy side.

318. Despite an early competitive landscape, Google's ad exchange (AdX) has enjoyed dominance in the United States since at least 2013. The closest competitors to Google's exchange include the exchanges provided by Magnite, AT&T's Xandr, and Index Exchange. But those exchanges transact much smaller shares of publishers' exchange impressions. While exact figures are not publicly disclosed,

Google's closest exchange competitors transact a mere fraction of publishers' exchange impressions compared to Google. In the exchange market, Google exhibits monopoly power by controlling prices (including charging supracompetitive prices), increasing its prices and exchange rates and demonstrating that it has insulated its exchange from any competitive market pressures that would otherwise incentivize it to lower its prices.

319. Google's market power in the exchange market is also protected by significant barriers to entry and expansion. A new entrant must achieve significant scale of both publishers and advertisers to become viable. Google also imposes additional barriers, including a variety of anticompetitive tactics allowing it to capture a large volume of the transactions otherwise available to competing exchanges by causing its publisher ad servers to preferentially route transactions to its exchange. Google imposes yet another barrier by exclusively and preferentially routing the bids of advertisers who use DV360 and Google Ads to Google's exchange, despite any competitive concerns that would lead to more efficient results for publishers and advertisers.

320. Networks are another market in which Google maintains monopoly power. Google's GDN reaches more user impressions and websites than any other display network, including over two million small online publishers globally. No other display ad network in the United States reaches as many publishers and advertisers. Google has immense scale amongst small online publishers.

321. Google's monopoly power is further evinced by its commissions: GDN charges high double-digit commissions on advertising transactions, which is supracompetitive compared to the standard rate elsewhere in the industry. Google purportedly has internally acknowledged that its market power allows it to charge supracompetitive rates as early as 2016.

322. Significant barriers to entry and expansion also protect Google's display ad network monopoly power. Google unilaterally captures a large volume of transactions through an array of anticompetitive tactics by causing its publisher ad servers to preferentially route transactions to its display

ad network. Google also preferentially routes bids of advertisers who use Google's ad buying tool for small advertisers (Google Ads) to its own GDN ad network. Scale is also an effective barrier to entry, as ad networks require scale on both the supply and demand sides.

323. Google also has monopoly power over the market for web display ad buying tools for small advertisers. Ad buying tools for small advertisers serve startups and local businesses such as real estate agents, doctors, dentists, restaurants, automotive repair shops, craftsmen, electricians, hair salons, architects, and landscapers. Google charges supracompetitive fees for exclusive access to Google Ads advertisers. The ability to extract such rents, dependent on Google Ads exclusivity, demonstrates Google Ads' monopoly power. Google's conduct is further anticompetitive because it obscures its margins by running sequential auctions, allowing it to avoid disclosure of its margins to advertisers.

324. Google's monopoly over ad buying tools through Google Ads is further protected because the small advertisers that use Google Ads most usually only use one ad buying tool. Using multiple ad buying tools would cost substantial additional time, effort, training, and expense that would be necessary to manage campaigns across different ad buying tools. Google Ads also does not permit small advertisers to export a complete data set that they would need to easily switch to another ad buying tool, further locking them into Google Ads. As a result of these costs and obstacles, while large advertisers may be able to absorb the transition costs associated with switch tools, or up-front cost of using an additional ad buying tool, small advertisers almost always just use one tool at a time.

325. Google Ads' market power is protected by at least three barriers to entry and expansion. First, Google Ads obscures its fees and does not let advertisers readily determine the ad inventory Google purchases on their behalf. This information asymmetry prevents advertisers from comparison shopping and making a determination to switch to a lower-cost or higher-quality rival provider. Second, Google withholds YouTube video inventory from rival ad buying tools, effectively locking small advertisers into Google Ads if they wish to advertise on YouTube. As a result, small advertisers often do not even try to

compete with Google Ads for small advertisers, because they cannot achieve sufficient scale with small advertisers who want to buy display, YouTube, and search ads through just one tool.  Third, Google Ads limits advertisers from accessing and taking data with them to another tool.  Advertisers use ad buying tools to keep track of the users they have targeted with ads, users who have made purchases, and users they would like to continue targeting with ads.  As a result of Google Ads preventing access to this information, advertisers are locked into the Google ecosystem and have high costs for switching to a different ad buying tool – including abandoning valuable data about their own transactions gathered in Google Ads.

### e.    Market Dominance over Instream Online Video Advertising

326.    Google's YouTube has market power in the instream online video advertising market in the United States.  YouTube's share of the overall video advertising market is at least 43% in the United States, and potentially much higher for instream online video advertising.  Further, YouTube reaches approximately 190 million consumers in the United States, including 77% of U.S. Internet users aged 15-25, as measured in Q3 2020.  Even amongst older age groups, YouTube reached roughly two-thirds of the population.  YouTube's vast reach makes it an essential source of online instream video inventory for advertisers, and Google incorporates ad spend for YouTube through its dominant ad buying tool, DV360.  Accordingly, Google wields significant market power in the instream online video ads market, as demand for YouTube content is unique compared to other online video publishers that sell instream online video advertising adjacent to short-form user created video content.

### B.    Anticompetitive Effects

#### 1.    General Search Services, General Search Text Advertising, and General Search Advertising

327.    Google has illegally maintained monopolies in general search services, general search advertising, and general search text advertising.  It exercises its monopoly power to prevent competition in search-related markets, hurting consumers and advertisers and preventing innovation.  There are no

competitive benefits from the challenged conduct that do or could offset the harm to the competitive process, advertisers, and consumers.

328.    Google's conduct has denied effective choice to consumers for general search services, which are essential for navigating the Internet.  Consumers are thereby deprived of the benefits of a competitive market, including the incentives for higher quality, new features, and greater innovation. Google also denies advertisers the benefit of a free, open, and competitive marketplace in the purchase of general search advertising and general search text advertising.  As a result, advertiser choice has been degraded, with lower quality and higher prices than would result in a more competitive market. Consumers further suffer to the extent the price of general search advertising is inflated, as consumers are likely to bear at least a part of the burden of the extra costs of advertising as higher prices are passed along to them.

329.    Google maintains and expands its monopolies at the expense of the potential entry and/or expansion of its competitors.  By keeping barriers to expansion and entry artificially high, Google has thwarted potential rivals and undermined the competitive process.  New potential entrants into general search services, which could provide features that directly challenge Google's core business model, could be of immense value to consumers.  Existing search engine competitors or new entrants still being developed could provide a competitive threat to Google once Google's exclusionary conduct is curtailed.

330.    Google's anticompetitive conduct also effects developing markets and future devices, such as smart home speakers, smart television sets, and connected automobiles, each of which could support or enable rival general search engines or provide simultaneous search alongside Google's offerings. Google's conduct in excluding its rivals from having a presence in voice assistants therefore eliminates additional access points and further limits competition by establishing further search-related monopolies, harming consumers, advertisers, and the competitive process further.

331.    Google further limits competition by constraining vertical search providers' access to prospective customers.  Google's tactics prevent vertical search providers from expanding their offerings and becoming stronger partners with existing or new general search engines that would exist in a more competitive market, boosting competition in Google's search-related markets while simultaneously lowering the artificially high barriers to expansion and entry in those markets.

332.    The anticompetitive effects are cumulative in their effect and impact on competition, resulting in durable monopolies in general search services, general search advertising, and general search text advertising that current market forces cannot rectify.

### 2.    Android App Distribution

333.    Google's anticompetitive efforts with respect to the distribution of apps on its Android platform caused anticompetitive harm and antitrust injury to consumers, app developers, and competing Android app stores.  Google's anticompetitive practices have the effect of stifling innovation, raising prices, limiting choices, depressing output, and reducing profits for developers.

334.    Google's anticompetitive restrictions are directed toward, and do cause, harm in the market for Android app distribution, a market that consumers directly participate in by buying apps.  Google places restraints on device manufacturers and developers specifically to prevent consumers from using alternative app distribution channels, which the restrained parties would otherwise be well-positioned to create.  Google, as a result, is able to make supracompetitive profits from consumers.

335.    Google's anticompetitive conduct harms consumers by impeding competition among app distributors who would otherwise innovate new models of app distribution and offer alternatives to the Google Play Store.  Because of Google's conduct, consumers are limited to the Play Store, whereby Google controls which apps are featured, identified, and prioritized in user searches.  Amazon's Amazon Underground app distribution product, for example, allowed Amazon to pay developers directly based on the amount of time that consumers spent interacting with their apps – representing an innovative new

model of app distribution.  However, Amazon Underground was ultimately unsuccessful because Google's restrictions on the distribution of app stores (including its restrictions on sideloading) crippled its distribution to consumers.  Consumers were directly harmed because they lost innovation and choice.

