PATRICK COUGHLIN (CA Bar No. 111070)
MAXWELL R. HUFFMAN (CA Bar No. 264687)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
pcoughlin@scott-scott.com
mhuffman@scott-scott.com

*Lead Attorneys for Co-Lead Plaintiffs*

[Additional Counsel on Signature Page.]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED<br>Case No.: 3:21-cv-9388-RFL<br><br>**CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:  Tuesday, July 8, 2025<br>TIME:   10:00 a.m.<br>JUDGE: Hon. Rita F. Lin, U.S.D.J.<br>DEPT:   Courtroom 15 – 18th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED .................................................................. 1

MEMORANDUM OF POINTS & AUTHORITIES.......................................................... 2

I.     INTRODUCTION ................................................................................................... 2

II.    BACKGROUND .................................................................................................... 4

     A.    Factual and Procedural History.................................................................. 4

     B.    The Terms of the Proposed Derivative Settlement .................................. 8

III.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL......... 16

     A.    The Standard for Preliminary Approval ................................................. 17

     B.    The Settlement Is Within the Range of Possible Final Approval ......................... 18

         1.    Great Weight Should Be Attributed to the Parties' Belief that the Settlement Is Fair and Reasonable ............................................................. 18

         2.    The Proposed Settlement Was Reached Through Arm's-Length Negotiations and Falls Well Within an Appropriate Range for Possible Final Approval ..................................................................... 20

         3.    The Settlement Confers a Substantial Benefit on Alphabet and Easily Outweighs the Mere Possibility of Future Relief After Protracted and Expensive Litigation ............................................................. 21

         4.    The Settlement Appropriately Weighs the Benefits Conferred Upon Alphabet with the Significant Risks of Continued Litigation.................. 22

IV.   THE PROPOSED NOTICE TO ALPHABET SHAREHOLDERS IS ADEQUATE ..... 23

V.    PROPOSED SCHEDULE FOR FINAL APPROVAL.................................................. 25

VI.   CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Alberto v. GMRI, Inc.*,
 252 F.R.D. 652 (E.D. Cal. 2008) ....................................................................................17, 18

*Arace v. Thompson*,
 No. 08 Civ. 7905, 2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ...........................................24

*Cohn v. Nelson*,
 375 F. Supp. 2d 844 (E.D. Mo. 2005)......................................................................................17

*de Rommerswael ex rel. Puma Biotech., Inc. v. Auerbach*,
 No. SACV18-00236, 2018 WL 6003560 (C.D. Cal. Nov. 5, 2018).........................................22

*Garner v. State Farm Mut. Auto. Ins. Co.*,
 No. CV 08 1365 CW EMC, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)............................21

*Gautreaux v. Pierce*,
 690 F.2d 616 (7th Cir. 1982) ...................................................................................................18

*Greenspun v. Bogan*,
 492 F.2d 375 (1st Cir. 1974).....................................................................................................17

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ..................................................................................................18

*In re AOL Time Warner S'holder Deriv. Litig.*,
 No. 02 Civ. 6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)............................................17

*In re Atmel Corp. Deriv. Litig.*,
 No. C 06-4592 JF (HRL), 2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) .............................21

*In re Austrian and German Bank Holocaust Litig.*,
 80 F. Supp. 2d 164 (S.D.N.Y. 2000)........................................................................................20

*In re First Cap. Holdings Corp. Fin. Prods. Sec. Litig.*,
 MDL No. 901, 1992 WL 226321 (C.D. Cal. June 10, 1992) ...........................................19, 20

*In re Hewlett-Packard Co. S'holder Deriv. Litig.*,
 No. 3:12-cv-06003-CRB, 2015 WL 1153864 (N.D. Cal. Mar. 13, 2015) ..............................21

*In re MRV Commc'ns, Inc. Deriv. Litig.*,
 No. CV 08-03800, 2013 WL 2897874 (C.D. Cal. June 6, 2013) ...............................17, 21, 24

*In re NVIDIA Corp. Deriv. Litig.*,
 No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) .......17, 20, 21, 23

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ............................................................................19

*In re PMC–Sierra, Inc. Deriv. Litig.*,
   No. 06-cv-05330-RS, 2010 U.S. Dist. LEXIS 5818 (N.D. Cal. Jan. 26, 2010)......................24

*In re Rambus Inc. Deriv. Litig.*,
   No. C 06-3513 JF (HRL), 2009 WL 166689 (N.D. Cal. Jan. 20, 2009)................................21

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ........................................................................17, 23

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970).........................................................................................21

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)..........................................................................................24

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................18, 20

*Officers for Just. v. Civil Serv. Comm'n of City and Cnty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982) ........................................................................16, 18

*Sved v. Chadwick*,
   783 F. Supp. 2d 851 (N.D. Tex. 2009) ................................................................22

*True v. Am. Honda Motor Co., Inc.*,
   No. EDCV 07-287, 2009 WL 838284 (C.D. Cal. Mar. 25, 2009)....................................17, 18

*U.S. v. McInnes*,
   556 F.2d 436 (9th Cir. 1977) ............................................................................16

*Villanueva v. Morpho Detection, Inc.*,
   No. 13-cv-05390-HSG, 2015 WL 4760464 (N.D. Cal. Aug. 12, 2015)................................23

*Williams v. First Nat'l Bank*,
   216 U.S. 582 (1910).......................................................................................2, 16

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P.
   Rule 23.1....................................................................................................1, 25
   Rule 23.1(c)..................................................................................................17

8 *Del. C.*
   §220..............................................................................................................4

15 U.S.C.
   §2................................................................................................................14

OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION, §21.632 (4th ed. 2004) ...................................................17, 18

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on Tuesday, July 8, 2025, or at such other date and time as ordered by the Court, in Courtroom 15, 18th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Co-Lead Plaintiffs in the above-captioned consolidated shareholder derivative action (the "Action") will appear before the Honorable Rita F. Lin, U.S.D.J., to move (the "Motion"), pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, for entry of an order granting preliminary approval of the Joint Stipulation and Agreement of Settlement (the "Stipulation" or "Stip.")[1] entered between and among the Parties to the instant Action.

This Motion seeks an order (the "Preliminary Approval Order"):[2] (a) granting preliminary approval of the settlement embodied within the Stipulation (the "Settlement"); (b) directing that notice of the Settlement (including the Fee Award Provision), be provided to current shareholders of Alphabet, Inc. ("Alphabet" or the "Company"), in substantially the form and method agreed to by the Parties and as ordered by the Court; (c) setting the deadline and procedure for current Alphabet shareholders to file and serve objections, if any, to the proposed Settlement in a form and manner directed by the Court; and (d) setting a date for a hearing on a motion for final approval of the Settlement (the "Settlement Hearing").

This motion is based on the accompanying Yu Declaration, and exhibits thereto, the Court's file, and such other matters as may be considered at the hearing.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Settlement, wherein the Board of Directors (the "Board") of Alphabet has agreed to adopt, fund, maintain, and implement important corporate governance reforms upon final approval, is within the range of possible approval such that notice of the Settlement should

---

[1]    The Stipulation is filed as Exhibit 1 to the Declaration of Jing-Li Yu in Support of Co-Lead Plaintiffs' Unopposed Notice of Motion and Motion for Preliminary Approval of Settlement (the "Yu Decl." or "Yu Declaration"), filed contemporaneously herewith.  All capitalized terms herein, unless otherwise defined, have the same meaning as set forth in the Stipulation.

[2]    The proposed Preliminary Approval Order is filed with the Motion.

1

be directed to current Alphabet shareholders and a date for a Settlement Hearing should be set by the Court.

