BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
REBECCA LOCKERT, State Bar No. 348810
rebecca.lockert@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants Larry Page, Sergey Brin, John L. Hennessy, L. John Doerr, K. Ram Shriram, Ann Mather, Alan R. Mulally, Roger W. Ferguson, Jr., Robin L. Washington, Frances H. Arnold, Sundar Pichai, and Eric Schmidt and Nominal Defendant Alphabet, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ALPHABET, INC. SHAREHOLDER DERIVATIVE LITIGATION | Consolidated Case No.: 3:21-cv-09388-RFL<br><br>**DEFENDANTS' RESPONSE TO ORDER REQUESTING SUPPLEMENTAL BRIEFING**<br><br>Judge:    Rita F. Lin |

Defendants provide the information below in response to the Court's order and to assist the Court in measuring and evaluating the value added of the settlement. We understand questions 1-3 to be directed to Defendants and questions 4-6 to Plaintiffs.

1. **Under the terms of the proposed settlement, the Company's commitment is to spend a *total* of $500 million on Regulatory Readiness Compliance and Board and Management Oversight Enhancements, not to spend an *additional* $500 million. What amount was projected to be spent on regulatory compliance and board and management oversight over the next ten years, prior to this agreement?**

As the Court correctly notes, the amount contemplated guarantees a minimum spend. The Company is committing to spend, at minimum, $500 million on its global compliance and regulatory readiness efforts during this timeframe. To implement this aspect of the proposed settlement, the Company will develop and adopt procedures and methodologies to track centrally this spend across relevant functions. These processes do not yet exist today. For this reason, it is difficult to answer the Court's question precisely. Alphabet does not currently track all of its regulatory compliance spending in a quantitative fashion in central repositories.

Generally speaking, however, the Company has, since the filing of this lawsuit, increased spending on many aspects of compliance that have some overlap with the regulatory compliance spending contemplated by the settlement. The exact division between additional spending, and spending that would have occurred even without the settlement is purely speculative, since it involves future events and unforeseeable contingencies. The Company's past compliance spend may also reflect anomalous or one-time variations in compliance spend (for example, initial compliance costs associated with landmark legislation such as the Digital Markets Act or Digital Services Act) and may not map directly on the functions in the settlement. Not coincidentally, one of the features of this settlement—and one source of additive value—is the creation of functions, procedures, and methodologies to track just such spending going forward, once the settlement is implemented. *See* Provisions 1.3(f)(ix) and (x). While these tracking functions may not provide much insight into historical patterns, they would measure spending on settlement implementation going forward.

The value of this aspect of the proposed settlement is to maintain a *guaranteed minimum* level of spending over a period of time. Absent the settlement, the Company's spend would be discretionary and not guaranteed. Nor would a specific quantum be required outside of the settlement. The settlement eliminates that discretion and requires a minimum amount of funding over a determined period of time. *Cf. Klein v. Gordon*, 2019 WL 1751839, at *2 (C.D. Cal. Feb. 12, 2019) ("Without the settlement, Opus would not be required to make changes to enhance both the integrity of the bank and the confidence of its shareholders.").

**2. Which of the proposed corporate governance and workplace measures and enhancements, if any, had the Company already adopted prior to reaching the settlement agreement?**

The Court's question uses as reference point the execution of the settlement agreement. We believe the more relevant timeframe is the filing of the lawsuit. The reason for that is that, following the lawsuit, and even during the lengthy negotiations with Plaintiffs, the Company was proactive in identifying and implementing enhancements. In any event, we answer the Court's question below, for both timeframes.

The corporate governance and workplace measures and enhancements are found in Provisions 1.3, 1.4, and 1.5. Provision 1.4, is not currently in place. Provision 1.4 will require a restructuring of the Company's board governance, creating a new Risk and Compliance Committee and focusing the responsibilities of its Audit and Compliance Committee. The management oversight bodies outlined in 1.5 were not in place at the time of the allegations in this case or when the lawsuit was filed in December 2021. The Company began creating these additional management oversight bodies after the lawsuit was filed and has continued to build on and enhance their role in the Company's overall compliance efforts. The settlement reflects the Company's continued and ongoing commitment to maintaining these important enhancements. As to the measures outlined in Provisions 1.3, beginning in approximately 2022, the Company began to develop and implement a more centralized compliance function charged with monitoring and reporting on design, implementation, and assurance for new and evolving areas of principal risk. This included developing and implementing many of the

compliance frameworks and processes outlined in Provisions 1.3. Those efforts continue today and will be further enhanced as a result of the settlement.

