**PAGES 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

IN RE ALPHABET, INC.,             )
SHAREHOLDER DERIVATIVE            )
LITIGATION.                       )        No. 3:21-cv-09388-RFL
_____  )


San Francisco, California

Tuesday, July 8, 2025


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiffs:
>               Scott & Scott Attorneys at Law LLP
>               600 W. Broadway, Suite 3300
>               San Diego, CA 92101
>          BY:  **PATRICK J. COUGHLIN, ATTORNEY AT LAW**
>
>               Scott & Scott Attorneys at Law LLP
>               230 Park Avenue, 24th Floor
>               New York, NY 10169
>          BY:  **JING-LI YU, ATTORNEY AT LAW**
>
>               Scott & Scott Attorneys at Law LLP
>               12434 Cedar Road, Suite 12
>               Cleveland Heights, OH 44106
>          BY:  **GEOFFREY M. JOHNSON, ATTORNEY AT LAW**

For Defendants:
>               Freshfields US LLP
>               855 Main Street
>               Redwood City, CA 94063
>          BY:  **BORIS FELDMAN, ATTORNEY AT LAW**
>               **DORU GAVRIL, ATTORNEY AT LAW**
>               **REBECCA LOCKERT, ATTORNEY AT LAW**


**REPORTED BY:  April Wood Brott, CSR No. 13782**
**Official United States Reporter**

1     **Thursday - July 8, 2025**                                    **10:04 A.M.**

2                              P R O C E E D I N G S

3                                   ---o0o---

4          **THE CLERK:**  This court is now in session, the

5     Honorable Rita F. Lin presiding.  Please be seated.

6          Calling Civil Case 21-9388, In re Alphabet Inc. versus --

7     not versus, I'm sorry -- In re Alphabet Inc. Shareholder

8     Derivative Litigation.

9          Counsel, please come forward and state your appearances,

10    beginning with the plaintiffs.

11         **MR. COUGHLIN:**  Good morning, Your Honor.  Patrick

12    Coughlin, Jeff Johnson, and Jing-Li Yu on behalf of the

13    plaintiffs.

14         **THE COURT:**  Good morning.

15         **MR. FELDMAN:**  Good morning, Your Honor.  For Google,

16    Boris Feldman, Doru Gavril, and Rebecca Lockert.  And if I may

17    introduce to you, we have three of our summer associates from

18    the Silicon Valley office here:  On the right, Justin Weathers,

19    a law student of Stanford; next to him, Rachel Roddy, a law

20    student at Columbia; and next to her, Noah Onoff of UCLA law

21    school, a former Navy SEAL, in case things get out of control

22    today.

23         **THE COURT:**  Welcome to all of you, and good morning to

24    all of you.

25         I thought I'd start off by giving you all some of my

1    initial thoughts about the preliminary approval hearing that we

2    have on today and that we can go through the questions that I

3    put out last week, and then after that, you'll have an

4    opportunity to tell me anything else you think I should know.

5        As you all know, the standard in this situation is for me

6    to look at whether the settlement that you all have proposed is

7    fair, reasonable, and adequate and not the product of fraud or

8    collusion, and I have to say I'm having a surprisingly hard

9    time assessing that based on the information that I have.

10        It looks to me like the three main elements of the

11   settlement are the 500 million dollar commitment to spend a

12   certain minimum amount on compliance and oversight; second, the

13   creation of this risk and compliance committee; and third, the

14   series of corporate reforms that are described in the

15   settlement agreement, most of which involve having more

16   attention paid to areas of compliance and oversight.

17        With respect to the 500 million dollar minimum spend, I

18   have to say when I initially saw it, I thought that looked

19   pretty good.  It seems like a pretty significant commitment.

20   Then I thought, "Well, gosh.  I ought to just do my due

21   diligence and ask the parties what's the history here," because

22   as all of us know, and it has been alleged in the complaint,

23   obviously Alphabet has been the target of a number of

24   investigations over the last few years, and enforcement

25   actions.

1         And it seemed to be possible that Alphabet may have

2    enacted many of these reforms and begun spending a very high

3    level on compliance and oversight independent of this lawsuit,

4    having nothing to do with the lawsuit.  So I thought to myself,

5    "Well, I ought to ask the question," because I think it's

6    important for the shareholders to understand that, even if we

7    go ahead with preliminary approval.  And I need to understand

8    it for preliminary approval.

9         So I asked Alphabet to tell me how much they were spending

10   before, and the answer that I got back, as I understand it, is

11   essentially, "It's really hard to calculate, Judge."  And I

12   have to say it's really hard for me to believe that Alphabet

13   would agree to spend a minimum of $500,000,000 on compliance

14   and oversight without having any idea or really reasonable

15   estimate of what it currently spends.  It just seems incredible

16   to me.  And it set off a lot of alarm bells for me when I got

17   Alphabet's answer.

18        Maybe it's my time as an ex prosecutor, former state court

19   judge, but when I ask someone a simple question and I don't get

20   a simple answer, it just raises a lot of red flags for me.  And

21   so now I am wondering whether I need and the shareholders need

22   a clear accounting from Alphabet of exactly how much it has

23   been spending over the last five years in terms of compliance

24   and oversight.

