1   PATRICK COUGHLIN (CA Bar No. 111070)
    MAXWELL R. HUFFMAN (CA Bar No. 264687)
2   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
    600 W. Broadway, Suite 3300
3   San Diego, CA 92101
    Telephone: (619) 233-4565
4   pcoughlin@scott-scott.com
    mhuffman@scott-scott.com
5
6   *Lead Attorneys for Co-Lead Plaintiffs*

    [Additional Counsel on Signature Page.]
7

8                 **UNITED STATES DISTRICT COURT**
                  **NORTHERN DISTRICT OF CALIFORNIA**
9                     **SAN FRANCISCO DIVISION**

10  IN RE ALPHABET, INC., SHAREHOLDER          CONSOLIDATED
    DERIVATIVE LITIGATION                      Case No.: 3:21-cv-9388-RFL
11
                                               **CO-LEAD PLAINTIFFS' NOTICE OF**
12                                             **MOTION AND MOTION FOR**
                                               **ATTORNEYS' FEES AND EXPENSES**
13                                             **AND CO-LEAD PLAINTIFFS' SERVICE**
                                               **AWARDS; MEMORANDUM OF POINTS**
14                                             **AND AUTHORITIES IN SUPPORT**
                                               **THEREOF**
15
                                               DATE:  Tuesday, September 30, 2025
16                                             TIME:   1:30 p.m.
                                               JUDGE: Hon. Rita F. Lin, U.S.D.J.
17                                             DEPT:  Courtroom 15 – 18th Floor

18

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ..................................................... 1

MEMORANDUM OF POINTS & AUTHORITIES.............................................. 2

I.      INTRODUCTION ................................................................................... 2

II.     BACKGROUND ..................................................................................... 4

        A.     The Results Achieved: the RCC and the RegReady Reforms ............... 4

        B.     The Time, Effort, and Expertise of Counsel .......................................... 5

               1.     Independent Case Development and Factual Investigation ....................... 6

               2.     Design and Negotiation of a Tailored Governance Reform Package ......... 6

               3.     Litigation Readiness and Strategic Trial Preparation ................................. 7

III.    DELAWARE AND NINTH CIRCUIT LEGAL STANDARDS STRONGLY SUPPORT THE REQUEST FEE AND EXPENSE AWARD ....................... 7

        A.     Results Achieved ...................................................................................... 8

        B.     Time and Effort of Counsel ..................................................................... 10

               1.     A Multi-Year, Trial-Ready Litigation Strategy Rooted in Independent Fact Development ......................................... 10

               2.     A Massive Investment of Time, Talent, and Internal Infrastructure ......... 10

               3.     Intensive Governance Reform Negotiations and a Transformative Settlement Outcome ............................................ 11

        C.     Complexity of the Litigation.................................................................... 12

               1.     A Difficult Legal Theory with a High Burden Under Delaware Law ............................................................ 12

               2.     Unparalleled Factual Record Spanning Three Major Federal Antitrust Actions .......................................................... 13

               3.     Reform Negotiations Required Deep Regulatory Knowledge and Structural Precision ................................................... 13

        D.     Contingent Nature of the Action .............................................................. 14

        E.     Standing and Ability of Counsel.............................................................. 15

        F.     The Fee Was Negotiated at Arm's-Length ............................................. 17

i

CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES AND CO-LEAD PLAINTIFFS' SERVICE AWARDS
CASE NO. 3:21-cv-09388-RFL

G.    The Lodestar Cross Check Confirms the Reasonableness of the Fee................... 19

H.    Expert Opinion Confirms the Reasonableness of the Fee Request and Timekeeping ................................................................................................ 20

IV.    THE PROPOSED SERVICE AWARDS ARE REASONABLE..................................... 23

V.    CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Feuer v. Thompson*,
  2013 WL 2950667 (N.D. Cal. June 14, 2013) ............................................................7

*Human Rights Def. Ctr. v. Cnty. of Napa*,
  2021 WL 1176640 (N.D. Cal. Mar. 28, 2021) ..........................................................22

*In re Apple Comput., Inc.*,
  2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ............................................................17

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996) .......................................................11, 12, 14, 19

*In re Dell Techs. Inc. Class V S'holders Litig.*,
  326 A.3d 686 (Del. 2024) .............................................................................7, 24

*In re Lithium Ion Batteries Antitrust Litig.*,
  853 F. App'x 56 (9th Cir. 2021) ..............................................................................24

*Mangold v. Cal. Pub. Utils. Comm'n*,
  67 F.3d 1470 (9th Cir. 1995) .....................................................................................7

*Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ...................................................................................23

*Razilov v. Nationwide Mut. Ins. Co.*,
  2006 WL 3312024 (D. Or. Nov. 13, 2006) ..............................................................23

*Rudi v. Wexner*,
  2022 WL 1682297 (S.D. Oh. May 16, 2022) .............................................................9

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ...................................................................................23

*Sugarland Indus., Inc. v. Thomas*,
  420 A.2d 142 (Del. 1980) ...................................................................................7, 10

*Tandycrafts, Inc. v. Initio Partners*,
  562 A.2d 1162 (Del. 1989) .........................................................................................8

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ...................................................................................7

*Wehlage v. Evergreen at Arvin LLC*,
  2012 WL 4755371 (N.D. Cal. Oct. 4, 2012) ............................................................17

iii

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
     Rule 23.1 ................................................................................................................................1

8 *Del. C.*
     §220 ........................................................................................................................................6

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that, pursuant to the Order Preliminarily Approving Settlement and Providing Notice, As Modified (ECF No. 103), on Tuesday, September 30, 2025, at 1:30 p.m., in Courtroom 15, 18th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Co-Lead Plaintiffs Police and Fire Retirement System of the City of Detroit and Bucks County Employees' Retirement System (together, "Co-Lead Plaintiffs") in the above-captioned consolidated shareholder derivative action (the "Action") will appear before the Honorable Rita F. Lin, U.S.D.J., to move (the "Motion"), pursuant to Federal Rule of Civil Procedure 23.1, for entry of an order awarding attorneys' fees and expenses and service awards to Co-Lead Plaintiffs.

This Motion seeks an order (the "Fee Award Order") in connection with the settlement of the Action (the "Settlement") as set forth in the Joint Stipulation and Agreement of Settlement (ECF No. 87-1) (the "Stipulation"), and for entry of the proposed Order and Final Judgment (ECF No. 87-1, Ex. D) (the "[Proposed] Final Approval Order"). The [Proposed] Final Approval Order: (i) grants final approval of the Settlement; and (ii) grants approval of the Fee and Expense Award. Defendants do not oppose the relief sought in this Motion.

This Motion is based on the attached Memorandum of Points and Authorities, the accompanying declarations and exhibits hereto, the Court's file, and such other matters as may be considered at the hearing.

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Should the Court approve an $80 million award of attorneys' fees and expenses to Co-Lead Plaintiffs' Counsel for securing a landmark derivative settlement, including the creation of a new board-level Risk & Compliance Committee ("RCC"), the implementation of the RegReady compliance architecture, and a $500 million funding commitment—achieved through nearly five years of dedicated litigation, strategic negotiation, and trial preparation?

