1   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
    PATRICK COUGHLIN (CA Bar No. 111070)
2   MAXWELL R. HUFFMAN (CA Bar No. 264687)
    600 W. Broadway, Suite 3300
3   San Diego, CA 92101
    Telephone: (619) 233-4565
4   pcoughlin@scott-scott.com
    mhuffman@scott-scott.com
5
6   *Lead Attorneys for Co-Lead Plaintiff Police and Fire Retirement System of the City of Detroit and Co-Lead Plaintiff Bucks County Employees' Retirement System*

7

8                   **UNITED STATES DISTRICT COURT**
9                  **NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
10

11  | IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED Case No.: 3:21-cv-9388-RFL |

12                                                          **DECLARATION OF PATRICK J. COUGHLIN IN SUPPORT OF CO-LEAD**
13                                                          **PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND**
14                                                          **ATTORNEYS' FEES AND EXPENSES**

15                                                          Hon. Rita F. Lin, U.S.D.J.

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Patrick J. Coughlin, pursuant to 28 U.S.C. §1746, declare and state as follows:

I am an attorney licensed in the State of California and admitted to the U.S. District Court for the Northern District of California.  I am Of Counsel at Scott+Scott Attorneys at Law LLP ("Scott+Scott," the "Firm," or "Lead Counsel"), counsel for Co-Lead Plaintiffs Police and Fire Retirement System of the City of Detroit ("Detroit") and Bucks County Employees' Retirement System ("Bucks County" and collectively with Detroit, the "Co-Lead Plaintiffs") in the above-captioned consolidated matter (the "Action").  I have personal knowledge of the facts set forth herein and, if called upon as a witness, could and would testify competently to them.

1.      I submit this declaration in support of Co-Lead Plaintiffs' Motion for Final Approval of the Settlement and for an Award of Attorneys' Fees and Expenses.  As explained in detail below, this Settlement[1] is the culmination of a five-year intensive litigation effort that has resulted in Alphabet, Inc. ("Alphabet" or the "Company") and Defendants[2] committing to enact a world-class compliance infrastructure, centered around a new Board committee dedicated solely to overseeing regulatory compliance, and bolstered by the largest ever funding commitment in a shareholder derivative suit to the tune of $500 million.

2.      In this declaration, I set forth: (a) a factual and procedural background for this Action; (b) facts supporting why the Settlement is fair, reasonable, and adequate; (c) facts supporting why Lead Counsel should be granted their requested fee and expense award; and (d) facts supporting why Co-Lead Plaintiffs should be granted the requested incentive award.

## I.      BACKGROUND

### A.      Summary of the Allegations

3.      This case is about Alphabet directors' and officers' failure to oversee antitrust compliance at the Company, which has resulted in billions of dollars of liability overseas, hundreds of millions of dollars in settlements domestically and overseas, and potential liability worth

---

[1]      "Settlement" refers to the Joint Stipulation and Agreement of Settlement dated May 30, 2025 (*see* ECF No. 87-1).
[2]      "Defendants" refers collectively to all named individual defendants in the Action.

1   billions of dollars domestically.  And in the officers' case, some of them actively participated in

2   violating antitrust laws.

3       4.    Google LLC ("Google") faces tremendous potential liability, having been found

4   liable for antitrust violations after three trials here: the Google Search cases (i.e., *United States v.*

5   *Google LLC*, No. 1:20-cv-03010; and *State of Colorado v. Google LLC*, No. 1:20-cv-03715) in

6   the U.S. District Court of the District of Columbia; the Google Ad Tech case (i.e., *United States*

7   *v. Google LLC*, No. 1:20-cv-00108) in the U.S. District Court of the Eastern District of Virginia;

8   and *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671, in the U.S. District Court of the Northern

9   District of California.  In the *Epic Games* case, Google just lost its appeal in the Ninth Circuit, and

10  is subject to a wide-ranging injunction against anticompetitive conduct in the Google Play Store.

11  A remedies ruling is expected this month in the Google Search case, which could potentially

12  include the divestiture of Google Chrome, a business worth billions.  For the Ad Tech case, a

13  remedies trial will be held in the Eastern District of Virginia later this year, potentially also

14  resulting in divestitures of multi-billion-dollar businesses.

15      5.    Alphabet's Board of Directors ("Board") has, over the last decade, received

16  numerous red flags concerning antitrust violations.  Yet, it did not seek to investigate or correct

17  these practices and instead allowed individual business units here to continue to engage in antitrust

18  violations.  Ultimately, these violations resulted in major government enforcement actions in the

19  United States, which were filed between October 2020 to January 2023.

20      6.    Similarly, senior officers at Google and Alphabet also failed to take corrective

21  action or investigate anticompetitive practices of which they were aware.  Indeed, in many

22  instances, senior officers implemented or engaged in anticompetitive conduct.  As one example,

23  Senior Vice President Philipp Schindler negotiated an agreement with Facebook (now Meta

24  Platforms) dividing the ad tech market between the two companies.  In another example: CEO

25  Sundar Pichai colluded with Tim Cook, CEO of Apple, Inc. ("Apple"), to lock up the general

26  search access points on Apple devices for Google, which prevented potential rivals from achieving

27

28

2

1  the scale necessary to offer any competition to Google, and prevented Apple itself from entering

2  the general search market.

3      7.     Alphabet's directors' and officers' oversight also suffered from a poorly designed,

4  siloed system, where individual business units made decisions that were not overseen by

5  compliance professionals.  Even these business professionals often recognized that the practices

6  they proposed were problematic.  For example, one executive raised whether Google had conflicts

7  of interest by owning companies in each part of the digital ad tech stack—he commented that it

8  was akin to Goldman Sachs owning the New York Stock Exchange.  Other business professionals

9  implemented practices that rigged the ad-auction process, including taking a "First Look" and a

10  "Last Look" at auctions ahead or behind other bidders.  Still other executives regularly turned on

11  "pricing knobs" to manipulate ad prices, without regard to quality of service, purely so that Google

12  could meet ad-target revenues.  And to protect its monopoly in Android-app distribution, senior

13  officers, including then-CFO (and now Chief Investment Officer) Ruth Porat, approved "Project

14  Hug" to "bear hug" app developers by offering them incentives to stop them from developing rival

15  distribution platforms.  All these business practices were done to maximize profits, but without

16  any regard to whether they complied with the law.

17      8.     Co-Lead Plaintiffs brought this lawsuit to correct these oversight failures.  And

18  through this Settlement, Co-Lead Plaintiffs have achieved a top-to-bottom compliance overhaul,

19  including a Risk & Compliance Committee ("RCC") at the Board level to focus solely on

20  regulatory compliance oversight, which will prevent similar problems from occurring in the future.

21  This litigation and role in crafting this Settlement provide an incalculable and invaluable corporate

22  benefit to Alphabet.

23      **B.     Procedural History**

24      9.     Lead Counsel began to investigate the burgeoning antitrust violations at Google

25  starting in 2020.  In July 2020, Sundar Pichai, CEO of Alphabet, was called before a Congressional

26  committee to testify about numerous alleged anticompetitive practices at Google.  In October 2020,

27  the majority staff of this committee released a report of over 400 pages that detailed Google and

28

other tech platforms' anticompetitive practices.  Starting in October 2020, the U.S. Department of Justice ("DOJ") and every state attorney general ("AG") eventually filed lawsuits against Google alleging widespread and longstanding antitrust violations.

10.     In 2021, Lead Counsel flagged for Co-Lead Plaintiffs whether failure to oversee antitrust compliance, as evident by these lawsuits and reports, violated Alphabet directors' and officers' fiduciary duties.  Co-Lead Plaintiffs then retained Scott+Scott to investigate.

11.     First, between February and October 2021, Scott+Scott made, under Section 220 of the Delaware General Corporation Law, books and records demands on behalf of Co-Lead Plaintiffs to seek internal Board minutes and presentations to determine what level of oversight the Board had.  Then, Scott+Scott negotiated productions of these books and records: an initial production was made on April 28, 2021, and a supplemental production was made on July 12, 2022.  These included Board minutes or Board members' written consents concerning several acquisitions that were the subject of government antitrust actions, as well as more recent Board minutes and presentations illustrating what, if any, oversight the Board conducted into antitrust compliance.

12.     In December 2021, after a thorough investigation of the various antitrust lawsuits, public record, and an analysis of the produced books and records, Scott+Scott determined that Alphabet's directors' and officers' lack of oversight into antitrust compliance violated their fiduciary duties.  The Firm recommended to the named Co-Lead Plaintiffs to file a derivative action, received approval, and filed alleging that Alphabet directors and officers violated their fiduciary duties to oversee the Company's regulatory compliance.

**C.     Co-Lead Plaintiffs' Investigation**

13.     In addition to the 220 production, Co-Lead Plaintiffs, through their counsel, negotiated to have documents produced for their review and analysis from the underlying antitrust actions.

14.     In May 2022, Alphabet produced 1.1 million pages of documents that were previously produced to the Texas AG before it filed its ad tech antitrust case in 2020.

4

15.     In June 2023, Alphabet produced 375 deposition transcripts and exhibits, from numerous antitrust actions against Google, to Co-Lead Plaintiffs.

16.     In November 2024, Alphabet produced more than 52,000 pages of trial exhibits, including those made under seal that were not publicly available.

17.     To review and analyze these productions, Lead Counsel assembled a staff-attorney team that consisted of up to 14 attorneys, who were experienced attorneys employed full-time by Scott+Scott—i.e., *not* contract attorneys—to develop facts and assess claims based on these productions.  This review spanned multiple years because of the volume and complexity of these productions.