336.    Google's anticompetitive conduct also harms consumers by increasing prices and reducing output.  Google takes a supracompetitive profit from Play Store purchases, including up to a 30% commission off the purchase price of all apps sold through the Google Play Store, which is much higher than would exist in a competitive market unimpaired by Google's anticompetitive conduct.  By comparison, for example, Google charges only 5% for each download from its Chrome Web Store, because web browser distribution is more diffuse.

337.    Developers are also harmed by Google's anticompetitive conduct.  If consumers had a choice between Android app stores, Google would not be able to charge a supracompetitive fee, consumers would purchase more apps and other digital content, and developers would earn greater profits.  Developers also lose the opportunity to select from multiple viable options for app distribution, which would likely lead to greater sales and better distribution options.

338.    Absent Google's anticompetitive conduct, competition for app distribution could allow consumers to discover new apps they would enjoy by employing more innovative ways for developers to advertise or distribute their apps.  Competition might also allow for certain app stores to specialize for certain segments or types of apps – including, for example, education, games, fitness, and others.  Apps catering to specific populations or niches would thereby be more able to reach their intended audiences.  Instead, currently to attract users, an app developer must go through the Google Play Store, purchasing advertisements through Google which further eat into their profits above the 30% commission already employed by Google.

### 3.    IAP Processing

339.    Google's anticompetitive tie in the IAP Processing Market harms both consumers and developers.  Google's restraints also reduce overall output by eliminating alternative avenues for IAP payment processing that consumers and developers would otherwise use.  Rather than competing on the merits by creating more efficient, innovative, or less expensive payment processing, Google simply blocks its competitive threats and takes a supracompetitive 30% commission on all IAP sales.

340.    Google Play Store has a monopoly over Android app distribution.  By requiring that apps purchased through the Google Play Store also use Google Play Billing for the purchase of digital content within apps, Google has illegally engaged in tying and exclusive dealing, extending its monopoly to include the IAP Processing Market.  Google's anticompetitive conduct has demonstrable anticompetitive effects on the IAP Processing Market that harm competition and injure app developers, payment processors, and consumers.

341.    Google's supracompetitive commission on in-app purchases raises prices for consumers, reduces profits for app developers, and chills the market for app development and digital content development by making digital content less profitable.  Google could not maintain this supracompetitive commission in a competitive market free from Google's illegal tying and other anticompetitive conduct. The fee Google charges is an order of magnitude higher than fees for platforms in which there is competition for electronic payment processing.

342.    Developers would have more options for in-app payment processing absent Google's exclusive-dealing requirements.  App developers would also have the potential to make higher profits, so that app developers could dedicate more money to innovation: research and development, marketing, and the creation of new apps.

343.    The Google Play Store tie with Google Play Billing for the purchase of digital content prevents developers from access to several key features, which are not offered through Google Play Billing

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

but are available through app developers' own proprietary payment systems or processors like Adyen and WorldPay. Those features include: (i) information about failed consumer IAP transactions, such as the specific reason that the transaction failed to complete (Google Play Billing indicates only that a problem exists with the transaction, without further explanation); (ii) features that minimize the inadvertent loss of users through short-term credit card issues such as credit card expiry or being put on hold; (iii) data relating to the successful use of a consumer's credit card with other merchants as a measure of creditworthiness; (iv) free trial services allowing developers to periodically offer free trials (Google Play Billing allows only one free trial service per lifetime per product); and (v) customized cancellation experiences allowing developers to learn more about a user's decision to discontinue a service and potentially offer additional services.

344. Google has prevented a competitive market for in-app payment processing from developing, so that developers cannot create their own payment infrastructure or accept third-party payment processing. These choices exist for other comparable transactions outside of the Android infrastructure – for instance, with retailers who accept different types of payment including credit, debit, and prepaid cards. Developers could also offer payment systems based on alternative currencies or billing to mobile carriers absent Google's restrictions. These innovations are completely foreclosed by Google's anticompetitive contractual requirements.

345. Absent Google's exclusive-dealing contract requirements, app developers could compete in the IAP Processing Market themselves, or party with third-party payment processors that charge a fraction of Google's 30% fee. This would allow developers to offer not only in pricing models, but also provide a variety of payment options tailored to their users' needs. Alternative payment options outside of the United States and outside of Google's monopolistic grasp include, for example, prepaid cards in convenience stores allowing consumers to purchase in-game content in mobile games without connecting a credit card or bank account to the app. Developers like Netflix and Epic Games have the best information

on their own business models and are thus best placed to select their own payment processing solutions, but are prohibited from doing so by Google.

346.     Google's anticompetitive conduct also harms potential payment processing competitors who would otherwise innovate by developing alternative payment processing tools to provide better functionality, lower prices, and/or better security.  However, these competitors are barred from entering the IAP Processing Market because of Google's exclusionary contracts, cutting them off from access to a large portion of the market and diminishing their sales and profits, which would be greater but for Google's conduct.

347.     Google also obscures relevant market information regarding the availability of lower-priced payment options for in-app purchases and app subscriptions, further harming consumers and developers.  Google's policies prevent app developers from efficiently informing customers about better deals, causing them to incur greater costs to otherwise communicate with customers.  Developers whose only, or primary, relationship with their customers is through the app they offer, are effectively foreclosed from providing this information to customers.  Communication through an app would be low-cost and efficient, but Google prevents any such communication because it would threaten its IAP processing monopoly, distorting the competitive process, harming consumers, and preventing the free exchange of information about better deals.

348.     There are no procompetitive efficiencies gained from Google's tie of distribution and payment processing services that could outweigh the harm to consumers, developers, and potentially competitive payment processors.  All market participants are harmed by Google's anticompetitive intermediation of in-app payment processing.

349.     Google has also harmed streaming and other subscription services by enforcing its supracompetitive commissions through contractual provisions requiring counterparties to use exclusively use Google-owned Google Play Billing services for payment processing.

350.    On September 28, 2020, Google publicly announced that, effective September 30, 2021, it would require content streaming and other subscription services to use Google Play Billing for their subscriptions.  Google's policy effective prior to September 2020 expressly exempted from its Google Play Billing requirement cases where "[p]ayment is for digital content that may be consumed outside of the app itself (e.g.[,] songs that can be played on other music players)."  Despite this reversal, Google claimed its September 28, 2020, policy change was a mere "clarification" of a "long standing policy" that had always been in place.

351.    The September 2020 policy change gives Google an unfair and overwhelming competitive advantage against streaming service developers who offer similar subscription services as those Google does.

352.    To conform with Google's new policy, subscription services must either: (1) offer an Android app in which consumers pay Google's 30% commission for subscriptions purchased through that app; or (2) offer only a "streaming only" (non-transactional) version of the app in the Google Play Store, which per Google's terms, cannot even inform consumers of the option to purchase a subscription elsewhere or direct them outside the app for payment.

353.    In addition to its competitive advantage by virtue of having a subscription streaming app preloaded on every Android device, Google will also be positioned to gain market information about its streaming competitors and their customers.  Offering a "streaming only" app – one of the two options under the September 2020 policy – would have disastrous consequences for many streaming services.

354.    A "freemium" music streaming service such as Spotify, for example, offers a "free," ad-supported version of its service.  Though the user base of the ad-supported service is typically large, the service earns a small percentage of its revenue from those users.  The large majority of its revenue comes from the smaller number of users who purchase a premium monthly subscription which features no ads.  Running a profitable service requires converting many users of the "free" version into paid subscribers.

106

355.    The vast majority of streamed music is now consumed on mobile devices. Thus, a music streaming service typically has no effective communication channel with its subscribers apart from the app from which they purchased their subscriptions. By prohibiting a "streaming only" music app from providing potential subscribers with information about, and an opportunity to purchase, premium subscriptions, Google can drastically raise the service's cost of acquiring paid customers and foreclose it from acquiring a substantial number of potential customers altogether. Google thus forces subscription-based app developers to choose between being significantly foreclosed from acquiring customers, or making its customers pay Google's large commission.

356.    Spotify, one of the largest streaming music providers, has noted the risk that Google plays in exercising its control over the tied Google Play app store and payment processing systems:

> [W]here the owner of a platform is also our direct competitor, the platform may attempt to use this position to affect our access to users and ability to compete. . . . [O]nline platforms may force us to use the platform's payment processing systems that may be inferior to, and more costly than, other payment processing services available in the market.