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

Co-Lead Plaintiffs and Defendants[3] have reached a settlement in the above-captioned Action resolving claims brought derivatively on behalf of Alphabet.  This settlement consists of a historic $500 million in funding for comprehensive reforms, over 10 years, that requires Alphabet and its main subsidiary, Google LLC ("Google"), to completely revamp and rebuild its global compliance structure, both at the board and executive level.  The Settlement will transform the regulatory and compliance environment at Google, and will provide incalculable benefits to the Company and its shareholders in the years to come.

As a result, Co-Lead Plaintiffs now seek an order from the Court: (i) granting preliminary approval of the proposed Settlement; (ii) directing that notice of the proposed Settlement be given to Alphabet's shareholders in the proposed form and manner submitted herewith; and (iii) scheduling a hearing before the Court to determine whether the proposed Settlement should be granted final approval.  As set forth in detail herein and in the Stipulation attached hereto, the proposed Settlement, including the corporate governance reforms that will be implemented and funded promptly, which directly address and seek to prevent the alleged wrongdoing from occurring again, finally resolves all the claims asserted in the Action.

The Settlement is the product of extensive arm's-length negotiations among the Parties to the Action.  The Settlement contains four components, interrelated, that we believe will substantially enhance Alphabet's compliance with regulatory requirements, both in the antitrust area and beyond.

*First*, the Company has agreed to create a committee of the Board, the Risk and Compliance Committee ("RCC").  Previously, regulatory oversight matters were the purview of

---

[3]    "Defendants" collectively refers to Larry Page, Sergey Brin, John L. Hennessy, L. John Doerr, K. Ram Shriram, Ann Mather, Alan R. Mulally, Roger W. Ferguson, Jr., Robin L. Washington, Frances H. Arnold, Sundar Pichai, and Eric E. Schmidt (collectively, the "Individual Defendants"), and Alphabet.

the Audit and Compliance Committee of the Board.  These matters will now be the sole focus of the RCC, which we believe will enhance Board oversight.  Relatively few major public companies have such a dedicated committee.  Adoption of this innovation by Alphabet may well spur other technology companies to follow suit.

*Second*, the Company has designed and committed to the implementation of advanced, elaborate internal compliance mechanisms.  These compliance mechanisms include: i) a new senior VP-level committee that will handle regulatory and compliance issues Company wide and will report directly to the CEO and the new Board-level RCC; (ii) a new rank-and-file executive-level compliance committee consisting of managers from each of Alphabet's product teams and its internal compliance experts, which will report directly to the senior VP-level compliance committee and will assist the senior VP-level committee with its work; and (iii) a complete overhaul Company-wide of Alphabet's policies and processes for handing risk assessment, legal advising, third-party commitments and contracts, compliance program management, governance operations, assurances, systems for checking for noncompliance, compliance complaints and appeals, third-party compliance management, and compliance reporting to third-party stakeholders, among other things (collectively, the "Corporate Reforms").  These will enhance Alphabet's regulatory compliance, not just in the United States, but globally, and not just with respect to antitrust, but also in connection with a variety of regulatory matters.  As one set of the Corporate Reforms relates to Google's interactions with third parties, including contracts with third parties, these specifically address the conduct at issue in the underlying antitrust actions, which involve Google's contracts with third parties that ensure exclusive default placement, or contracts with third parties that funnel them into Google's app store and in-app payment processing, or Google's treatment of third-party publishers and advertisers in Google's Ad Tech.

*Third*, the Company – after quite challenging negotiations – has committed to fund all these compliance efforts at a significant level:  a total of $500 million over the next 10 years.  This should ensure that the well-designed new regulatory-compliance enhancements are implemented fully.  Alphabet has also agreed to commit a minimum of $500 million to fund the Corporate

1    Reforms over 10 years.  This guaranteed funding level is a significant corporate benefit because
2    it ensures that adequate resources will be devoted to implement the Corporate Reforms.

3        **Fourth**, Alphabet has committed to implementing policies that ensure that previously
4    ephemeral communications are preserved, so that compliance with the various measures created
5    by this settlement can be monitored and enforced.

6        The Co-Lead Plaintiffs here – two respected institutional investors with longstanding
7    commitments to high standards of corporate governance – are proud of these interrelated elements
8    of the Settlement.  Together, they will take Google's regulatory compliance to a new level that
9    we believe will set a benchmark for other major American corporations.

10       In sum, the Settlement provides significant and material benefit to Alphabet, was reached
11   after intensive arm's-length negotiations between experienced and informed counsel on both
12   sides, and is well within the range of what might be approved as fair, reasonable, and adequate at
13   a final approval hearing.  Accordingly, Co-Lead Plaintiffs respectfully submit, and Defendants
14   do not oppose, that the Court should enter the Preliminary Approval Order, granting preliminary
15   approval of the Settlement and providing for notice to Alphabet's shareholders.

16   **II.     BACKGROUND**

17       **A.     Factual and Procedural History**

18       This lawsuit alleges that under the management and oversight of the Board, Alphabet
19   engaged in systematic anticompetitive behavior across several core business operations, including
20   advertising, searching, and Google Play services.  ¶1.[4]  This anticompetitive conduct broadly
21   exposed the Company to antitrust investigations and enforcement actions by the U.S. Department
22   of Justice ("DOJ"), state attorneys general, the U.S. House of Representatives, foreign authorities,
23   and private litigation.  *See* ¶¶2, 411–17, 552–53, 702–855, 880–95.

24       Between February 10, 2021, and October 1, 2021, Co-Lead Plaintiffs sent books and
25   records demands seeking Board-level materials relating to the potential wrongdoing pursuant to

26

27   [4]       All "¶_" and "¶¶__" references herein are to the Verified Amended Consolidated
     Shareholder Derivative Action Complaint and Jury Demand filed in redacted form and
28   provisionally under seal on May 30, 2025 (ECF Nos. 84 and 85-4, respectively) (the "Amended
     Complaint").

8 *Del. C.* §220 ("Section 220") (the "220 Demands").  On April 28, 2021, and July 12, 2022, Alphabet produced certain corporate books and records to Co-Lead Plaintiffs in response to the 220 Demands.

Utilizing documents produced in response to the 220 Demands, Co-Lead Plaintiffs filed two verified shareholder derivative complaints on behalf of nominal defendant Alphabet: 5:21-cv-09388 ("*Detroit*"), ECF No. 1, and 5:21-cv-09389 ("*Bucks County*"), ECF No. 1.  On December 8, 2021, the Court consolidated these two cases and appointed the law firm of Scott+Scott Attorneys at Law LLP as Plaintiffs' Lead Counsel.  *Detroit* ECF Nos. 27, 28.  On January 14, 2022, Co-Lead Plaintiffs filed a Consolidated Amended Complaint, which asserted claims for (1) breach of fiduciary duty, (2) unjust enrichment, and (3) corporate waste.  *Detroit* ECF No. 32.  On May 30, 2025, Co-Lead Plaintiffs amended their complaint.  ECF No. 84.  Each of those claims relates to alleged anticompetitive business practices and decisions and seeks to hold Alphabet's leadership responsible for allegedly exposing the Company to government investigations and lawsuits, as well as other related civil litigation.  The Amended Complaint alleges that Co-Lead Plaintiffs have standing to bring the shareholder derivative claims because a demand on Alphabet's Board would have been futile.  *Id.*

The Action seeks: (1) a judgment against the Individual Defendants and in favor of Alphabet for the amount of damages sustained by the Company or which will be sustained as a result of the Individual Defendants' alleged violations of law, along with pre- and post-judgment interest as allowed by law; (2) a judgment against the Individual Defendants and in favor of Alphabet for restitution and disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants; (3) injunctive relief directing Alphabet to take all necessary actions to reform and improve the Company's corporate governance practices and internal control systems to comply with applicable laws and to protect Alphabet and its shareholders from a repeat of the misconduct alleged in the complaints; (4) extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities, or their other assets; (5) reasonable attorneys' fees, accountants'

1  fees, consultants' fees, experts' fees, and expenses; and (6) other and further relief that this Court
2  may deem just and proper.  Am. Compl., Prayer for Relief at 349, ECF No. 84.