These changes, made in response not just to this lawsuit, but changes in global regulatory landscapes, represented the Company's ongoing commitment to compliance best practices, and demonstrate its willingness to make improvements where appropriate. The Company was proactive in identifying and implementing reforms and improvements in its compliance and oversight systems—implementing some of these negotiated reforms before the settlement was finalized. Historically, in evaluating settlements, courts have credited reforms adopted during the pendency of the lawsuit, if they were connected to the efforts of Plaintiffs. *See Klein*, 2019 WL 1751839, at *2 (settlement approved where derivative lawsuit "contributed, at least in part, to the initial corporate reforms adopted by Opus which are aimed at preventing future misconduct."); *see also In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 290 (Del. 2002) (recognizing "well-established case law that, in the absence of evidence that the litigation did not result directly in a cognizable benefit to the class," Delaware law "presum[es] that there is a causal relationship between the benefit and a timely filed suit."). There are sound policy reasons for this practice: derivative cases tend to take a long time to litigate and/or settle and, during this period, the Company may choose to adopt valuable reforms even without the certainty of a settlement, simply because they have positive therapeutic effects on the corporate entity. *See In re Maxwell Techs., Inc., Derivative Litig.*, 2015 WL 12791166, at *6 (S.D. Cal. July 13, 2015) (approving reforms pre-dating settlement because "the Reforms have the potential to reduce the reoccurrence of the wrongdoing alleged here . . . and may also reduce the likelihood of new misconduct."); *Adkins v. Facebook, Inc.*, 2020 WL 6710086, at *2 (N.D. Cal. Nov. 15, 2020) (approving reforms pre-dating settlement because "ongoing review" of "voluntarily implemented" measures benefits class). A framework that did not allow for consideration of reforms during the pendency of negotiations could lead to suboptimal incentives: encouraging companies to delay or refrain from implementing reforms unless and until a final settlement is reached.

So while some of the corporate governance and compliance measures were adopted before the execution of the settlement, these policy and process reforms took place after the lawsuit was filed and while settlement discussions between the Parties were ongoing. They are part of the Company's

commitment to enhancing and improving its compliance efforts in response to the need for more centralized regulatory compliance and management oversight as a result of increasing regulatory scrutiny globally. While perhaps true that the Company may have adopted some of these measures regardless of this lawsuit, the settlement's added value comes from recognizing the merits of these reforms and requiring that such functions be maintained (or enhanced in the various ways enumerated) for a set period of time and with a firm spending commitment. *See In re NVIDIA Corp. Deriv. Litig.*, 2009 U.S. Dist. LEXIS 24973, at *6 (N.D. Cal. Mar. 18, 2009) (finding that maintaining corporate reforms over a period of time "provide[s] substantial value to NVIDIA and its shareholders."); *In re Resideo Techs., Inc.*, 2024 WL 95194, at *2 (D. Minn. Jan. 9, 2024) (commitment to "maintain [reforms] for a minimum of three years" and "spend $300,000 per year for five years" weighed in favor of settlement).

3. **Had the Company already changed its Google Chat policy, as described in the settlement, prior to reaching the settlement agreement?**

Yes. That change was adopted before the execution of the settlement, but after the lawsuit was filed, concomitant with discussions with Plaintiffs regarding these topics. For the reasons discussed above, it is good public policy for Alphabet to adopt a reform even without the certainty of a settlement if it finds it to be of value independent of the ultimate resolution of this case.

In the period since the events covered by the Amended Complaint, much has changed in the world and regulatory uncertainties and challenges have multiplied. The Company sees the settlement as an intersection of shareholder engagement and opportunity to continue to enhance internal controls and corporate governance.

Dated: July 1, 2025                                     FRESHFIELDS US LLP

                                                        By: /s/ Boris Feldman
                                                            Boris Feldman

                                                        BORIS FELDMAN

-4-

DEFS.' RESP. TO ORDER
REQUESTING SUPP. BRIEFING
CASE NO. 3:21-cv-09388-RFL

DORU GAVRIL
REBECCA LOCKERT
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
boris.feldman@freshfields.com
doru.gavril@freshfields.com
rebecca.lockert@freshfields.com

*Attorneys for Defendants*