25        And I totally understand the parties' point that even if

1    Alphabet's currently spending in that range, it is important to

2    have a commitment to continue to spend that amount for the time

3    period that's described in the settlement agreement.  But

4    obviously the value of that commitment is dependent on what the

5    spend has been in the past.  I mean, if I tell my teenage son

6    I'm going to give him a minimum of a $15 allowance going

7    forward and I've been giving him $20 for the last ten years,

8    he's not going to value that very much.

9        And I don't want to be simplistic about it, but I think

10   it's important for the shareholders and for the Court to be

11   able to assess that information.  I need to know what Alphabet

12   has spent, and so do the shareholders in determining whether

13   they would object to the proposed settlement.

14       So that's my initial view of it.  I'm open to hearing

15   more, but I am now in a place where I think I need a

16   significantly higher level of detail than I would have,

17   honestly, if Alphabet had just been a little bit more upfront

18   in its initial response.

19       So the second component I see in the settlement is the

20   risk and compliance committee.  I do see real value in that.

21   As you all saw from my request for supplemental briefing, I do

22   have some concern that the core allegation in the complaint is

23   that the board was allegedly captured by insiders, but I could

24   see how this advances the ball on that issue even, if it

25   doesn't take it on in a real direct sense.  It's hard to

1    imagine what reform would take it on in a real direct sense

2    anyway.  So I do see the value in the committee.

3        The remaining list of reforms, I understand the point that

4    these were implemented prior to the settlement but after the

5    filing of the lawsuit.  On the current record though, it seems

6    likely to me that the investigations at issue caused the

7    changes and not the filing of the lawsuit.

8        Maybe there's something I don't know, something I should

9    understand about how the lawsuit triggered this, but it seems

10   like if Alphabet has been the subject of this series of

11   investigations and started all of these reforms in the

12   2021-2022 range, it's hard for me to see how I could credit

13   that to the filing of this lawsuit as opposed to the

14   investigations that are at issue in the lawsuit.

15       And it also seems likely to me for the same reason that

16   Alphabet would be motivated to continue those reforms because

17   of those prior and ongoing investigations rather than because

18   of this lawsuit.  It's hard for me to say how I could credit

19   those reforms to this lawsuit, which brings me back around to

20   the importance of the minimum spend on compliance, which I

21   think of as the linchpin of this settlement agreement, and the

22   value that it brings to the table.

23       Normally I have some hesitation of preliminarily approving

24   a settlement that I think that there's a strong possibility I

25   will not give final approval to, because I don't like to put

1    you all through the cost of notice if I don't think it's likely

2    that there will be final approval, but I don't think the costs

3    of notice are going to be that high in this instance.  I

4    thought your notice plan, which is the standard notice plan in

5    these cases, is reasonable.  Seems like it would make sense to

6    get the shareholder reaction to the proposed settlement, but in

7    order for the shareholders to have an educated reaction, I do

8    think we need the information about the current compliance

9    spending.

10    So my tentative plan is to take the matter under

11    submission until I get more information about that from

12    Alphabet, until I'm satisfied that we have enough for the

13    shareholders to be able to weigh in effectively and for me to

14    conclude that this meets the preliminary approval bar.  So

15    that's my initial thought.

16    I did also want to give Plaintiffs' counsel a heads-up

17    that I will likely have a lot of questions about attorneys fees

18    when we get to that stage, which hopefully we will, as long as

19    I get the information I need and I can see the value in the

20    settlement.  But I think there's a strong possibility that

21    whatever attorneys fees I give will be on a lodestar basis or

22    something that is keyed off of how much work you've put into

23    this.

24    So as you're preparing your attorneys fees declaration, I

25    would just encourage you to make sure that there's detailed

1    information in the public filing about exactly what you've done

2    and why it costs so much and how much resources you've put in,

3    and I would encourage you to give me, under seal if you'd like,

4    detailed billing records that gives me a sense of exactly why

5    it took so long and exactly how much you invested in this.  I

6    have a lot of hesitation about giving you 80 million dollars to

7    look at discovery that was produced in other litigation and

8    essentially to ride on the coattails of other litigation that's

9    already been mostly completed.

10       I completely understand the value added in terms of

11   reviewing the Section 220 documents and all of the board

12   deliberations on this, but it's hard for me to imagine giving

13   you total value on reviewing documents from other litigations

14   that are pending.  I just want you to know that upfront so that

15   you can make the showing you need to to try to get the results

16   you want.