2.     Should the Court approve $50,000 service awards to each Co-Lead Plaintiff in recognition of their ongoing oversight of the litigation and valuable contributions to the successful resolution of the case?

## MEMORANDUM OF POINTS & AUTHORITIES

## I.     INTRODUCTION

Co-Lead Plaintiffs Bucks County Employees Retirement Fund and the Police and Fire Retirement System of the City of Detroit (together, "Plaintiffs") respectfully submit this memorandum in support of their motion for an award of attorneys' fees and expenses following the successful resolution of this landmark shareholder derivative action brought on behalf of Alphabet, Inc. ("Alphabet" or the "Company"). This case resulted in a transformative package of structural governance reforms—anchored by the creation of a new, independent board-level Risk & Compliance Committee (RCC) and supported by a 10-year, $500 million commitment to overhaul Alphabet's legal, compliance, and risk oversight systems. Collectively known as the "RegReady" reforms, these measures embody leading-edge governance practices designed to ensure that legal and regulatory risks across Alphabet's expansive and decentralized business operations are systematically identified, escalated, and addressed at the highest levels.

The RCC and RegReady reforms are specifically designed to remedy the core compliance failures that allowed systemic regulatory risks to spread unchecked across Alphabet's major business lines, including Google Search, Google Ad Tech, and the Play Store. The RCC will be responsible for oversight of regulatory and compliance matters, including receiving periodic updates on principal risks and compliance enhancements. In parallel with the creation of the RCC, the Settlement requires Alphabet to implement the RegReady initiative—a risk-based, Company-wide compliance program designed to identify and address emerging regulatory risks, with a particular focus on competition issues. RegReady provides for dedicated compliance professionals with appropriate expertise, centralized oversight and management of compliance programs, direct collaboration with product teams, and structured integration with governance bodies such as the Trust & Compliance Council ("TCC") and the Trust & Compliance Steering Committee

2

("TCSC").  Together, these reforms are designed to strengthen Alphabet's ability to proactively identify, assess, and address compliance risks across its sprawling business operations. Governance expert Professor Evan Epstein has described the reforms as "significant" and "could set a precedent for the broader industry."  *See* Declaration of Evan Epstein in Support of Co-Lead Plaintiffs' Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Expenses ("Epstein Decl.") ¶34, attached as Exhibit B to the Declaration of Patrick J. Coughlin in Support of Co-Lead Plaintiffs' Motions for Final Approval of Settlement and Attorneys' Fees and Expenses ("Coughlin Decl.").

In addition, the Settlement includes a landmark $500 million funding commitment—the largest in the history of any shareholder derivative action for corporate governance reforms—to ensure that Alphabet has the financial resources and institutional backing necessary to implement and sustain the RegReady reforms over the next decade.  This level of investment reflects the seriousness of the reforms and the scale of Alphabet's compliance challenges.  It dwarfs the Company's prior regulatory readiness spending, which totaled just $129 million over the three years preceding the Settlement ($11 million in 2022, $40 million in 2023, and $78 million in 2024)—barely a quarter of the Settlement's funding commitment.

This outcome was not the result of parallel government action or regulatory compulsion. It was achieved solely through the efforts of Plaintiffs' counsel, Scott+Scott Attorneys at Law LLP ("Scott+Scott") ("Plaintiffs' counsel" or "Lead Counsel")—who, over the course of nearly five years, prepared this case as though it were going to trial.  Lead Counsel reviewed over one million pages of Alphabet's internal materials—including board presentations, compliance reports, risk assessments, internal business documents, and email correspondence among senior executives— and synthesized that evidence into a compelling narrative of fiduciary breach and tailored reform proposals.  At the same time, counsel undertook a comprehensive analysis of trial transcripts, expert reports, and exhibits from overlapping enforcement actions brought by the U.S. Department of Justice ("DOJ") and numerous state attorneys general ("AGs").  In effect, Plaintiffs' counsel

1  had to litigate and develop a trial-ready record not only on their own claims, but across multiple

2  enforcement tracks, to create the leverage needed to obtain structural reforms of this magnitude.

3  Lead Counsel's preparation included developing and refining factual theories, distilling

4  complex regulatory data into board-level deficiencies, collaborating with governance, compliance,

5  and damages experts, and identifying credible, enforceable reforms tailored to Alphabet's unique

6  organizational risks.  The result was a carefully structured, independently negotiated settlement

7  that addressed the root causes of Alphabet's governance breakdowns and will materially improve

8  its compliance risk posture moving forward.

9  The requested $80 million in attorneys' fees and expense—payable from Alphabet's D&O

10  insurance—is commensurate with the value of the forward-looking relief obtained, the magnitude

11  of the compliance benefits secured, and the extraordinary investment of time, effort, and expertise

12  required to achieve this result.  The request is well supported under Delaware and Ninth Circuit

13  law.  Accordingly, Plaintiffs respectfully request that the Court approve the request in full.

14  **II.    BACKGROUND**

15  **A.    The Results Achieved: the RCC and the RegReady Reforms**

16  The centerpiece of the Settlement is the creation of the Risk & Compliance Committee

17  (RCC)—a new, independent Board-level committee with a broad mandate and real authority to

18  oversee Alphabet's most significant legal, regulatory, and competition-related risks.  The RCC

19  will service as a critical safeguard against the types of board-level oversight failures that allowed

20  Alphabet's regulatory exposure to grow unchecked over the past decade.

21  The Settlement also mandates the implementation of Regulatory Readiness Compliance

22  (RegReady)—a company-wide, risk-based compliance program focused on proactively

23  identifying and addressing evolving areas of regulatory risk.  RegReady includes the appointment

24  of compliance professionals with appropriate subject matter expertise, centralized management of

25  the compliance program, collaboration with product teams, and coordination with internal

26  governance bodies such as the Trust & Compliance Council (TCC) and Trust & Compliance

27  Steering Committee (TCSC).  The program is guided by DOJ principles and global best practices

28

and incorporates core compliance functions such as risk assessment, policy development and training, internal reporting mechanisms, control systems, and enhanced risk management. The RCC and RegReady reforms establish a structured, resourced, and enforceable compliance framework to support Alphabet's long-term legal and regulatory oversight.

The Settlement also secures an unprecedented $500 million funding commitment to support the implementation and long-term operation of the RCC and RegReady reforms. This commitment—the largest of its kind ever obtained in a shareholder derivative action—ensures that Alphabet's governance overhaul is fully resourced for sustained execution over the next decade. The scale of this investment underscores the seriousness of the structural changes and the magnitude of the Company's historical oversight failures. These structural reforms have been recognized as "significant" by Professor Epstein, who has advised boards and regulators on compliance governance. Epstein Decl. ¶34. In his declaration, Professor Epstein concluded that the RCC and RegReady reforms are "meaningful and material governance reforms that directly address the alleged oversight deficiencies, enhance board-level accountability, and align with best practices in corporate governance. In particular, the creation of a dedicated board-level compliance committee, the implementation of enhanced management-level compliance controls, and the Company's long-term financial commitment to compliance collectively demonstrate a good faith effort to strengthen the Board's oversight function and mitigate future risks." *Id.* ¶4. He noted that the "establishment of a dedicated board-level risk and compliance committee marks an innovative governance approach for technology companies" and provides a replicable model for other large technology companies. *Id.* ¶33.