18.     In addition, the staff attorneys also reviewed trial transcripts and exhibits, as well as other public records from the three actions that went to trial: *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671 (N.D. Cal.), *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.) ("Google Search") (consolidated from the DOJ and Colorado AGs' initially separate suits), and *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.) ("Google Ad Tech") (filed by DOJ, with an earlier filed lawsuit by the Texas AG still pending trial).  Collectively, these trials lasted almost six months—with Google Search alone lasting more than two months for the liability phase—with each day's transcript frequently running to hundreds of pages.  The staff attorney team had to synthesize all this information and produce summaries and memoranda for the litigation team to utilize.  Findings from these publicly available transcripts and exhibits were directly incorporated into the amended consolidated complaint, which was filed on May 30, 2025.

**D.     Co-Lead Plaintiffs' Initial Settlement Demands**

19.     Co-Lead Plaintiffs initially began to explore resolution in 2022.  On December 15, 2022, Co-Lead Plaintiffs and Defendants, through their counsel, engaged in an initial in-person mediation, where each side presented the merits of their position.  At the initial session, settlement did not appear to be close, but the parties agreed to continue to discuss resolution.

20.     In late 2023, Defendants expressed further interest in resolution, and because the interest appeared to be more serious, Co-Lead Plaintiffs, through Scott+Scott, presented a written

1    settlement demand in February 2024.  On February 7, 2024, the parties, through their counsel,

2    attended a second in-person mediation session at the offices of Freshfields US LLP ("Freshfields"),

3    Defendants' outside counsel.  This initial demand, among other things, included a stand-alone

4    Board committee which would focus on regulatory compliance oversight, as well as other

5    compliance reforms, and a commitment to fund the reforms by the Company.

6           **E.    Settlement Negotiations**

7           21.    After the February 2024 mediation session, the parties, through their counsel,

8    continued to engage in active negotiations, which included correspondence, phone calls, and

9    meetings over the course of months.

10           22.    In September 2024, the parties attended another in-person mediation session.  After

11    this session, they continued to engage in further settlement negotiations.

12           23.    One of the key sticking points was the need for a stand-alone Board committee to

13    oversee compliance risks.  For more than year, Scott+Scott stuck to their guns on the creation of a

14    stand-alone board committee.

15           24.    Alphabet eventually agreed to a board committee. After the board committee was

16    agreed to, and most of the reforms to support the Board were also agreed to, Scott+Scott again

17    fought for a high level of funding to ensure that the reforms were implemented with adequate

18    resources.  This funding took many months for the parties to negotiate.

19           25.    In April 2025, the parties signed a memorandum of understanding ("MOU") to

20    memorialize the substantive terms of the Settlement.

21           26.    After the terms of settlement were memorialized, the parties discussed a potential

22    fee.  In late spring 2025, the mediator, the Hon. Layn R. Phillips (Ret.) (the "Mediator"),

23    determined a fair fee and made a mediator's recommendation to the parties of $80 million.  The

24    parties accepted the Mediator's proposal: Co-Lead Plaintiffs agreed to seek no more than $80

25    million in fees and expenses; Defendants agreed not to oppose a request of up to that amount.

26

27

28

## II.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.    The Terms of the Settlement

27.    The centerpiece of the Settlement is a stand-alone Board committee that will focus solely on regulatory compliance oversight, to be called the Risk & Compliance Committee (RCC). To implement the RCC, the Board will pass a resolution chartering it.  The RCC, among other things, shall receive periodic updates on principal risks and compliance enhancement measures, which will be set out in its charter.

28.    Directly supporting the RCC will be two officer-level oversight and strategy bodies. The Trust & Compliance Council ("TCC") will consist of senior vice presidents who report directly to Board member and Alphabet CEO Sundar Pichai.  The TCC will assist the RCC, especially with regard to compliance at Google, by providing a forum to discuss high-impact Trust and Compliance initiatives, provide recommendations related to prioritization risks and resource allocation, and discuss areas of risk identified as high or critical.  The TCC members, who report directly to the CEO, will meet at least quarterly.  The Trust & Compliance Steering Committee ("TCSC"), consisting of vice presidents across business functions and product areas, directly supports the TCC by providing a forum for cross-functional alignment on significant compliance initiatives and by providing direction on recommendations and escalations to the TCC.  The TCSC shall meet at least six times a year.  These two structures, as explained specifically in the Settlement, shall not prevent other individuals from reporting to the RCC on matters suitable for its attention.

29.    Furthermore, the Settlement will create an entire compliance structure to support the RCC, in a package of reforms together known as "RegReady."  This new comprehensive compliance architecture is modeled on, and exceeds, guidelines articulated by DOJ for corporate compliance programs.  Key elements of RegReady include:

- designating compliance professionals with appropriate subject-matter expertise to focus on high-risk areas and ensure that compliance considerations are embedded at every stage of product development and business operations;

7

DECLARATION OF PATRICK J. COUGHLIN IN SUPPORT OF CO-LEAD PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES
CONSOL. CASE NO.: 3:21-cv-9388-RFL

- centralizing oversight and management of compliance functions to allow for consistent standards, coordinated processes, and streamlined reporting across all Alphabet business lines;

- ensuring ongoing collaboration between compliance staff and product teams, so that potential risks are surfaced and addressed before new products, services, or features are launched; and

- integrating compliance functions into Alphabet's highest-level governance bodies, including the Trust & Compliance Council and the Trust & Compliance Steering Committee, thereby ensuring that compliance insights and risk assessments inform corporate decision-making at the senior executive level.

30.     Furthermore, the Settlement commits the Company to provide the scale of resources necessary to implement this compliance architecture.  Through this Settlement, Alphabet commits to fund the reforms through $500 million, guaranteed over a 10-year period.  This financial guarantee ensures that the RCC and RegReady program are not merely announced, but actually implemented, sustained, and resourced.  Alphabet has also committed to centralized tracking and reporting of compliance spending, enabling both internal and external oversight of reform implementation.  This level of funding far exceeds Alphabet's historical spending on compliance: the Company's outside counsel has represented that between 2022-2024, added together, the Company's compliance spending was $129 million.  The Settlement almost quadruples that commitment.

31.     As (Retired) Judge Layn R. Phillips, a prominent class and derivative action mediator stated, this is to his knowledge the largest spending commitment by a company in a shareholder derivative action.  Declaration of Hon. Layn R. Phillips (FMR.) in Support of Co-Lead Plaintiffs' Motion for Final Approval of Settlement ("Phillips Decl."), attached as Exhibit A.

32.     Alphabet has further agreed to implement robust policies for the preservation of litigation-related communications, including previously ephemeral or auto-deleting messages, which addresses the concerns of numerous federal courts that have adjudicated antitrust actions

8

against Google, and found that Google left communication preservation up to individuals' discretion even after they were issued litigation holds.

**B.    The Settlement Achieves Historic Benefits for the Company and Its Stockholders**

33.     The core of the Settlement is the establishment of a new Board committee—the RCC—which is an innovative structural reform for a major technology company.  *See* Exhibit B, Declaration of Evan Epstein in Support of Co-Lead Plaintiffs' Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Expenses ("Epstein Decl.") ¶33.  Oversight of legal and regulatory risk is, today folded into one of many responsibilities of the Audit and Compliance Committee, where compliance issues must compete for attention with financial controls and accounting.   If the Settlement were approved, legal and regulatory compliance risk will be centralized and prioritized within the RCC, directly reporting to the Board for evaluation, which would focus on oversight of Alphabet's legal and regulatory risks, including, but not limited to, competition and antitrust, across its expansive global operations.

34.     As Defendants' counsel observed at the preliminary approval hearing, a compliance committee solely devoted to compliance is unprecedented among major technology companies.  *See* Transcript of Preliminary Approval Hearing at 11, attached hereto as Exhibit C; Epstein Decl. ¶33.  Furthermore, Defendants' counsel acknowledged at the Preliminary Approval Hearing that Co-Lead Plaintiffs were solely responsible for the RCC's creation because "the committee is a hundred percent this lawsuit, and but for this, I do not believe we could have gotten the company to agree to it."  Tr. of Prelim. Appr. Hr'g at 13:17–19.  By creating a distinct and dedicated compliance function at the Board level, the Settlement ensures that regulatory problems and risks are appropriately and transparently elevated and addressed.  This reform will not only benefit Alphabet but also can serve as a governance model for the broader technology sector.

35.     The RegReady compliance architecture and officer-level oversight, through the TCC and TCSC, described above, further benefits the Company because the reforms provide the structure necessary to ensure that the Board's and RCC's oversight will be comprehensive and occur in real time.

9

36.     These reforms address key problems highlighted by the Action, which is how Alphabet and Google lacked adequate central oversight or a robust compliance oversight process into business decisions.  Each of the practices in the underlying antitrust actions may have appeared to be good business decisions when only profit is considered, but nevertheless, posed an unacceptable risk that the Company would engage in illegal activities.  These practices included:

- **default search contracts** that locked out competing search engines;
- **vertical integration across the ad tech stack**, described by one Google executive as "if Goldman or Citibank owned the NYSE";
- **restricting app developers** from using their own billing systems, combined with scare tactics to deter sideloading of rival apps;
- **manipulation of advertising auction systems** through tactics like "First Look" and "Last Look," along with pricing "knobs" to increase ad rates; and
- **imposing a 30% commission in the Google Play Store**, untethered from market competition.