357.    Google's conduct is especially injurious to competition in music streaming, because music streaming subscription businesses must pay 65% or more of their revenues in royalties to the rights holders of the music they stream. Google's premium music streaming offerings will thus gain a significant, unfair competitive advantage over Spotify and similar services. Google's monopolistic expansion of its IAP processing services thus serve a dual anticompetitive purpose: they allow Google to take a huge portion of its subscription streaming services' profits if they capitulate to the illegal tie, or allow Google to poach many subscribers or potential subscribers if they do not submit to the illegal tie. Either way, Google's IAP monopoly will grow in scope and strength.

358.    Google is well aware that the sudden imposition of its September 2020 policy change will create an anticompetitive IAP tie on major subscription streaming services. Google's recent decision to change its policy and require subscription-based digital content purchased through an app to be paid for

using Google Play Billing thus poses a grave threat to streaming and other subscription-based businesses, and will likely lead to reduced consumer choice, less innovation, and higher prices.

359.    Google defends its anticompetitive tie for IAP payment processing by citing security concerns.  However, security of payments is equally important to payments for both digital and physical content, yet Google ties its Google Play Billing requirements only for the sale of digital content.  Further, there are many highly secure and reliable payment processing systems used on desktop computers.  If Google were truly concerned about security, it would simply require that payment processors use reasonable security protocols.  Instead, Google's internal strategy around pricing and policy for in-app payments reveals that its purported security concerns are merely a means of justifying Google's anticompetitive conduct rather than genuine concerns.

360.    Google's tie of app distribution through the Google Play Store with developers' exclusive use of Google Play Billing to process in-app purchases harms consumers who would otherwise have the choice to use payment processors that do not share their information with Google.  There are no legitimate consumer-benefitting or security justifications for this tie.  Any security or consistency that Google can offer consumers through payment processing can also be offered by any other payment processor in a competitive market at a competitive price.  Google's monetization of the Google Play Store in order to maintain its control of the Android ecosystem is similarly anticompetitive and unnecessary.  In short, Google has unjustifiably used its monopolistic control over the Android app distribution market to force developers to use Google Play Billing as their exclusive in-app payment processor.  Google thus deprives consumers of choice among in-app payment options and of the benefits of competitive pricing and innovation in payment services for in-app purchases of digital content.

361.    Google's supracompetitive commission, which it extracts as a result of the increased prices it demands for in-app purchases, likely deters some consumers from making purchases and reduces app developers' profitability for purchases that consumers do make, therefore depriving app developers of

resources they could use to develop innovation in apps and content.  Developers are further harmed by profits lost from Google's imposition of a supracompetitive commission, and because Google has foreclosed their ability to offer efficient, inexpensive in-app purchase options that are integrated into their apps themselves, which would increase demand.  Other payment processors are also harmed, because they are foreclosed from offering their payment processing services to compete with Google Play Billing.

362.    Consumers are direct purchasers of services from Google in the IAP Processing market.  Consumers are direct purchasers of apps and in-app digital content sold through the Google Play Store.  When consumers purchase Android apps, they do so directly from the Google Play Store and pay Google directly, using a credit card or other payment method.  When consumers purchase in-app digital content, they do so through the Google Play Store, using the pre-established payment streams set up by the Play Store.  When consumers purchase in-app digital content, they pay Google directly.

363.    Google requires consumers to enter into a contractual agreement with Google to use Google Play Billing.  Google does not disclose its IAP commission of up to 30%, nor does it disclose its foreclosure of competition in the IAP Processing Market, in any of the series of consumer contracts and terms Google unilaterally requires consumers to agree to.  Instead, Google's fee disclosures state that it charges $0 for nearly all transactions, and fractions of one percentage point for others.  This disclosure runs contrary to the fact that consumers, as direct purchasers, and as a matter of law, pay the entirety of Google's IAP commission.  Insofar as Google makes any disclosure whatsoever regarding its IAP processing tie and the concurrent foreclosure of competition, nearly all consumers are unaware of them and have not knowingly consented to them.

### 4.    Third-Party Advertising

364.    Google's exclusionary conduct for third-party advertising has caused a wide range of anticompetitive effects, including the exit of rival firms, and limited (and declining) entry rates in the

relevant antitrust markets. Google's activity harms competition by causing lower quality, lower transparency, less innovation, lower output, and higher prices.

365.    Google unlawfully maintains monopolies by using its market power to disadvantage competition via tying, exclusionary conduct, and other misconduct, including:

    i.    foreclosing competition in the exchange market by cutting off access to inventory and advertiser demand;

    ii.    foreclosing competition in the publisher ad server market by tying its ad server with its market-dominant exchange;

    iii.    foreclosing competition in the publisher ad server market and using its market power in the publisher ad server market to harm competition in the exchange market, the market for display ad buying tools for small advertisers, and the market for display ad buying tools for large advertisers;

    iv.    foreclosing competition in the markets for display ad buying tools for small advertisers and display ad buying tools for large advertisers;

    v.    increasing barriers to entry in the markets for publisher ad servers, exchanges, display ad buying tools for small advertisers, and display ad buying tools for large advertisers;

    vi.    harming innovation which would otherwise benefit publishers, advertisers, and consumers;

    vii.    harming publishers' ability to effectively monetize their content, reducing publishers' revenues and thereby reducing output;

    viii.    obscuring margins and selling processes, harming competition in the exchange and display ad buying tool markets;

    ix.    increasing advertisers' costs to advertise and reducing the effectiveness of their advertising, harming businesses' ability to deliver products and services and reducing output; and

x.    protecting Google's products from competitive pressures, thereby allowing it to extract supracompetitive fees and avoid innovation pressure.

### a.    Anticompetitive Effects in the Publisher Ad Server Market

366.    Google's exclusionary conduct in the publisher ad server market includes tying its ad server to its exchange, as well as its network and ad buying tools.  Competing publisher ad servers have either exited the market or significantly scaled back offerings, leaving publishers with little to no choice but to license Google's ad server.  Several large firms previously competed in this market, including Microsoft, Yahoo!, WPP PLC, and OpenX – but all four firms have since exited the market.  Entry of new competition has been remarkably weak for a decade, as new entrants have been thwarted by the barriers to entry and expansion that Google has erected.

367.    Google has harmed customers in this market (online publishers).  Google's exclusionary conduct and barriers to entry have permitted its ad server to charge supracompetitive fees (5% to 10% fees on gross transactions executed in non-Google exchanges and networks) and have resulted in lower quality than what would be available at competitive levels by blocking and interfering with competition from non-Google exchanges.

368.    Google has also harmed the customers of publishers – individual consumers – through their interference with the competitive process.  Publishers use revenue generated from selling ad space to improve content quality, offer more content, and offer less expensive subscriptions or free access to content.  Because Google's ad server charges supracompetitive prices, depressing publishers' inventory yield, publishers are able to offer consumers less content, of lower quality, and with less innovation with content delivery and higher fees.

### b.    Anticompetitive Effects in the Exchange Market

369.    Google has foreclosed competition in the exchange market through its exclusionary conduct and artificial barriers to entry and expansion.  Google's exclusionary conduct includes deceptively

blocking, interfering with, and obstructing exchange competition, cutting off non-Google exchange access to publishers' user IDs, manipulating advertiser bids and exchange price floors, manipulating its auctions, tying its ad server to its exchange, ad network, and ad buying tools, requiring publishers and advertisers to trade in Google's exchange, and a wide set of practices pursued for the purpose of destroying header bidding.

370.    As a result, Google's competition has exited the market and new entrants are unable to effectively compete.  While Microsoft, Yahoo!, and other venture funds all competed in the exchange market over 10 years ago with exchanges such as AdECN, AdBrite, and ADSDAQ, all three of these exchanges have since exited the market.  Competition from new entrants has been weak due to Google's barriers to entry and other obstructions: competing exchanges have, for instance, tried to obtain market share by lowering their fees to half and even a quarter of Google's exchange rate fees.  However, Google's interference has effectively eliminated market competition, so that lowering prices has no effect on market share.

371.    Google's anticompetitive conduct has also harmed the customers in this market – online publishers and advertisers.  In a competitive market, publishers and advertisers would benefit from competitive rates and quality.  Publishers would be able to retain a greater share of their advertising revenue, permitting them to make more content, of higher quality, and to subsidize more content.  Advertisers would have to pay less to purchase ad space, permitting them to reinvest those cost savings into the production of higher-quality, lower-priced goods and services.  Instead, Google takes supracompetitive fees and provides service quality below competitive levels.  Google's high fees do not reflect the magnitude of anticompetitive harm Google has caused, because the inefficiencies Google creates in the allocation of its impressions has also caused reduced output in the exchange market.