3       Although active motion practice has been on hold owing to the numerous progressing
4  pending antitrust suits against Google, Co-Lead Plaintiffs have been hard at work keeping up to
5  date with the rapidly evolving antitrust and technological landscape, as well as making serious
6  progress during the pendency of this Action in attempting to resolve it.  To that end, since the
7  consolidated complaint in this Action was filed, the Parties undertook negotiations regarding a
8  possible resolution of the Action and engaged in extensive ADR proceedings.  The Parties
9  participated in several in-person mediation sessions.  Apart from the formal sessions, the Parties
10  held many one-on-one discussions and engaged in specific negotiations on particular features of a
11  potential settlement.  To assist Co-Lead Plaintiffs with assessing the strength of their claims,
12  Defendants agreed to re-produce to Co-Lead Plaintiffs the documents that Google produced to the
13  Texas AG's office, consisting of more than 1.1 million pages of communications, contracts, and
14  other documents.  This production was made to Co-Lead Plaintiffs on May 31, 2022.  On June 9,
15  2023, to further assist Co-Lead Plaintiffs in assessing the strength of their claims, Defendants
16  produced numerous deposition transcripts from numerous antitrust cases against Google.  And on
17  November 1, 2024, Alphabet further produced 52,818 pages of trial exhibits from the underlying
18  antitrust actions (collectively, the "Production").  Co-Lead Plaintiffs, through their counsel,
19  reviewed all of these documents to assess the strength of their claims.

20       In addition, throughout the pendency of this case, Co-Lead Plaintiffs and their counsel also
21  kept up to date with factual developments, including reviewing the trial transcripts and exhibits
22  from: *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C.), *State of Colorado v.*
23  *Google LLC*, No. 1:20-cv-03715-APM (D.D.C.), *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-
24  05671-JD (N.D. Cal.), and *United States v. Google LLC*, No. 1:20-cv-00108-LMB-JFA (E.D. Va.).
25  On a day-to-day basis, Co-Lead Plaintiffs and their counsel also kept up to date with other
26  regulatory, litigation, and factual developments.  For example, the rapid growth of artificial
27  intelligence required extensive and ongoing factual review by the trial team.  In addition, Co-Lead
28  Plaintiffs and their counsel have been monitoring ongoing regulatory actions in Europe, where

6

1    Google is being investigated for its compliance with the Digital Markets Act ("DMA").

2            The Amended Complaint filed in this Action, at ECF No. 84, demonstrates the efforts Co-

3    Lead Plaintiffs have placed into investigating and documenting the numerous types of

4    anticompetitive conduct that Google has been accused of.  As a result of those arm's-length

5    negotiations, Co-Lead Plaintiffs and Defendants reached a tentative agreement-in-principle for the

6    resolution of the Action.  On April 9, 2025, Co-Lead Plaintiffs and Defendants executed a

7    Memorandum of Understanding (the "MOU"), memorializing the terms of their agreement-in-

8    principle to resolve the Action, subject to the approval of the Board.

9            Co-Lead Plaintiffs and their counsel recognized that because of the rapidly developing

10   technology landscape, including the fast-paced evolution of AI, and because Google has engaged

11   and may engage in other anticompetitive conduct or otherwise violate evolving laws and

12   regulations, a meaningful resolution to Co-Lead Plaintiffs' action that would benefit the Company

13   would require the Company to enact robust and comprehensive corporate governance reforms,

14   rather than narrowly focus on past or future antitrust issues.

15           Following agreement among the Parties to the terms of the Stipulation, other than with

16   respect to the amount of any attorneys' fees and expenses to be paid to Co-Lead Plaintiffs'

17   Counsel, Plaintiffs' Lead Counsel and Defendants' counsel separately reached agreement

18   regarding the amount of attorneys' fees and expenses to be paid to Plaintiffs' Lead Counsel.  The

19   Parties did not discuss the appropriateness of any amount of attorneys' fees and expenses before

20   all other terms of the Settlement were agreed upon, and the Settling Parties understood at all times

21   that the Settlement was not contingent upon agreement or payment of any attorneys' fees and

22   expenses to Plaintiffs' Lead Counsel.

23           As a result of these negotiations, the Parties reached an agreement to settle the Action

24   upon the terms and conditions set forth in the Stipulation.

25           On April 16, 2025, the Alphabet Board approved the Settlement.  Separately, on April 16,

26   2025, Co-Lead Plaintiff Bucks County's Boards of Trustees also approved the Settlement.  On

27   April 17, 2025, Co-Lead Plaintiff Detroit's Board of Trustees also approved the Settlement.

28

7

Co-Lead Plaintiffs have owned shares of Alphabet common stock since the outset of the Action and continue to do so. Co-Lead Plaintiffs, having thoroughly considered the facts and law underlying the Action, and based upon the investigation and prosecution of the Action, and after weighing the risks of continued litigation, and the value of the proposed Settlement, have determined that it is in the best interest of Alphabet and Alphabet shareholders that the Action be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation, and that those terms and conditions are fair, reasonable, and adequate to Alphabet and Alphabet shareholders.

The Individual Defendants have denied and continue to deny the allegations of wrongdoing and the allegations of liability arising out of the conduct, statements, acts, or omissions alleged, or that could have been alleged in the Action. Nonetheless, the Individual Defendants have concluded that further proceedings would be protracted, expensive, and uncertain, and have determined that it is desirable that the claims against them be settled to avoid further distraction, disruption, and to reduce the risk and expense of further litigation, on the terms reflected in the Stipulation.

### B.    The Terms of the Proposed Derivative Settlement

On April 9, 2025, Scott+Scott Attorneys at Law LLP and Defendants' counsel reached a settlement, subject to the approval of the respective Parties' boards of directors or trustees, with robust corporate governance reforms and $500 million in new funding for global compliance measures that the Company has committed to keep in place for 10 years. Stipulation, ¶1.6. This funding ensures that Alphabet and Google will devote sufficient resources to ensure that the agreed to reforms will actually be implemented and will be effective. To ensure that the reforms will lead to a deeply rooted culture change, the Settlement states that they are to last for at least four years. *Id.*, ¶1.2. These reforms, rarely achieved in shareholder derivative actions, constitute a comprehensive overhaul of Alphabet's compliance function, and address all of the problems identified above, as well as prevent future compliance and antitrust problems from arising.

The reforms will ensure that Alphabet will have Board-level oversight into all risk and compliance issues. Currently, Alphabet's Board has one committee that oversees both financial

1    reporting and accounting compliance, as well as regulatory and legal compliance, in its Audit and

2    Compliance Committee.  But as the antitrust actions, as well as numerous other litigation,

3    illustrate, Alphabet faces a wide variety of regulatory, compliance, and enterprise risks that

4    require more in-depth and regular oversight that can best be achieved through a standalone

5    committee.  To that end, the Settlement specifies that the Board shall charter a new committee

6    devoted solely to overseeing regulatory, compliance, and enterprise-risk issues, to be called the

7    Risk and Compliance Committee ("RCC").  *Id.*, ¶1.4.

8         The Settlement will also improve the Company's "[r]egulatory [r]eadiness" by having the

9    Company's "compliance function include[] compliance specialists and advisors from the

10   Company's Global Affairs unit (or successors thereto) responsible for evaluating and addressing

11   new or changing areas of principal compliance risk to the Company, in key risk domains,

12   including Competition" and "[t]he Company will ensure that its compliance function is designed

13   to employ a risk-based, cross-company, global, compliance strategy that analyzes current

14   compliance measures and works to ensure that the Company's products and services minimize

15   regulatory risk."  *Id.*, ¶1.3(a) and (b).