17       So those are my initial thoughts.  I'm sure both sides

18   will have plenty to say about all of that, but let's just work

19   through the questions first, and then you can have an

20   opportunity to tell me more.  So if counsel would both come to

21   the podium, let me just start with question 1, which is

22   probably really for Alphabet.

23       What's Alphabet's best estimate of its total spending on

24   regulatory readiness, compliance, and board and management

25   oversight in each over the past five years?  Do you have that

1     information?

2            **MR. FELDMAN:**  I have some information on it.  And Your

3     Honor, thank you for the questions in advance, which enabled us

4     to focus on this.  I'd like to give you the numbers and then

5     the context:  2022, 11 million dollars; 2023, 40 million

6     dollars; 2024, 78 million dollars.

7            And now if I can tell you what those are for, there was a

8     sea change in how Alphabet managed regulatory compliance across

9     the board beginning in 2022 with a project called reg ready,

10    regulatory readiness.  Of the many ongoing internal legal and

11    compliance functions, we think that's the most analogous to

12    what will be required under the settlement agreement if you

13    approve it.

14           So that did two things:  One, it took compliance away from

15    the individual units like YouTube and others, and it

16    centralized them.  And second, it established very detailed

17    protocols for compliance situations around the world, not just

18    competition.

19           So that is not -- what those numbers include are not every

20    lawyer under the umbrella Alphabet, part of whose job may have

21    entailed working on regulatory issues.  It was the creation and

22    the rollout of reg ready.  It began in 2022, which was two

23    years after the lawsuit was filed.  The lawsuit was filed in

24    December of 2020, I guess you could say early COVID, and the

25    first settlement mediation was in December of 2022, although we

1    had had discussions about a settlement before.

2        In 2023, there was an internal management reorg that

3    refocused how reg ready was being rolled out.  So when you look

4    at those three numbers, I just want to be clear for the Court,

5    those were the internal sums spent on reg ready to design and

6    start to roll out this regulatory framework.

7        If I can give you a perspective of looking at the 500

8    million, I think it was Everett Dirksen who used to say, "A

9    million here, a million there, pretty soon you're talking about

10   real numbers."  I think the better way of looking at it is not

11   "Oh, that comes out to 50 million dollars a year for ten

12   years."

13       I think the way the parties approached it in fashioning

14   the settlement was we want to make sure that there's enough

15   money to implement this.  We're going to commit half a billion

16   dollars to implement it.  So my expectation, although it's not

17   a promise, is that the expenditure of that 500 million will

18   occur much more rapidly than ten years.

19       If you approve the settlement, it will then begin to roll

20   out and be implemented, and the 500 million commitment

21   guarantees that there won't be a response saying, "We couldn't

22   do this.  We didn't have enough money for it."  There is an

23   analogy in Google's history.  It was a case where Scott & Scott

24   was one of the firms on the other side.  We referred to it

25   internally as G-19 because it was in 2019.

1          They were derivative suits in federal court, Santa Clara

2     Superior, and Delaware Chancery.  And a component of it was a

3     minimum funding commitment of 310 million over ten years.  So

4     that kicked in in 2020.

5          There, as here, the expenses weren't tracked before in the

6     manner that they would -- so the company set up mechanisms in

7     finance to make sure that they would track it and would satisfy

8     the commitment.  I double-checked this morning, just to be

9     sure, with the in-house person working on it, who said they've

10    nearly satisfied the spend in five years rather than ten, and

11    finance was able to implement tracking mechanisms for it.

12         So the reason I think this is -- it's better to look at

13    this as a half billion dollar bolus rather than a

14    50-million-dollar-a-year spend is there's really a tripartite

15    structure to the settlement, and I think the parties may

16    evaluate the portions a little differently.

17         If I may, the centerpiece of this, the headline, if you

18    will, is the new board committee, and the plaintiffs may want

19    to talk about that.  That was the biggest fight.  That was a

20    bigger fight than the money.  We represent a lot of tech

21    companies.  I believe this is the first technology company that

22    is splitting off regulatory oversight issues to a dedicated

23    board committee.  That's part of it.

24         A big part of it is the internal changes.  And I

25    understand completely, Your Honor, might these have happened

1    without the derivative suit?  I don't know.  Did they happen

2    with an eye on the derivative suit and potential resolution?

3    They did.  So to every point, as the company was going through

4    it, we were getting hammered by the plaintiffs for "You

5    need to" -- I think their first demand letter may have been

6    21-pages single-spaced, and it had a lot more than we finally

7    agreed to.

8        But just to highlight, so at a 10,000-foot level, what

9    matters is it won't now be YouTube's compliance function.  It

10   will be Alphabet centralized, which I think you can appreciate

11   may enhance the oversight quality, especially when those people

12   then have a dedicated board committee.  But there are two of

13   the bodies that are being created and under the settlement will

14   be required.