## B. The Time, Effort, and Expertise of Counsel

The results achieved in this litigation were the product of an extraordinary, multi-year effort by Plaintiffs' counsel that required not only mastery of fiduciary and antitrust law but also meticulous factual development, strategic planning, and trial-level preparation. From inception, this was not a case that could rely on the momentum of parallel enforcement or agency-driven discovery. Rather, Plaintiffs' counsel had to independently develop a case capable of surviving

1  dismissal, supporting discovery, and ultimately prevailing at trial if necessary.  That approach

2  defined every phase of their work.

### 1.    Independent Case Development and Factual Investigation

4  Beginning with an extensive Delaware General Corporation Law Section 220, 8 *Del. C.*

5  §220, books and records investigation, counsel spent more than a year assembling the factual

6  foundation of their complaint—identifying, analyzing, and organizing almost 2,000 pages of

7  internal Alphabet documents, including Board minutes, agendas, committee presentations, director

8  & officer questionnaires, policies, and training materials.  The resulting derivative complaint, filed

9  in 2021 and amended in 2022 and 2025, reflected a granular understanding of Alphabet's board

10  governance structures, compliance reporting systems, and antitrust exposure across business units.

11  Over the next four years, Plaintiffs' counsel conducted a parallel investigation into the

12  publicly available record generated by federal and state antitrust enforcement efforts.  They

13  dissected hundreds of pleadings and exhibits, cross-referenced testimony and trial transcripts from

14  three major enforcement actions, and synthesized the overlapping factual narratives into a cohesive

15  record of alleged Board-level failure to monitor Alphabet's systemic legal risk.  This work was

16  essential not only to demonstrate oversight gaps, but to rebut anticipated defenses and articulate a

17  credible theory of fiduciary breach under Delaware law.

### 2.    Design and Negotiation of a Tailored Governance Reform Package

19  Simultaneously, counsel began crafting a blueprint for meaningful governance reform.

20  They consulted with leading governance and damages experts, studied DOJ guidance on effective

21  compliance programs, and reviewed historical reform models from prior derivative settlements.

22  They tailored that research into a bespoke framework—what became the RCC and RegReady

23  reforms—designed specifically for Alphabet's scale, structure, and platform-related regulatory

24  challenges.  These negotiations unfolded across numerous mediation sessions and direct meetings,

25  often requiring Plaintiffs' counsel to defend, revise, and justify individual reform provisions under

26  pressure from multiple defense constituencies.

27

28

### 3.    Litigation Readiness and Strategic Trial Preparation

Throughout, Plaintiffs' counsel prepared the case for trial. They developed opening arguments, mapped potential witness testimony, and prepared a trial record capable of establishing director liability. In parallel, they built a detailed record of Board and committee conduct—including oversight failures, meeting frequencies, and escalation shortfalls—to support not just liability but also injunctive relief and governance remedies. In total, Plaintiffs' counsel invested more than 37,000 hours of attorney and professional time into this litigation. That investment yielded an unprecedented, enforceable governance package that fundamentally restructures Alphabet's oversight of regulatory and compliance risk.

## III.    DELAWARE AND NINTH CIRCUIT LEGAL STANDARDS STRONGLY SUPPORT THE REQUEST FEE AND EXPENSE AWARD

Both Delaware and Ninth Circuit law fully support a substantial attorneys' fee award where, as here, Plaintiffs' counsel have achieved exceptional corporate benefits through extensive investigation, rigorous case development, and effective prosecution of complex claims. Under Ninth Circuit precedent, the law that governs the claims also governs the fee award. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995). Because Delaware law governs the derivative claims here, it also governs the standards for awarding attorneys' fees and expenses. *See Feuer v. Thompson*, 2013 WL 2950667, at *2 (N.D. Cal. June 14, 2013).

Delaware courts assess the reasonableness of attorneys' fee awards in derivative and class actions using the five-factor framework set forth in *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del. 1980). The *Sugarland* factors are: (1) the results achieved; (2) the time and effort expended by counsel; (3) the complexity of the litigation; (4) the contingent nature of the representation; and (5) the standing and ability of counsel. Among these, the Delaware Supreme Court has repeatedly confirmed that the "results achieved" is the single most important factor. *In re Dell Techs. Inc. Class V S'holders Litig.*, 326 A.3d 686, 698 (Del. 2024). Applying these factors

1   to the record here overwhelmingly supports the conclusion that the requested $80 million fee is

2   fair, reasonable, and fully warranted.

3       **A.    Results Achieved**

4       The results achieved in this Action are extraordinary by any measure and justify the

5   requested fee award under Delaware's governing standard.    The Settlement delivers a

6   transformative governance overhaul at Alphabet—addressing the precise compliance and

7   oversight failures that gave rise to the underlying federal antitrust enforcement actions—and

8   includes a $500 million funding commitment to support and institutionalize these reforms over the

9   next decade.    This is the largest governance-focused funding commitment ever obtained in a

10  shareholder derivative action and represents a substantial corporate benefit under Delaware law.

11      The reforms are structural, enforceable, and tailored to Alphabet's regulatory risk profile.

12  They include the creation of a Board-level Risk and Compliance Committee, the implementation

13  of the RegReady program to enhance Company-wide compliance infrastructure, the appointment

14  of compliance professionals with appropriate subject-matter expertise, centralized compliance

15  program management, collaboration with product teams, and integration with governance bodies

16  such as the TCC and the TCSC.    The $500 million commitment ensures these measures will be

17  backed by meaningful financial resources—not left to discretionary budgeting or deferred

18  implementation.    Alphabet's leadership agreed to these reforms only after years of hard-fought

19  litigation, and only in direct response to the pressure created by this Action.

20      Courts in Delaware and the Ninth Circuit have consistently recognized that structural

21  corporate reforms—particularly those designed to mitigate future regulatory risk—are a form of

22  cognizable, quantifiable corporate benefit that justifies a substantial fee award.    The Delaware

23  Supreme Court has made clear that "changes in corporate policy . . . if attributable to the filing of

24  a meritorious suit, may justify an award of counsel fees." *Tandycrafts, Inc. v. Initio Partners*, 562

25  A.2d 1162, 1165 (Del. 1989).    This case exemplifies that principle.    The corporate reforms secured

26  here were specifically negotiated and customized to address Alphabet's ongoing exposure to multi-

27  billion-dollar government enforcement actions.    As the Hon. Layn R. Phillips (Ret.) confirmed,

28

1    "[t]o my knowledge . . . this is the largest spend commitment ever reached in a Derivative

2    settlement." *See* Declaration of Hon. Layn R. Phillips (FMR.) in Support of Co-Lead Plaintiffs'

3    Motion for Final Approval of Settlement ("Phillips Decl.") ¶18, Coughlin Decl., Ex. A.

4         A helpful benchmark is provided by the *Rudi v. Wexner* ("*L Brands*") derivative settlement.

5    There, the parties secured a $90 million funding commitment to support governance reforms at the

6    company.   The Southern District of Ohio approved a $21 million fee award—representing

7    approximately 23% of the combined $90 million fund.  In doing so, the court emphasized that:

8    where reforms are significant and material, and backed by a substantial financial commitment,

9    courts have not hesitated to award a fee that reflects the real value created. *See Rudi v. Wexner*,

10   2022 WL 1682297, at *4–5 (S.D. Oh. May 16, 2022).