37.     Creating compliance oversight across business areas that helps ensure that otherwise profit-maximizing businesses practices are lawful, or at least not so obviously unlawful that it would violate a Delaware corporation's fiduciary's duties to engage in it.  This is why the Corporate Reforms are invaluable: by creating a comprehensive, top-to-bottom compliance oversight structure, the Reforms help ensure that each business decision is first compliant, and that any compliance issues would be raised to and addressed by senior executives and the Board.  Thus, the RegReady reforms and RCC will help prevent the anticompetitive conduct that Google has been found liable for, in the United States, Europe, and other jurisdictions.

38.     These reforms are especially relevant in the emerging AI era, where Alphabet's market dominance could be leveraged to unfairly promote its own AI products.  For example, evidence from the Google Search remedies trial suggests that Alphabet may already be conditioning access to key distribution channels on adoption of its AI tools.  Without robust compliance guardrails, these behaviors could once again place the Company at risk.

39.    Co-Lead Plaintiffs were the cause for these RegReady reforms.    Defendants'
counsel stated at the preliminary approval hearing that these "enhancements were shaped by what
will we need to get the plaintiffs to agree [to settle] and to get the judge to approve [the
settlement]." Tr. of Prelim. Appr. Hr'g at 13:19–21, Ex. C, *supra*.

40.    Furthermore, Co-Lead Plaintiffs fought for a Settlement that would commit funding
to ensure adequate resources to implement the RegReady and RCC reforms.    As Defendants'
counsel explained to the Court, the funding commitment in this Settlement is not a "routine
operating expense" of $50 million per year over 10 years, but rather, "put[ting] half a billion dollars
behind this rollout" of these reforms.    *Id.* at 13:24.    A $500 million funding commitment is
unprecedented.

41.    Finally, this Settlement will address the concerns of at least three federal courts in
the underlying antitrust actions concerning Google's record-keeping practices.    The Settlement
will memorialize the Company's commitment to ensure the retention of employee chats beyond
the Company's default period of 24 hours, particularly when a litigation hold has been issued for
that employee.    Google had been sanctioned for its practice of leaving retention up to each
individual's discretion by the Northern District of California.    Google was also criticized for this
practice by the courts that held the Search and Ad Tech trials, and only avoided sanctions because
the courts already determined it was liable for antitrust violations.

42.    Attached as Exhibit B, *supra*, is a true and correct copy of the Declaration of
Professor Evan Epstein, the founding executive director of the UC Center for Business Law San
Francisco and an Adjunct Professor at the University of California College of the Law in San
Francisco, who has reviewed the Settlement and related documents, and offers an expert opinion
on the significance of the RegReady reforms and the Board and officer-level oversight reforms.
Professor Epstein concludes: "the Settlement provides meaningful governance reforms that
directly address the alleged oversight deficiencies, enhance board-level accountability, and align
with best practices in corporate governance.    In particular, the creation of a dedicated board-level
compliance committee, the implementation of enhanced management-level compliance controls,

1   and the company's long-term financial commitment to compliance collectively demonstrate a good

2   faith effort to strengthen the board's oversight function and mitigate future risks."  Epstein Decl.

3   ¶4.

4         43.     Professor Epstein further explains, "Establishing a new dedicated board-level risk

5   and compliance committee should significantly strengthen board oversight by explicitly assigning

6   responsibility for risk and compliance matters.   This structure ensures focused attention on

7   compliance risks, clear oversight responsibilities, and accountability at the highest governance

8   level. . . .   Additionally, establishing a dedicated board-level Risk and Compliance Committee

9   signals the Company's strong and ongoing commitment to effective oversight, reinforcing trust

10  among all its stakeholders. . . .   This governance enhancement signals that risk management and

11  regulatory compliance are strategic priorities deserving of the highest level of oversight and

12  accountability."  *Id.* ¶¶22, 25.

13        44.     Epstein further opines, the RCC is not a "trivial" reform because of the underlying

14  antitrust liability, and how "Courts and regulators increasingly expect boards to actively oversee

15  central compliance risks."  *Id.* ¶29.   Epstein cites how the DOJ has "establish[ed] specific

16  expectations for board oversight" as part of adequate corporate compliance, and how "Federal

17  Sentencing Guidelines[] explicitly require boards to be knowledgeable about and actively oversee

18  compliance programs.   This oversight responsibility encompasses ensuring the compliance

19  function receives adequate resources, authority, and direct reporting access to the board or a board

20  committee."  *Id.* ¶30(a).  Moreover, the Guidelines indicate "that meaningful board involvement

21  can significantly mitigate penalties and improve outcomes when misconduct occurs."   *Id.*

22  Furthermore, "the DOJ's *Evaluation of Corporate Compliance Programs*, also emphasizes the role

23  of the board."  Though how to conduct this oversight "remains a matter of business judgment,"

24  having "a new board-level risk and compliance committee, the RCC reflects an evolving standard

25  and demonstrates a commitment to independent, specialized, and continuous board-level

26  monitoring."  *Id.* ¶¶31–32.

27

28

45.    Professor Epstein opines on how "innovative" and "pioneering" the RCC is for a technology company.  He cites a report by Wilson Sonsini (a major law firm well-known for its representation of Silicon Valley companies) on 150 major Silicon Valley companies' corporate governance practices, and how "only one [of these 150 companies] has established a separate, dedicated board-level compliance committee."  *Id.* ¶33.  Professor Epstein states that this Settlement, by establishing this new committee "could set a precedent for the broader industry.  As a market leader with substantial market capitalization . . . Alphabet's governance decisions often influence industry-wide practices and standards."  *Id.* ¶34.  Indeed, while "creating a separate board-level compliance committee is not unprecedented among public companies," they are "relatively rare"—with less than 7% of S&P 500 companies having a separate compliance committee, which tend to be in companies in highly regulated industries.  *Id.* ¶35.

46.    Professor Epstein cites an academic study concerning board compliance to outline three factors facing a company that would make it especially a good practice for it to have a board-level compliance committee: "heightened compliance activity, the availability of capacity among board members, and the gradual diffusion of information about Compliance Committees."  Applying these factors to Alphabet and the conduct in this Action, Professor Epstein opines:

> These three key factors support establishing a new board-level compliance committee at Alphabet.  First, heightened regulatory scrutiny has intensified due to the increasing number and scope of antitrust and competition law enforcement actions and litigation.  The regulatory environment may become even more complex with the emerging wave of AI regulations.  Given that AI represents the next paradigm shift in the technology industry and Alphabet is widely considered a frontrunner investing billions in this space, establishing robust compliance oversight now is essential for navigating the evolving regulatory landscape and mitigating future enforcement risks.  Second, the Company has independent directors available to serve in this capacity, providing the necessary expertise and governance structure.  Third, clearer regulatory guidance and industry best practices now exist regarding compliance committee scope and responsibilities, offering a proven framework for effective implementation and operation.

*Id.* ¶37.

47.    Professor Epstein cites how the board compliance study concluded that a dedicated compliance committee would be "expected to engage in much more focused oversight of compliance policies and personnel than typical Audit Committees."  *Id.* ¶39.  This is because "where a Compliance Committee is established, oversight of compliance is likely to be pursued

13

1    more vigorously than where this is simply added to the Audit Committee's mandate" and "a

2    Compliance Committee is likely to establish a much clearer, and more tightly controlled, reporting

3    channel to the Board from the company's compliance function than would be the case with an

4    Audit Committee beyond financial matters." *Id.* ¶40.

5        48.    Professor Epstein also opined on the value of the management-level oversight

6    reforms.  First, for the senior-level Trust and Compliance Council, its support for the RCC "marks

7    a significant advancement in organizational governance.  This Council, comprising multiple Senior

8    Vice Presidents who report directly to the CEO, creates a very strong level of executive

9    accountability and engagement in compliance matters." *Id.* ¶45(a)(i).  Moreover, "[b]y convening

10   quarterly at a minimum, this leadership body ensures that compliance considerations remain at the

11   forefront of strategic decision-making throughout the year."  Furthermore, "[t]he TCC mandate

12   extends beyond mere oversight, it serves as a strategic body for compliance initiatives, recognizing

13   that effective compliance requires comprehensive frameworks that anticipate challenges, prioritize

14   risks intelligently, and allocate resources where they can deliver maximum protective value[.]" *Id.*

15   ¶45(a)(i).

16       49.    Professor Epstein also opined on the value of the Trust & Compliance Steering

17   Committee, which "represents an additional layer of operational compliance management. By

18   bringing together Vice Presidents from across functional areas and Product Areas ('PAs'), this

19   committee creates essential cross-functional alignment that breaks down traditional silos and

20   ensures that compliance initiatives are integrated seamlessly across Alphabet."  By "[m]eeting at

21   least six times annually, the committee demonstrates a dedication to continuous engagement and

22   proactive management of compliance challenges while serving as the vital bridge between

23   operational realities and executive strategy[.]" *Id.* ¶45(a)(ii).