### c. Anticompetitive Effects in the Network Market

372.    Google's exclusionary conduct has foreclosed competition in the display ad network market and the in-app mobile ad network market, creating artificial barriers to entry and expansion. Google's exclusionary conduct includes Google routing advertisers' bids on Google Ads through only Google's network, then deceptively re-routing those advertisers' bids to Google's exchange.  As a result, competing displays and in-app networks have exited the market and new entrants are unable to effectively compete.  Competition between exchanges used to be vigorous.

373.    Google's elimination of competition has harmed customers in this market – small publishers and advertisers.  In a competitive market, small publishers and advertisers would benefit from networks competing with each other on fees and quality.  Competition would result to lower fees, benefitting publishers and advertisers.  Small publishers could retain a greater share of their advertising revenue, permitting them to create more content, of higher quality, and with subsidized access for consumers.  Advertisers would pay less to purchase ad space, re-investing those cost savings into providing consumers with higher-quality and lower-priced goods and services.  Google's foreclosure of competition in the network market has allowed its display network, GDN, to charge double-digit fees.

### d. Anticompetitive Effects in the Markets for Ad Buying Tools for Small Advertisers and Display Ad Buying Tools for Large Advertisers

374.    Google's exclusionary conduct has foreclosed competition in the ad buying tool markets for both large and small advertisers and has created artificial barriers to entry and expansion.  Google's exclusionary conduct in these separate markets includes the tying of its ad server to its exchange, ad network, and ad buying tools (requiring publishers and advertisers to trade in Google's exchange), cutting off non-Google ad buying tools' access to publishers' ad server user IDs, manipulating advertiser bids and exchange price floors on the auction, and tying YouTube to its ad buying tools.

375.    Competing ad buying tools have exited the market and new entrants are unable to effectively compete as a result.  Competition in the ad buying tool markets for small and large advertisers

113

were once robust, but today Google Ads is effectively the only remaining choice for small advertisers wishing to purchase display ad space from exchanges.  Many large advertisers have no choice but to use DV360, because they choose to use only one ad buying tool, and because DV360 has exclusive access to YouTube ad inventory, which large advertisers must have to compete.

376.     Google harmed customers – both small and large advertisers – in these markets.  Ad buying tools, whether for small or large advertisers, should advance advertisers' best interests by finding the lowest price possible to place advertisement for any given impression.  In a competitive market, advertisers would benefit from ad buying tools competing on price and quality.  Google's exclusionary conduct has permitted its ad buying tool for small advertisers to charge supracompetitive fees and lower quality below competitive levels, including charging non-transparent fees, manipulating advertisers' bids to purchase ad space for higher prices trading on Google's exchange and network, and arbitraging small advertisers' bids to extract higher fees.  Similarly, Google's exclusionary conduct has permitted Google's ad buying tool for large advertisers to charge supracompetitive fees and lower quality below competitive levels, including failing to adequately audit Google conflicts of interest and fraudulent impressions.  Google's conduct has consequently also lowered output in these markets.

377.     Google harms the competitive process in the ad buying tool markets and has also harmed advertisers' customers – consumers.  The fees advertisers would save on ad buying tools and ad purchases in the absence of Google's anticompetitive conduct would result in reduced deadweight costs that advertisers would ultimately pass on to consumers.  Consumers would benefit through better quality and lower-priced goods and services.  Advertising also allows consumers to learn of the range of competitors in a market, their prices, and the nature of the products and services offered.  When advertising effectiveness is reduced, competition between products and services is reduced, and consumers are harmed.

### e.    Harm to Innovation

378.    In each of the relevant product markets, Google's exclusionary conduct has resulted in harm to innovation.  A critical example of this is how, for many years, Google's publisher ad server depressed publishers' inventory yields by blocking real-time competition from non-Google exchanges.  When publishers found a way to work around the restrictions imposed by Google's ad server using header bidding, publishers' yields jumped by over 30%, sometimes even over 100%.  It was not until 2018, about eight years after the invention of real-time bidding, that Google's ad server finally permitted publishers to route their inventory to multiple exchanges in real time.  In other words, the lack of competition caused by Google's foreclosure of competition and entry permitted Google's ad server to get away with significantly depressing publishers' inventory yields for almost 10 years.

379.    Google's response to header bidding has further harmed innovation in the exchange and publisher ad server markets.  Google has used its market power in the publisher ad server market and exchange markets to destroy header bidding, rather than competing on the merits.  Header bidding helped publishers make more money by enhancing exchange access to, and competition for, publishers' impressions.  By crippling interoperability with this new and beneficial invention, Google stifles rather than promotes beneficial innovation in the market.

### C.    Google Also Engages in Unfair and Deceptive Conduct that Harms Consumers

380.    Google engages in unfair, fraudulent, and/or deceptive conduct regarding its Google Play Store in addition to the monopolistic conduct described above.  The untrue statements that Google has disseminated about its Google Play Store have had, and continue to have, the capacity, tendency, or effect of deceiving or misleading consumers and/or app developers.

### 1.    False and Misleading Statements About Sideloading Apps

381.    Google uses a series of technological barriers and pretextual warnings designed to prevent users from sideloading Android apps and app stores onto their Android devices, circumventing the Google

Play Store.  Google promotes the misleading and overbroad premise that it is harmful to download apps from "unknown" sources, which includes every other source other than the Play Store.  In particular, Google's own website states under the heading, *Download apps from other sources*: "Important: If you download apps from unknown sources, your phone and personal information can be at risk.  Your phone could get damaged or lose data.  Your personal information could be harmed or hacked."[5]

382.    Google's notice regarding the security risks and dangers of sideloaded apps have the capacity, tendency, or effect of deceiving or misleading consumers and/or app developers.  The security settings and warnings associated with sideloading limit even mainstream, non-malicious apps and app stores, such as the Amazon Appstore and *Fortnite*, from reaching Android users.  Yet Google makes no effort to differentiate harmful apps and app stores from apps it knows to be safe, instead labeling all non-Play Store apps and app stores as malicious.

383.    When a user attempts to sideload an app or an app store to their Android device, Google displays an ominous warning that the installation file "can harm your device."  Google's Android further blocks the attempted download and alerts the user that, "your phone is not allowed to install unknown apps from this source," presenting the user with only two options – "Cancel" and "Settings."  There is no indication that installation is possible through the "Settings" option.  Further, the user is warned that his or her "phone and personal data are more vulnerable to attack" by the "unknown app," and required to select a feature by which he or she agrees that he or she is "responsible for any damage" to the phone "or loss of data that may result" from the installation – warnings that are designed to scare the user and convince them to abandon their attempts to install.  Google also labels apps that are sideloaded "UNSAFE."

---

[5]      *Download apps from other sources*, (GOOGLE SUPPORT) PIXEL PHONE HELP, https://support.google.com/pixelphone/answer/7391672?hl=en (last visited Oct. 25, 2021).

384.    On its website, Google also represents to users that it "analyzes every app that it can find on the internet," and categorizes a subset of them as "Potentially Harmful Applications," or PHAs.  If it finds a PHA on a user's device, it directs actions against the PHA or automatically disables the PHA for the user.  Additionally, it tells users that Android is "secure to the core," and that "[Google] guard[s] each app at the operating system level, so other apps won't snoop on what you do."[6]

385.    Google's representations that appear when a user attempts to sideload an app or app store on an Android device lead users to believe that sideloaded apps or app stores are "unknown," harmful, and could damage their devices.  Google purposefully deceives users by presenting warnings that falsely describe highly popular apps from well-known developers as "unknown app[s]," giving the user the false or misleading impression that apps and app stores downloaded from any source outside of the Google Play Store are PHAs or that they are otherwise harmful.  Google displays these misleading warnings in order to dissuade users from installing apps or app stores outside the Google Play Store, keeping all Android apps within Google's walled garden.  Google's statements regarding the dangers of sideloading were knowingly false at the time they were made.

## 2.    False and Misleading Statements About "Openness"

386.    In 2008, Google launched the Google Play Store's predecessor, Android Market, which at the time offered fewer than 50 apps.  Android Market was distributed as part of the open-source Android OS, and it became the *de facto* app store on early Android devices.  Google described Android Market as "an open content distribution system," similar to YouTube.  In August 2008, Google informed the public through its Android blog: "We chose the term 'market' rather than 'store' because we feel that developers should have an open and unobstructed environment to make their content available."