16        As the antitrust actions and Co-Lead Plaintiffs' Amended Complaint illustrate, many

17   anticompetitive decisions were led at the executive level.  At the highest executive level, Sundar

18   Pichai (CEO of Google and, as of 2019, Alphabet) met with Tim Cook, the CEO of Apple, to

19   discuss how the companies could work together.  ¶236.  A senior executive, Philip Schindler, met

20   with Facebook, Inc. (now Meta, Inc.), executives to negotiate an agreement to steer Facebook

21   away from endorsing header bidding, which would have threatened Google's Ad Tech business.

22   ¶654.  Other senior executives at Google, including then-CFO Ruth Porat (who is now in charge

23   of business development), negotiated or approved payments and other incentives to game

24   developers to induce them to not offer alternative app stores, to protect Google's own monopoly

25   on app stores, as part of "Project Hug."  ¶415(f).  These are merely a few examples among many

26   of senior-executive-level involvement in anticompetitive conduct that has led to significant

27   liability findings and both private and government lawsuits.

28

1      The Settlement will prevent future such problems from recurring because it will ensure

2  that Alphabet and Google executives will take a more active role in overseeing regulatory and

3  compliance issues.  To that end, the Settlement establishes a new senior-VP-level committee that

4  will handle regulatory and compliance issues Company-wide, which will report directly to the

5  CEO and the new Board compliance committee.  Emphasizing its broader compliance and risk

6  oversight role, the new committee will be called a "Trust & Compliance Council" ("TCC") to

7  "assist the RCC to oversee and monitor the Company's compliance with regard to Google LLC

8  (including its subsidiaries), by providing a forum to discuss specific high-impact Trust and

9  Compliance initiatives, to provide recommendations as needed related to prioritization risks and

10 associated resource allocations, and to discuss areas of risk identified as high or critical."  Stip.,

11 ¶1.5(a).  The TCC's membership "shall include multiple Senior Vice Presidents who report

12 directly to the Company's CEO, and who meet (at a minimum) quarterly."  *Id.*

13     The antitrust actions and Co-Lead Plaintiff's Amended Complaint also show that day-to-

14 day activities can foster anticompetitive conduct, because day-to-day activities are required to

15 maintain Google's anticompetitive practices, such as testing "pricing knobs" to increase ad

16 revenues without advertising knowledge, enforcing the exclusive use of Google's in-app billing

17 software for app developers, or engineering rigged auctions that give Google AdX a "first" or

18 "last look" advantage.  *E.g.*, ¶¶211–27, 480–93, 699(j)–(o).  The Settlement will prevent such

19 issues from recurring by implementing more day-to-day regulatory and compliance issues

20 through a new rank-and-file executive-level compliance committee consisting of managers from

21 each of Alphabet's product teams and its internal compliance experts, which will report directly

22 to the senior VP-level compliance committee and will assist the senior VP-level  committee with

23 its work.  To reflect its broader role beyond antitrust and compliance issues, the new committee

24 shall be called a "Trust & Compliance Steering Committee" ("TCSC") that will "support the TCC

25 by providing a forum for cross-functional alignment on significant compliance initiatives and by

26 providing direction on recommendations and escalations to the TCC.  The TCSC shall include

27 Vice Presidents across functions and PAs and shall meet (at a minimum) six times annually."

28 Stip., ¶1.5(b).

1        At the same time, the new executive-level oversight specifically is ***not*** meant to prevent

2  lower-level employees from raising their concerns to the Board.  To that end, the Settlement

3  provides, "[n]othing in this section shall prevent other individuals from reporting to the RCC on

4  matters suitable for the RCC's attention, as set out in the RCC's charter."  *Id.*, ¶1.5(c).

5        In addition to buttressing personnel, the Settlement creates a complete overhaul Company-

6  wide of Alphabet's policies and processes for handing risk assessment, legal advising, third-party

7  commitments and contracts, compliance program management, governance operations,

8  assurances, systems for checking for noncompliance, compliance complaints and appeals, third-

9  party compliance management, and compliance reporting to third-party stakeholders, among

10  other things.  These process improvements will result from:

11      • placement of compliance specialists across business units and all relevant product

12          areas ("PAs"), thus "providing a continuing advisory and oversight role, including

13          updates to" the TCC and TCSC "as necessary and appropriate based on risk-

14          assessments."  Stip., ¶1.3(c);

15      • closely integrate compliance with product and business teams, "including in the form

16          of support by engineers, product managers, and other staff in the PAs for relevant

17          compliance enhancement projects."  *Id.*, ¶1.3(d);

18      • provide regular advice and oversight through: providing legal advice; maintaining an

19          "Enterprise Risk Framework and top-line key risk indicators" and establishing and

20          maintaining relevant controls, monitoring, and training.  *Id.*, ¶1.3(e)(i) and (ii);

21      • "[c]entralizing regulatory obligation efforts" and the like.  *Id*., ¶1.3(e)(iii);

22      • developing "compliance policies and processes with key stakeholder teams and

23          advising PAs on compliance requirements."  *Id.*, ¶1.3(e)(iv);

24      • "[m]aintaining charters and managing meetings for compliance governance forums,

25          including the TCC and TCSC, operating compliance governance processes, and

26          maintaining top-level performance metrics for the Compliance Function."  *Id*.,

27          ¶1.3(e)(v); and

28

PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT
CASE NO. 3:21-cv-09388-RFL

- "[m]onitoring and testing controls, reporting on control documentation, efficacy, performance, metrics, monitoring and advisory of remediation activities." *Id.*, ¶1.3(e)(vi).

Moreover, the Settlement commits the Company to "ensure that its compliance function is designed to apply a risk-based framework for evaluating and addressing new or changing areas of principal compliance risk, drawing on industry best practices and guidance that outlines the criteria and methodology to be used when designing and/or evaluating compliance programs and related processes and systems." *Id.*, ¶1.3(f). The Settlement ensures that the compliance "framework will take into consideration the U.S. Department of Justice's guidance for evaluating the effectiveness of a compliance program . . . as well as other applicable global regulatory guidance." *Id.* Because they are keyed to the stringent standards of the DOJ, the process reforms will ensure best-in-class compliance. Specifically, the compliance framework will contain the following components:

- "[p]rocesses and programs to identify the types of misconduct (as well as the gravity of associated risks) most likely to occur in connection with its businesses. Such assessments will, if appropriate, include a nomenclature of categorizing risks in high, moderate, and low categories." *Id.*, ¶1.3(f)(i);

- "[p]olicies articulating Company rules, guidelines, and compliance expectations to relevant personnel; periodically assess and revise policies, procedures, codes of conduct, and training methods to ensure their efficacy in promoting a culture of compliance." *Id.*, ¶1.3(f)(ii);

- "[r]eview and revise (as needed) the processes and methodologies associated with oversight of Google's third-party contracting processes." *Id.*, ¶1.3(f)(iii);

- a variety of processes and controls, with "[p]rocesses to (1) facilitate compliance with laws, regulations, rules, and policies, and (2) reduce the risk of noncompliance or other outcomes that could harm the Company's business. Controls to (1) document compliance requirements, and (2) facilitate risk identification, prevention, and remediation." *Id.*, ¶1.3(f)(iv). And controls that may include: (i) "Preventative controls, which are designed to present or lessen the chance of noncompliance before it occurs, e.g., use of encryption to prevent unauthorized access to user data;" (ii) "Detective controls, which are designed to identify noncompliance after it occurs, such as when a preventive control fails"; and (iii) "Remedial controls, which are designed to mitigate and reduce the effects of noncompliance after it occurs, as well as reduce the likelihood that noncompliance would re-occur." *Id.*;