15       One is the trust and compliance committee, and the other

16   is the trust and compliance steering committee.  They sound

17   like more sort of just Alphabet committees, but the trust and

18   compliance committee is all of Sundar Pichai's direct reports.

19   I shouldn't say all of his direct reports.  Everyone on the

20   committee is a direct report to the CEO.  So it's a very senior

21   committee at the company.

22       And the steering committee is all vice president level and

23   will meet, I think, every other month.  So those are -- and

24   you're right.  The company's been under a lot of regulatory

25   scrutiny around the world, as has Apple, as has Meta, as has

1    Amazon.  So this is a serious attempt, I think, to change the

2    entire structure.

3        So if the message to Plaintiffs' lawyers from this is "You

4    can't get credit for it," then the next time I try to settle a

5    case, they're going to say, "Don't implement that."  I mean,

6    it's just the reality of game theory.  They're going to say,

7    "Don't implement this.  We love what you've designed.  Hold off

8    on it."

9        One reason that this settlement took so long is what you

10    pointed out.  We had a lot of stuff going on in all the

11    underlying matters, and so there's a limited corporate

12    attention span to how many things you can deal with at one

13    time.  So as the company dealt with those other matters, it was

14    in constant negotiation with these plaintiffs to say, "What do

15    you think the right way is to address this going forward?"

16        So to me, the three key things are the committee, the

17    internal enhancements.  If you -- the committee is a hundred

18    percent this lawsuit, and but for this, I do not believe we

19    could have gotten the company to agree to it.  The enhancements

20    were shaped by what will we need to get the plaintiffs to agree

21    and to get the judge to approve it.

22        And then the money was not "All right.  As a routine

23    operating expense, we'll spend 50 million a year."  It was "Can

24    you put half a billion dollars behind this rollout?"  So I hope

25    that helps.

1          In terms of additional information, if you need it, if we

2     can focus on the spend for the reg ready project, I could get

3     that to you in two weeks.  If there's something else you

4     want -- and I know it seems funny because we manage the world's

5     information, so you would think we could hit F3 and it would

6     spit it out.  But it was decentralized across many units, and

7     there's an allocation issue.

8          If you're a product counsel for Verily, which is one of

9     the partially owned subsidiaries that does health care

10    management issues, how do you retrospectively go back to

11    someone who is product counsel and then say, "Well, X percent

12    of her time was really regulatory" as opposed to something

13    else?

14         But if you're comfortable with the reg ready project, we

15    can get that to you, and I apologize for not getting it to you

16    before.  I understand that we should have.

17         **THE COURT:**  Thank you.  Let me just make sure I

18    understand the reg ready project and exactly what it is.  So

19    what I hear you saying is that it took compliance functions

20    that were previously decentralized among subunits and

21    centralized them all in one place.

22         So is, for example, the 2024 reg ready spend -- is that

23    now the project has basically been rolled out, and so that

24    amount is how much Google -- or not just Google, but Alphabet,

25    across all its companies, is spending on compliance and

1    oversight now that it's all been centralized in one place?  I

2    understand in the early years, maybe it's lower because it's a

3    transition period and you're rolling out the centralized

4    system, and so some of it is decentralized and some of it is

5    centralized, but by the time you get to 2024, I'm assuming

6    you're done and it's all centralized.  Is that about right?

7         **MR. FELDMAN:**  I believe it is not accurate.  So reg

8    ready -- like sourdough starter, reg ready's not done.  In

9    part, it will continue to be shaped by what you do in your

10    approval of the settlement.  But there are many, many people

11    throughout the organization working on, for example, anti-money

12    laundering through Google Pay.  This doesn't capture that.

13    This captures the costs of imposing on all the entities the reg

14    ready structure.

15         I don't think that's done.  I believe the amount that will

16    be spent this year is almost certainly going to be more than

17    what was spent in 2024, but I don't want to overstate it.  This

18    is not every dollar that Google lawyers spend on compliance

19    across the board.

20         **THE COURT:**  And when you're measuring what the 500

21    million dollar spend commitment is, I think I want something

22    that's close to that.  Whatever you're going to use to measure

23    that, I think what the shareholders and what the Court need to

24    understand is how much do you spend on that category now.

25         So it is hard for me to understand from what you're saying

what the difference is between -- it seems, like, totally
different to me, honestly, based on what you're saying.  I
don't have a clear understanding of what the difference is
between the reg ready amount that's being spent as opposed to
the amount you're committing to spend.

**MR. FELDMAN:**  So by design, we wanted to leave the
board maximum flexibility in how it spends the half billion
dollars.  For all we know, two years from now, most of that
could go to AI regulation in Europe.  Over the last few years,
with the DSA and the DMA in Europe, those were regulatory items
that people hadn't really focused on in prior years that
consumed a lot of resources.

The settlement agreement commits the spending amount that
the parties felt would be adequate to roll all this out, but it
doesn't allocate it.  We thought that the closest analog to
rolling out an integrated, company-wide regulatory system was
reg ready.