11        The governance reforms in *L Brands* did not include a new board committee, did not

12   involve parallel DOJ litigation risk, and did not cover a business segment as expansive or globally

13   exposed as Alphabet's.  Yet the court had no difficulty recognizing that a $90 million fund backing

14   meaningful governance change supported a 23% fee.  The Court found that reforms, which the

15   $90 million fund supported, confers a substantial benefit on the Company, and supports the

16   reasonableness of the requested $21 million fee (approximately 23%) of the fund. *Id.*

17        Here, the $500 million fund is more than five times greater, and the requested $80 million

18   fee equals only 16% of that amount.  If anything, the requested fee is conservative.  Moreover, the

19   funding commitment provides an objective, quantifiable floor on the value of the corporate benefit

20   conferred.  Alphabet is a profit-maximizing enterprise.  Its fiduciaries would not have approved

21   the $500 million spending commitment unless they believed it would generate at least that much

22   in compliance value and risk mitigation.   This strongly supports the reasonableness of the

23   requested fee.

24        Finally, the funding commitment includes specific mechanisms to ensure oversight of how

25   the funds are spent, reporting obligations to the new Board committee, and staggered timelines to

26   ensure continued investment.  These safeguards confirm that the value is real, enforceable, and

27   designed to produce long-term benefit for the Company and its stockholders.  In sum, the results

28

1    achieved are monumental—both in scope and in financial value.  Under *Sugarland* and the

2    decisions in *L Brands* and similar governance reform cases, a 16% fee on a $500 million

3    governance fund is more than justified by the benefit conferred.

4         **B.    Time and Effort of Counsel**

5         The time and effort invested by Plaintiffs' counsel in this case was extraordinary in both

6    duration and depth, reflecting their commitment to achieving meaningful structural reform at one

7    of the most powerful and complex technology companies in the world.  Over nearly five years,

8    Lead Counsel undertook an extensive factual investigation, strategic litigation planning, and multi-

9    year reform negotiation process that required a sustained and focused commitment of attorney

10   time, resources, and expertise.

11        **1.    A Multi-Year, Trial-Ready Litigation Strategy Rooted in Independent**
                  **Fact Development**
12

13        As detailed in the declarations of Patrick J. Coughlin, Geoffrey M. Johnson, and Jing-Li

14   Yu, Plaintiffs' counsel approached this matter as if it were proceeding to trial.  From the outset,

15   counsel began constructing a comprehensive evidentiary record and legal theory around the

16   Alphabet Board's failure to oversee compliance with antitrust laws, developing a strategic

17   roadmap for derivative litigation that could survive demand futility, and deliver real corporate

18   reform.  Mr. Coughlin, the lead trial counsel, closely analyzed evidentiary patterns to evaluate the

19   strength of the claims, assess trial readiness, and manage litigation risk.  Mr. Johnson personally

20   oversaw the coordination of legal strategy, document analysis, and mediation posture.  Mr. Yu

21   continued to refine the complaint and legal theories in real time, updating factual allegations and

22   legal citations based on emerging trial testimony and enforcement filings.

23        **2.    A Massive Investment of Time, Talent, and Internal Infrastructure**

24        To support these efforts, Scott+Scott committed a full-time team of up to 14 staff attorneys

25   who, over a multi-year period reviewed, analyzed, and summarized more than 1.1 million pages

26   of internal Alphabet documents, 375 deposition transcripts and exhibits, and the complete trial

27   records from three high-stakes antitrust actions: *Epic Games, Inc. v. Google LLC*, No. 20-cv-05671

28

10

CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES
AND CO-LEAD PLAINTIFFS' SERVICE AWARDS
CASE NO. 3:21-cv-09388-RFL

(N.D. Cal.), *U.S. v. Google LLC (Search)*, No. 20-cv-03010 (D.D.C.), and *U.S. v. Google LLC (Ad Tech)*, No. 23-cv-00108 (E.D. Va.).  These staff attorneys, all full-time employees with significant experience, produced hundreds of pages of work product, including: (1) detailed memoranda on key liability themes; (2) summaries of pivotal documents and testimony; (3) chronologies of events and oversight failures; (4) weekly updates and legal research reports.  This infrastructure allowed senior attorneys to build and refine case strategy, prepare amended complaints, develop mediation materials, and negotiate comprehensive reforms—work that unfolded in an evolving regulatory and litigation landscape.  The scale of the firm's investment is reflected in the time records.  Plaintiffs' counsel collectively invested more than 37,000 attorney hours, generating over $34 million in lodestar.

Lead Counsel also conducted intensive legal research and fact development on fiduciary duty claims, particularly under Delaware's *Caremark* standard, which is notoriously difficult to plead and prove.  They tracked enforcement trends, analyzed evolving DOJ compliance guidance, and incorporated those insights into draft reform proposals aimed at aligning Alphabet's governance with regulatory expectations.  As Messrs. Johnson and Yu explain in their declarations, counsel continuously updated their legal analysis and reform design to reflect findings in the underlying trials and evolving antitrust theories being tested in federal court.

### 3.    Intensive Governance Reform Negotiations and a Transformative Settlement Outcome

Throughout the litigation, Lead Counsel also engaged in robust settlement discussions.  These involved the development of multiple governance reform proposals, modeling of implementation costs, feedback from the mediator, and extensive back-and-forth with defense counsel.  Indeed, the process of preparing the RegReady reform framework required the same level of planning and rigor as litigation itself.  Counsel negotiated implementation structures, aligned oversight procedures with board reporting systems, and embedded compliance mechanisms across product and business lines—ensuring these reforms would be functional, enforceable, and effective.

1    The resulting Settlement reflects this investment of time and effort.  Without it, there would

2    be no independent Regulatory Compliance Committee of the Board; no system-wide RegReady

3    architecture; no executive-level compliance restructuring; no overhaul of Alphabet's document

4    retention and chat policies; and no $500 million funding commitment to ensure real

5    implementation.  In short, the magnitude of the results achieved is a direct product of the time,

6    resources, and professional judgment that Plaintiffs' counsel devoted to this case.  Their work

7    spanned nearly five years, against a highly sophisticated adversary represented by an elite law

8    firm, under evolving regulatory scrutiny and without any governmental admissions of wrongdoing.

9    **C.    Complexity of the Litigation**

10    This case presented exceptional legal, factual, and procedural challenges at every stage.

11    Plaintiffs' counsel prosecuted a fiduciary oversight case under Delaware law based on Alphabet's

12    alleged failure to monitor compliance with antitrust laws—one of the most difficult theories in

13    corporate law.    Achieving a landmark governance overhaul and a $500 million funding

14    commitment required mastery of overlapping litigation records, evolving legal doctrines, and

15    Alphabet's complex internal systems.

16    **1.    A Difficult Legal Theory with a High Burden Under Delaware Law**

17    Plaintiffs advanced a claim under the *Caremark* standard, which the Delaware Court of

18    Chancery has recognized as "possibly the most difficult theory in corporation law upon which a

19    plaintiff might hope to win a judgment."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d

20    959, 967 (Del. Ch. 1996).  Unlike transactional misconduct or false statements, the core allegation

21    was that Alphabet's Board consciously failed to monitor and respond to systemic antitrust risk.