24       50.    Professor Epstein also explained the value of the overhaul of the compliance system

25   because it "seek[s] to bolster the Company's commitment to implementing a risk-based, cross-

26   company, global compliance strategy. This risk-based approach ensures that compliance

27   investments generate maximum value by focusing on areas where regulatory exposure is highest

28

and business impact is most significant." *Id*. ¶45(b). These compliance enhancements include "embed[ding] specialists into its compliance function to proactively identify and address emerging regulatory risks, particularly in competition law[,]" which "creates an early-warning system that transforms compliance from reactive to preventive, ensuring management has dedicated expertise to anticipate regulatory changes and mitigate potential violations before they occur[.]" *Id*. ¶45(b)(i). In addition, the compliance overhaul implements "[a] comprehensive compliance strategy that spans the entire global organization and prioritizes risks based on their potential impact[,]" staffs the compliance function with qualified professionals who will "actively collaborate with [product areas] and other business functions to evaluate existing compliance measures and design new ones as needed[,]" "embed[s] compliance considerations into operational teams rather than keeping them siloed, ensuring regulatory requirements are integrated into actual product development and business processes[,]" and having compliance "collaborate with six specialized teams when addressing regulatory risks[.]" *Id*. ¶45(b)(ii)-(v). This compliance overhaul, especially in the centralization of its personnel functions, "create[s] an integrated approach that spans legal analysis, risk management, policy development, governance oversight, and performance monitoring" and incorporates a "comprehensive risk-based compliance framework that incorporates DOJ guidance  and industry best practices[.]" Overall, "[t]he framework requires centralized documentation, oversight throughout all compliance phases, and aims not only to minimize regulatory risk but also to promote transparency, audit effectiveness, and user trust." *Id*. ¶45(b)(v)-(vi).

51.    Professor Epstein also opined on the value of the $500 million funding component: "Such a commitment provides critical resources for enhancing compliance programs, hiring specialized compliance personnel, leveraging technological solutions for monitoring and risk detection, and ensuring continuous training and education for employees, management and board-level oversight" and "underscores the Company's seriousness regarding compliance oversight and significantly mitigates future risks by investing proactively rather than reactively." *Id*. ¶¶46, 47. This funding commitment would "rank as the second-largest derivative lawsuit settlement on

record"—just smaller than a $735 million settlement involving Tesla Motor Company's board compensation.

### C. Consideration of the Benefits Conferred on Alphabet with the Risk of Continued Litigation Favor Final Approval

52.    While Co-Lead Plaintiffs are confident in the strength of their case, they also acknowledge the high legal hurdles they would face to establish demand futility at the dismissal stage, where most *Caremark* cases fail.  And if Co-Lead Plaintiffs defeat an initial motion to stay, they still face the risk that the Board would form a Special Litigation Committee ("SLC") that could recommend a motion to terminate.  *See In re Carvana Co. S'holders Litig.*, 2024 WL 1300199, at *1 (Del. Ch. Mar. 27, 2024) (granting SLC motion to terminate).  Defeating an SLC's motion to terminate, another hurdle which Co-Lead Plaintiffs would need to accomplish to win at trial may be uncertain, leaving aside injunctive and damages relief.  For all these reasons, Co-Lead Plaintiffs weighed the risks of litigation against the benefits of the Settlement and determined that the Settlement was the better option rather than continuing with litigation.

### D. The Parties' Thorough Understanding of the Strengths and Weaknesses of the Case Also Favor Final Approval

53.    Co-Lead Plaintiffs developed a thorough understanding of the strengths and weaknesses of the case through multiple years of litigation, accompanied by ongoing fact development.

54.    Even before litigation commenced, Co-Lead Plaintiffs made a demand for Board minutes and supporting materials under Section 220 of the Delaware General Corporation Law, and received materials that informed Co-Lead Plaintiffs' ability to write a strong initial complaint. After the case was filed, the parties engaged in extensive, though informal, discovery during the pendency of the case.  Approximately six months after the initial consolidated complaint was filed in this case, Defendants produced, under the mediation privilege, to Co-Lead Plaintiffs the production made to the Texas AG during the pendency of its investigation, which totaled approximately 1.1 million pages of emails, contracts, and other documents, primarily relating to Google's ad tech products.  Approximately a year later, again under the mediation privilege,

Defendants also produced deposition transcripts and exhibits from the various Google antitrust actions. A year after that, under the mediation privilege, the Defendants further produced more than 52,000 pages of trial exhibits, which included those not yet made public. Co-Lead Plaintiffs then reviewed and analyzed these productions to assess the strengths of their claims, and developed a thorough understanding of the underlying facts based on their review.

55. Co-Lead Plaintiffs also reviewed the publicly available trial transcripts and exhibits, as well as an otherwise extensive public record, to assess the strengths of their claims and to write a comprehensive amended consolidated complaint that they filed in May 2025 that reflects the latest developments in the industry, in particular relating to artificial intelligence, and to Google's anticompetitive conduct and antitrust liability. This analysis of both the public record and documents controlled by the Company allowed Co-Lead Plaintiffs to develop a thorough understanding of the claims, and therefore, of the merits of settlement.

### E. The Complexity, Expense, and Duration of Continued Litigation Favors Settlement

56. This was a relatively complex shareholder derivative action, due to the complex and myriad underlying antitrust actions and anticompetitive conduct. Google faced multiple antitrust actions against it in numerous areas, including actions brought by coalitions of state attorneys general and the DOJ in three areas: (1) Android app stores and their billing arrangements (specifically, Google Play Store and in-app-payment processing); (2) advertising technologies (e.g., ad servers, ad networks, and ad exchanges); and (3) Google Search. Despite losing at least one trial in each of these areas, and losing an appeal before a Ninth Circuit panel in the *Epic Games* Action, Google, to this day, has not admitted wrongdoing and continues to signal either its intent to appeal or is in the process of appealing each judgment. These actions took multiple years to even reach the trial stage, even in the "rocket docket" Eastern District of Virginia. The long process these antitrust actions has taken also affected Alphabet's timing for resolving this Action. Thus, if this Action had not settled, it likely would have been litigated for at least as long as the antitrust actions, which could take years more to resolve.

1

**F.    The Settlement was Negotiated by Experienced and Well-Informed
Counsel and Arms'-Length Were Negotiations Overseen by an
Experienced and Respected Mediator**

2

3        57.        Scott+Scott, counsel for Co-Lead Plaintiffs, and Freshfields, counsel for the

4    Defendants, are both experienced law firms that have extensive experience handling these types

5    of cases.  Scott+Scott's experience is illustrated through its résumé, attached as Exhibit 1 to the

6    Declaration of Daryl F. Scott in Support of Co-Lead Plaintiffs' Counsel's Fee Application ("Scott

7    Declaration"), which is attached as Exhibit D hereto.   This experience includes most of the

8    significant corporate governance settlements with funding commitments in the last five years:

9        a) ***In re Alphabet Inc. S'holder Derivative Litig.***, No. 19CV343086 (Cal. Super. Ct.) and

10            ***Irving Firemen's Relief and Ret. Fund v. Page***, C.A. No. 2019-0355 (Del. Ch.)

11            ("*Alphabet I*"): $310 million in funding for corporate reforms, including improving

12            oversight at the Board level, and numerous reporting enhancements at the managerial

13            and business line level, and an expert advisory council consisting in part of outside

14            experts and in part with Alphabet officers, regarding discrimination, harassment, and

15            retaliation; Alphabet's counsel at the preliminary approval hearing attested that while

16            the spending commitment was over a 10-year period, in actuality, the spending was

17            accelerated so that the full commitment is almost complete;

18        b) ***Rudi v. Wexner***, No. 2:20-cv-03068 (S.D. Oh.) (*L Brands*): $90 million in funding for

19            corporate reforms, including improved reporting and investigative processes relating

20            to sexual harassment, discrimination, and retaliation, outside experts or consultants to

21            assist with reviewing the Company's harassment, discrimination and retaliation

22            policies, and implementing stand-alone retaliation and anti-sexual harassment policies

23        c) ***In re Altria Group, Inc. Derivative Litig.***, No. 3:20-cv-00772 (E.D. Va.) (*Altria*): $117

24            million in funding for corporate reforms, including improved officer-level oversight in

25            the form of a managerial steering committee, as well as a court-designated corporate

26            monitor, relating to preventing youth vaping.

27

28

58.     In addition, Scott+Scott is counsel in a derivative action involving Meta Platforms's privacy violations, including those relating to the Cambridge Analytica scandal and the following $5 billion settlement with the U.S. Federal Trade Commission over then-Facebook's violation of a privacy consent decree.  Scott+Scott, representing an institutional investor, took and defended numerous depositions, reviewed millions of pages of documents, took the case to trial, and only one day after trial began, achieved a settlement.  Scott+Scott has further expertise because it is also prosecuting an antitrust action against Meta Platforms where some of the facts overlap with the Google Ad Tech cases.  Thus, Scott+Scott has the knowledge and experience to have taken this case to trial if that had become necessary.

59.     In addition, the negotiation was conducted under the auspices of an experienced mediator, Hon. Layn R. Phillips, Chief Judge of the Western District of Oklahoma (Ret.), and John Kiernan, former Chair of Litigation at Debevoise & Plimpton LLP, of Phillips ADR.  Judge Phillips has attached a declaration stating his grounds for why this settlement is fair, reasonable, and adequate.  A true and correct copy of the Phillips Decl. is attached as Ex. A, *supra*.

60.     Judge Phillips has mediated many of the largest shareholder derivative settlements in recent years, including "the Boeing air crash derivative litigation, the United Healthcare derivative litigation, . . . multiple Wells Fargo derivative and class actions, the FirstEnergy derivative litigation, the Fox News and News Corp derivative litigation, the Facebook Cambridge Analytica derivative litigation, and numerous other class action and derivative actions in the high-tech sector."  Phillips Decl. ¶6.