---

[6]    *Mobile Safety*, ANDROID, https://www.android.com/safety/ (last visited Oct. 25, 2021).

387.    Early in the Android OS and Android Market lifespans, Google entered a suite of partnership agreements with OEMs and mobile carriers.  These partners negotiated with Google for different degrees of control over Google's proprietary app pre-loading, app placement, and user experience.  OEMs had bargaining power because they chose which OS to install on devices and whether to distribute Google's proprietary apps, including Android Market.  Mobile carriers had bargaining power because they could customize devices, preinstall apps and app stores, and offer "direct carrier billing" for Android Market purchases, which allowed purchases to be charged to a user's mobile phone bill through the mobile carrier.

388.    Google assured mobile carriers, OEMs, and consumers that it would operate Android Market as an "open system" for the benefit of Google's partners and app developers, a façade which Google maintains today.  For example, on Google's own website maintaining the purportedly "Open Source Android Project," Google describes the Android Open Source Project as follows:

> Android is an open source operating system for mobile devices and a corresponding open source project led by Google.  This site and Android Open Source Project (AOSP) repository offer the information and source code needed to create custom variants of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.[7]

389.    Google also pledged to consumers that the Android source code was an "open source platform" that was "available for anyone to view, download, modify, enhance, and redistribute" in or around 2009.  Google understood that its promise of Android's "openness" and revenue sharing strategy were key to securing critical mass for Android Market, and that it could later use the dominance of its Android app store to control the Android ecosystem.

---

[7]    *Android Open Source Project*, (ANDROID) SOURCE, https://source.android.com/ (last visited Oct. 25, 2021).

390.    Google's "openness" commitments to OEMs and mobile carriers were knowingly false when made and were material to Google's obtaining a monopoly in app distribution.  Google promised repeatedly that Android would be the basis for an "open" ecosystem in which industry participants could freely compete, and, in Google's words, have "[f]ull control of [their] brands and business."  For instance, in August 2008, Google informed the public through its Android blog that developer should have, "an open and unobstructed environment to make their content available."

391.    According to the Utah AG Action, in 2009 through at least 2010, internal Google presentations indicated that Google offered "open-source," "free" Android to induce widespread adoption and attain market dominance.  For instance, in a 2009 presentation, a Google executive answered the question, "Why don't we license Android?" by stating, "We need the highly-fragmented mobile industry [to] adopt Android.  You can't beat free."  The executive posed another question, "Why not take a rev-share on Market?"  The answer: "We don't have a dominant market position right now."

392.    By 2010, internal Google presentations indicated that, "Google was historically seen as a threat to [mobile carriers], [in that] giving up control was a key component of [mobile carriers] adopting Android."  But, "If we gave it away, how can we ensure we get to benefit from it?"  The answer lay in controlling the app store – Android Market, and, later, the Google Play Store.  "We created the first app store for Android and it got critical mass quickly.  The store now has value and partners want access to it because of the number of apps available."  Google intended to, "[o]wn the ecosystem [it] enabled" by attaining dominance through the Google Play Store.

393.    As Google recognized when looking back in 2009, "[t]he novelty of smartphones and apps, combined with a material utility advantage relative to the Web, gave Apple and Android an opportunity to define new closed Internet ecosystems.  These new closed ecosystems centralized Content distribution via app stores . . . [and] payments via app store services."  To own the ecosystem, Google intended to

"[s]et the rules." Having driven adoption of Android by promising an open platform outside its control, Google intended to close the ecosystem once it had the market power to do so.

394.    Closing the Android ecosystem allowed Google to claim a larger share of the revenue generated through the distribution of Android apps through its app store. To do this, Google reneged on its repeated assurances that Android Market would operate as an open, revenue-neutral system, which were the key factor driving initial adoption of Google's app store. Google launched the rebranded Google Play Store in 2012, run entirely for Google's own benefit and breaking Google's promises to operate the Play Store in a revenue-neutral manner for the benefit of the Android ecosystem. Google thereby capitalized on the lucrative revenue stream it saw through Android app purchases.

395.    Google operates Android and the Play Store as a closed system despite its repeated representations that the Android ecosystem would be open for the benefit of Google's partners and app developers. Google's knowingly false statements regarding its intention to keep the Play Store and its predecessor open had the capacity, tendency, and/or effect of deceiving or misleading consumers and app developers.

### 3.    False and Misleading Statements and Deceptive Conduct Regarding Google Play Billing

396.    Google tied its Google Play Billing services to use of the Google Play Store, requiring developers to accept Google Play Billing in order to have access to distribution on Google's Play Store. Google thereby forced all users and developers to use Google Play Billing to process payments for all in-app digital content purchases and thereby pay Google's supracompetitive commissions. Google further gags app developers by prohibiting them from informing their users of other lower-priced options, even when lower-priced alternatives are available from other sources, such as at a developer's website.

397.    Google also made false and misleading statements regarding its in-app purchase billing policies. Prior to September 2020, Google expressly exempted the requirement that developers use Google Play Billing in cases where, "[p]ayment is for digital content that may be consumed outside of the

app itself (e.g.[,] songs that can be played on other music players)."  On September 28, 2020, however, Google announced that, effective September 30, 2021, it would require content streaming services such as Netflix and Spotify to use Google Play Billing for their subscription services.  Google publicly claimed that this was simply a "clarification" of the intention of a "long standing policy" in response to "feedback that our policy language could be more clear regarding which types of transactions require the use of Google Play's billing system, and that the current language was causing confusion."  Google also claimed that "this isn't new" and that it had "always required developers . . . to use Google Play's billing system if they offer in-app purchases of digital goods, and pay a service fee from a percentage of the purchase."  Google's statements about its prior billing policies were false and misleading with respect to streaming services, which were expressly exempt under the prior policy.

398.    Consumers have been harmed as a result of Google's unfair conduct.  Google forces consumers to pay a supracompetitive commission of up to 30% to purchase any app other than those that are free.  Google actively gags app developers by prohibiting them from informing their consumers about the 30% commission and the possibility of obtaining lower prices through alternative channels.  It does this by preventing information flows regarding the availability of lower-priced payment options for in-app purchases of digital content and app subscriptions.  Google's policies gag app developers from efficiently informing consumers about better deals, meaning developers are forced to incur significant costs to communicate through other means.  Developers whose only relationship with their customers is through their apps are effectively foreclosed from providing this information to them.  Google stops the most low-cost and efficient means of communication – through the developer's app – thereby harming consumers, many of whom are unlikely to learn about better deals.

399.    Google's conduct also harms consumers by depriving them of the benefits of true competition in app distribution, including the potential for better services to develop through competition, like enhanced app discovery features or improved data security.  Google's supracompetitive commissions

also reduce developer profits and impede them from researching, developing, and bringing to market innovative new apps, resulting in further lost profits for them and less innovation and choice for consumers.

400.    Google also impedes competition among app distributors, who cannot innovate new models of app distribution and provide consumers with alternatives to the Google Play Store as a result of Google's conduct.  Consumers are left to search among millions of apps in one monopolized app store, where Google controls which apps are featured, identified, or prioritized in user searches, limiting their ability to discover new apps.

401.    Google defends its anticompetitive practices by citing to security concerns, but those assertions are also false and misleading.  Google claims that Google Play Billing must be tied to the Google Play Store in the name of user security, but Google requires the use of Google Play Billing for digital content only.  If security was a genuine concern, Google would simply require that payment processors use reasonable technical security protocols, as in the highly secure and reliable payment processing systems used on personal computers.

402.    Consumers and app developers have actually and reasonably relied on Google's actions and false representations to their detriment.  Google knows that its conduct is harmful to developers and users.  Google's false representations have had, and continue to have, the tendency or effect of deceiving or misleading consumers and/or app developers.



123

124

125

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

127

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**E.    The Department of Justice and State Attorneys General Bring Antitrust Enforcement Claims Against the Company; Private Suits Follow**

418.    As a result of the Individual Defendants' breaches of fiduciary duties, four main enforcement actions have been filed against the Company, each with distinct yet overlapping theories with respect to the Company's broad monopolistic and anticompetitive business practices: (i) *U.S. v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. 2020) (the DOJ Action); (ii) *Utah v. Google LLC*, Case No. 3:21-cv-05227 (N.D. Cal. 2021) (the Utah AG Action); (iii) *Texas v. Google LLC*, Case No. 4:20-cv-00957 (E.D. Tex. 2021) (the Texas AG Action); and (iv) *Colorado v. Google LLC*, Case No. 1:20-cv-03715 (D.D.C. 2020) (the Colorado AG Action).