- furthermore, "[i]nternal monitoring/auditing systems to detect instances of noncompliance within the corporation; tools to facilitate compliance with laws, regulations, rules, and policies, including anonymous reporting of non-compliance

12

(e.g., a "hotline" phone number or email address made available to both internal and external parties)." *Id.*, ¶1.3(f)(v);

- "[m]echanisms to process internal complaints in a timely and transparent manner." *Id.*, ¶1.3(f)(vi);

- managing third parties: "[e]valuate the risk profile of third parties with which the Company has engaged or is considering engaging; conduct due diligence on potential merger partners or acquisition targets and ensure that if/when an entity is acquired or merged, it is integrated into the Company's compliance program." *Id.*, ¶1.3(f)(vii);

- "[p]rocesses to ensure that regulators, customers, and/or competitors are provided with applicable complete and accurate compliance reporting. This entails, among other things, processes for (1) tracking regulatory requests, (2) compiling and reviewing information slated for disclosure, and (3) obtaining internal approvals for regulatory reporting and disclosures." *Id.*, ¶1.3(f)(viii);

- "central repositories" for "documentation to show the implementation of this Settlement." *Id.*, ¶1.3(f)(ix);

- continuous compliance by "ensur[ing] that its compliance function assists in providing centralized oversight, monitoring, and reporting through each phase of the Company's compliance process, including design, implementation, and assurance." *Id.*, ¶1.3(f)(x); and

- "[t]he Company will ensure that its compliance function not only seeks to minimize regulatory risk, but also to promote transparency, increase auditory efficacy, and demonstrate its commitment to building (and maintaining) user trust." *Id.*, ¶1.3(f)(xi).

The Settlement will also have a direct prophylactic impact on the types of anticompetitive conduct that underly Co-Lead Plaintiffs' Amended Complaint and the antitrust actions that went to trial or were led by the DOJ and numerous state AGs. For example, Google entered numerous anticompetitive agreements. In the Search cases, Google entered numerous contracts giving it exclusive default positioning at key search access points in return for sharing revenues. ¶¶235–88. Given Google's already wide margin of market dominance, its contracting counterparties could not afford to terminate those contracts because it would involve giving up billions of dollars in revenues. For smaller browser companies such as Mozilla, those revenues constitute the vast majority of its operating budget. ¶261. Even for Apple, giving up the revenue from Google could be more than a sixth of its operating profits. ¶242. Similarly, Google has achieved a monopoly in the ad exchange space by funneling demand from its ad server only through the ad exchange. ¶699(i). The ad server demand, built up from Google's dominant search engine, is so large that no advertiser could realistically forego access to it no matter how much better features a rival ad

13

1   exchange may have.  *Id.*  And for Google Play Store, Google entered agreements with OEMs that

2   bribed them with revenue share to give Google Play Store default positioning on their devices,

3   and then further prevented rival app stores from taking root by creating a process with multiple

4   steps and "scare screens" to discourage their download, and by agreements with major developers

5   to forego creating their own app stores.  ¶541.

6        More broadly, all the antitrust actions identify Google's anticompetitive conduct directed

7   against third parties – against advertisers or app developers, or against Google's customers in the

8   form of worsening quality and stifling competitive innovation.  For example, in the Search cases,

9   the U.S. District Court for the District of Columbia found that Google, through its monopoly

10  power, harmed advertisers by giving them less information and by increasing prices.  ¶¶210–33.

11  Co-Lead Plaintiffs, Google competitors, and the Colorado AG's action also emphasized how

12  Google stifled competition from specialized search providers when Google engaged in various

13  forms of self-preferencing: for example, by misappropriating other providers' data and featuring

14  it on the Google search results page, which drove traffic to Google but stifled traffic to other sites.

15  *E.g.*, ¶¶383–87.

16       Similarly, Co-Lead Plaintiffs also identified problems in Google's Ad Tech that were the

17  subject of suits by the United States and a group of state AGs, filed in the U.S. District Court for

18  the Eastern District of Virginia (where, in May 2025, the court found liability against Google),

19  and by another group of state AGs, filed in the U.S. District Court for the Eastern District of

20  Texas.  ¶¶552–53.  These problems include how Google made its ad exchange the only means to

21  obtain demand from its ad server where it had a huge pool of demand from publishers, so that

22  advertisers were forced to use Google's ad exchange to access that demand and thus pay above-

23  market fees to Google, and how Google rigged ad auctions to give itself or advertisers who used

24  its ad exchange an unfair advantage, through mechanisms such as giving Google a "first look" or

25  a "last look" or by setting a uniform pricing floor to reduce bidders' flexibility.  *See* ¶¶698–99.

26       Co-Lead Plaintiffs also found, and Epic Games, Inc. ("Epic"), and a coalition of states led

27  by the Utah AG in separate actions alleged, that Google violated the Sherman Antitrust Act of

28  1890, 15 U.S.C. §2, by entrenching its monopoly in mobile app stores and in-app payment

14

1  processing, through conduct such as using "scare screens" to discourage downloading alternative

2  app stores or apps directly outside of the app store ("sideloading"); forcing app developers to use

3  Google Play Billing to process payments for in-app purchases; and paying some app developers

4  large amounts of money or other benefits to steer them away from developing their own app

5  stores. *See* ¶¶411–537.  The state AGs settled with Google shortly before trial, but the settlement

6  is pending approval.  ¶417.  Meanwhile, Epic took its case to trial and a jury found Google to be

7  liable on all counts.  ¶¶538–40.  The Court then entered a permanent injunction that, among other

8  things, will allow third-party developers to host app stores on Android devices and allow third-

9  party developers to place their app stores in Google Play to ease discovery and downloading.

10  ¶543.

11        The reforms in the Settlement directly address and are designed to prevent misconduct

12  identified in Co-Lead Plaintiffs' Amended Complaint and in the antitrust actions as they relate to

13  third parties, particularly in the three areas that have drawn the most government scrutiny –

14  Search; AdTech; and the Play Store – which all concern Google's conduct with respect to third

15  parties.  For example, the reforms commit the Company to overseeing compliance issues relating

16  to third-party contracts, which were all at issue in the Search and Play Store actions.  The reforms

17  also commit the Company to transparent compliant reporting to external stakeholders, such as

18  regulators, customers, and competitors, which would help ensure that Google does not engage in

19  anticompetitive conduct such as forcing third parties to use tied Google products and would

20  discourage Google from using secret methods that disadvantage third parties, such as the auction

21  manipulation at issue in the Ad Tech cases, the "scare screens" meant to prevent sideloading at

22  issue in the Play Store cases, and the price and data manipulation and self-preferencing that

23  disadvantage advertisers at issue in the Search cases.

24        In addition to the antitrust misconduct identified in each of the above actions, each court

25  that has tried antitrust actions against Google criticized Google for its poor document retention

26  practices and for improperly designating communications as attorney-client privileged.  ¶¶856–

27  74.  The practice that each court criticized – and in the case of *Epic Games v. Google*, imposed

28  sanctions against – was Google's practice of automatically and permanently deleting internal

1    messages, or "chats," within 24 hours, by default, unless one of the chat participants turned "on"

2    their "history."  As the Court in *Epic Games, Inc. v. Google, LLC* stated, it was the "most serious

3    and disturbing evidence" the court had encountered "with respect to a party intentionally

4    suppressing potentially relevant evidence in litigation."  ¶867.