**THE COURT:**  And when you're talking about the amount
that Alphabet spends on reg ready, right, in 2024, for example,
does that include the actual compliance functions, that is the
person who is, you know, looking at new laws that are coming
out in California or other jurisdictions to see if the company
is complying?

Does it cover, you know, all of the sort of standard
compliance functions, or is it just limiting -- the amount

1  you're telling me for 2024 is just limited to creating a new

2  structure for centralizing compliance and that special project

3  reassigning people to different roles and all of that, which

4  seem to me to be a small percentage of what the total cost of

5  compliance and oversight at Alphabet would be?

6        **MR. FELDMAN:**  It's between the two.  It is not just

7  assembling the team and moving it from the YouTube product area

8  to the regulatory compliance group, but it is not every dollar

9  that someone at Alphabet is spending on compliance.

10       **THE COURT:**  And can you give me some sense of where it

11  lands between those two things, and what does it include that

12  is part of actual compliance functions?

13       **MR. FELDMAN:**  I don't know the answer to that, and I

14  will get it.

15       **THE COURT:**  If I wanted to understand better how much

16  Alphabet spends on actual compliance functions, are you really

17  telling me that there's no -- you all cannot come up with an

18  estimate of what that is?  It seems -- I have to say it just

19  seems hard for me to believe that you all would agree to spend

20  a certain amount on regulatory readiness, compliance, and

21  oversight without having any sense of whatever it is right now.

22       **MR. FELDMAN:**  The way the number was negotiated was

23  not "Okay.  We're spending X now, and we can agree to increase

24  it to Y or maintain it."  It was "What level of funding do we

25  think will ensure that this initiative is rolled out with

1    adequate funding."  So I can't -- what I can say to you with

2    confidence --

3          THE COURT:  I'm sorry.  Let me just interrupt you.

4    When you say "this initiative," are you talking about reg

5    ready?

6          MR. FELDMAN:  No.  The whole settlement.

7          THE COURT:  Okay.

8          MR. FELDMAN:  Way beyond reg ready --

9          THE COURT:  So the reforms that are listed in the

10    settlement agreement, in terms of various management positions

11    that are going to be compliance-focused that will be embedded

12    throughout the organization, that type of thing?  That's what

13    you all were trying to make sure there was enough money for

14    funding?

15          MR. FELDMAN:  Exactly.

16          THE COURT:  Okay.

17          MR. FELDMAN:  So, again, I know it's hard to imagine

18    that we can't hit a button to do it, but in large part because

19    of the transition from product area compliance people to

20    centralized, it's not like there are time sheets that we can go

21    back and say, "Well, for him, how much did he spend on this or

22    that?"  We can track it going forward because we'll set up

23    those kind of tracking systems in advance, which is why we know

24    we'll be able to monitor the half billion and ensure that they

25    get it.

1         But to do an apples-to-apples comparison, we're pretty

2    confident -- I'd say quite confident -- in the reg ready

3    figures, but to go beyond that, our degree of confidence goes

4    way down.

5         **THE COURT:**  I'll tell you what I'm hearing from this,

6    and you can tell me if you think that's the wrong impression.

7    What I'm hearing from this is that Alphabet already spends a

8    lot on compliance.  It's probably in total significantly more

9    than -- over the next ten years would be significantly more

10   than 500 million anyway, a lot more.

11        This is just a way of ensuring that one of the components

12   of that compliance is sufficiently funded, that is the

13   committee and all of the requirements to embed certain

14   compliance functions within different parts of that Alphabet

15   organization.  So the value of the settlement -- maybe I'm

16   looking at it wrong, but the value is really -- the 500 million

17   is not necessarily the headline.  The headline is more the

18   compliance committee, which I understand.  I see the value in

19   that.

20        But that's my big-picture reaction to what you're saying.

21   I'm open to hearing if they're something you think I'm

22   undercounting there, but I wanted to put that out there for

23   you.

24        **MR. FELDMAN:**  You articulated it brilliantly.  It's

25   exactly what you just said.  As we were negotiating this and

1    got over the final stumbling block where the board split off

2    into a committee, we thought that the headline was the

3    committee followed by -- again, to borrow from history, when we

4    did the MeToo settlement and set up -- I don't know if I can

5    use these words anymore.  It was a diversity advisory committee

6    to the board, and other companies followed that, and they said,

7    "Wow, it's Google," and this is sort of state-of-the-art.

8        I believe that the regulatory compliance mechanisms that

9    we're setting up here will become sort of a good housekeeping

10    model for other tech companies.  I don't view the funding as

11    nearly as important.  I view it in the way that you

12    articulated.

13        **THE COURT:**  Okay.  Let me give Plaintiffs an

14    opportunity --

15        **MR. COUGHLIN:**  Yes.