22    To prevail, Plaintiffs needed to demonstrate that the Board's inaction amounted to bad faith.  This

23    was a high-stakes claim requiring Plaintiffs to align evidence of complex market misconduct with

24    failures in governance structure, board reporting, risk escalation, and compliance design.  There

25    was no roadmap.  Plaintiffs had to innovate, develop novel legal arguments, and continuously

26    update their theories based on shifting regulatory guidance and trial outcomes in related

27    government cases.

28

12

CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES
AND CO-LEAD PLAINTIFFS' SERVICE AWARDS
CASE NO. 3:21-cv-09388-RFL

### 2. Unparalleled Factual Record Spanning Three Major Federal Antitrust Actions

The factual complexity of this case was extraordinary. Plaintiffs' counsel had to independently review and synthesize discovery materials from major federal antitrust cases, including: (1) over 1.1 million pages of documents; (2) more than 375 deposition transcripts and exhibits; and (3) dozens of trial days and evolving evidentiary records from *Epic Games v. Google* (N.D. Cal.), *United States v. Google – Search* (D.D.C.), and *United States v. Google – Ad Tech* (E.D. Va.). Each of these actions involved distinct legal theories, markets, and factual timelines. Plaintiffs' counsel could not simply adopt findings from these cases—they had to build an independent record of fiduciary breach using raw source materials. This required not only a detailed understanding of Alphabet's product and legal risk profile, but also the ability to trace that risk back to Board-level knowledge, inaction, and structural deficiencies. As Mr. Johnson explains in his declaration, this was a dynamic process. Counsel engaged in continuous monitoring of the public trial records, analyzed cross-examination testimony, extracted evidence of internal reporting failures, and mapped those against Alphabet's governance structure. This was necessary to plead actionable oversight failures and prepare for trial.

### 3. Reform Negotiations Required Deep Regulatory Knowledge and Structural Precision

Settlement negotiations added another layer of complexity. The reforms were highly customized, grounded in real-time legal analysis and tailored to Alphabet's governance risks. Crafting the RegReady and RCC frameworks required: (1) detailed knowledge of Alphabet's Board and committee structures; (2) familiarity with DOJ guidance on effective corporate compliance programs; and (3) expertise in designing enforceable oversight mechanisms that could operate across Alphabet's massive organizational footprint.

Plaintiffs' counsel developed reform term sheets, drafted policy language, modeled implementation costs, and engaged in multiple rounds of redlines and revisions. Negotiations occurred in parallel with a rapidly shifting enforcement landscape—DOJ lawsuits, public trials,

1  evolving regulatory demands—and had to account for internal Alphabet dynamics and insurer

2  constraints.

3       This was not a standard settlement process.  It was a prolonged, technical negotiation under

4  the supervision of a former federal judge.  Plaintiffs' counsel defended each component of the

5  reform package on the merits, while also building a record capable of withstanding judicial

6  scrutiny in a final approval hearing.

7       **D.**    **Contingent Nature of the Action**

8       From inception, this case was prosecuted on an entirely contingent basis.  Plaintiffs'

9  counsel undertook this litigation with no guarantee of recovery—shouldering all litigation risk,

10  advancing all attorney and staff time without compensation, and absorbing all costs over a period

11  of nearly five years.  During that time, they litigated against one of the world's most valuable

12  companies, represented by elite defense counsel from a top-tier law firm, without any interim fee

13  payments.

14       Unlike many securities fraud or merger objection cases where a monetary settlement is

15  often a foreseeable resolution, shareholder derivative cases—particularly those brought under

16  Delaware's stringent *Caremark* standard—are notoriously difficult to win and risky to pursue.

17  Delaware courts have emphasized that the chances of success for plaintiffs in a *Caremark* case are

18  low, and have repeatedly dismissed even well-pleaded complaints.  Plaintiffs' counsel proceeded

19  despite that reality, knowing that a successful outcome would likely require years of investigation,

20  negotiation, and expert development of compliance reforms that would deliver demonstrable, long-

21  term corporate benefit.

22       In addition to the legal risks, the economic risks were significant.  Plaintiffs' counsel had

23  incurred over $34 million in lodestar and significant unreimbursed expenses.  Declaration of Daryl

24  F. Scott in Support of Co-Lead Plaintiffs' Counsel's Fee Application at 1 –2, Coughlin Decl., Ex.

25  D.  The staff attorney team alone—up to 14 attorneys at different points—had spent years

26  conducting detailed document and trial record review, without compensation.  Senior attorneys

27  likewise devoted thousands of hours to strategy development, reform drafting, legal research, and

28

mediation—all on a purely contingent basis.  At multiple points in the case, the risk of total loss was real.  Alphabet and its Board have consistently denied wrongdoing not only in this derivative action, but also in the underlying DOJ and private antitrust cases.  There were no government admissions or regulatory findings that Plaintiffs could rely upon.

Unlike cases where a corporate board adopts reforms in response to a government investigation or settlement, here, the RegReady and RCC reforms were secured solely through private litigation.  Had the litigation failed—on demand futility, on summary judgment, or at trial—Plaintiffs' counsel would have received nothing for their years of work or the millions of dollars of firm resources expended.  Without Plaintiffs' counsel's willingness to undertake this matter on contingency, despite its complexity and difficulty, the Company would not have obtained the structural reforms and funding commitment.  Accordingly, the contingent nature of the representation weighs heavily in favor of approving the requested fee and expense award.

### E.    Standing and Ability of Counsel

The standing and ability of Plaintiffs' counsel further support the reasonableness of the requested fee and expense award.  This litigation required not only deep subject-matter expertise in shareholder derivative and fiduciary duty law, but also extensive experience in antitrust enforcement, complex document review, and corporate governance reform.  As reflected in the accompanying declarations of Messrs. Coughlin, Johnson, and Yu, Plaintiffs' counsel brought to this case the experience, judgment, and institutional strength necessary to litigate against one of the most powerful and well-represented companies in the world.

Scott+Scott is nationally recognized for its expertise in corporate governance and fiduciary litigation.  Over the past several years, the firm has led the majority of large-scale derivative cases resulting in board-level reforms backed by dedicated funding commitments.  These include:

- ***Rudi v. Wexner***, No. 2:20-cv-03068 (S.D. Oh.) – $90 million corporate reform and funding settlement addressing workplace misconduct and board oversight failures;

1
2
3

- ***In re Altria Group, Inc. Derivative Litig.***, No. 3:20-cv-00772 (E.D. Va.) – $117 million reform and funding settlement arising from the Company's investment in Juul; and

4
5
6
7

- ***Irving Firemen's Relief and Ret. Fund v. Page***, C.A. No. 2019-0355 (Del. Ch.) ("*Alphabet I*") and ***In re Alphabet Inc. S'holder Derivative Litig.***, No. 19CV343086 (Cal. Super. Ct.) – $310 million corporate governance reform and funding commitment.