61.     Judge Phillips attests to how "hard fought on all sides" the Settlement negotiations were: "this mediation spanned several years and included three formal, in-person all-day mediation sessions, as well as numerous other mediation sessions held by way of teleconferences, virtual joint and separate working group caucus sessions, emails, and written submissions by the Parties." *Id.* ¶¶7–8.  Judge Phillips attests, "First, the Parties spent a significant amount of time and effort to negotiate the Corporate Reforms. . . .  One particular point of contention was whether the Board needed to create a stand-alone committee devoted to overseeing the Company's regulatory

19

compliance, which took over a year to negotiate." *Id*. ¶16.  Judge Phillips then attests, "After the Parties agreed to the substance of the Corporate Reforms, they again negotiated in a civil but adversarial manner, with each side vigorously advocating for its respective position, concerning the level of funding Alphabet needed to commit to effectively implement the Corporate Reforms. After many months of further negotiations, the Parties were finally able to agree to a funding level of $500 million in the spring of 2025." *Id*. ¶17.  Judge Phillips declares, "To my knowledge, having mediated many, if not most, of the high-profile derivative cases in the United States in recent years, this is the largest spend commitment ever reached in a Derivative settlement." *Id*. ¶18.

62.    Judge Phillips concludes, "Understanding that every aspect of the final approval of this Settlement is committed to the sound discretion of the trial court, after presiding over the mediation process concerning the matter, it is my professional opinion that the Settlement, as well as the agreed-upon attorneys' fees and expenses for Plaintiffs' counsel, are fair and reasonable and are the product of vigorous and independent advocacy and of arm's-length negotiations conducted in good  faith by the Parties." *Id*. ¶20.

## III.    THE AGREED-TO FEE AND EXPENSES AWARD IS FAIR AND REASONABLE, AND SHOULD BE APPROVED

### A.    Co-Lead Plaintiffs, through their Counsel, Achieved Historic Governance Improvements at Alphabet

63.    As outlined above, the centerpiece of the Settlement is the Regulatory Compliance Committee (RCC)—a Board-level committee with a broad mandate and authority to oversee Alphabet's most significant legal and regulatory risks, which include those relating to competition and antitrust laws.  This improved oversight will help prevent the types of board-level oversight failures that allowed Alphabet's regulatory exposure to grow unchecked over the past decade.

64.    The Settlement also implements the Regulatory Readiness compliance infrastructure (RegReady)—a Company-wide, risk-based compliance program focused on proactively identifying and addressing evolving areas of regulatory risk, in contrast to Alphabet's previously reactive and business-specific (and thus, siloed) practices.  RegReady's key features

include the appointment of compliance professionals with appropriate subject matter expertise, centralized management of the compliance program, collaboration with product teams, and coordination with internal governance bodies.  These new bodies include the Trust & Compliance Council (TCC), which includes senior vice presidents who report directly to Sundar Pichai, Alphabet's Chief Executive Officer and a Board director, and the Trust & Compliance Steering Committee (TCSC), which includes executives who implement the compliance initiatives.  The program is expressly guided by DOJ principles and global best practices and incorporates core compliance functions such as risk assessment, policy development and training, internal reporting mechanisms, control systems, and enhanced risk management.  The RCC and RegReady reforms establish a structured, resourced, and enforceable compliance framework to support Alphabet's long-term legal and regulatory oversight.

65.    To ensure adequate resources to implement the above reforms, the Settlement secures an unprecedented $500 million funding commitment to support the implementation and long-term operation of the RCC and RegReady reforms.  The Settlement includes specific mechanisms to ensure oversight of how the funds are spent, reporting obligations to the new Board committee, and staggered timelines to ensure continued investment.  These safeguards confirm that the value is real, enforceable, and designed to produce long-term benefit for the Company and its stockholders.  This commitment—the largest of its kind ever obtained in a shareholder derivative action—ensures that Alphabet's governance overhaul is fully resourced for sustained execution over the next decade.  The scale of this investment underscores the seriousness of the structural changes and the magnitude of the Company's historical oversight failures.  These structural reforms have been recognized as "significant" and "could set a precedent for the broader industry" by Professor Evan Epstein, who has advised boards and regulators on compliance governance.  In his declaration, Ex. B, *supra*, Professor Epstein concluded that the RCC and RegReady reforms are "meaningful and material governance reforms that directly address the alleged oversight deficiencies, enhance board-level accountability, and align with best practices in corporate governance.  In particular, the creation of a dedicated board-level compliance

1   committee, the implementation of enhanced management-level compliance controls, and the

2   Company's long-term financial commitment to compliance collectively demonstrate a good faith

3   effort to strengthen the Board's oversight function and mitigate future risks."  Epstein Decl. ¶4.

4   He noted that Alphabet's reformed structure is "innovative" and provides a replicable model for

5   other large technology companies.

6   **B.    The Co-Lead Plaintiffs' Counsel Devoted Significant Time, Effort, and Expertise to the Action**

7

8   66.    Co-Lead Plaintiffs were able to achieve these extraordinary benefits for the

9   Company because their counsel undertook a diligent, intense multi-year effort that required not

10  only mastery of fiduciary and antitrust law but also meticulous factual development, strategic

11  planning, and trial-level preparation.  This was not a case that could rely on the momentum of

12  parallel enforcement or agency-driven discovery because government actions took a long time to

13  wind through the courts.  Rather, Lead Counsel had to independently develop a case capable of

14  surviving dismissal, supporting discovery, and ultimately prevailing at trial if necessary.  That

15  approach defined every phase of their work.

16  67.    Counsel did not passively monitor the parallel litigation.  Lead Counsel

17  approached this matter as if it were proceeding to trial.  From the outset, counsel began

18  constructing a comprehensive evidentiary record and legal theory around the Alphabet Board's

19  failure to oversee compliance with antitrust laws, developing a strategic roadmap for derivative

20  litigation that could survive demand futility and deliver real corporate reform.  Mr. Coughlin, the

21  lead trial counsel, closely analyzed evidentiary patterns to evaluate the strength of the claims,

22  assess trial readiness, and manage litigation risk.   Mr. Johnson personally oversaw the

23  coordination of legal strategy, document analysis, and mediation posture.  Mr. Yu continued to

24  refine the complaint and legal theories in real time, updating factual allegations and legal citations

25  based on emerging trial testimony and enforcement filings.

26

27

28

68.     Attached as Exhibit D, *supra*, is the Declaration of Daryl F. Scott in Support of Co-Lead Plaintiffs' Counsel's Fee Application, who attests to the time-keeping practices and records of the Firm.  Mr. Scott is the Chief Financial Officer of Scott+Scott.

69.     Attached as Exhibit E is the Declaration of Stephen J. Herman in Support of Co-Lead Plaintiffs' Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Expenses ("Herman Decl."), explaining that the Firm's amount and type of work are appropriate for this type of complex shareholder derivative action.

### 1.     Counsel Independently Developed the Case and Investigated the Facts

70.     Beginning with an extensive Section 220 books and records investigation and examination of a massive public record consisting of the results of a Congressional investigation and numerous government and private civil lawsuits, counsel devoted more than a year assembling the factual foundation of their complaint—identifying, analyzing, and organizing over 1,500 pages of internal Alphabet documents, including Board minutes, agendas, committee presentations, and director & officer questionnaires (later supplemented by other internal policies and training materials).  The resulting derivative complaint, filed in 2021, reflected a granular understanding of Alphabet's Board governance structures, compliance reporting systems, and antitrust exposure across business units.

71.     Over the next four years, Lead Counsel conducted a parallel investigation into the publicly available record generated by federal and state antitrust enforcement efforts, as well as extensive private litigation.  They dissected hundreds of pleadings and exhibits, cross-referenced testimony and trial transcripts from three major actions that went to trial, and synthesized the overlapping factual narratives into a cohesive record of alleged Board-level failure to monitor Alphabet's systemic legal risk.  This work was essential not only to demonstrate oversight gaps, but to rebut anticipated defenses and articulate a credible theory of fiduciary breach under Delaware law.

72.     In addition to Section 220 documents (which totaled more than 2,000 pages, including a supplemental production that was made after the Action was filed), the Company made

1    three massive productions to help Co-Lead Plaintiffs assess the strength of their claims. Starting

2    in 2022, the Company produced 1.1 million pages of internal Alphabet documents that were

3    produced to the Texas AG before it filed its enforcement action, 375 deposition transcripts and

4    exhibits from various underlying antitrust actions against Google, and more than 52,000 pages of

5    trial exhibits (including those filed under seal) in the three high-stakes antitrust actions that went

6    to trial, and covered the three major areas of anticompetitive conduct Google engaged in: *Epic*

7    *Games, Inc. v. Google LLC* (concerning Android app distribution and in-app payment processing),

8    *U.S. v. Google LLC* and *Colorado v. Google LLC* (consolidated into one trial, concerning Google

9    Search and search ads), and *U.S. v. Google LLC* (concerning Google's dominance of the digital

10   advertisement technology, or "ad tech" stack).

11           73.    To develop the extensive factual record, Scott+Scott committed a full-time team of

12   staff attorneys—totaling up to 14 attorneys—who, over a multi-year period reviewed, analyzed,

13   and memorialized findings from the productions, as well as the complete public trial records from

14   three high-stakes antitrust actions: *Epic Games, Inc. v. Google LLC*, *U.S. v. Google LLC (Search)*,

15   and *U.S. v. Google LLC (Ad Tech)*. These staff attorneys, all full-time employees with significant

16   experience, produced, collectively, hundreds to thousands of pages of work product, including: (1)

17   detailed memoranda on key liability themes; (2) summaries of pivotal documents and testimony;

18   (3) chronologies of events and oversight failures; and (4) weekly updates and legal research

19   reports. Their foundational fact development allowed senior attorneys to build and refine case

20   strategy, prepare amended complaints, develop mediation materials, and negotiate comprehensive

21   reforms—work that unfolded in an evolving regulatory and litigation landscape.