419.    In addition to the government litigation, Google also faces numerous private antitrust lawsuits.  These lawsuits have become so numerous that many lawsuits relating to advertising and the Google Play Store have been consolidated in California and New York.

420.    In California, Google is facing numerous consolidated and coordinated actions concerning its conduct in the Google Play Store.  In addition to the Utah AG Action, Google faces antitrust litigation by consumers and developers.  *See In re Google Play Consumer Antitrust Litigation*, No. 3:20-CV-05761 (N.D. Cal.) and *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792 (N.D. Cal.).

421.    Moreover, Google is facing a trial for its conduct against Epic Games.  *See Epic Games Inc. v. Google LLC*, No. 3:20-cv-05671 (N.D. Cal.).  Epic Games recently won an injunction against Apple in a similar lawsuit that required Apple to allow developers to offer or direct alternative payment processing systems.  Epic Games has similar allegations against Google, and if it wins on this point in its upcoming trial, could cause Google to lose its Google Play Billing monopoly.

422.    Furthermore, Google has faced so many private lawsuits regarding its anticompetitive conduct in the digital advertising marketplace that the cases have been consolidated into a multi-district litigation ("MDL").  While the lawsuits were originally in the Northern District of California, as well as

other courts throughout the country, these lawsuits, and the Texas AG Action, have recently been transferred to, and are organized in, the Southern District of New York. *See In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.).

423.    Google is exposed to potentially billions of dollars in liability from these private lawsuits, in addition to the major regulatory actions that it faces. So far, Google has lost many early rulings in these actions. For example, in both the Northern District of California and Southern District of New York, the Courts have ordered information from suits pending before them to be unsealed, thus forcing Google to reveal many aspects of its monopoly, including its market shares, fees, and numerous internal communications and presentations showing that Google executives knowingly pushed for anticompetitive conduct.

## V.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

424.    Plaintiff brings this action derivatively in the right of, and for the benefit of, Alphabet to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants as alleged herein.

425.    Plaintiff is a current stockholder of Alphabet and has continuously held Alphabet stock for the duration of the Relevant Period, and will continue to hold Company stock through the resolution of this Action.

426.    Plaintiff will adequately and fairly represent the interests of Alphabet and other Alphabet stockholders in enforcing and prosecuting Alphabet's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.

427.    Plaintiff has not made a demand because doing so would be futile for two reasons: (1) the current directors all face a substantial likelihood of personal liability for allowing Alphabet to carry out a vast array of illegal and anticompetitive business plans; and (2) the current directors cannot assess a claim

independently and disinterestedly because of their business ties with one another and the material impact Board compensation has on their income.

428.    Demand is futile as to the Board because all current directors face a substantial likelihood of personal liability for condoning illegal anticompetitive practices, including through their refusal to conduct direct oversight over the illegal business plans described herein even as it became increasingly apparent that regulators would bring enforcement actions against the Company based on investigations into the myriad anticompetitive practices described herein.  Furthermore, all current directors were on the Board by the time regulators began to investigate and eventually filed the antitrust actions described herein.

429.    Page and Brin are the co-founders of Google and face liability for their actions in authoring and directing the illegal and anticompetitive business plans described herein.  In addition, Page and Brin together control who sits on the Board due to their majority voting power.

430.    Hennessy, Doerr, and Shriram cannot independently assess a litigation demand against Page and Brin because of their longstanding business relationships with them.  Arnold and Washington are not independent because the Board compensation they receive forms a material part of their income.  And Pichai cannot be independent of Page and Brin due to his position as an Alphabet employee and because of his own exposure to liability for the wrongdoing described herein.

431.    Shriram was one of four initial angel investors in Google, and a founding director of the Board.  During Google's earliest days, he held weekly meetings with Page and Brin, helped incorporate the Company, and assisted with a licensing agreement with Stanford University ("Stanford") regarding the search algorithm Google was based on.  His close friendship with Page and Brin is also evident in how he jointly licenses the use of Moffett Airfield with them (along with Schmidt).  Due to his early investment in Google, he has made hundreds of millions to billions of dollars.  Shriram also has extensive ties to Stanford, where Page and Brin had their start, and has served as a member of Stanford's Board of Directors

since 2009.  Institutional proxy advisor ISS also views Shriram as being too tightly connected to the Company and its founders to be considered an independent director.  His monetary gains from his investments and his mentorship of Page and Brin render him unable to independently assess a litigation demand against either.

432.    Doerr is also one of the earliest investors in Google and, along with Page, Brin, and Schmidt, holds Class B shares which give him disproportionate voting power.  When Doerr was the head of Kleiner Perkins, he decided to recruit Schmidt to Google's CEO position.  Doerr also serves as a long-time mentor for Page and Brin.  Kleiner Perkins also has numerous investments with Google and affiliated entities controlled by Page and Brin, including approximately $40 million within the last year alone, according to Alphabet's latest annual proxy statement.  Doerr has also personally made hundreds of millions or billions of dollars from his investment in Google.  The institutional proxy advisor ISS also views Doerr as not being independent because his long-term relationships, monetary gains from investment in the Company, and other investments render him unable to independently assess a litigation demand against Page or Brin.

433.    Hennessy is also not independent on numerous grounds.  Hennessy was a mentor for Page and Brin at Stanford.  He also served as Stanford's President from 2000 to 2016, benefitting immensely from Stanford's association with Google and its founders as Google made significant contributions to Stanford.  Hennessy was appointed to Google's Board shortly before its initial public offering in 2004, due in large part to the urging of Doerr.  Hennessy also personally invested in Kleiner Perkins.  In addition, before Google's initial public offering, Hennessy was granted 65,000 options to buy Google stock at a price of $20.  Hennessy additionally received over 10,000 shares of Google stock pursuant to his Kleiner Perkins investment, and has personally made over $8 million through his sales of Google stock – an amount material to Hennessy's personal wealth.  As Stanford's president, Hennessy also benefits from Alphabet's (and previously Google's) generous university grants (approximately $38 million annually),

132

which involve Hennessy's personal involvement as the President of Stanford. In addition to the personal shares of Google stock Hennessy was granted, during Google's initial public offering, Stanford received shares of Google stock that it has since sold for $336 million. Stanford also continues to receive annual licensing fees as a result of the relationship that the foregoing Stanford alumni have with Stanford. Hennessy's mentorship of Brin and Page, the monetary compensation he has received via Google and via his nexus between Google and Stanford, and the personal wealth Hennessy has created through Google stock, renders him incapable of independently assessing a litigation demand against Brin and Page.

434.    Arnold is not independent because her directorship contributes materially to her income. She was granted a stock award of $1,000,000 upon her election to the Board, which constitutes perhaps three times her annual salary as a professor at the California Institute of Technology. Her annual stock award of $350,000 also likely exceeds her annual salary.

435.    Pichai cannot independently assess a litigation demand because he is employed by Alphabet. Unlike many CEOs, and like virtually all Alphabet employees, Pichai does not have an employment agreement, but instead serves at Brin and Page's pleasure. Pichai's job thus is dependent on his remaining in the good graces of the Board as a whole, and Brin and Page in particular, with their majority voting share. Pichai's rapid promotion through Alphabet also was largely the result of his working relationship with Page, and his promotion to Alphabet CEO was largely the result of Brin and Page agreeing to step aside and allow him to assume certain executive functions. Moreover, due to his senior executive status at Alphabet, Pichai is personally implicated in the monopolistic and anticompetitive conduct described herein. Pichai, therefore, cannot independently assess a litigation demand.

1

## VI.    CONTROL ALLEGATIONS

### A.    Alphabet Is Controlled by Brin, Page, and Schmidt

436.    Alphabet's subsidiary and predecessor, Google, was founded by Defendants Brin and Page. The two have been close friends since they first met at Stanford in 1995.  The two worked together on their first search engine and continue their collaboration today.  Defendants Brin and Page also remain key figures in Google's development and business strategy, which they have steered since its founding. Brin and Page have also both been directors and controlling stockholders of Google since its founding, in addition to their executive positions.

437.    Brin and Page further draft an annual "Founders' Letter" to investors, describing their vision for the Company.  In their initial letter, included with Google's Registration Statement, Defendant Page wrote that, "Sergey and I intend to write you a letter like this one every year in our annual report. We'll take turns writing the letter so you'll hear directly from each of us."  The formation of Alphabet did not change the role that Brin and Page take for the Company, as reflected in the following statement from the 2015 Founders' Letter written by Page: "you should expect that Sundar, Sergey, and I will use this space to give you a good personal overview of where we are and where we are going."