5         In addition to the broader compliance-related reforms discussed above, Plaintiffs' Lead

6    Counsel also negotiated with Defendants' counsel reforms specifically tailored to the Company's

7    Google Chat Communications Policy that will prevent the discovery misconduct identified in the

8    actions above from occurring further.  The Company commits to maintaining policies, processes,

9    and capabilities that: (1) allow individual conversation retention settings ("history on" or "history

10   off") when an employee on legal hold is in that conversation; (2) ensure that all Google-owned

11   messages of an employee on legal hold are preserved from the date the hold was issued for the

12   duration of the hold; and (3) any original, edited, or deleted text of employees subject to a legal

13   hold will be automatically preserved from the time of the issuance of the hold.  Stip., ¶1.7.

14   **III.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL**

15        The Settlement creates significant material benefits for Alphabet and is the result of

16   intense arm's-length negotiations by experienced counsel under the auspices of experienced

17   mediators.  As a result of the filing, prosecution, and settlement of the Action, Defendants have

18   agreed to implement and fund meaningful corporate governance reforms designed to prevent the

19   misconduct alleged in the Amended Complaint.  Accordingly, Co-Lead Plaintiffs respectfully

20   submit that the Settlement is fair, reasonable, and adequate, and should be preliminarily approved

21   by the Court.  Defendants agree that the Settlement is fair, reasonable, and adequate, and should

22   be preliminarily approved by the Court.

23        It is well settled that "[c]ompromises of disputed claims are favored by the courts."

24   *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Officers for Just. v. Civil Serv. Comm'n*

25   *of City and Cnty. of S.F.*, 688 F.2d 615, 635 (9th Cir. 1982) (recognizing that the "settlement

26   process [is] favored in the law"); *U.S. v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) (explaining

27   that "there is an overriding public interest in settling and quieting litigation").  This is particularly

28   true with respect to shareholder derivative litigation, "because such litigation is 'notoriously

difficult and unpredictable.'"  *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983).[5]  *See also In re AOL Time Warner S'holder Deriv. Litig.*, No. 02 Civ. 6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) (recognizing that public policy favors settlement of shareholder derivative litigation); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (settlement of shareholder derivative suits is "'particularly favored'").

### A.    The Standard for Preliminary Approval

Federal Rule of Civil Procedure 23.1(c) provides that "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  In addition, Rule 23.1(c) mandates that "[n]otice of a proposed settlement . . . must be given to shareholders or members in the manner that the court orders."  This generally involves a two-step process.  "[U]nder Ninth Circuit precedent, [the] Court must grant preliminary approval of a settlement, including approval of the notice to shareholders and the proposed method of notice, before having the final settlement hearing." *In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008); *In re MRV Commc'ns, Inc. Deriv. Litig.*, No. CV 08-03800, 2013 WL 2897874, at *2 (C.D. Cal. June 6, 2013) ("[A]pproval of a derivative action appears to be a two-step process, similar to that employed for approving class action settlements, in which the Court first determines whether a proposed settlement deserves preliminary approval and then, after notice of the settlement is provided to class members, determines whether final approval is warranted."); *True v. Am. Honda Motor Co., Inc.*, No. EDCV 07-287, 2009 WL 838284, at *3 (C.D. Cal. Mar. 25, 2009) (citing MANUAL FOR COMPLEX LITIGATION, §21.632 (4th ed. 2004) ("*Manual*")); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974) (preliminary approval and notice in a derivative action is designed to "'fairly apprise'" the company's shareholders "'of the terms of the proposed settlement and of the options that are open to them'").

At this time, the Court need only ***preliminarily*** approve the Settlement by "conduct[ing] a cursory review of the terms of the parties' settlement for the purpose of resolving any glaring deficiencies" before authorizing the dissemination of notice of the settlement.  *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (granting preliminary approval of a proposed class

---

[5]         Unless otherwise noted, internal citations are omitted and emphasis is added.

1  action settlement).  At the preliminary approval stage, the Court's review of the proposed

2  Settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is

3  not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that

4  the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for*

5  *Just.*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

6         This is a low threshold, requiring the Court to determine only "whether a proposed

7  settlement is '***within the range of possible approval***' and that notice should be sent to class

8  members."  *True*, 2009 WL 838284, at *3; *see also Manual*, §13.14 ("First, the [court] reviews

9  the proposal preliminarily to determine whether it is sufficient to warrant public notice and a

10  hearing.  If so, the final decision on approval is made after the hearing.").[6]  A finding that a

11  proposed settlement deserves preliminary approval is merely "the ground work for a future

12  fairness hearing."  *Alberto*, 252 F.R.D. at 659 (citing *Nat'l Rural Telecomms. Coop. v. DIRECTV,*

13  *Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)).

14         As demonstrated below, application of the relevant factors dictates that preliminary

15  approval of the proposed Settlement should be granted.

16         **B.      The Settlement Is Within the Range of Possible Final Approval**

17         The Settlement should be preliminarily approved because it provides substantial benefits

18  to Alphabet and its shareholders, is designed to prevent the "corporate trauma" alleged in the

19  Amended Complaint, was negotiated at arm's-length, informed by substantial investigation, and

20  appropriately balances the risks of litigation against the benefits of settlement.  Accordingly, the

21  Settlement falls within the range of possible approval.

22         **1.      Great Weight Should Be Attributed to the Parties' Belief that the
                 Settlement Is Fair and Reasonable**

23

24         The Settlement meets the standards for preliminary approval.  As a threshold matter, the

25  Parties and their respective counsel believe that the proposed Settlement before the Court

26  represents a fair, reasonable, beneficial, and practical resolution of highly uncertain litigation, and

27

28  _____
[6]      *See also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (purpose of preliminary approval is "to ascertain whether there is ***any reason*** to notify the class members of the proposed settlement and to proceed with a fairness hearing").

1   that its terms fairly account for the risks and potential rewards of the claims being settled.  Stip.

2   at 12.  As the Ninth Circuit has recognized, significant weight should be attributed to the parties'

3   belief that the litigation should be settled on the proposed terms, since "[p]arties represented by

4   competent counsel are better positioned than courts to produce a settlement that fairly reflects

5   each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th

6   Cir. 1995); *see also In re First Cap. Holdings Corp. Fin. Prods. Sec. Litig.*, MDL No. 901, 1992

7   WL 226321, at *2 (C.D. Cal. June 10, 1992) (finding belief of counsel that the proposed

8   settlement represented the most beneficial result for the class to be a compelling factor in

9   approving settlement).

10      Here, Co-Lead Plaintiffs and Plaintiffs' Lead Counsel have engaged in extensive

11   investigation, document discovery, and other litigation efforts throughout the prosecution of the

12   Action, including, among other things: (i) reviewing Alphabet's press releases, public statements,

13   U.S. Securities and Exchange Commission ("SEC") filings, and securities analysts' reports and

14   advisories about Alphabet; (ii) reviewing media reports about Alphabet; (iii) researching the

15   applicable law with respect to the claims alleged in the Action and the potential defenses thereto;

16   (iv) conducting preliminary damages analyses; (v) preparing and filing the Amended Complaint;

17   (vi) participating in informal conferences with Defendants' Counsel regarding the specific facts

18   of the case, the perceived strengths and weaknesses of the case, and other issues in an effort to

19   facilitate negotiations and fact gathering; (vii) reviewing and analyzing over 1.1 million pages of

20   documents produced by Alphabet in response to the 220 Demands or in preparation for mediation

21   and to understand rapid factual developments as well as prepare an amended complaint; and (viii)

22   negotiating this Settlement with Defendants.  Stip. at 9–12.  The accumulation of the information

23   discovered through these efforts enabled Co-Lead Plaintiffs and Plaintiffs' Lead Counsel to be

24   well informed about the strengths and weaknesses of the case and to engage in effective settlement

25   discussions with Defendants.  *Id.*

26      While Co-Lead Plaintiffs believe that the claims alleged in the Action are meritorious,

27   continued litigation of the Action would be extremely complex, costly, and of substantial

28   duration.  *Id.* at 12.  Plaintiffs' Lead Counsel has also taken into account the uncertain outcome

and the risk of any continued litigation, especially in complex cases such as the Action, as well as the difficulties and delays inherent in such litigation.  *Id.*  The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery for Alphabet after years of additional litigation, while ensuring that Alphabet and its shareholders obtain immediate benefits.