16        **THE COURT:**  -- to weigh in on it.  I'd also be

17    interested in hearing your sell maybe a little bit more than

18    what's in the papers as to why this compliance committee is

19    really something that's, you know, valuable enough to be the

20    linchpin of the settlement.

21        **MR. COUGHLIN:**  Well, I think you're right that you

22    focused on what we argued about for a year and a half in the

23    settlement was a board -- whether we would actually have a

24    board committee.  Right now the compliance issues go through

25    the audit committee, and of course what the audit committee is

1    concerned about are the numbers.  What are we doing here?  What

2    are we spending there?  What's the cost there?  Much less so

3    than compliance.

4        That's why when you looked at our complaint and you said,

5    "Oh, you've identified a lot of red flags, and now what you're

6    doing is just trying to give notice to the board," you know,

7    doesn't seem like you're really impacting, you know, what this

8    company's doing.

9        And I'd say just the complete opposite.  By setting up a

10   board committee -- like, when I did the Enron case, once that

11   happened and it blew up and Arthur Andersen blew up and

12   disappeared, audit committees became really important across

13   the board, and everybody started to pay attention.  Do we have

14   800 off-the-books partnerships?  You know, it really changed

15   the way public companies were doing -- were reporting their

16   auditing in a public way.

17       Here, you won't find a risk-ready or a regulatory

18   compliance committee on any of these high-tech companies,

19   whether it's Amazon, Meta.  You go across the board.  None of

20   them have it.  And they don't -- I don't want to say it like

21   this.  Not that they didn't want it, but I think they might

22   even have been concerned about the risk of having such a

23   committee on the board responsible for getting reported to and

24   having a place at the board.

25       You see, these minutes we've reviewed over the years about

1    the red flags being reported -- and that's exactly what they

2    are.  They're reported, but there's no indication that hey, you

3    know what?  They're complaining over in the EU that some of our

4    search contracts are exclusive, you know, that we are paying

5    people, you know, to be the only default on their search or to

6    be their only search, or we're paying the original equipment

7    manufacturers not to have other apps on the rollout of the

8    original product and things like that.

9        And that's it.  They say it in the board minutes.  They

10   know that the EU has a compliant.  They get fined 8.2 billion

11   dollars, and nothing changes.  Okay?  And so we argued for at

12   least the last year and a half about getting a board committee,

13   and so that was the linchpin of this, you know.

14       And kind of like what you just assumed, "Oh, well, this is

15   a big company across the world.  They've got a hundred, you

16   know, lawsuits sitting out there.  You know, I'm sure they're

17   spending all this money."  No.  All this money that they might

18   have been spending here and there to put out this fire or that

19   fire or to answer something with the Digital Markets Act over

20   in Europe.  Okay?

21       That was always at the product level.  Like, if you go to

22   the -- let's say their ad, the ad tech case where they've just

23   lost, right?  Three.  They've lost Play, search, and ad.  The

24   ad tech case -- well, they go out and buy, you know, the ad

25   tech centerpiece, which is like the New York Stock Exchange,

1    in 2008.  Nobody says anything about it like, "Wait a second.

2    We're on the advertiser side, we're on the publisher side, and

3    now we control the exchange."

4        You know, that should have set off a red flag.  In fact,

5    one of the executives writes, "Hey, you know, somebody's going

6    to call us on this because shouldn't this be like the New York

7    Stock Exchange and be out here and that we don't control it?

8    Right now we have first look.  We have last look," you know,

9    and something else with the waterfall.  And then that wasn't

10   even good enough.

11       They looked over and they saw that "Hey, maybe we should

12   go into the -- you know, the social area, and yet we've got

13   Meta over there," so they make a deal to divide up, you know,

14   what they call the accessible market.  In other words, there

15   was 53 billion dollars sitting over here, and they decided to

16   make a deal because it's at the product level and it makes good

17   business sense for that division to make a deal with Meta,

18   right?

19       And Meta says, "Okay.  You give us our social media

20   customers," because now Google's good enough to identify who's

21   on Facebook.  Send those customers first to Facebook.  Divide

22   up the money between the two of them.  They keep the overall

23   search group to themselves for those ads.  You know, and all of

24   that is happening in the company, and nobody is saying, "You

25   know what?  That agreement -- that's not okay.  It's not okay

1    to look out and see this much is out there.

2         And we have a threat -- and they write about it.  "We have

3    an existential threat for header bidding."  Okay?  Which was a

4    new thing where the ad people and the publishers said, "Hey,

5    we've got to get away.  We've got to get a little distance from

6    both Meta, who we're trying to get to join header bidding, and

7    from Google.  We're just getting swallowed up."

8         Google wasn't even looking at the prices they charge for

9    ads because they knew they had no competition.  So if they

10   moved an increment here, did this, or 10 percent for these

11   three months, nothing happened.  Nothing happened to their

12   market share.  Nothing happened to the volume.