8   Scott+Scott's success in these matters has made it one of the few firms capable of designing and

9   negotiating governance settlements that impose real, enforceable reforms and secure meaningful

10  financial commitments to ensure implementation.

11          Lead trial counsel Patrick Coughlin brought to this matter over four decades of trial and

12  litigation experience in complex class and derivative cases, including antitrust, securities, and

13  corporate fraud.  In the 1990s and 2000s, Mr. Coughlin led some of the largest civil antitrust and

14  price-fixing actions in U.S. history, including actions involving the credit card companies and

15  major banks in interchange, the tobacco companies, and foreign exchange traders (e.g., *Regents of*

16  *the Univ. of Cal v. Credit Suisse First Bos.*, 482 F.3d 372 (5th Cir. 2007); *In re Payment Card*

17  *Interchange Fee and Merchant Discount Antitrust Litig.*, 62 F.4th 704 (2d Cir. 2023); *In re: Text*

18  *Messaging Antitrust Litig. Aircraft Check Servs. Co. v. Verizon Wireless*, 782 F.3d 867 (7th Cir.

19  2015)).  His deep familiarity with antitrust law, particularly in digital and platform markets, was

20  instrumental in guiding the team's analysis of the parallel DOJ and private enforcement actions

21  against Alphabet and developing the fiduciary theories underpinning this derivative case.  His

22  ability to assess evidentiary patterns and trial viability in antitrust settings shaped the legal strategy

23  and informed both litigation and settlement planning.

24          Geoffrey Johnson, head of Scott+Scott's governance and shareholder litigation practice,

25  directed the day-to-day litigation, coordinated the firm's internal workstreams, and led the

26  negotiation of the RegReady framework.  With more than 25 years of experience in shareholder

27  and fiduciary duty litigation, Mr. Johnson has successfully prosecuted dozens of derivative and

28

1   securities actions, including many involving novel governance structures and board-level reforms.

2   Jing-Li Yu, with 15 years of litigation experience, supervised the document review and fact

3   development team, including a full-time team of staff attorneys through the review of more than

4   1.1 million pages of internal Alphabet documents and hundreds of trial exhibits and deposition

5   transcripts from the underlying *Epic Games*, *DOJ Search*, and *DOJ Ad Tech* litigations, and drafted

6   key filings, including the complaint and mediation statements.  Mr. Yu also conducted extensive

7   legal research on fiduciary duties, Delaware law, and DOJ compliance expectations and played a

8   central role in designing the detailed oversight framework that was ultimately adopted in the

9   Settlement.

10          This team invested the time, resources, and professional capital required to deliver

11  meaningful reform.  The complexity of the underlying issues, the size and power of the corporate

12  defendant, and the scale of the achievement confirm the firm's national reputation for excellence

13  in shareholder litigation.  The standing and ability of Plaintiffs' counsel weigh strongly in favor of

14  approving the requested attorneys' fee and expense award.

15          **F.    The Fee Was Negotiated at Arm's-Length**

16          Courts in the Ninth Circuit and Delaware routinely approve attorneys' fee awards in

17  shareholder derivative actions where the fees were negotiated separately from the substantive

18  settlement and at arm's-length under the supervision of an experienced mediator.  When parties

19  reach a fee agreement after settlement terms are finalized, "a court should refrain from substituting

20  its own value for a properly bargained[-]for agreement."  *In re Apple Comput., Inc.*, 2008 WL

21  4820784, at *3 (N.D. Cal. Nov. 5, 2008); *see also Wehlage v. Evergreen at Arvin LLC*, 2012 WL

22  4755371, at *5 (N.D. Cal. Oct. 4, 2012) (approving fee negotiated at arm's-length).  Similarly, the

23  Delaware Court of Chancery, in approving a fee in *Alphabet I*, emphasized:

24          "[G]iven that fiduciaries for the company, with the assistance of an able mediator,
           have reached an amount independent of the settlement for a fee of $11.33 million,
25          and given the stockholders have had an opportunity to come forward and have not
           objected, and given that this is a contingent litigation and the lodestar indicates that
26          the amount requested is not out of line with previous decisions, does not create
           unwholesome incentives, for all of those reasons, I am going to approve the
27          requested $11.33 million fee."

28

1 Transcript of Telephonic Hearing and Rulings of the Court on Plaintiff's Motion for Approval of

2 Fees and Expenses at 20, *Irving Firemen's Relief and Ret. Fund v. Page*, C.A. No. 2019-0355

3 (Del. Ch. Dec. 23, 2020), Coughlin Decl., Ex. F.

4         Here, the requested $80 million in attorneys' fees and expenses was separately negotiated

5 only after the core terms of the Settlement had been finalized.  Critically, both the Settlement and

6 the subsequent fee discussions were overseen by Judge Phillips, a former U.S. District Judge and

7 one of the most respected mediators in the country.  In his declaration submitted in support of final

8 approval, Judge Phillips confirmed that the parties engaged in "protracted arm's-length

9 negotiations" over a multi-year period to reach the Settlement and that the fee negotiations were

10 entirely separate from the merits.  Phillips Decl. ¶7.  He specifically noted that:

11   •   the parties reached agreement on the governance reforms and the $500 million
12       spending commitment before any fee discussions began;

13   •   the fee negotiations were initiated only after that substantive agreement was
14       complete; and

15   •   the parties jointly requested that Judge Phillips provide a Mediator's
16       Recommendation regarding the appropriate fee and expense amount, and they then
17       accepted his recommendation of $80 million.

18         Judge Phillips also emphasized that the corporate reforms in this case—particularly the

19 $500 million implementation commitment—represented "to [his] knowledge, . . . the largest spend

20 commitment ever reached in a Derivative settlement."  *Id.* ¶18.  He attested that the reforms were

21 hard-fought and carefully negotiated, and that the requested fee was reasonable in light of the scale

22 of the benefit and the complexity of the matter.  The procedural integrity and independence of this

23 process strongly support approval of the fee request.  Courts give substantial weight to fee

24 agreements reached under the supervision of neutral mediators, especially when the agreement is

25 unopposed and follows the resolution of all material terms of settlement.

26

27

28

### G.    The Lodestar Cross Check Confirms the Reasonableness of the Fee

The requested $80 million fee and expense award is further supported by a lodestar cross-check, which confirms that the request is reasonable under both Delaware and Ninth Circuit standards.  Based on contemporaneous time records submitted by Scott+Scott, Plaintiffs' counsel invested more than 37,000 hours in this litigation, resulting in a total lodestar of approximately $34 million.  The requested fee represents a modest 2.35x multiplier on that figure—a level well within the range routinely approved in complex shareholder litigation involving contingent risk and non-monetary structural reform.

This multiplier is consistent with, and in many respects more conservative than, lodestar multipliers awarded in similar derivative settlements.  For example, in *Alphabet I*, the Delaware court approved a 3.9x multiplier on lodestar in connection with a $310 million corporate governance settlement, which did not include the creation of a new board committee.  In *L Brands*, the court awarded a $21 million fee for corporate reforms backed by a $90 million funding commitment, reflecting a multiplier of approximately 3.1x.  Here, the 2.35x multiplier is below both comparables, despite the significantly larger scale of the $500 million funding commitment and the Board-level Regulatory Compliance Committee and RegReady infrastructure.