22           74.    Lead Counsel also conducted intensive legal research and fact development on

23   fiduciary duty claims, particularly under Delaware's *Caremark* standard, which is notoriously

24   difficult to plead and prove. They tracked enforcement trends, analyzed evolving DOJ compliance

25   guidance, and incorporated those insights into draft reform proposals aimed at aligning Alphabet's

26   governance with regulatory expectations. As Messrs. Johnson and Yu explain in their declarations,

27

28

counsel continuously updated their legal analysis and reform design to reflect findings in the underlying trials and evolving antitrust theories being tested in federal court.

### 2. Counsel Designed and Negotiated a Tailored Governance Reform Package

75.     Beginning in 2022, Lead Counsel also engaged in robust settlement discussions—beginning with the production referenced above.  These discussions involved the development and redlining of multiple governance reform proposals, financial modeling of implementation costs, iterative feedback from the Mediator, and extensive back-and-forth with defense counsel. The multi-year process of preparing the RegReady reform framework required the same level of planning and rigor as litigation itself.  Lead Counsel negotiated implementation structures, aligned oversight procedures with board reporting systems, and embedded compliance mechanisms across product and business lines—ensuring these reforms would be functional, enforceable, and effective

76.     Simultaneously, counsel began crafting a blueprint for meaningful governance reform.  They consulted with leading governance and damages experts, studied DOJ guidance and the Federal Sentencing Guidelines on effective compliance programs, and reviewed historical reform models from prior derivative settlements.  They tailored that research into a bespoke framework—what became the RCC and RegReady reforms—designed specifically for Alphabet's scale, structure, and platform-related regulatory challenges.  Lead Counsel prepared a comprehensive set of structural proposals addressing board committee formation, executive reporting protocols, certification and escalation mechanisms, root cause analysis tools, audit rotation, and funding requirements.

77.     This reform package was tailored to Alphabet's expansive compliance needs.  Lead Counsel developed and iterated on multiple redline drafts, modeled implementation costs, negotiated adoption timelines, and prepared detailed supporting materials—including governance charts, policy drafts, and operational scenarios—to facilitate adoption by the Board and acceptance by the Company's insurers.  These negotiations unfolded across numerous mediation sessions and direct meetings and over several years (as evident by how the first in-person mediation was held

in December 2022 and the last in-person session was held in September 2024), often requiring Lead Counsel to defend, revise, and justify individual reform provisions under pressure from multiple defense constituencies.

### 3. Lead Counsel Prepared for Litigation and Trial Through the Five-Year Duration of this Case, When Settlement Was Uncertain

78.     Throughout this litigation, Lead Counsel also prepared the case for trial.  They developed opening arguments, mapped potential witness testimony, and prepared a trial record capable of establishing director liability.  In parallel, they built a detailed record of Board and committee conduct—including oversight failures, meeting frequencies, and escalation shortfalls— to support not just liability but also injunctive relief and governance remedies.  This litigation was not driven by document requests or third-party subpoenas; it was driven by deep internal review, creative legal theory, and sustained expert engagement.

79.     The scale of the Firm's investment is reflected in the time records.  Lead Counsel collectively invested more than 37,000 attorney hours, generating over $34 million in lodestar, including: (1) Approximately half of the lodestar reflected the staff attorneys' efforts, representing thousands of hours of sustained, high-volume document review, analysis, and written and oral fact development and memorialization; (2) Most of the rest of the lodestar reflected the almost five years of litigation by the three core senior attorneys, who led strategy, managed attorney teams, prepared pleadings, engaged in negotiations, and served as the primary interface with the Mediator and opposing counsel.

80.     The resulting Settlement reflects that investment.  Without this time and effort, there would be no independent Risk & Compliance Committee of the Board; no system-wide RegReady architecture; no executive-level compliance restructuring; no overhaul of Alphabet's document retention and chat policies; and no $500 million funding commitment to ensure robust implementation.  In short, the magnitude of the results achieved is a direct product of the time, resources, and professional judgment that Lead Counsel devoted to this case.  Their work spanned

1  nearly five years, against a highly sophisticated adversary represented by elite global law firms,

2  under evolving regulatory scrutiny and without any governmental admissions of wrongdoing.

3  **C.    The Complexity of this Litigation Justifies the Requested Fee and Expense Award**

4

5  81.    This case presented exceptional legal, factual, and procedural challenges at every

6  stage.  Lead Counsel prosecuted a fiduciary oversight case under Delaware law based on

7  Alphabet's alleged failure to monitor compliance with antitrust laws—one of the most difficult

8  theories in corporate law.  Achieving a landmark governance overhaul and a $500 million funding

9  commitment required mastery of overlapping litigation records, evolving legal doctrines,

10  Alphabet's complex internal systems, and an in-depth understanding of the underlying antitrust

11  liability.  The latter was especially complicated because of: the vast array of anticompetitive

12  practices Google engaged in; the complicated terminology, players, entities, and technology in at

13  least three industries (Search, Play Store, and Ad Tech); the numerous jurisdictions Google had

14  liability exposure in, including at the federal level, at individual state levels, and across the globe;

15  the complicated legal theories that underlay the numerous litigations; and the stiff resistance

16  Google offered at each step to each antitrust action.

17  82.    Co-Lead Plaintiffs advanced a claim under the *Caremark* standard, which the

18  Delaware Court of Chancery has recognized as "possibly the most difficult theory in corporation

19  law upon which a plaintiff might hope to win a judgment."  *In re Caremark Int'l Inc. Derivative*

20  *Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  Unlike transactional misconduct or false statements,

21  the core allegation was that Alphabet's Board consciously failed to monitor and respond to

22  systemic antitrust risk.  To prevail, Co-Lead Plaintiffs needed to demonstrate that the Board's

23  inaction amounted to bad faith.  This was a high-stakes claim requiring Co-Lead Plaintiffs to align

24  evidence of complex market misconduct with failures in governance structure, board reporting,

25  risk escalation, and compliance design.  There was no roadmap.  Co-Lead Plaintiffs had to

26  innovate, develop novel legal arguments, and continuously update their theories based on shifting

27  regulatory guidance and trial outcomes in related government cases.

28

83.    The factual complexity of this case was extraordinary.  Lead Counsel had to independently review and synthesize discovery materials from three landmark federal antitrust cases: *Epic Games, Inc. v. Google LLC* (N.D. Cal.), *United States v. Google LLC – Search* (D.D.C.), and *United States v. Google LLC – Ad Tech* (E.D. Va.).  Just the small sliver of documents produced to Co-Lead Plaintiffs included: (1) almost 2,000 pages of internal Board minutes and materials, director & officer questionnaires, and policies and training materials; (2) Over 1.1 million pages of internal documents broadly related to ad tech; (3) more than 375 deposition transcripts and exhibits; and (4) more than 52,000 pages of trial exhibits, including those still sealed from the public.  Furthermore, Lead Counsel mastered the public materials from dozens of trial days and evolving evidentiary records.  Each of these actions involved distinct legal theories, markets, and factual timelines.

84.    Moreover, Lead Counsel could not simply adopt findings from these cases—they had to build an independent record of fiduciary breach using raw source materials.  This required not only a detailed understanding of Alphabet's product and legal risk profile, but also the ability to trace that risk back to Board-level knowledge, inaction, and structural deficiencies.  As Mr. Johnson explains in his declaration, this was a dynamic process.  Counsel engaged in continuous monitoring of the public trial records, analyzed cross-examination testimony, extracted evidence of internal reporting failures, and mapped those against Alphabet's governance structure.  This was necessary to plead actionable oversight failures and prepare for trial.

85.    Settlement negotiations added another layer of complexity.  The reforms were not generic or off-the-shelf—they were highly customized, grounded in real-time legal analysis and tailored to Alphabet's governance risks.  Crafting the RegReady and RCC frameworks required:

a)  detailed knowledge of Alphabet's Board and committee structures;

b)  familiarity with DOJ guidance on effective corporate compliance programs; and

c)  expertise in designing enforceable oversight mechanisms that could operate across Alphabet's massive organizational footprint.

86.    Lead Counsel developed reform term sheets, drafted policy language, modeled implementation costs, and engaged in multiple rounds of redlines and revisions.  Negotiations occurred in parallel with a rapidly shifting enforcement landscape—DOJ lawsuits, public trials, evolving regulatory demands—and had to account for internal Alphabet dynamics and insurer constraints.

87.    This was not a standard settlement process.  It was a prolonged, technical negotiation under the supervision of a former federal judge.  Lead Counsel defended each component of the reform package on the merits, while also building a record capable of withstanding judicial scrutiny in a final approval hearing.

### D.    The Lead Counsel Prosecuted This Action on a Wholly Contingent Basis

88.    Lead Counsel prosecuted this case on an entirely contingent basis.  Lead Counsel undertook this litigation with no guarantee of recovery—shouldering all litigation risk, advancing all attorney and staff time without compensation, and absorbing all costs over a period of nearly five years.  During that time, they litigated against one of the world's most valuable companies, represented by elite defense counsel from top-tier law firms, without any interim fee payments or funding from outside investors or from clients.

89.    Unlike many securities fraud or merger objection cases where a monetary settlement is often a foreseeable resolution, shareholder derivative cases—particularly those brought under Delaware's stringent *Caremark* standard—are notoriously difficult to win and risky to pursue.  Delaware courts have emphasized that the chances of success for plaintiffs in a *Caremark* case are low, and have repeatedly dismissed even well-pleaded complaints.  Lead Counsel proceeded despite that reality, knowing that a successful outcome would likely require years of investigation, negotiation, and expert development of compliance reforms that would deliver demonstrable, long-term corporate benefit.