438.    Schmidt also has a significant role at the Company, serving at the highest levels of Google and Alphabet.  He was Google's CEO from July 2001 to April 2011.  He was also Chairman of Google's Board from March 2001 to April 2004 and from April 2007 to April 2011.  He also served as the Executive Chairman of Alphabet's Board from April 2011 to January 2018.

439.    Indeed, Brin, Page, and Schmidt have themselves explicitly stated that they are uniquely in control of Alphabet.  As the first Founders' Letter to shareholders, included in Google's Registration Statement for its 2004 IPO, discloses, "[w]e run Google as a triumvirate."  They further explain, "[t]he three of us run the company collaboratively with Sergey and me [Page] as Presidents."  The first Founders'

Letter further recognizes that the "structure is unconventional," but that "we have worked successfully in this way."

440.    The 2004 Founders' Letter also included further information about the unique impact and control that Brin, Page, and Schmidt exert over the Company.  It stated, "[t]o facilitate timely decisions, Eric, Sergey and I [Page] meet daily to update each other on the business and to focus our collaborative thinking on the most important and immediate issues."  The letter further stated, "[d]ecisions are often made by one of us, with the others being briefed later.  This works because we have tremendous trust and respect for each other and we generally think alike."  In addition, the letter stated, "Eric, Sergey, and I [Page] run the company without any significant internal conflict, but with healthy debate.  As different topics come up, we often delegate decision-making responsibility to one of us."  The letter further stated that, "Eric, Sergey and I [Page] intend to operate Google differently, applying the values it has developed as a private company to its future as a public company," also reiterating that the three would "run the company collaboratively with Eric, our CEO, as a team of three."

441.    Brin, Schmidt, and Page oversee each and every one of the Company's major decisions and launches, together with other high-ranking executives known as Alphabet's operating committee (the "OC," later renamed the "L Team," short for Larry [Page]'s Team).  The OC is a management-level committee consisting of over a dozen Google executives who advise Google's co-founders and CEO on the Company's strategic direction and all-important decision-making, including acquisitions, major contracts, and new product launches.

442.    The powerful "triumvirate" of Brin, Page, and Schmidt also exerts control over Alphabet through their dominant stock holdings.  The three dominate Alphabet's voting rights, with majority voting power.  Brin, Page, and Schmidt, respectively, have 26.3%, 25.3%, and 4.5% of total voting power at Alphabet, a dominating 56.1% of total voting power (Schmidt also owns significantly more shares of Alphabet stock through a limited partnership and a living trust, which he controls as general partner and

as co-trustee, respectively).  The Company also openly acknowledges the influence of these individuals, touting it as a strength.  For instance, in the Company's proxy statement for 2016, it stated, "[w]e believe that our success is owed in large part to the leadership and vision provided by Larry, Sergey, and Eric E. Schmidt," and that, "[t]hrough their leadership and focus on innovation and long-term growth, we have established a track record of building a strong company and creating stockholder value."  Similarly, the Company stated in its Form 10-K for fiscal year 2015 that Brin, Page, and Schmidt, "have significant influence over management and affairs and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions . . . for the foreseeable future."

**B.     Brin, Page, and Schmidt Directed and Oversaw the Company's Anticompetitive Business Practices**

443.    Alphabet's controlling stockholders, Brin, Page, and Schmidt, have directly overseen and instituted a series of anticompetitive business practices for virtually every market in which Alphabet transacts business, using dominance in one product category to gain more in the next and reinforce its monopolies.

444.    Defendant Page, one of the founders of Alphabet and a director since 1998, has served as CEO since April 2011.  Prior to that time, Page served as Google's President, Products, from July 2001 to April 2011.  As CEO with a background in the Company's Products division, Page had intimate involvement in all aspects of the Company's business strategy and has shown no qualms about engaging in illegal conduct.  For instance, in August 2011, federal prosecutors who had investigated Alphabet's practice of allowing illegal online pharmacies on its Web search engine between 2003 and 2009 singled out Page as a primary violator.  Prosecutors said Page had personal knowledge of the alleged crime and failed to prevent it, leading to Alphabet paying $500 million to avoid criminal charges.  Page has also been a primary reason why the Company has exploited its dominance in search in other areas.  As Jordan Rohan, an analyst at Stifel, Nicolaus & Co., remarked in August 2011, "[i]t's clear that Larry Page isn't

satisfied with Google's dominant position in Web search and intends to broaden the areas of dominance," even though that was inviting more government scrutiny and "bumps in the road."

445.    Defendant Brin, one of Alphabet's founders and a director since 1998, has served as President since 2001.  Like Page, Brin, too, has not been shy to directly implicate himself in violations of antitrust laws.  During his time as President, Brin was intimately involved in executing the Company's anti-poaching practices.  According to e-mails unearthed in the Anti-Poaching Action; to wit: *In re: High-Tech Employee Antitrust Litigation*, Case No. 5:11-cv-02509 (N.D. Cal. 2011), Defendant Brin took a hands-on approach in assuring Apple's employees would not be actively solicited by Alphabet – a clear violation of black letter antitrust law.  At the insistence of Brin, Alphabet agreed to enter into an anti-poaching agreement with many competitors, entitled, "Special Agreement Hiring Policy: Protocol for 'Restricted Hiring,' 'Do Not Cold Call,' and 'Sensitive Companies.'"  The Special Agreement Hiring Policy listed nine companies that the Company should not "Cold Call" – *i.e.*, an explicit agreement not to solicit employees from other companies.

446.    Defendant Schmidt has also commanded a significant role as both an executive and director of Alphabet.  He served as Executive Chairman of the Board from April 2011 to January 2018, and, prior to that, served as CEO from July 2001 to April 2011.  During his time as CEO, Defendant Schmidt had intimate involvement in the Company's anticompetitive business practices, e-mailing other company executives to discuss the illegal hiring practices.  One of his e-mails even noted that he "would prefer that [an employee] do it verbally since I don't want to create a paper trail over which we can be sued later?[.]"

447.    Defendant Schmidt also had personal knowledge of the illegal practices alleged herein.  While acting as CEO, Defendant Schmidt was called to testify before the Senate Antitrust Subcommittee regarding the Company's practice of favoring its own products over other company's products in its search results.  During that testimony, Defendant Schmidt openly admitted that Alphabet has monopoly power in the area of general search.  Defendant Schmidt also fielded many questions regarding the Company's

illegal practices.  Rather than view these practices as problematic, Defendant Schmidt basically took the position that absent a court order reprimanding Alphabet for its business practices, the Company would continue to engage in the misconduct.

448.     Defendants Page, Brin, and Schmidt have all exhibited a willingness to openly and actively flaunt antitrust laws in the past.  Their roles as controlling stockholders and executives of the Company are the primary driver of Alphabet's illegal business practices.  Given the out-sized role of Page, Brin, and Schmidt at Alphabet, their presence on the Board, and their roles as controlling stockholders, the Board went along with the illegal business practices and sat idle as these individuals fostered a top-down culture that ignored antitrust laws.

### C.     The Board Fails to Challenge the Anticompetitive Conduct Orchestrated by Brin, Page, and Schmidt

449.     As a result of the triumvirate's dominance, the Board, beholden to Page, Brin, and Schmidt, caused or failed to prevent Alphabet from engaging in a breathtaking array of illegal and anticompetitive business practices involving Alphabet's core products and services.  As described above in Section IV.D, the Board left the Company rudderless as Alphabet's monopolistic practices spread across an ever-increasing number of its product and service offerings.

## VII.     DAMAGES TO THE COMPANY

450.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Alphabet has engaged in the anticompetitive practices alleged herein.  These illegal business practices violated U.S. antitrust law, with untold and potentially severe damages and remedial measures at stake.

451.     As a direct and proximate result of the Individual Defendants' actions, Alphabet has expended, and will continue to expend, significant sums of money, including, but not limited to, costs incurred from:

A.     fines paid to the United States for violations of U.S. antitrust law;

B.  substantial legal fees incurred by the Company in responding to the litany of government investigations spawned by its anticompetitive conduct;

C.  increased regulatory scrutiny of new products and services;

D.  increased damages due to the Company's continued violations of antitrust law;

E.  costs related to implementing any corrective and/or remedial measures as a result of the regulatory actions currently pending against the Company;

F.  defending, settling, or paying any adverse judgment from any other legal actions pertaining to the Company's anticompetitive business practices described herein; and

G.  compensation and benefits paid to the Individual Defendants at the time they were breaching their duties to Alphabet and its stockholders.