### 2.  The Proposed Settlement Was Reached Through Arm's-Length Negotiations and Falls Well Within an Appropriate Range for Possible Final Approval

Where "the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex . . . litigation, the Settlement will enjoy a presumption of fairness."  *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173–74 (S.D.N.Y. 2000).  The Settlement negotiations in this case have been fair, honest, and at arm's-length.  The Settlement was only reached after extensive arm's-length negotiations between counsel for the Parties.   The negotiations included Co-Lead Plaintiffs sending Defendants a detailed settlement demand and multiple mediation sessions and telephonic meet and confers during which the Parties responded and exchanged counter-proposals.  This factor thus weighs in favor of preliminary approval of the proposed Settlement.  *See, e.g.*, *NVIDIA*, 2008 WL 5382544, at *3 (derivative settlement preliminarily approved where the settlement "appears to be the result of good faith arm's-length bargaining").

As noted *supra*, the Parties engaged in settlement discussions after they thoroughly evaluated the risks of continued litigation and had sufficient information to support the decision regarding the fairness, adequacy, and reasonableness of the Settlement.  Counsel for all parties were thus fully apprised of the strengths and weaknesses of the case when the Settlement was reached.  The arm's-length negotiations were also conducted by experienced counsel from firms that have extensive experience in complex shareholder litigation.  This fact favors preliminarily approving the Settlement.  *See, e.g.*, *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528 ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").  Furthermore, the arm's-length negotiations were conducted through experienced mediators, Hon. Layn R. Phillips (Ret.), formerly the Chief Judge of the U.S.

20

District Court for the Western District of Oklahoma, and John Kiernan, formerly Co-Chair of the Litigation Department at Debevoise & Plimpton LLP.  Their experience and guidance of the settlement process further provides the Court with confidence that the negotiations were conducted in good faith and at arm's-length, and provides a further reason for the Court to approve the Settlement.  *See Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010).[7]

### 3. The Settlement Confers a Substantial Benefit on Alphabet and Easily Outweighs the Mere Possibility of Future Relief After Protracted and Expensive Litigation

"'The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest."  *In re Atmel Corp. Deriv. Litig.*, No. C 06-4592 JF (HRL), 2010 WL 9525643, at *12 (N.D. Cal. Mar. 31, 2010).  Corporate governance measures such as those achieved here provide valuable benefits to public companies. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395–96 (1970) ("[A] corporation may receive a 'substantial benefit' from a [stockholder's action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," because "'corporate therapeutics' . . . furnish a benefit to all shareholders by providing an important means of enforcement of [a corporation's director and officer obligations]."); *see also NVIDIA*, 2008 WL 5382544, at *3; *In re Rambus Inc. Deriv. Litig.*, No. C 06-3513 JF (HRL), 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009); *In re Hewlett-Packard Co. S'holder Deriv. Litig.*, No. 3:12-cv-06003-CRB, 2015 WL 1153864, at *5 (N.D. Cal. Mar. 13, 2015); *MRV*, 2013 WL 2897874, at *4.  As a direct result of the litigation of the Action, resulting in the Settlement, Defendants have agreed to adopt and implement the governance reforms.  Moreover, Alphabet has bolstered these reforms through their Settlement commitment to fund the Corporate Reforms with a minimum of $500 million over 10 years. Alphabet's Board has approved the Settlement, in which "Defendants agree that the Settlement

---

[7]    As set forth in the Stipulation, the parties did not begin negotiating the amount of fees and expenses payable to Co-Lead Plaintiffs' Lead Counsel until after all the substantive terms of the Settlement were agreed upon.  This factor further demonstrates the fairness of the arm's-length Settlement.

confers substantial benefits on Alphabet and its stockholders[.]" Stip., ¶4.1. The Settlement also acknowledges that Lead Counsel had "roles in creating such benefits of the Settlement" and Co-Lead Plaintiffs had "participation" in and made "efforts in the creation of the benefits of the Settlement." *Id.*, ¶¶4.1 & 4.6. As a result of these substantial and material benefits, the Settlement is an outstanding resolution for Alphabet of a case of substantial complexity and cost, and it positions Alphabet and its shareholders to reap the long-term benefits of strong corporate governance.

In addition, the fact that the governance reforms provided by the Settlement directly address and seek to prevent the alleged wrongdoing and failures alleged in the Amended Complaint strongly militates in favor of preliminary approval. *See de Rommerswael ex rel. Puma Biotech., Inc. v. Auerbach*, No. SACV18-00236, 2018 WL 6003560, at *3 (C.D. Cal. Nov. 5, 2018) ("Courts recognize that 'a corporation may receive a "substantial benefit" from a derivative suit ... regardless of whether the benefit is pecuniary in nature.'"); *Sved v. Chadwick*, 783 F. Supp. 2d 851, 864 (N.D. Tex. 2009) (approving derivative litigation settlement because it "offers tangible, long-term remedial measures that are specifically designed to avoid the alleged missteps in [the company's] past and protect shareholders as the company moves forward").

### 4. The Settlement Appropriately Weighs the Benefits Conferred Upon Alphabet with the Significant Risks of Continued Litigation

Although it is not the role of the Court at this stage of the litigation to evaluate the merits of the Settlement, it is clear that there exist serious questions of law and fact that could negatively impact this case if it were litigated through to judgment and appeal. The uncertainties and vagaries of further litigation of the Action demonstrate that the proposed Settlement is within the range of approval, and that Co-Lead Plaintiffs' motion should be granted. Although Co-Lead Plaintiffs believe that their claims were (and are) meritorious, they recognize the significant risks in continuing to prosecute the Action. For example, had Co-Lead Plaintiffs proceeded in litigation and even if Defendants' anticipated motion to dismiss was denied, liability was by no means a foregone conclusion. Continued litigation would be extremely complex, costly, and lengthy. The parties would have had to undertake extensive factual and expert discovery, as well as take

22

1    deposition testimony relating to both. Defendants' expected motions for summary judgment

2    would have to be briefed and argued and a trial would have to be held. Even if liability were

3    established at trial, the amount of recoverable damages would still have posed significant issues,

4    would have been subject to further litigation, and the availability of injunctive relief such as what

5    the Corporate Reforms provide in the Settlement would have been contested. *See, e.g.*, *NVIDIA*,

6    2008 WL 5382544, at *3–4 (preliminarily approving the derivative settlement after balancing the

7    risks faced by plaintiffs and defendants).

8           Considering the difficulty and unpredictability of a lengthy and complex trial – where

9    witnesses could become unavailable or the fact finder could react to the evidence in unforeseen

10   ways – the benefits of the Settlement become all the more apparent. Even a victory at trial is no

11   guarantee that the judgment would ultimately be sustained on appeal or by the trial court in post-

12   trial motions. The proposed Settlement eliminates these and other risks of continued litigation,

13   including the very real risk of no recovery after several more years of litigation, while providing

14   Alphabet with substantial benefits immediately. *See, e.g.*, *Maher*, 714 F.2d at 466 (derivative

15   settlement approved where "'the parties' conclusion that any possible benefit to Zapata from

16   pursuing the causes of action would be more than offset by the additional cost of litigation was

17   based on an intelligent and prudent evaluation of their case.'").