13        You know, and then they moved away from click-throughs

14   just to, again, show that "Hey, we don't need to tell you what

15   your click-throughs are.  We're going to charge you by the

16   image."  None of these things were getting up to the board

17   level for somebody to say, "Hey, this is a problem," you know,

18   and so now --

19             **THE COURT:**  So are you saying that when you were going

20   through the, you know, 220 records, you didn't even see these

21   being raised in the first place?  Because I know the complaint

22   has a whole list of red flags you say were raised to the board

23   that were ignored, but you're saying that there were also all

24   these other issues that should have -- didn't even get to the

25   red flag level, the board never even heard about, and so at

1    least we'll be moving the needle on those?

2    **MR. COUGHLIN:** Absolutely. We identified, you know, a

3    bunch of the red flags in the complaint, but there were so many

4    more, so to speak, red flags and things that should have been

5    identified and dealt with that were not dealt with, and so we

6    needed -- we thought that you had to have a board committee and

7    that we weren't going to settle without the board committee.

8    And the funding, frankly, you know, that we ended up agreeing

9    to was a secondary thing. It was the structure of the

10    reporting.

11    And Your Honor said, "Well, you know, I'm a little

12    concerned about you guys taking credit for the information that

13    was uncovered in the ad tech case, the search case," you know,

14    the Play case in front of Donato. Well, I have to say --

15    because I was supposed to go to trial, actually, last month

16    with Meta for the ads. I have to say to actually negotiate

17    with these guys about these issues, we had to understand each

18    of those areas.

19    So it wasn't just like -- I wasn't just reviewing it. You

20    know, I was reviewing it like, "Hey, I might have to go to

21    trial here because right now all the big tech companies are

22    pushing back," you know. And so yes, they've now lost in the

23    three. But that's just the start of it.

24    It's almost going to be like Microsoft all over again -- a

25    ten-year pushback, you know, and the remedies. Like, if you go

1    look at what the remedy -- fight, you know, now back in the

2    Eastern District of Virginia or in the DC case, you know, about

3    search, the remedies -- the fight about what the remedies are

4    going to be are really -- you know, it's almost like they're

5    still totally in litigation.

6        It's almost like there wasn't a loss, that somebody found

7    they were a monopoly and that there were some unfair business

8    practices, that they, you know, favored their own products

9    first or there was an exclusive agreement with this or that

10    company, whether it's Mozilla or Apple.

11        I mean, we really had to understand what was going on, and

12    we felt that we needed to address these things, because right

13    now, you look at this company -- and I'm not picking on it.

14    I'm not picking on the company, but it was just all over the

15    board.  Everybody was in it for their own "Hey, how can we

16    improve over here in that and this?"

17        And it's very different than Meta where really Zuckerberg

18    has got kind of an iron fist and control in it all the way

19    down.  And yet here, you have, like, you know, some founders

20    and other people, and they didn't appear to be outright, "Let's

21    see if we can crush the competition."  They were just, like,

22    making the business decisions like, "Well, wouldn't it be

23    better if we not only had first look at the ads?  We get second

24    look.  Let's take down to the second price."

25        Everything, you know, was being done here at the product

1    level, as Mr. Feldman says, you know, as my friend Mr. Feldman

2    says.  But it wasn't -- nobody said, "Well, we'd better watch

3    out for that because somebody's going to come along."  And

4    they're not -- in any of these cases, including in the Epic,

5    you know, Games case upstairs, they're not saying, "Oh, wow.

6    We really had a problem here.  Look what happened."  No.

7    They're pushing back and fighting this, and we need somebody to

8    address it at the board level that somebody's going to listen

9    to and say, "Everybody's responsible."

10    Like, right now, the audit committee goes -- the audit and

11    compliance committee -- they're just -- they're more worried

12    about, as well they should be, the audited numbers.  But

13    they're not evaluating the Digital Markets Act over in Europe

14    and what they have to do to comply there and what they have to

15    do here for privacy or any of those issues are just really not

16    being addressed.

17    So this structure is so unique and different, and that's

18    why they pushed back.  They didn't say right away, "Hey, that's

19    great."  No.  We had to go through, that's right, those cases,

20    figure out what was happening, figure out what the potential

21    remedies might be, and change as it might be necessary and know

22    that the only way you were going to get those changes in is if

23    you had a board committee that was responsible.

24    And once that board committee has to sign off on something

25    like these issues -- and that was not done before -- you know,

1    there seemed to be almost no remedies being proposed.  You're

2    going to see a real change, and it is going to -- it is, just

3    like the audit committees changed after Enron.  It is going to

4    go across these high-tech companies.  And so there was a lot of

5    pushback.

6        The 500 million, you know --

7        **THE COURT:**  Yeah.  I don't think I need more on the

8    500 million.  I kind of understand now that the headline is

9    really the compliance committee, and I see the value --

10       **MR. COUGHLIN:**  Okay.