The reasonableness of the lodestar is further confirmed by the scope and nature of the work performed, as set forth in the declarations of Patrick J. Coughlin, Geoffrey M. Johnson, and Jing-Li Yu.  Over the course of nearly five years, Plaintiffs' counsel built a comprehensive factual and legal record to support a *Caremark* oversight claim against one of the most powerful and complex technology companies in the world.  This work included:

- **reviewing more than 1.1 million pages** of internal Alphabet documents produced in the underlying antitrust actions;

- **analyzing 375 deposition transcripts and exhibits** from *Epic Games, Inc. v. Google LLC*, *U.S. v. Google LLC (Search)*, and *U.S. v. Google LLC (Ad Tech)*;

- **digesting hundreds of trial exhibits and multiple full trial transcripts** from three high-stakes federal cases;

- **preparing detailed memoranda, legal research reports, and strategy documents** on oversight failures, regulatory risks, and evolving antitrust enforcement; and

- **drafting amended complaints, mediation briefs, and reform proposals** tailored to real-world implementation and corporate accountability.

This work was led by a senior team of attorneys with decades of high-stakes litigation experience. Mr. Coughlin, the lead trial lawyer, brought more than 40 years of litigation experience, including leading the trial teams in historic antitrust actions against Microsoft and NASDAQ. Mr. Johnson, the head of Scott+Scott's governance and shareholder litigation practice, supervised the litigation and led reform negotiations. Mr. Yu, with 15 years of litigation experience, directed the document review team and was the principal drafter of litigation filings and governance frameworks. Supporting them was a dedicated staff attorney team—ranging from up to 14 attorneys at any given time—who spent years reviewing and analyzing the underlying record.

The attorney billing rates underlying the lodestar are also well within market norms. Mr. Coughlin billed at $2,050 per hour, Mr. Johnson at $1,575 per hour, and Mr. Yu at $1,145 per hour—rates that are conservative in comparison to defense counsel at leading firms. According to a 2024 American Bar Association Journal report, senior partners at Am Law 50 firms command rates exceeding $2,100 per hour, and partners at top Silicon Valley firms such as Wilson Sonsini bill over $2,700 per hour. *See Law.com* Article, Coughlin Decl., Ex. G. Senior associates at these firms often exceed $1,500–$2,000 per hour. In contrast, Scott+Scott's staff attorneys—experienced full-time litigators who performed the equivalent of senior associate-level document analysis—were billed between $525–$720 per hour.

## H. Expert Opinion Confirms the Reasonableness of the Fee Request and Timekeeping

To further support the reasonableness of the requested attorneys' fee and expense award, Co-Lead Plaintiffs retained legal fee expert Stephen J. Herman to evaluate whether the legal work performed by Lead Counsel was reasonably necessary in the context of this complex litigation and whether the billing records reflect sound professional judgment. Mr. Herman brings more than 30 years of experience evaluating time and expense submissions in high-stakes litigation and has

1  served in leadership roles in some of the most consequential cases in recent decades, including the

2  Deepwater Horizon and tobacco litigation.

3       Mr. Herman concludes unequivocally that the time and effort invested by Lead Counsel in

4  this action are what he "would have expected to see in connection with the investigation and

5  prosecution of a civil action of this nature" and that the billing records "reflect sound billing

6  judgment." *See* Declaration of Stephen J. Herman in Support of Co-Lead Plaintiffs' Motion for

7  Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Expenses ("Herman

8  Decl.") ¶¶18, 20, Coughlin Decl., Ex. E.  His opinion reinforces that the work performed here was

9  both necessary and properly documented.

10       Importantly, Mr. Herman highlights that the fees are being paid primarily, if not

11  exclusively, from insurance proceeds and do not in any way reduce the monetary or injunctive

12  benefits provided to Alphabet or its shareholders.  As he explains, this structure eliminates any

13  risk of the fee diminishing the value of the Settlement to the Company or its investors.  In Mr.

14  Herman's words: "It is significant to note that the attorneys' fees are being paid primarily, if not

15  exclusively, out of available insurance proceeds, and do not in any way affect or diminish the

16  injunctive or monetary benefits inuring to the individual shareholders or to the company as a

17  whole." *Id.* ¶22.

18       Mr. Herman also emphasizes the importance of taking an "ex ante" approach to evaluating

19  time and effort in complex litigation.  Because it is often impossible to predict which research or

20  projects will ultimately yield concrete results, courts should not retroactively second-guess

21  whether a given task directly contributed to a particular reform: "If courts only reward common

22  benefit time that is traced, in retrospect, to direct and concretely perceived benefits, when the next

23  complex and coordinated action comes along, the court-appointed attorneys and/or other

24  volunteers will not be incentivized to undertake the more difficult or risky projects that are

25  necessary to the collective interests of all plaintiffs, and/or in the furtherance of judicial economy."

26  *Id.* ¶44.

27

28

Mr. Herman further notes that the investigative work undertaken by Plaintiffs' counsel—particularly their comprehensive review of materials from related antitrust litigation—was entirely appropriate. He affirms that it is "standard and customary practice" for lawyers in complex derivative matters to gather and analyze materials from parallel proceedings, including civil, regulatory, and criminal actions. *Id.* ¶23. In his own experience in major coordinated actions, including Deepwater Horizon, courts routinely considered such review work to be compensable. *Id.* ¶¶24–26.

Recognizing that derivative litigation focuses on board oversight failures rather than direct corporate misconduct, Mr. Herman underscores that understanding the facts underlying Alphabet's alleged antitrust violations was necessary to assess potential fiduciary breaches under Delaware law. As he states: "While this derivative action was focused on the knowledge and inaction of the Board of Directors, as distinct from the conduct of the company, it was necessary to understand the factual predicates of alleged antitrust and other potentially unlawful activity." *Id.* ¶28.

On the issue of billing judgment, Mr. Herman found that the time entries were free of red flags, such as block billing or vague entries, and that even the more general time narratives by staff attorneys were acceptable in the context of complex common benefit work. *Id.* ¶¶49, 55. He further observes that because Scott+Scott "was essentially the only firm conducting the litigation," this eliminates concerns about duplicative efforts. *Id.* ¶53. Mr. Herman also emphasized that firms like Scott+Scott, which work on a contingency basis, have no incentive to inflate hours because their compensation is tied to case success. He cited established Ninth Circuit precedent cautioning courts not to second-guess firms' internal staffing decisions, reaffirming that: "It is the difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys—that must drive the district court's decision." *Id.* ¶54 (quoting *Human Rights Def. Ctr. v. Cnty. of Napa*, 2021 WL 1176640, at *14 (N.D. Cal. Mar. 28, 2021)).

Finally, Mr. Herman opines that the $500 million spending commitment achieved in this case is a reasonable proxy for assessing the monetary value of the Settlement. *Id.* ¶¶56–59. Based

on that metric, the $80 million fee request represents just 16% of the benefit conferred, well below

the 25% benchmark typically used in class actions in the Ninth Circuit.  He further notes that this

calculation likely understates the value of the non-monetary governance reforms, which

themselves are of lasting and substantial benefit to shareholders.  *Id.* ¶60.