90.    In addition to the legal risks, the economic risks were significant.  As noted in the Scott Declaration, by the time of the fee application, Lead Counsel had incurred over $34 million

in lodestar and significant unreimbursed expenses.  The staff attorney team alone—ranging from up to 14 attorneys at different points—had spent years conducting detailed document and trial record review, without compensation.  Senior attorneys likewise devoted thousands of hours to strategy development, reform drafting, legal research, and mediation—all on a purely contingent basis.  At multiple points in the case, the risk of total loss was real.  Alphabet and its Board have consistently denied wrongdoing not only in this derivative action, but also in the underlying DOJ and private antitrust cases.  There were no government admissions or regulatory findings that Co-Lead Plaintiffs could rely upon.

91.    Unlike cases where a corporate board adopts reforms in response to a government investigation or settlement, here, the RegReady and RCC reforms were secured solely through private litigation.  Had the litigation failed—on demand futility, on summary judgment, or at trial—Lead Counsel would have received nothing for their years of work or the millions of dollars of Firm resources expended.  Without Lead Counsel's willingness to undertake this matter on contingency, despite its complexity and difficulty, the Company would not have obtained the structural reforms or made the funding commitment.  Accordingly, the contingent nature of the representation weighs heavily in favor of approving the requested fee and expense award.

**E.    The Quality of Representation Also Justifies the Requested Fee and Expense Award**

92.    The standing and ability of Lead Counsel further support the reasonableness of the requested fee and expense award.  Prosecuting this litigation required not only deep subject-matter expertise in shareholder derivative and fiduciary duty law, but also extensive experience in antitrust enforcement, complex document review, and corporate governance reform.  As reflected in the declarations of Patrick J. Coughlin, Geoffrey M. Johnson, and Jing-Li Yu, Lead Counsel brought to this case the experience, judgment, and institutional strength necessary to litigate against one of the most powerful and well-represented companies in the world.

93.    Scott+Scott is nationally recognized for its expertise in corporate governance and fiduciary litigation, of which it has decades of experience.  Over the past several years, the Firm

has led the majority of large-scale derivative cases resulting in board-level reforms backed by dedicated funding commitments.  These include:

    a) ***Rudi v. Wexner***, No. 2:20-cv-03068 (S.D. Oh.) – $90 million corporate reform settlement addressing workplace misconduct and board oversight failures;

    b) ***In re Altria Group, Inc. Derivative Litig.***, No. 3:20-cv-00772 (E.D. Va.) – $117 million reform and funding settlement arising from the Company's investment in Juul; and

    c) ***Irving Firemen's Relief and Ret. Fund v. Page***, C.A. No. 2019-0355 (Del. Ch.) ("*Alphabet I*") and ***In re Alphabet Inc. Shareholder Derivative Litig.***, No. 19CV343086 (Cal. Super. Ct.) – $310 million corporate governance reform and funding commitment.

94.    Scott+Scott's success in these matters has given it the leading expertise among law firms that are capable of designing and negotiating governance settlements that impose real, enforceable reforms and secure meaningful financial commitments to ensure implementation.

95.    Lead trial counsel Patrick Coughlin brought to this matter over four decades of trial and litigation experience in complex class and derivative cases, including antitrust, securities, and corporate fraud.  Mr. Coughlin developed extensive trial experience as an attorney in the DOJ, where he served both at Main Justice and in two U.S. attorneys' offices.  He has tried many more cases in his decades in private practice.  In the 1990s and 2000s, Mr. Coughlin led some of the largest civil antitrust and price-fixing actions in U.S. history, including actions involving the credit card companies and major banks in interchange, the tobacco companies, and foreign exchange traders (e.g., *Regents of the Univ. of Cal v. Credit Suisse First Bos.*, 482 F.3d 372 (5th Cir. 2007); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 62 F.4th 704 (2d Cir. 2023); *In re: Text Messaging Antitrust Litig. Aircraft Check Servs. Co. v. Verizon Wireless*, 782 F.3d 867 (7th Cir. 2015)).  His deep familiarity with antitrust law, particularly in digital and platform markets, was instrumental in guiding the team's analysis of the parallel DOJ and private enforcement actions against Alphabet and developing the fiduciary theories

31

underpinning this derivative case.  His ability to assess evidentiary patterns and trial viability in antitrust settings shaped the legal strategy and informed both litigation and settlement planning.

96.    Geoffrey Johnson, head of Scott+Scott's governance and shareholder litigation practice, directed the day-to-day litigation, coordinated the Firm's internal workstreams, and led the negotiation of the RegReady framework.  With more than 25 years of experience in shareholder and fiduciary duty litigation, Mr. Johnson has successfully prosecuted dozens of derivative and securities actions, including many involving novel governance structures and board-level reforms.

97.    Jing-Li Yu, with 15 years of litigation experience, supervised the document review and fact development team and was the primary drafter of key filings, including the complaint and mediation statements.  Mr. Yu led a full-time team of staff attorneys through the review of more than 1.1 million pages of internal Alphabet documents and hundreds of trial exhibits and deposition transcripts from the underlying *Epic Games*, Search, and DOJ Ad Tech litigations.  Mr. Yu also conducted extensive legal research on fiduciary duties, Delaware law, and DOJ compliance expectations and played a central role in designing the detailed oversight framework that was ultimately adopted in the Settlement.

98.    This team invested the time, resources, and professional capital required to deliver meaningful reform.  The complexity of the underlying issues, the size and power of the corporate defendant, and the scale of the achievement confirm the Firm's national reputation for excellence in shareholder litigation.  The standing and ability of Lead Counsel weigh strongly in favor of approving the requested attorneys' fee and expense award.

F.    **The Agreed-upon Fee and Expense Award Was Reached Through Extensive and Arms'-Length Negotiations Overseen by an Experienced Mediator**

99.    The attorneys' fees and expenses was separately negotiated only after the core terms of the Settlement had been finalized.  Critically, both the Settlement and the subsequent fee discussions were overseen by the Hon. Layn R. Phillips (Ret.), a former U.S. District Judge and one of the most respected mediators in the country.  In his declaration submitted in support of

32

final approval, Judge Phillips confirmed that the parties engaged in "extensive, arm's-length negotiations" over a multi-year period to reach the Settlement and that the fee negotiations were entirely separate from the merits.  He specifically noted that:

- the parties reached agreement on the governance reforms and the $500 million spending commitment before any fee discussions began;

- the fee negotiations were initiated only after that substantive agreement was complete;

- the parties jointly requested that Judge Phillips provide a Mediator's Recommendation regarding the appropriate fee and expense amount; and

- both sides accepted Judge Phillips's recommended fee of $80 million, which Defendants agreed not to oppose.

100.    Judge Phillips also emphasized the difficulty of the negotiations, noting that the corporate reforms in this case—particularly the $500 million implementation commitment—represented "to [his] knowledge, the largest spend commitment ever reached in a Derivative settlement."  Phillips Decl. ¶18.  He attested that the reforms were hard-fought and carefully negotiated, and that the requested fee was reasonable in light of the scale of the benefit and the complexity of the matter.

101.    As a result, Judge Phillips made a mediator's proposal for $80 million in fees and expenses.  The parties accepted that proposal.

102.    The procedural integrity and independence of this process strongly support approval of the fee request.  Courts give substantial weight to fee agreements reached under the supervision of neutral mediators, especially when the agreement is unopposed and follows the resolution of all material terms of settlement.  *See* Attached hereto as Exhibit F, a true and correct copy of the Transcript of the Telephonic Hearing and Rulings of the Court on Plaintiff's Motion for Approval of Fees and Expenses, *Alphabet I*, C.A. No. 2019-0355 (Del. Ch. Dec. 23, 2020).

### G.    Lead Counsel's Lodestar Confirms the Reasonableness of the Fee Request

103.    The requested $80 million fee and expense award is further supported by a lodestar cross-check, which confirms that the request is reasonable under both Delaware and Ninth Circuit

standards.  Based on contemporaneous time records and the Scott Declaration submitted by Scott+Scott, Lead Counsel invested more than 37,000 hours in this litigation, resulting in a total lodestar of approximately $34 million.  The requested fee represents a modest 2.35x multiplier on that figure—a level well within the range routinely approved in complex shareholder litigation involving contingent risk and non-monetary structural reform.

104.    This multiplier is consistent with, and in many respects more conservative than, lodestar multipliers awarded in similar derivative settlements.  For example, in *Alphabet I*, the Delaware court approved a 3.9x multiplier on lodestar in connection with a $310 million corporate governance settlement, which did not include the creation of a new board committee.  In *L Brands*, the court awarded a $21 million fee for corporate reforms backed by a $90 million funding commitment, reflecting a multiplier of approximately 3.1x.  Here, the 2.35x multiplier is below both comparables, despite the significantly larger scale of the $500 million funding commitment and the Board-level Regulatory Compliance Committee and RegReady infrastructure.

105.    The reasonableness of the lodestar is further confirmed by the scope and nature of the work performed, as set forth in the declarations of Patrick J. Coughlin, Geoffrey M. Johnson, and Jing-Li Yu.

106.    Over the course of nearly five years, Lead Counsel built a comprehensive factual and legal record to support a *Caremark* oversight claim against one of the most powerful and complex technology companies in the world.  This work included:

- **reviewing more than 2,000 pages** of Alphabet Board minutes, presentations, written consents, director & officer questionnaires, policies, and training materials;

- **reviewing more than 1.1 million pages** of internal Alphabet documents produced in the underlying antitrust actions;

- **analyzing 375 deposition transcripts and exhibits** from *Epic Games, Inc. v. Google LLC*, *U.S. v. Google LLC (Search)*, and *U.S. v. Google LLC (Ad Tech)*;

- **digesting hundreds of trial exhibits and multiple full trial transcripts** from three high-stakes federal cases;

- **preparing detailed memoranda, legal research reports, and strategy documents** on oversight failures, regulatory risks, and evolving antitrust enforcement; and

- **drafting amended complaints, mediation briefs, and reform proposals** tailored to real-world implementation and corporate accountability.