452.   Finally, Alphabet's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of U.S. antitrust law.

## VIII.   CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Against the Individual Defendants in Their Capacity as Directors)

453.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

454.   The Individual Defendants owed and owe Alphabet the highest fiduciary obligations of loyalty and good faith in managing the Company's affairs.

455.   The Individual Defendants violated and breached their fiduciary duties of good faith and loyalty.  Specifically, the Individual Defendants violated their duties of good faith and loyalty by willfully ignoring the obvious and pervasive anticompetitive business practices occurring at the Company, the complete absence of internal controls in place to examine and correct those practices and prevent their recurrence, and failing to make a good faith effort to bring the Company into compliance with prevailing positive U.S. antitrust law, ultimately leading to the vast array of the illegal conduct complained of herein.

456.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages and will continue to suffer, as alleged herein.

457.     Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

<u>COUNT II</u>
**Breach of Fiduciary Duty**
**(Against Brin, Page, Schmidt, and Pichai in Their Capacity as Officers)**

458.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

459.     Defendants Brin, Page, Schmidt, and Pichai owed and owe Alphabet the highest obligations of loyalty and good faith in managing the Company's affairs.

460.     Defendants Brin, Page, Schmidt, and Pichai violated and breached their fiduciary duties of good faith and loyalty.  Specifically, Defendants Brin, Page, Schmidt, and Pichai violated their duty of good faith and loyalty by creating a culture of lawlessness within Alphabet and directing and carrying out monopolistic and anticompetitive business plans for a vast array of Alphabet products and services, outside the bounds of positive U.S. antitrust law.

461.     As a direct and proximate result of these breaches of fiduciary obligations, the Company has suffered significant damages and will continue to suffer, as alleged herein.

462.     Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

<u>COUNT III</u>
**Breach of Fiduciary Duty**
**(Against Brin, Page, and Schmidt in Their Capacity as Controlling Stockholders)**

463.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

464.     As controlling stockholders of Alphabet, Defendants Brin, Page, and Schmidt owed and owe Alphabet the highest obligations of loyalty and good faith in managing the Company's affairs.

465.     Defendants Brin, Page, and Schmidt violated and breached their fiduciary duties of good faith and loyalty.  Specifically, Defendants Brin, Page, and Schmidt violated their duties of good faith and loyalty by creating a culture of lawlessness within Alphabet and directing and carrying out monopolistic and anticompetitive business plans for a vast array of Alphabet products and services, outside the bounds of positive U.S. antitrust law.

466.     As a direct and proximate result of these breaches of fiduciary obligations, the Company has suffered significant damages and will continue to suffer, as alleged herein.

467.     Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

### COUNT IV
**Unjust Enrichment**
**(Against the Individual Defendants)**

468.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

469.     By their wrongful acts, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Alphabet in the form of salaries, bonuses, and/or other forms of compensation.

470.     The Individual Defendants' enrichment was directly and causally related to acts that have materially damaged Alphabet.

471.     These benefits were accepted by the Individual Defendants under such circumstances that make it inequitable for them to be retained.  As alleged above, the Individual Defendants breached their fiduciary duties and/or abused their positions of control at Alphabet and, therefore, are not justified in retaining the benefits conferred upon them.  These benefits should be disgorged back to the Company.

472.     Additionally, the wrongful conduct alleged herein was continuous, connected, and ongoing throughout the period of misconduct described herein.  The wrongful conduct thus resulted in continuous, connected, and ongoing harm to the Company.

473.    Plaintiff, as an Alphabet stockholder and representative of Alphabet, seeks restitution from these Individual Defendants, and each of them, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and breaches of fiduciary duty.

**COUNT V**
**Corporate Waste**
**(Against the Individual Defendants)**

474.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

475.    As alleged in detail herein, the Individual Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of Alphabet and, in the use and preservation of its property and assets, they had the highest obligation of fair dealing.  The Individual Defendants breached these duties by diverting corporate assets for improper and unnecessary purposes.  Any benefits received by the Company cannot reasonably be viewed as a fair exchange for the corporate assets and monies expended by Alphabet.

476.    The Individual Defendants' misconduct wasted Alphabet's corporate assets by paying or approving the payment of undeserved executive and/or director compensation based on the illegal conduct described herein, which exposed and continues to expose the Company to substantial civil liabilities and fines.  The handsome remuneration paid to wayward fiduciaries who breached their fiduciary duties to Alphabet was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair and reasonable.

477.    Moreover, the Individual Defendants wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the antitrust proceedings alleged herein.  No person of ordinary, sound business judgment would view the Company's legal expenditures as fair or reasonable,

given that these expenditures stem from illegal conduct of the Company of which the Individual Defendants had full knowledge and/or participated.

478.    Finally, the Individual Defendants wasted corporate assets by: (a) failing to maintain sufficient internal controls over virtually all of the Company's major products and services; (b) failing to properly consider the interests of the Company and its public stockholders; and (c) failing to conduct proper supervision.

479.    Any benefits received by the Company cannot reasonably be viewed as a fair exchange for the corporate assets and monies that Alphabet will expend as a result of the Individual Defendants' misconduct.

480.    The wrongful conduct alleged herein was continuous, connected, and ongoing throughout the period of the misconduct described herein.  The wrongful conduct resulted in continuous, connected, and ongoing harm to the Company.

481.    As a result of the Individual Defendants' wrongful conduct, Alphabet has suffered, and continues to suffer, economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.

482.    As a result of the waste of corporate assets, the Individual Defendants are liable to Alphabet.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and post-judgment interest as allowed by law resulting from the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and/or waste of corporate assets;

B.     Awarding to the Company restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

C.     Directing Alphabet to take all necessary actions to reform and improve its corporate governance practices and internal control systems to comply with applicable laws, and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to implement the following Corporate Governance Policies:

    i.     strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

    ii.     a Board Committee of independent directors to oversee compliance, particularly of antitrust laws;

    iii.     reform of Alphabet's anticompetitive practices with respect to all markets, products, and services complained of herein;

    iv.     strengthen internal controls concerning antitrust laws;

    v.     strengthen the roles of independent members of the Board in directing and overseeing the Company's operations; and

    vi.     permit the stockholders of Alphabet to nominate at least three candidates for election to the Board;

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities, or their other assets so as to ensure that Plaintiff on behalf of Alphabet has an effective remedy;

E.     Awarding to Plaintiff costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants', and experts' fees, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

1  **X.    JURY DEMAND**

2       Plaintiff hereby demands a trial by jury.

3  Dated:  December 3, 2021                Respectfully Submitted,
4                                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

5                                           *s/ Alex M. Outwater*
6                                          Alex M. Outwater (CA Bar. No. 259062)
                                           600 W. Broadway, Suite 3300
7                                          San Diego, CA 92101
                                           Telephone: 619-233-4565
8                                          aoutwater@scott-scott.com

9                                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
10                                         Geoffrey M. Johnson (*pro hac vice forthcoming*)
                                           12434 Cedar Road, Suite 12
11                                         Cleveland Heights, OH 44106
                                           Telephone: 216-229-6088
12                                         gjohnson@scott-scott.com

13                                         **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
14                                         Donald A. Broggi (*pro hac vice forthcoming*)
                                           Scott R. Jacobsen (*pro hac vice forthcoming*)
15                                         Jing-Li Yu (*pro hac vice forthcoming*)
                                           The Helmsley Building
16                                         230 Park Avenue, 17th Floor
                                           New York, NY 10169
17                                         Telephone: 212-223-6444
                                           dbroggi@scott-scott.com
18                                         sjacobsen@scott-scott.com
19                                         jyu@scott-scott.com

20                                         *Attorneys for Plaintiff*

21

22

23

24

25

26

27

28

## <u>VERIFICATION</u>

*Police and Fire Retirement System of the City of Detroit v. Larry Page*

I, DAVID CETLINSKI, do hereby declare:

1.      I am the Executive Director of the Police and Fire Retirement System of the City of Detroit ("Detroit"), located in Detroit, Michigan.

2.      Detroit is a derivative plaintiff in the above-titled action.  I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint"), to be filed in this action and that the facts stated in the Complaint, as they concern Detroit, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.      Detroit has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Detroit; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 23rd day of November, 2021.

David Cetlinski, Executive Director
Police and Fire Retirement System of the
City of Detroit
Detroit, Michigan