18   **IV.      THE PROPOSED NOTICE TO ALPHABET SHAREHOLDERS IS ADEQUATE**

19           Federal Rule of Civil Procedure 23.1(c) provides that "'[n]otice of a proposed settlement,

20   voluntary dismissal, or compromise must be given to shareholders or members in the manner that the

21   court orders.'" The purpose of providing shareholders notice of a proposed settlement is to "apprise

22   interested parties of the pendency of the action and afford them an opportunity to present their

23   objections." *Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2015 WL 4760464, at *7

24   (N.D. Cal. Aug. 12, 2015).

25           In accordance with these requirements, Co-Lead Plaintiffs respectfully request that the Court

26   approve the form and content of the Notice of Proposed Settlement and of Settlement Hearing (the

27   "Notice") and the Summary Notice of Proposed Settlement and of Settlement Hearing (the "Summary

28   Notice"), as well as the method of notice dissemination to shareholders. With respect to form and

content, the proposed Notice includes information about the nature and history of the Action, Co-Lead Plaintiffs' claims, the Parties' reasons for the proposed Settlement, and the essential terms of the proposed Settlement.  It also includes information regarding the $80 million Fee and Expense Award and the $50,000 Incentive Award for each Co-Lead Plaintiff that Plaintiffs' Lead Counsel will seek in connection with the Settlement.  It sets forth the procedure for objecting to the proposed Settlement, and provides the date, time, and place of the Settlement Hearing.  The Notice also provides contact information for the Parties' counsel, and informs shareholders as to how they may obtain additional information.  Alphabet shareholders are advised that if they fail to comply with the procedures and deadlines for filing objections, they will lose any opportunity to object to any aspect of the proposed Settlement, as well as the right to be heard.  The Summary Notice contains much of the same material, as well as instructions on how shareholders may obtain additional information, including internet access to the Stipulation and Notice.

Regarding the manner of notice, the Stipulation provides that Alphabet shall: (i) disclose the terms of the Settlement through the filing of a Form 8-K with the SEC, attaching the Notice; (ii) publish the Summary Notice in *Investors' Business Daily*; and (iii) post a copy of the Notice and the Stipulation on Alphabet's investor relations website.  In addition, Plaintiffs' Lead Counsel shall post the Notice on its website.  This is a robust notice program consistent with notice programs previously approved.  *See MRV*, 2013 WL 2897874, at *1; *see also Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950) (notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").  Indeed, courts have approved notice programs consisting of only one or two of the components of the proffered notice program here.  For example, both notice solely by publication, as well as notice by publication plus posting of settlement-related documents on a company's website, have been held to satisfy due process standards in shareholder derivative action settlements.  *Arace v. Thompson*, No. 08 Civ. 7905, 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011); *In re PMC–Sierra, Inc. Deriv. Litig.*, No. 06-cv-05330-RS, 2010 U.S. Dist. LEXIS 5818 (N.D. Cal. Jan. 26, 2010) (providing for notice of proposed derivative settlement by publication in *Investor's Business Daily* and on company's website).

Since the form of the Summary Notice and Notice, as well as the manner of dissemination, fulfill the requirements of due process and Rule 23.1, Co-Lead Plaintiffs respectfully request that the Court approve the proposed plan of notice.

**V.     PROPOSED SCHEDULE FOR FINAL APPROVAL**

Co-Lead Plaintiffs request that the Court: (i) grant preliminary approval of the Settlement; (ii) approve, as to form and content, the Notice and Summary Notice, annexed as Exhibits B and C to the Stipulation; (iii) find that the Notice complies with due process and shall constitute due and sufficient notice for all purposes to Current Alphabet Shareholders; and (iv) set a date for the Settlement Hearing.   Co-Lead Plaintiffs, with consent of all parties, propose the following schedule:

| | |
|---|---|
| Alphabet shall file a Form 8-K with the SEC which shall attach to the Notice, and shall cause the Summary Notice to be published in *Investor's Business Daily* | Within fourteen (14) business days after the entry of the Preliminary Approval Order |
| Alphabet will post the Notice and Stipulation on Alphabet's investors' relations website and Plaintiffs' Counsel will post the Notice on its website | Within ten (14) business days after the entry of the Preliminary Approval Order and until Judgment becomes final |
| Deadline for Parties to file an appropriate affidavit or declaration with respect to providing Notice | At least seven (7) calendar days before the Settlement Hearing |
| Deadline for Alphabet shareholders to comment on the Settlement in writing | At least ten (10) calendar days before the Settlement Hearing |
| Deadline for Parties to file papers in support of Final Approval of the Settlement | At least twenty-eight (28) calendar days before the Settlement Hearing |
| Deadline for Parties to file reply briefs to shareholder comments | At least seven (7) calendar days prior to the Settlement Hearing |
| Settlement Hearing | The Parties request that the Court hold this hearing within sixty (60) days after the Notice has been given |

**VI.     CONCLUSION**

The Settlement achieved is an excellent result in light of the risks inherent in the litigation and the substantial cost and complexity if the case proceeded to trial.   Accordingly, Co-Lead Plaintiffs respectfully request that the Court preliminarily approve the Settlement and enter the Preliminary Approval Order.

25

DATED: May 30, 2025                Respectfully submitted,
                                   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                   _s/ Jing-Li Yu_
                                   Patrick Coughlin (CA Bar No. 111070)
                                   Maxwell R. Huffman (CA Bar No. 264687)
                                   600 W. Broadway, Suite 3300
                                   San Diego, CA 92101
                                   Telephone: (619) 233-4565
                                   pcoughlin@scott-scott.com
                                   mhuffman@scott-scott.com

                                   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                   Geoffrey M. Johnson (*pro hac vice*)
                                   12434 Cedar Road, Suite 12
                                   Cleveland Heights, OH 44106
                                   Telephone:  216-229-6088
                                   gjohnson@scott-scott.com

                                   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                   Donald A. Broggi (*pro hac vice*)
                                   Jing-Li Yu (CA Bar No. 342985)
                                   The Helmsley Building
                                   230 Park Avenue, 24th Floor
                                   New York, NY 10169
                                   Telephone: 212-223-6444
                                   dbroggi@scott-scott.com
                                   jyu@scott-scott.com

                                   *Lead Attorneys for Co-Lead Plaintiff Police and*
                                   *Fire Retirement System of the City of Detroit and*
                                   *Co-Lead Plaintiff Bucks County Employees'*
                                   *Retirement System*

                                   **BONI, ZACK & SNYDER LLC**
                                   Michael J. Boni (*admitted N.D. Cal.*)
                                   Joshua D. Snyder (*pro hac vice*)
                                   15 St. Asaphs Road
                                   Bala Cynwyd, PA 19004
                                   Telephone: (610) 822-0203
                                   mboni@bonizack.com
                                   jsnyder@bonizack.com

                                   *Additional Attorneys for Co-Lead Plaintiff Bucks*
                                   *County Employees' Retirement System*

26

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on May 30, 2025, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4

to the e-mail addresses denoted on the Electronic Mail Notice List.  All parties not so registered

5

will be served via e-mail or U.S. Mail.

6

Executed on May 30, 2025, at New York, New York.

7

  *s/ Jing-Li Yu*

8

JING-LI YU (CA Bar No. 342985)
SCOTT+SCOTT ATTORNEYS AT LAW LLP

9

*Counsel for Co-Lead Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27