11       **THE COURT:**  -- in what you're saying the compliance

12   committee brings to the table and that it's very different from

13   what the current setup is.  But also, it's not something that

14   is present in the industry, and it also is helpful to

15   understand that part of the issue is not just that red flags

16   were ignored but also that red flags just never reached the

17   board level.

18       **MR. COUGHLIN:**  That's right.

19       **THE COURT:**  And it was helpful, Mr. Feldman's point

20   about the makeup of the domestic compliance committee, and that

21   it will be folks that have a direct reporting relationship to

22   the CEO.  So it is people who will potentially have the ability

23   to move the needle and to raise the alarm when it needs to be

24   raised.  So I understand the value in that.  This argument was

25   really helpful.

1          I think what I'm going to do is -- I don't think I need

2     the declaration that was described in question 2.  It seems to

3     me from the additional submissions you all have made that you

4     all agree that I should let any current shareholder object.  So

5     I don't think I need to ask question 3 anymore.

6          Question 5 was the same way in terms of building out

7     enough time in the schedule for folks to look at the attorneys

8     fees motion.

9          So that just leaves me question 4, which is just

10    confirming with you all that you're okay with me adding a

11    requirement to the preliminary approval order that you put all

12    the papers --

13              **MR. COUGHLIN:**  Yes.

14              **THE COURT:**  -- on the website.

15              **MR. COUGHLIN:**  We're fine.  Yes, we'll do that.

16              **MR. FELDMAN:**  Yes, Your Honor.

17              **THE COURT:**  The other question I had about that is I

18    found our conversation today to be very helpful in terms of

19    understanding from the parties what the value of the settlement

20    was and that there was not necessarily a big new commitment to

21    spend a lot more money on compliance.  That was not the

22    headline of the settlement and is really, I don't think,

23    necessarily accurately a significant difference in the amount

24    that Alphabet will be spending on compliance.

25          I think it would be helpful for the shareholders to have a

1   copy of our conversation.  So I would like to include the

2   transcript of this oral argument on the website also.  Do the

3   parties have any objection to that requirement?

4        **MR. COUGHLIN:**  No objection.

5        **THE COURT:**  Okay.  Great.  So thank you.  I appreciate

6   the conversation.

7        I am going to preliminarily approve the settlement.  I

8   find it fair, reasonable, and adequate for the reasons we

9   talked about in terms of the committee, and I will say I do

10  want to hear the shareholder reaction to the committee, because

11  I'm sure there's folks who are much more well-versed than I am

12  in the industry who will have opinions on how valuable the

13  committee is, and I need to hear that from folks.  But I

14  definitely think it's worth getting the shareholder reaction,

15  and it meets the low bar for preliminary approval.

16       I did want to -- I know I promised you all an opportunity

17  at the end to tell me anything else you want.  Is there

18  anything else you all wanted to tell me about approval or

19  attorneys fees or anything along those lines?  I'll give

20  Plaintiffs an opportunity and then Alphabet.

21       **MR. COUGHLIN:**  Your Honor, you talked about how the

22  central part was the compliance committees, and that's

23  absolutely true.  That's really what we fought over.  That's

24  not to say that we didn't say, "Hey, we need a certain amount

25  that's committed to funding," and that really is a part of the

1    settlement.  And if Google had -- if Alphabet had walked in

2    here and said, "Hey, you know, we're going to spend this

3    anyway," that's really not really what happened.

4        We said, "Hey, to put this into effect, you're going to at

5    least have to spend a half a billion dollars," and they agreed

6    and understood that.  So that's part of the settlement.  I

7    understand what you're saying and the questions you've asked.

8    I just didn't want to walk out of here and not say that.

9        As to the attorneys fees, we understand.  You're going to

10   look at our lodestar and say, "Hey, you know, you said you

11   spent X," you know, and I really think hopefully I can show you

12   that the analysis and the due diligence of actually -- I didn't

13   know if I would be preparing for trial.  I was preparing for

14   trial against Meta that was supposed to start last month.

15   Probably go in September.

16       But we really had to understand these issues, and then --

17   and we're really now just focused on the remedies, then the

18   pushback that Alphabet is giving.  So just close with those

19   comments.

20           **THE COURT:**  Thank you.

21           **MR. FELDMAN:**  Thank you, Your Honor.

22           **THE COURT:**  Be well.  I will issue a written order

23   later today on the preliminary approval, and we'll set the

24   hearing at -- I believe my courtroom deputy cleared the date

25   with you of September 30th.  We'll set the hearing on that

1    date.

2            **MR. COUGHLIN:**  Great.  Thank you, Your Honor.

3            **THE COURT:**  Thank you.  Be well.

4            **THE CLERK:**  Court is in in recess.

5        (The proceedings concluded at 10:54 A.M.)

6                        ---o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, July 10, 2025


_____

April Wood Brott, CSR No. 13782