## IV.    THE PROPOSED SERVICE AWARDS ARE REASONABLE

Courts in the Ninth Circuit have consistently recognized that reasonable incentive awards

to representative plaintiffs are appropriate to compensate them for the time, effort, and risks

undertaken on behalf of the class or, as here, the corporation.  Such awards encourage institutional

investors and other shareholders to step forward and shoulder the responsibility of monitoring

complex derivative litigation, which serves the broader public policy of promoting corporate

accountability.  *See Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000); *Staton v.

Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003); *Razilov v. Nationwide Mut. Ins. Co.*, 2006 WL

3312024, at *2 (D. Or. Nov. 13, 2006) (noting that courts may consider factors including the risks

undertaken, burdens encountered, time and effort expended, duration of litigation, and whether the

plaintiff obtained any personal benefit from the suit).

Here, Plaintiffs have each devoted significant time and attention to the oversight of this

Action.  Representatives from both funds remained actively involved throughout the nearly five-

year duration of the case—reviewing pleadings and filings, evaluating strategic decisions,

approving proposed settlement frameworks, and participating in regular updates with counsel

regarding case progress and settlement negotiations.  Their ongoing engagement and diligence

reflect the kind of fiduciary stewardship derivative litigation is designed to vindicate.

Given the duration and complexity of this litigation—spanning multiple years, novel

governance reforms, and one of the largest spending commitments in the history of derivative

litigation—an incentive award of $50,000 for each fund is reasonable and warranted.  This amount

is justified by the magnitude of the case, the significance of the result achieved, and the exemplary

manner in which the Plaintiffs fulfilled their representative responsibilities.  Courts have approved

awards at this level in similarly complex derivative and class actions involving prolonged litigation

1 and substantial governance results. *See, e.g.*, *In re Activision Blizzard, Inc. S'holder Litig.*, Consol.

2 C.A. No. 8885-VCL (Del. Ch. May 20, 2015); *In re Dell Techs. Inc. Class V S'holders Litig.*,

3 Consol. C.A. No. 2018-0816-JTL (Del. Ch. Aug. 24, 2023).

4       Importantly, the proposed awards do not impose any additional cost on Alphabet or its

5 insurers.  The awards would be paid out of the attorneys' fee portion of the Settlement, and thus

6 do not affect the Company's financial obligations or reduce the value of the governance reforms

7 secured.  Nor do they raise any concern of undue influence or improper incentive.  Service awards

8 are permissible so long as they are not conditioned on support of the settlement or agreed to in

9 advance of the litigation. *See In re Lithium Ion Batteries Antitrust Litig.*, 853 F. App'x 56, 58 (9th

10 Cir. 2021).  That is the case here—no such agreement was made prior to litigation, and both

11 Plaintiffs supported the action throughout based on their independent judgment and fiduciary

12 obligations.

13       Accordingly, Plaintiffs respectfully request that the Court approve the requested $50,000

14 incentive awards as fair and reasonable recognition of the time, diligence, and leadership they

15 demonstrated on behalf of Alphabet and its shareholders.

16 **V.    CONCLUSION**

17       The outcome achieved in this case is both historic and extraordinary.  It was not the product

18 of regulatory mandate or government enforcement.  Rather, it was secured exclusively through the

19 initiative and sustained efforts of Plaintiffs and their counsel—who, over nearly five years, built a

20 comprehensive evidentiary record, crafted novel governance reforms, and engaged in complex,

21 high-stakes negotiations with one of the most sophisticated and powerful companies in the world.

22 These negotiations were conducted at arm's-length and under the supervision of an experienced

23 former federal judge.  The Settlement's $500 million funding commitment—unprecedented in any

24 shareholder derivative action—ensures Alphabet's long-term implementation of sweeping

25 structural reforms, including board-level oversight through the Risk and Compliance Committee

26 and a Company-wide compliance realignment through RegReady.

27

28

24

CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES
AND CO-LEAD PLAINTIFFS' SERVICE AWARDS
CASE NO. 3:21-cv-09388-RFL

1   Against that backdrop, the requested $80 million fee and expense award—representing just

2   16% of the $500 million governance funding commitment—is both proportionate and reasonable.

3   It reflects the extraordinary complexity of the litigation, the years of intensive effort undertaken

4   without any guarantee of recovery, and the historic nature of the reforms secured for the Company

5   and its shareholders.   Accordingly, Plaintiffs respectfully request that the Court grant final

6   approval of: (1) the Settlement in its entirety; (2) the requested $80 million award of attorneys'

7   fees and expenses; and (3) service awards of $50,000 each to the Plaintiffs.

8   DATED: August 15, 2025                    Respectfully submitted,
                                              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
9
                                               *s/ Jing-Li Yu*
10                                            Patrick Coughlin (CA Bar No. 111070)
                                              Maxwell R. Huffman (CA Bar No. 264687)
11                                            600 W. Broadway, Suite 3300
                                              San Diego, CA 92101
12                                            Telephone: (619) 233-4565
                                              pcoughlin@scott-scott.com
13                                            mhuffman@scott-scott.com

14                                            **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                              Geoffrey M. Johnson (*pro hac vice*)
15                                            12434 Cedar Road, Suite 12
                                              Cleveland Heights, OH 44106
16                                            Telephone:  216-229-6088
                                              gjohnson@scott-scott.com
17
                                              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
18                                            Donald A. Broggi (*pro hac vice*)
                                              Jing-Li Yu (CA Bar No. 342985)
19                                            The Helmsley Building
                                              230 Park Avenue, 24th Floor
20                                            New York, NY 10169
                                              Telephone: 212-223-6444
21                                            dbroggi@scott-scott.com
                                              jyu@scott-scott.com
22
                                              *Lead Attorneys for Co-Lead Plaintiff Police and*
23                                            *Fire Retirement System of the City of Detroit and*
                                              *Co-Lead Plaintiff Bucks County Employees'*
24                                            *Retirement System*

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BONI, ZACK & SNYDER LLC**
Michael J. Boni (*admitted N.D. Cal.*)
Joshua D. Snyder (*pro hac vice*)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0203
mboni@bonizack.com
jsnyder@bonizack.com

*Additional Attorneys for Co-Lead Plaintiff Bucks
County Employees' Retirement System*

CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES
AND CO-LEAD PLAINTIFFS' SERVICE AWARDS
CASE NO. 3:21-cv-09388-RFL

1

**<u>CERTIFICATE OF SERVICE</u>**

2

     I hereby certify that on August 15, 2025, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4

to the e-mail addresses denoted on the Electronic Mail Notice List.  All parties not so registered

5

will be served via e-mail or U.S. Mail.

6

     Executed on August 15, 2025, at New York, New York.

7

                       *s/ Jing-Li Yu*

8

                      JING-LI YU (CA Bar No. 342985)
SCOTT+SCOTT ATTORNEYS AT LAW LLP

9

                      *Counsel for Co-Lead Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CO-LEAD PLAINTIFFS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES
AND CO-LEAD PLAINTIFFS' SERVICE AWARDS
CASE NO. 3:21-cv-09388-RFL