107.    This work was led by a senior team of attorneys with decades of high-stakes litigation experience.  Mr. Coughlin, the lead trial lawyer, brought more than 40 years of litigation experience, including leading the trial teams in historic antitrust actions against Microsoft and NASDAQ.  Mr. Johnson, the head of Scott+Scott's governance and shareholder litigation practice, supervised the litigation and led reform negotiations.  Mr. Yu, with 15 years of litigation experience, directed the document review team and was the principal drafter of litigation filings and governance frameworks.  Supporting them was a dedicated staff attorney team—of up to 14 attorneys at any given time—who spent years reviewing and analyzing the underlying record.

108.    The attorney billing rates underlying the lodestar are also well within market norms. Mr. Coughlin billed at $2,050 per hour, Mr. Johnson at $1,575 per hour, and Mr. Yu at $1,145 per hour—rates that are conservative in comparison to defense counsel at leading firms.  According to a 2024 American Bar Association Journal report, senior partners at Am Law 50 firms command rates exceeding $2,100 per hour, and partners at top Silicon Valley firms such as Wilson Sonsini bill over $2,700 per hour. Senior associates at these firms often exceed $1,500–$2,000 per hour. In contrast, Scott+Scott's staff attorneys—experienced full-time litigators who performed the equivalent of senior associate-level document analysis—were billed at $525–$720 per hour, significantly below the prevailing market rate.  Attached hereto as Exhibit G is a true and correct copy of this report.

## H.    Expert Opinion Confirms the Reasonableness of the Fee Request and Timekeeping

109.    To further support the reasonableness of the requested attorneys' fee and expense award, Co-Lead Plaintiffs retained legal fee expert Stephen J. Herman to evaluate whether the legal work performed by Lead Counsel was reasonably necessary in the context of this complex litigation and whether the billing records reflect sound professional judgment.  Mr. Herman brings

35

1   more than 30 years of experience evaluating time and expense submissions in high-stakes

2   litigation and has served in leadership roles in some of the most consequential cases in recent

3   decades, including the Deepwater Horizon and tobacco litigation.  Attached as Ex. E, *supra*, is a

4   true and correct copy of his declaration.

5       110.    Mr. Herman concludes unequivocally that the time and effort invested by Lead

6   Counsel in this action "fall within the nature, scope, and extent of legal services that would be

7   expected to be undertaken as reasonably necessary in this type of complex litigation," and that

8   the billing records "reflect sound billing judgment[.]"  Herman Decl. ¶13.  His opinion reinforces

9   that the work performed here was both necessary and properly documented.

10      111.    Importantly, Mr. Herman highlights that the fees are being paid exclusively from

11  insurance proceeds and do not in any way reduce the monetary or injunctive benefits provided to

12  Alphabet or its shareholders.  As he explains, this structure eliminates any risk of the fee

13  diminishing the value of the Settlement to the Company or its investors.  In Mr. Herman's words:

14  "It is significant to note that the attorneys' fees are being paid primarily, if not exclusively, out of

15  available insurance proceeds, and do not in any way affect or diminish the injunctive or monetary

16  benefits inuring to the individual shareholders or to the company as a whole."  *Id.* ¶22.

17      112.    Mr. Herman also emphasizes the importance of taking an "*ex ante*" approach to

18  evaluating time and effort in complex litigation.  Because it is often impossible to predict which

19  research or projects will ultimately yield concrete results, courts should not retroactively second-

20  guess whether a given task directly contributed to a particular reform: "If courts only reward

21  common benefit time that is traced, in retrospect, to direct and concretely perceived benefits,

22  when the next complex and coordinated action comes along, the court-appointed attorneys and/or

23  other volunteers will not be incentivized to undertake the more difficult or risky projects that are

24  necessary to the collective interests of all plaintiffs, and/or in the furtherance of judicial

25  economy."  *Id.* ¶44.

26      113.    Mr. Herman further notes that the investigative work undertaken by Lead

27  Counsel—particularly their comprehensive review of materials from related antitrust litigation—

28

36

was entirely appropriate. He affirms that it is "standard and customary practice" for lawyers in complex derivative matters to gather and analyze materials from parallel proceedings, including civil, regulatory, and criminal actions. *Id.* ¶23. In his own experience in major coordinated actions, including Deepwater Horizon, courts routinely considered such review work to be compensable.

114. Recognizing that derivative litigation focuses on board oversight failures rather than direct corporate misconduct, Mr. Herman underscores that understanding the facts underlying Alphabet's alleged antitrust violations was necessary to assess potential fiduciary breaches under Delaware law. As he states: "While this derivative action was focused on the knowledge and inaction of the Board of Directors, as distinct from the conduct of the company, it was necessary to understand the factual predicates of alleged antitrust and other potentially unlawful activity." *Id.* ¶28.

115. On the issue of billing judgment, Mr. Herman found that the time entries were free of red flags, such as block billing or vague entries, and that even the more general time narratives by staff attorneys were acceptable in the context of complex common benefit work. He further observes that the absence of multiple firms in this litigation eliminates concerns about duplicative efforts: Scott+Scott "was essentially the only firm conducting the litigation[.]" *Id.* ¶53. Mr. Herman also emphasized that firms like Scott+Scott, which work on a contingency basis, have no incentive to inflate hours because their compensation is tied to case success. He cited established Ninth Circuit precedent cautioning courts not to second-guess firms' internal staffing decisions, reaffirming that: "It is the difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys—that must drive the district court's decision." *Id.* ¶54 (quoting *Hum. Rts. Def. Ctr. v. Cnty. of Napa*, 2021 WL 1176640, at *14 (N.D. Cal. Mar. 28, 2021)).

116. Finally, Mr. Herman opines that the $500 million spending commitment achieved in this case is a reasonable proxy for assessing the monetary value of the Settlement. Based on that metric, the $80 million fee request represents just 16% of the benefit conferred, well below

the 25% benchmark typically used in class actions in the Ninth Circuit.  He further notes that this calculation likely understates the value of the non-monetary governance reforms, which themselves are of lasting and substantial benefit to shareholders.

## IV.    THE CO-LEAD PLAINTIFFS SHOULD BE AWARDED SERVICE AWARD

117.    Here, Co-Lead Plaintiffs Bucks County Employee Retirement Systems and Police and Fire Retirement System of the City of Detroit have each devoted significant time and attention to the oversight of this Action.  Representatives from both funds remained actively involved throughout the nearly five-year duration of the case—reviewing pleadings and filings, evaluating strategic decisions, approving proposed settlement frameworks, and participating in regular updates with counsel regarding case progress and settlement negotiations.  Their ongoing engagement and diligence reflect the kind of fiduciary stewardship derivative litigation is designed to vindicate.

118.    Given the duration and complexity of this litigation—spanning multiple years, novel governance reforms, and one of the largest spending commitments in the history of derivative litigation—an incentive award of $50,000 for each fund is reasonable and warranted. This amount is justified by the magnitude of the case, the significance of the result achieved, and the exemplary way the Co-Lead Plaintiffs fulfilled their representative responsibilities.

119.    Importantly, the proposed awards do not impose any additional cost on Alphabet or its insurers.  The awards would be paid out of the attorneys' fee portion of the Settlement, and thus do not affect the Company's financial obligations or reduce the value of the governance reforms secured.  Nor do they raise any concern of undue influence or improper incentive, because there was no conditioning of service or incentive awards based on support of the Settlement.

120.    Courts have approved awards at this level in similarly complex derivative and class actions involving prolonged litigation and substantial governance results.  *See, e.g.*, *In re Activision Blizzard, Inc. S'holder Litig.*, Consol. C.A. No. 8885-VCL (Del. Ch. May 20, 2015); *In re Dell Techs. Inc. Class V S'holders Litig.*, Consol. C.A. No. 2018-0816-JTL (Del. Ch. Mar.

1    29, 2024).   Accordingly, Co-Lead Plaintiffs respectfully request that the Court approve the

2    requested $50,000 incentive awards as fair and reasonable recognition of the time, diligence, and

3    leadership they demonstrated on behalf of Alphabet and its shareholders.

4            I declare under penalty of perjury under the laws of the United States of America that the

5    foregoing is true and correct.

6            Executed on August 15, 2025, at San Diego, California.

7                                                   /s/ Patrick J. Coughlin
                                                   PATRICK J. COUGHLIN
8                                                   SCOTT+SCOTT ATTORNEYS AT LAW LLP

9                                                   *Counsel for Co-Lead Plaintiffs Police and Fire
                                                   Retirement System of the City of Detroit and
10                                                  Bucks County Employees' Retirement System*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>CERTIFICATE OF SERVICE</u>**

2
3
4
5

I hereby certify that on August 15, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.  All parties not so registered will be served via e-mail or U.S. Mail.

6

Executed on August 15, 2025, at New York, New York.

7
8

 /s/ Jing-Li Yu
JING-LI YU (CA Bar No. 342985)
SCOTT+SCOTT ATTORNEYS AT LAW LLP

9

*Counsel for Co-Lead Plaintiffs*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF PATRICK J. COUGHLIN IN SUPPORT OF CO-LEAD PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF
SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES
CONSOL. CASE NO.: 3:21-cv-9388-RFL