# EXHIBIT B

1

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
PATRICK COUGHLIN (CA Bar No. 111070)

2

MAXWELL R. HUFFMAN (CA Bar No. 264687)
600 W. Broadway, Suite 3300

3

San Diego, CA 92101
Telephone: (619) 233-4565

4

pcoughlin@scott-scott.com
mhuffman@scott-scott.com

5

6

*Lead Attorneys for Co-Lead Plaintiff Police and Fire Retirement System of the City of Detroit and Co-Lead Plaintiff Bucks County Employees' Retirement System*

7

8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

10

11

| | |
|---|---|
| IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED Case No.: 3:21-cv-9388-RFL |

12

**DECLARATION OF EVAN EPSTEIN IN SUPPORT OF CO-LEAD PLAINTIFFS'**

13

**MOTION FOR FINAL APPROVAL OF SETTLEMENT AND MOTION FOR AN**

14

**AWARD OF ATTORNEYS' FEES AND EXPENSES**

15

Hon. Rita F. Lin, U.S.D.J.

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Evan Epstein, pursuant to 28 U.S.C. §1746, declare and state as follows:

1. I am the founding Executive Director of the UC Center for Business Law San Francisco and an Adjunct Professor at UC Law San Francisco (formerly UC Hastings), where I specialize in corporate governance. I also serve as a Lecturer in Management at Stanford Graduate School of Business, where I teach MBA students about corporate governance. My career spans over two decades advising corporate directors, executives, and investors on governance matters, with a focus on fiduciary duties and director conduct. I have been retained as a consulting and expert witness in litigation involving complex governance issues, including derivative actions and claims for breach of fiduciary duty.[1]

2. I have been retained by counsel, Scott+Scott Attorneys at Law LLP, as the corporate governance expert for the plaintiffs. I have been asked to review the corporate governance reforms of the Joint Stipulation and Agreement of Settlement ("Settlement") between: (1) Police and Fire Retirement System of the City of Detroit and Bucks County Employees' Retirement System ("Plaintiffs" or "Settling Stockholders"); (2) Nominal Defendant Alphabet, Inc. ("Alphabet" or the "Company"); and (3) Alphabet Board of Directors ("Board") members ("Individual Defendants" and together with Alphabet, "Defendants") (the Settling Stockholders and Defendants are collectively referred to herein as the "Parties" or "Settling Parties") in a derivative suit pending in the Northern District of California captioned: *In re Alphabet Inc. Shareholder Derivative Litigation*, Consol. C.A. No.5:21-cv-09388-RFL (N.D. Cal.) (the "Litigation").[2]

3. The Settlement includes three primary corporate governance components: (1) the creation of a new risk and compliance board-level committee ("Board Oversight Enhancements"); (2) the implementation of significant management-level compliance reforms ("Regulatory Readiness Compliance Enhancements" and "Management Oversight Enhancements"); and (3) a

---

[1] Rather than provide a standard recitation of qualifications, I respectfully refer the Court to my attached résumé (Exhibit A).
[2] The Settlement was filed on May 30, 2025, as an exhibit to the Motion for Preliminary Approval of Derivative Settlement (*see* ECF No. 87-1).

1  substantial financial commitment to support the Company's compliance efforts ("Spending

2  Commitment").

3        4.      It is my opinion that the Settlement provides meaningful and material governance

4  reforms that directly address the alleged oversight deficiencies, enhance board-level

5  accountability, and align with best practices in corporate governance.  In particular, the creation

6  of a dedicated board-level compliance committee, the implementation of enhanced management-

7  level compliance controls, and the Company's long-term financial commitment to compliance

8  collectively demonstrate a good faith effort to strengthen the Board's oversight function and

9  mitigate future risks.

10  **I.    BACKGROUND**

11        5.      The underlying litigation is a shareholder derivative suit brought on behalf of the

12  Company against various current and former officers and directors, arising from the Company's

13  alleged systematic anticompetitive conduct.  These acts have subjected the Company to multiple

14  antitrust investigations, fines, adverse litigation outcomes, and ongoing legal challenges both

15  domestically and internationally.

16        6.      The Plaintiffs' Verified Amended Consolidated Shareholder Derivative Action

17  Complaint and Jury Demand (the "Complaint")[3] details how the Company has faced numerous

18  antitrust and competition investigations and lawsuits.   For instance, multiple European

19  Commission investigations between 2010 and 2019 resulted in collective fines totaling billions of

20  euros.  The European competition investigations and actions put the Alphabet's Board on notice

21  of the Company's antitrust and competition problems.  As the Board allegedly ignored red flags

22  from Europe, the Company faced multiple U.S. regulatory actions alleging antitrust or competition

23  violations, resulting in additional billions of dollars in damages.  The U.S. Department of Justice

24  ("DOJ") and all state Attorneys General, along with the attorneys general of the District of

25  Columbia, Puerto Rico, and the U.S. Virgin Islands, have filed enforcement actions against the

26  Company.  The U.S. House of Representatives also demanded accountability, requesting testimony

27

28  _____

[3]    The Complaint was filed in redacted form on May 30, 2025 (*see* ECF No. 84), and subsequently refiled in unredacted form on July 8, 2025 (ECF No. 100).

2

1  and releasing a report detailing the Company's monopolistic conduct. The Company is now

2  reportedly subject to over 100 antitrust cases spanning 23 jurisdictions.[4]

3      7.    The Complaint alleges that under the Individual Defendants' management and

4  supervision, the Company systematically pursued anticompetitive conduct:

> Defendants Brin, Page, Schmidt, and Pichai asserted dominance and control over Alphabet. Under their leadership, and with the blessing of the Board, Alphabet pursued an array of illegal and anticompetitive business plans, including leveraging dominance in certain business markets to capture and monopolize others. The Board had no direct oversight over the Company's illegal business practices, having utterly failed to monitor compliance requirements for a wide variety of products and services that the Board knew would be potentially monopolistic or anticompetitive. The Board never investigated nor even inspected the illegal business practices that were the subject of the mounting regulatory investigations facing the Company. By sanctioning Alphabet's illegal conduct and allowing it to continue even after receiving numerous red flags that a vast majority of Alphabet's products and services were being used to conduct anticompetitive business practices and extract supracompetitive fees that could not otherwise be sustained in a competitive market, the Individual Defendants breached their duties owed to the Company.

13  *See* Complaint ¶3.

14      The Complaint further alleges that as a result of these anticompetitive practices, "Alphabet

15  has suffered substantial harm, spent tens of millions of dollars on investigations and civil actions,

16  and faces billions of dollars in potential fines, and Alphabet's reputation has suffered immense

17  harm" and that this action "seeks to hold the Individual Defendants — who are the controlling

18  shareholders, senior executives, and Board of Directors of Alphabet — accountable for the

19  Company's anticompetitive and monopolistic business practices." *Id.* ¶¶4–5.

20      8.    Plaintiffs allege breaches of fiduciary duties against the Individual Defendants in

21  their capacity as directors, and against Brin, Page, Schmidt, and Pichai in their capacity as Officers

22  and Controlling Shareholders.

23      9.    Subsequent negotiation efforts eventually led to the Settlement, setting forth all

24  material terms associated with the resolution of the Litigation, which was agreed to by the Settling

---

[4]    Bergqvist, Christian. *Taking Stock of Google's Antitrust Troubles as the World Turns Against It.* PROMARKET (Feb. 19, 2024), www.promarket.org/2024/02/19/taking-stock-of-googles-antitrust-troubles-as-the-world-turns-against-it/.

1  Parties on May 30, 2025.  The Board also approved the terms and conditions of this Settlement

2  and determined that the Settlement is in the best interests of the Company and its stockholders.

3  **II.    PROCESS**

4        10.    On December 4, 2023, I was retained by Plaintiffs' counsel to advise on corporate

5  governance reforms in connection with a potential settlement of this Litigation and to present my

6  opinion on the efficacy of the proposed settlement terms from a governance perspective.

7        11.    Following my engagement by Plaintiffs' counsel, I conducted an extensive analysis

8  of the corporate documentation to evaluate the Board's governance structure and assess the alleged

9  fiduciary duty breaches.  Additionally, I contributed to the development and review of corporate

10  governance reform measures designed for potential inclusion in settlement negotiations.

11        12.    On April 24, 2025, I was asked to evaluate and opine through a formal declaration

12  on the anticipated impact and significance of the corporate governance reforms included in the

13  Settlement.

14        13.    I am compensated for my work on this matter at the rate of $900 per hour.  My

15  compensation is not contingent on the outcome of the Litigation.

16        14.    On July 8, 2025, the Settling Parties appeared before the Court for a settlement

17  fairness hearing ("Settlement Hearing"), and the Court preliminarily approved the Settlement.

18  **III.    ANALYSIS OF SETTLEMENT COMPONENTS**

19        15.    At its core, the Settlement aims to strengthen the Company's adherence to

20  applicable laws and regulations.  To properly evaluate how these reforms benefit the Company

21  and its stockholders, we must examine two critical factors: first, the inherent value the Company

22  gains from enhanced legal and regulatory compliance; and second, how effectively the new

23  governance measures work and the extent to which they represent meaningful improvements over

24  the Company's pre-Litigation compliance framework.

25        16.    The settlement establishes three core governance reforms: (1) Board oversight

26  enhancements; (2) introducing comprehensive management-level compliance reforms; and (3)

27  allocating significant funding to bolster the Company's compliance operations.

28

### A.    Board Oversight Enhancements

17.    The most significant corporate governance element of the Settlement is the establishment of a new dedicated board-level committee called the "Risk and Compliance Committee" ("RCC").

18.    The Company currently maintains four board-level committees: 1) the Audit and Compliance Committee ("ACC"); 2) the Leadership Development, Inclusion and Compensation Committee; 3) the Nominating and Corporate Governance Committee; and 4) the Executive Committee.

19.    Under the Settlement, compliance oversight will be separated from the existing ACC through the establishment of the new RCC.  This separation ensures enhanced focus, independence, and specialized expertise in managing complex regulatory matters and compliance obligations.

20.    The Board will amend the current charter of the ACC to remove the provisions of the charter relating to oversight of certain regulatory and compliance matters and to rename the ACC to be the Audit Committee.

21.    The RCC, and ultimately the Board, will have responsibility for oversight of the various regulatory and compliance matters involving the Company.  Among other things, the RCC shall receive periodic updates on principal risks and compliance enhancement measures, as set out in the RCC's charter.

22.    Establishing a new dedicated board-level risk and compliance committee should significantly strengthen Board oversight by explicitly assigning responsibility for risk and compliance matters.  This structure ensures focused attention on compliance risks, clear oversight responsibilities, and accountability at the highest governance level.

23.    This reform should also strengthen Alphabet's Audit Committee by allowing it to focus exclusively on financial reporting and audit issues, which may have received less attention previously due to the committee's dual responsibility for audit and compliance matters.[5]

---

[5]    "[M]any boards are delegating specific risk oversight duties to standing committees for a more intensive review than the full board can undertake. Depending on the company size and

5

24.     Following the Sarbanes-Oxley Act of 2002, audit committees at large public companies became fully occupied with overseeing financial disclosures.  This financial focus is evident in Alphabet's current ACC charter, where three of the four stated purposes center on monitoring the integrity of the Company's financial statements, external auditor relationships, and internal audit functions.  Only the fourth purpose addresses Alphabet's major risk exposures, "including financial, operational, data privacy and security, competition, legal, regulatory, compliance, civil and human rights, sustainability, and reputational risks."[6]

25.     Additionally, establishing a dedicated board-level RCC signals the Company's strong and ongoing commitment to effective oversight, reinforcing trust among all its stakeholders including customers, employees, suppliers, communities, and stockholders.  This governance enhancement signals that risk management and regulatory compliance are strategic priorities deserving of the highest level of oversight and accountability.

26.     This is not a trivial reform.  This Litigation and its Settlement come after extensive public and private antitrust enforcement activity targeting the Company.  The Plaintiffs allege that Defendants either oversaw the implementation of Google's anticompetitive business practices or were aware of red flags of the Company's unlawful conduct.  Each failed to ensure that the Company was complying with the law.  As a result, the Company has paid billions of dollars in fines and faces significant exposure from pending government and private lawsuits.  The Complaint seeks to hold Defendants liable for their oversight failures.

---

industry, we see boards delegating to various committees' responsibility to support the board's oversight of mission-critical risks, as well as climate; ESG; human capital management; cybersecurity and data governance; legal and regulatory compliance; supply chain; mergers and acquisitions; and more." *Clarifying committee oversight*, KPMG (2022). https://kpmg.com/us/en/board-leadership/articles/2022/clarifying-committee-oversight.html (last visited Aug. 8, 2025).

[6]     *See* Alphabet's Audit and Compliance Committee, available at https://abc.xyz/investor/board-and-governance/acc/.

1        27.     Since at least the landmark opinion of *In re Caremark International Inc. Derivative*

2  *Litigation*,[7] directors must implement and monitor systems for legal compliance.[8]  This duty was

3  reinforced in *Stone ex. Rel. AmSouth Bancorporation v. Ritter*,[9] and more recently in *Marchand v.*

4  *Barnhill*[10] (better known as "*Blue Bell*"), where the Delaware Supreme Court found directors liable

5  for failing to provide adequate oversight in a highly regulated business.

6        28.     Some of the reasons Chancellor Allen provided for recognizing the board's duty of

7  oversight in the Caremark case was "the seriousness with which the corporation law views the role

8  of the corporate board,"[11] the "fact that relevant and timely *information* is an essential predicate

9  for satisfaction of the board's supervisory and monitoring under Section 141,"[12] and the

10  importance of having compliance systems in place so the corporation could receive credit under

11  the federal Organization Sentencing Guidelines.

---

[7]    698 A.2d 959 (Del. Ch. 1996).  It may also be noted that the concept of the duty of oversight traces back to the Delaware Supreme Court's earlier decision in *Graham v. Allis-Chalmers Manufacturing Co.*, 188 A.2d 125 (Del. 1963).  That decision was understood to establish "the protective 'red flags' rule," under which directors could be liable for failing to act only if they were aware of red flags indicating wrongdoing and consciously chose not to act.  *See In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 359 (Del. Ch. 2023) (discussing *Caremark* claims).

[8]    As Chancellor Allen expressed in the *Caremark* opinion: "[I]t would, in my opinion, be a mistake to conclude that . . . corporate boards may satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance." *Caremark*, 698 A.2d at 970.

[9]    911 A.2d 362 (Del. 2006).  In this case, the Delaware Supreme Court adopted the reasoning of *Caremark* as a standard of liability for director oversight and identified two types of *Caremark* claims: a "prong-one" *Caremark* claim (when directors utterly fail to implement any reporting or information system or controls), or a "prong-two" *Caremark* claim (when directors having implemented such a system or controls, consciously fail to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention).

[10]    212 A.3d 805 (Del. 2019).  In this case, the Delaware Supreme Court observed that, while Blue Bell had certain food safety programs in place and "nominally complied with FDA regulations," it "had no [board] committee overseeing food safety, no full board-level process to address food safety issues, and no protocol by which the board was expected to be advised of food safety reports and developments."  This "dearth of any board-level effort at monitoring" the company's risk management supported an inference that the directors had breached their oversight obligations.  To "satisfy their duty of loyalty," the court held, "directors must make a good faith effort to implement an oversight system and then monitor it" themselves.  *Id.* at 809, 821.

[11]    *Caremark*, 698 A.2d at 970.

[12]    *Id.* (emphasis in original).

29.     Thus, courts and regulators increasingly expect boards to actively oversee central compliance risks.  The modern "duty of oversight" requires both the implementation of an effective compliance system and board-level action when red flags arise.

30.     The expectation of board oversight in compliance has emerged from two principal sources: (a) DOJ guidance on corporate compliance programs; and (b) the evolution of fiduciary duties under Delaware's *Caremark* line of case law.

    a)     <u>DOJ Guidance</u>: Since 1991, U.S. authorities have emphasized the importance of corporate compliance, establishing specific expectations for board oversight. The Federal Sentencing Guidelines[13], explicitly require boards to be knowledgeable about and actively oversee compliance programs.  This oversight responsibility encompasses ensuring the compliance function receives adequate resources, authority, and direct reporting access to the board or a board committee.  The Guidelines emphasize that meaningful board involvement can significantly mitigate penalties and improve outcomes when misconduct occurs.  Prosecutors evaluate multiple factors when assessing board effectiveness, including the board's compliance expertise, its level of engagement with compliance officers, and whether it conducts independent sessions to assess risk management and oversight effectiveness.  Separately, the DOJ's *Evaluation of Corporate Compliance Programs*, also emphasizes the role of the board.[14]

---

[13]     U.S. SENT'G GUIDELINES MANUAL ch. 8 (Sentencing of Organizations) §§ 8A–8F (U.S. SENT'G COMM'N 2024), available at https://www.ussc.gov/guidelines/2024-guidelines-manual/annotated-2024-chapter-8#8b21.

[14]     U.S. Dep't of Just. Crim. Div., *Evaluation of Corporate Compliance Programs* (updated Sept. 2024), available at https://www.justice.gov/criminal/criminal-fraud/page/file/937501/dl?inline=.  "The company's top leaders – the board of directors and executives – set the tone for the rest of the company."  In its "*Oversight*" section, it asks: "What compliance expertise has been available on the board of directors?  Have the board of directors and/or external auditors held executive or private sessions with the compliance and control functions? What types of information have the board of directors and senior management examined in their exercise of oversight in the area in which the misconduct occurred?"  And in its "*Autonomy*" section, it asks: "Do the compliance and relevant control functions have direct reporting lines to anyone on the board of directors and/or audit committee? How often do they

8

b) <u>Corporate Law, Oversight Duties</u>: Recent developments in oversight duties, commonly known as *Caremark* claims, have reinforced that identifying, managing, and monitoring key corporate risks constitute fundamental board responsibilities,[15] and courts have explicitly extended these duties to corporate officers as well.[16] Moreover, courts have made clear that generic, one-size-fits-all approaches to oversight are insufficient in today's complex regulatory environment. Boards must now demonstrate tailored, risk-specific oversight that reflects their company's unique circumstances and industry challenges.

31. However, the appropriate level of detail for compliance systems remains a matter of business judgment, as neither DOJ guidance nor corporate law prescribes a specific process for how the board should exercise its compliance oversight. In other words, what constitutes "effective" or sound compliance is not fixed and is ultimately left to the board's discretion in both design and execution. In this context, the board's choice of process may carry significant implications, and one way to demonstrate a robust approach is by establishing a distinct board-level compliance committee.

32. In this case, the creation of a new board-level risk and compliance committee, the RCC, reflects an evolving standard and demonstrates a commitment to independent, specialized, and continuous board-level monitoring.

33. The establishment of a dedicated board-level risk and compliance committee marks an innovative governance approach for technology companies, and a pioneering move within

---

meet with directors? Are members of the senior management present for these meetings? How does the company ensure the independence of the compliance and control personnel?"

[15] For example, some notable cases include: *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188 (Del. Ch. Oct. 1, 2019) (for non-compliance with FDA drug-development protocols); *Hughes v. Xiaoming Hu*, 2020 WL 1987029 (Del. Ch. Apr. 27, 2020) (for non-compliance with financial reporting requirements); *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065 (Del. Ch. Aug. 24, 2020) (for illegal repackaging of cancer-treatment drugs); *In re Boeing Co. Derivative Litig.*, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021) (for non-compliance with plane safety oversight); Ont. Prov. Council Carpenters' Pension Tr. Fund v. Walton ("*Walmart II*"), 2023 WL 3093500 (Del. Ch. Apr. 26, 2023) (for its role in the opioid crisis); and *In re Facebook Inc. Derivative Litigation*, Consol. C.A. No. 2018-0307 (Del. Ch. Apr. 25, 2018) (for non-compliance with data privacy regulations).

[16] *See McDonald's*, 289 A.3d 343 (holding that corporate officers owe a duty of oversight akin to that owed by directors under *Caremark*).

Silicon Valley.  For example, according to Wilson Sonsini's *2024 Silicon Valley 150 Corporate Governance Report*,[17] which examines the governance practices and disclosures of the region's largest public companies by annual revenue, only one SV150 company has established a separate, dedicated board-level compliance committee.

34.    By establishing this new board committee, Alphabet is implementing a significant corporate governance reform that could set a precedent for the broader industry.  As a market leader with substantial market capitalization and recognition as one of the "Magnificent Seven,"[18] Alphabet's governance decisions often influence industry-wide practices and standards.[19]

35.    But creating a separate board-level compliance committee is not unprecedented among public companies, although it remains relatively rare.  An empirical study from 2020 found that although the proportion of firms adopting compliance committees has increased over time, their overall adoption remains limited; for example, between 2004 and 2017, less than 5% of U.S. public companies had established a separate compliance committee, and among S&P 500 companies specifically, the fraction rose modestly from 5.3% to 6.8% during that period.[20]

---

[17]    Wilson Sonsini Goodrich & Rosati, SV150 Corporate Governance Report 2024, https://www.wsgr.com/a/web/hy6MMpQJLCd4ZRNQuuM2YU/sv150_corp_gov_report_2024.pdf (last visited July 17, 2025).

[18]    "The Magnificent 7 stocks are a group of large-cap companies (corporations with large market capitalizations determined by the number of shares times each share's value) in the technology sector, including Alphabet (parent company of Google), Amazon, Apple, Meta Platforms (parent company of Facebook and Instagram), Microsoft, Nvidia, and Tesla.  Due to their size and performance, these stocks accounted for roughly one-third of the S&P 500's total market capitalization at the end of 2024.  They also made up a significant percentage of the market's total 2024 returns but experienced some volatility in early 2025."  Fidelity, What Are the Magnificent 7 Stocks?, FIDELITY (Jan. 26, 2024), https://www.fidelity.com/learning-center/smart-money/magnificent-7-stocks.

[19]    Alphabet is the fourth largest company in the United States measured by market capitalization ($2.368 trillion, according to companiesmarketcap.com, last checked on August 5, 2025) and the second largest company in the SV150 with over $307 billion in sales (2023) (only behind Apple).

[20]    John Armour Min, et al., *Board Compliance*, MINN. L. REV. 3248 (2020), https://scholarship.law.umn.edu/mlr/3248 (hereinafter the "Board Compliance Study").  It's important to note that the authors of this study define a Compliance Committee broadly to include (i) a stand-alone compliance committee, (ii) a "Risk and Compliance Committee," or (iii) restyling an audit committee as "Audit and Compliance" during the relevant period.  They also found that the industries that were the heaviest adopters of Compliance Committees were banking (28%), healthcare (12.46%), pharmaceutical products (12.14%), medical equipment (8.62%), and business services (7.67%).  Why these industries?  "An intuitive explanation is that these industries are all heavily regulated; in most cases some form of compliance program is mandated by substantive regulation."

36.     The Board Compliance Study referenced above suggests three factors that might make a firm choose to implement a board-level compliance committee (when not compelled to do so by prosecutors as part of a DPA or other settlement): (1) heightened compliance activity[21], (2) the availability of capacity among board members[22], and (3) the gradual diffusion of information about Compliance Committees.[23]

37.     These three key factors support establishing a new board-level compliance committee at Alphabet.  First, heightened regulatory scrutiny has intensified due to the increasing number and scope of antitrust and competition law enforcement actions and litigation.  The regulatory environment may become even more complex with the emerging wave of AI regulations.  Given that AI represents the next paradigm shift in the technology industry and Alphabet is widely considered a frontrunner investing billions in this space, establishing robust compliance oversight now is essential for navigating the evolving regulatory landscape and mitigating future enforcement risks.[24]  Second, the Company has independent directors available

---

[21]     "All other things equal, a Compliance Committee would be most useful for companies in which it could complement other large investments in compliance programs.  Where a firm has an extensive compliance program, the compliance oversight intensity a Compliance Committee can deliver would be useful to enhance the effectiveness of that program."  *See* Board Compliance Study at 1243.

[22]     "We might expect that firms with larger boards, and in particular, with more independent directors, would be more likely to establish a Compliance Committee."  *See* Board Compliance Study at 1245.

[23]     "The pattern of Compliance Committee adoption—rare, but gradually increasing over time—is consistent with other types of innovation in corporate governance.  Even if new mechanisms are beneficial, it is costly for boards facing tight time constraints to learn about these benefits.  These learning costs put a brake on the diffusion of new practices.  As a consequence, boards may be more likely to adopt a new innovation of which one or more of their members have prior experience in a different context—for example, through sitting on the board of a different company at which the innovation has been deployed.  Prior studies suggest that interlocking directors (that is, directors who serve on the boards of more than one company concurrently) can function as a transmission mechanism for learning about a range of new corporate governance practices. . . . [I]t may be that directors who have experienced a compliance committee in operation at another company may be a source of information for colleagues about the benefits (or costs) of these bodies."  *See* Board Compliance Study at 1246.

[24]     Alphabet raised its projected 2025 capital expenditures to $85 billion, citing "strong and growing demand for our Cloud products and services" and ongoing infrastructure expansion to support AI-powered technologies.  This revised estimate exceeds the $75 billion projection announced in February and significantly surpasses the $58.84 billion expected by Wall Street at that time.  The increase reflects surging demand for cloud services driven by the rapid adoption of AI across the tech industry.  *See Google's $85 Billion Capital Spend Spurred by Cloud, AI Demand*, CNBC (July 23, 2025), https://www.cnbc.com/2025/07/23/googles-85-billion-capital-spend-spurred-by-cloud-ai-demand.html.

11

1  to serve in this capacity, providing the necessary expertise and governance structure.  Third, clearer

2  regulatory guidance and industry best practices now exist regarding compliance committee scope

3  and responsibilities, offering a proven framework for effective implementation and operation.

4       38.     From a best practice perspective, establishing a compliance oversight function at

5  the board level has been recognized as a significant innovation to improve effective board

6  governance and as a mechanism to elevate the compliance function's importance while enhancing

7  its independence from management.[25]

8       39.     The authors of the Board Compliance Study referenced above reviewed

9  Compliance Committee and Audit Committee charters from a dataset including 6,372 unique U.S.

10  public companies for the period 2004–2017, and they found material differences: "Compliance

11  Committees are expected to engage in much more focused oversight of compliance policies and

12  personnel than typical Audit Committees.  Moreover, interviews with practitioners suggest board

13  members view setting up a Compliance Committee as a significant matter.  Boards work under

14  tight time constraints, and so there is a real opportunity cost to adding a Compliance Committee:

15  time used in staffing this committee must be foregone elsewhere.  Establishing a new committee,

16  it seems, is not a trivial matter."[26]

17       40.     The Board Compliance Study also stated that "where a [Compliance Committee] is

18  established, oversight of compliance is likely to be pursued more vigorously than where this is

19  simply added to the [Audit Committee]'s mandate" and that "a [Compliance Committee] is likely

20  to establish a much clearer, and more tightly controlled, reporting channel to the Board from the

21  company's compliance function than would be the case with an audit committee beyond financial

22  matters."[27]

23

---

24  [25]    *See* Martin Lipton, et al., *Risk Management and the Board of Directors*, Harv. L. Sch.,
Forum on Corp. Governance & Fin. Reg. (Mar. 20, 2018),
25  https://corpgov.law.harvard.edu/2019/11/20/risk-management-and-the-board-of-directors-
7/(describing the board's oversight role).  "The risk oversight function of the board of directors
26  has never been more critical and challenging than it is today.  Rapidly advancing technologies,
new business models, dealmaking and interconnected supply chains continue to add to the
27  complexity of corporate operations and the business risks inherent in those operations."  *See also*
*supra* note 20.
28  [26]    *See* Board Compliance Study at 1221.
   [27]    *See* Board Compliance Study at 1222.

12

1

## B.    Governance Reforms at Management Level

2        41.    The Settlement requires comprehensive management-level compliance reforms as

3    a core obligation.  To meet this requirement, the Company must significantly strengthen its legal

4    and compliance teams, creating the essential infrastructure needed to support both the RCC and

5    the Board in executing their expanded monitoring and oversight duties.

6        42.    Some scholars have argued that the internal compliance function, once viewed as a

7    weak or peripheral actor in corporate governance, has quietly gained significant influence through

8    structural and legal developments.  The expansion of compliance programs, along with regulatory

9    incentives and enforcement policies such as DOJ guidance and settlement agreements, has

10   institutionalized the reporting of misconduct to corporate boards.  This reporting creates a

11   documented trail that courts and regulators can use to show that directors were aware of or

12   consciously disregarded red flags.  As a result, compliance functions now play a central role in

13   exposing board failures and enabling shareholder litigation and regulatory accountability,

14   transforming compliance from a passive function into a powerful mechanism for internal

15   oversight.[28]

16       43.    As discussed above, the meaning of "effective" or sound compliance remains

17   subject to board interpretation and extends to both the structural framework and operational

18   deployment of compliance initiatives.  An optimal compliance program would theoretically be one

19   that minimizes the combined total of misconduct costs and the costs associated with preventing

20   and identifying such misconduct.[29]

21

22   _____

[28]      Stavros Gadinis & Amelia Miazad, *The Hidden Power of Compliance*, 103 MINN. L. REV.
23   2135 (2019).
[29]      Geoffrey P. Miller, *An Economic Analysis of Effective Compliance Programs*, in Research
24   Handbook on Corporate Crime and Financial Misdealing (Jennifer Arlen ed., 2018) (exploring the
     economic meaning of effective compliance programs).  The DOJ's *Evaluation of Corporate*
25   *Compliance Programs* explains that "the Criminal Division does not use any rigid formula to
     assess the effectiveness of corporate compliance programs," recognizing that "each company's
26   risk profile and solutions to reduce its risks warrant particularized evaluation."  Prosecutors make
     "a reasonable, individualized determination in each case" based on factors including the
27   company's size, industry, geographic footprint, regulatory landscape, and other internal and
     external elements that might affect the compliance program.  The DOJ identifies three
28   "fundamental questions" that guide this analysis: (1) Is the corporation's compliance program well
     designed?  (2) Is the program being applied earnestly and in good faith?  In other words, is the

13

44.     The management-level compliance reforms outlined in the Settlement aim to create a robust program that goes beyond a "paper program," as described in the DOJ Guidelines.   To determine a program's effectiveness, one must consider "whether the corporation has provided for a staff sufficient to audit, document, analyze, and utilize the results of the corporation's compliance efforts."[30]

45.     The Settlement introduces two major compliance reforms at the management level of the Company: a) Management Oversight Enhancements, and b) Regulatory Readiness Compliance Enhancements.

    a)  <u>Management Oversight Enhancements</u>: The Settlement introduces the Trust & Compliance Council ("TCC") to assist the RCC to oversee and monitor the Company's compliance regarding Google LLC (including its subsidiaries) and a Trust & Compliance Steering Committee ("TCSC") to support the TCC by providing a forum for cross-functional alignment on significant compliance initiatives and by providing direction on recommendations and escalations to the TCC.   These are important additions to the management-level compliance oversight of Alphabet:

        i.  the establishment of TCC to support the RCC marks a significant advancement in organizational governance.   This Council, comprising multiple Senior Vice Presidents who report directly to the CEO, creates a very strong level of executive accountability and engagement in compliance matters.   By convening quarterly at a minimum, this leadership body ensures that compliance considerations remain at the forefront of strategic decision-making throughout the year.   The TCC mandate extends beyond mere oversight, it serves as a strategic body for

---

program adequately resourced and empowered to function effectively?  And (3) does the program work in practice?  *See supra* note 14.

[30]     *The US Department of Justice Guidance: The DOJ's Three-Pronged Evaluation Framework for Corporate Compliance Programs*, Fin. Crime Acad. (July 23, 2025), https://financialcrimeacademy.org/the-us-department-of-justice-guidance/.

compliance initiatives, recognizing that effective compliance requires comprehensive frameworks that anticipate challenges, prioritize risks intelligently, and allocate resources where they can deliver maximum protective value;

ii.   the creation of the TCSC represents an additional layer of operational compliance management.  By bringing together vice presidents from across functional areas and Product Areas ("PAs"), this committee creates essential cross-functional alignment that breaks down traditional silos and ensures that compliance initiatives are integrated seamlessly across Alphabet.  Meeting at least six times annually, the committee demonstrates a dedication to continuous engagement and proactive management of compliance challenges while serving as the vital bridge between operational realities and executive strategy;

iii.  the integration of these two bodies creates an extra oversight ecosystem at the management-level.  The TCC provides high-level guidance and resource allocation decisions, while the TCSC ensures that initiatives are practically implementable and aligned across functional boundaries; and

iv.   the regular meeting cadence of both bodies ensures that compliance considerations remain current and relevant, while the senior-level participation demonstrates to the entire organization that compliance is a top priority worthy of executive attention and resources.

b)   <u>Regulatory Readiness Compliance Enhancements</u>: These management-level reforms seek to bolster the Company's commitment to implementing a risk-based, cross-company, global compliance strategy.  This risk-based approach ensures that compliance investments generate maximum value by focusing on

15

areas where regulatory exposure is highest and business impact is most significant. For example, the Settlement requires and/or mandates:

    i.    the Company to embed specialists into its compliance function to proactively identify and address emerging regulatory risks, particularly in competition law. The arrangement creates an early-warning system that transforms compliance from reactive to preventive, ensuring management has dedicated expertise to anticipate regulatory changes and mitigate potential violations before they occur;

    ii.    a comprehensive compliance strategy that spans the entire global organization and prioritizes risks based on their potential impact. The approach requires systematic analysis of existing compliance measures while ensuring all products and services are designed to minimize regulatory exposure;

    iii.    the compliance function must be staffed with qualified professionals who possess the necessary expertise, resources, and authority to effectively perform their duties. It requires these individuals to actively collaborate with PAs and other business functions to evaluate existing compliance measures and design new ones as needed;

    iv.    the compliance function must work directly with product and business teams across all PAs, with engineers, product managers, and other staff actively supporting compliance enhancement projects. It embeds compliance considerations into operational teams rather than keeping them siloed, ensuring regulatory requirements are integrated into actual product development and business processes through collaborative partnerships;

    v.    the compliance function must collaborate with six specialized teams when addressing regulatory risks: (1) Legal Advising (translating legal

requirements into actionable compliance designs); (2) Risk Frameworks & Standards (maintaining enterprise risk management and training programs); (3) Compliance Program Management (centralizing regulatory obligations and creating scalable processes); (4) Compliance Policy (drafting policies and advising PAs); (5) Governance Operations (managing compliance forums, including the TCC and TCSC, and performance metrics); and (6) Assurance (monitoring and testing control effectiveness). Together, these teams create an integrated approach that spans legal analysis, risk management, policy development, governance oversight, and performance monitoring; and

vi. a comprehensive risk-based compliance framework that incorporates DOJ guidance[31] and industry best practices across 12 key components: Risk Assessment (categorizing risks as high/moderate/low), Policies & Training (articulating rules and promoting compliance culture), Commitments & Contracts (overseeing third-party processes), Processes & Controls (implementing preventative, detective, and remedial controls), Systems for Reporting Non-Compliance (internal monitoring and anonymous reporting mechanisms), Internal Complaints & Appeals (timely complaint processing), Third-Party Management (due diligence and integration), and Reporting & Transparency (accurate regulatory disclosure). The framework requires centralized documentation, oversight throughout all compliance phases, and aims not only to minimize regulatory risk but also to promote transparency, audit effectiveness, and user trust.

---

[31] Citing the DOJ's guidance for evaluating the effectiveness of a compliance program, as in effect at the time of the Settlement. *See supra* note 14.

17

C.    **Substantial Funding Commitment**

46.    The Settlement includes a binding financial commitment of at least $500 million over the next decade dedicated to compliance and oversight efforts.  Such a commitment provides critical resources for enhancing compliance programs, hiring specialized compliance personnel, leveraging technological solutions for monitoring and risk detection, and ensuring continuous training and education for employees, management, and board-level oversight.

47.    This historic half-a-billion-dollar funding commitment underscores the Company's seriousness regarding compliance oversight and significantly mitigates future risks by investing proactively rather than reactively.

48.    The funding commitment should be viewed as a strategic corporate investment rather than just a cost to the Company.  It reinforces internal controls and governance structures, supporting directors' and officers' fiduciary duties while reducing the risk of litigation, regulatory sanctions, reputational harm, and oversight failures.  Beyond risk mitigation, the investment enhances operational efficiency by improving processes and decision-making frameworks, ultimately yielding measurable returns through cost savings and competitive advantage.

49.    Most critically, this proactive approach functions as high-value insurance against future legal costs.  Delaware jurisprudence consistently demonstrates that documented, good-faith compliance efforts substantially reduce director liability exposure and generate positive returns through reduced litigation costs and settlement amounts, enhanced stakeholder confidence and trust, and strengthened regulatory relationships.

50.    Moreover, some scholars argue that corporate compliance should no longer be seen solely as a defensive tool for reducing legal liability.  Instead, they propose a new framework that positions compliance as a meaningful driver of firm revenue and strategic value.  This shift reframes compliance from a reactive function to a proactive business asset.  Using real-world examples, they show how companies leverage compliance to meet societal expectations, enhance reputational capital, and navigate complex regulatory environments.  This reconceptualization

1    expands the academic lens on compliance and provides business leaders with a practical roadmap

2    for embedding it into core strategy.[32]

3        51.    These same authors showed in an earlier study that consumers place substantial

4    importance on effective compliance programs, often valuing them more than conventional product

5    features, and are willing to pay a premium for products from companies perceived to comply with

6    privacy, environmental, or labor standards.  Their findings indicate that the value consumers assign

7    to compliance varies by context and product category, suggesting that strong compliance can

8    enhance a company's competitive position.  By linking compliance to measurable financial

9    outcomes, the authors provide both theoretical insights and practical guidance for integrating

10   compliance into corporate strategy and governance.[33]

11       52.    In this case, the Settlement's funding commitment would rank as the second largest

12   derivative lawsuit settlement on record, according to *D&O Diary*.[34]  This industry publication

13   tracks major derivative settlements, identifying 33 cases between 2005 and 2025 with payouts of

14   at least $62.5 million.  The top 10 settlements range from $735 million (Tesla Board Compensation

15   Derivative Litigation) to $180 million (FirstEnergy Corp. case).[35]

16       53.    Other industry analyses of large derivative suit settlements report similar figures.

17   "[L]arge dollar settlements related to derivative suits seem to be on the rise.  The graphic below

18

19

20

---

21   [32]    "Aptly termed *offensive compliance*, companies can use this framework to gain market

22   share in competitive environments.  By doing so, they unlock benefits for all corporate
     stakeholders and create a new landscape for legal and business scholars to explore.  Ultimately,

23   offensive compliance as we conceptualize it is an argument for a robust compliance function in
     every company, a gain for all."  *See* Suneal Bedi & Todd Haugh, *Retheorizing Corporate*

24   *Compliance*, U.C. DAVIS L. REV., forthcoming (Apr. 21, 2025), available at SSRN:
     https://ssrn.com/abstract=5224592.

25   [33]    Todd Haugh & Suneal Bedi, *Valuing Corporate Compliance*, 109 IOWA L. REV. 541
     (2024).

26   [34]    Kevin LaCroix, *Alphabet Settles Antitrust-Related Derivative Suit for $500 Million*, D&O
     DIARY (June 10, 2025), https://www.dandodiary.com/2025/06/articles/shareholders-derivative-

27   litigation/alphabet-settles-antitrust-related-derivative-suit-for-500-million/.
     [35]    Kevin LaCroix, *Largest Derivative Lawsuit Settlements*, D&O Diary (Dec. 5, 2014),

28   https://www.dandodiary.com/2014/12/articles/shareholders-derivative-litigation/largest-
     derivative-lawsuit-settlements/.

1  visually confirms that, compared to a decade ago, we are seeing more large dollar derivative suit

2  settlements."[36]



16      54.     While not the first derivative litigation settlement to include a substantial funding

commitment, this Settlement stands out as the largest to date by a significant margin.  Other notable

examples include: (1) a $310 million commitment over up to 10 years to support workplace

initiatives focused on diversity, equity, and inclusion (also by Alphabet);[37] (2) a $117 million

commitment to be spent on third-party programs designed to prevent underage use of tobacco and

nicotine delivery system products;[38] (3) a $90 million commitment over five years to prevent

sexual harassment, sexual misconduct, discrimination, and retaliation with the goal of improving

and fostering a safe, inclusive, and equitable culture at the company;[39] (4) a $75 million

---

[36]    Priya Cherian Huskins, *Large derivative suit settlements and your Side A D&O insurance*, WOODRUFF SAWYER (Oct. 2, 2024).  https://woodruffsawyer.com/insights/derivative-suit-settlements-side-a.
[37]    *In re Alphabet S'holder Derivative Litig.*, No. 19CV341522 (Cal. Super. Ct. Santa Clara Cnty. Nov. 30, 2020).
[38]    *In re Altria Grp. Inc. Derivative Litig.*, No. 3:20-cv-00772 (E.D. Va. Feb. 20, 2023).
[39]    *Rudi v. Wexner*, No. 2:20-cv-03068 (S.D. Ohio July 30, 2021).

20

DECLARATION OF EVAN EPSTEIN IN SUPPORT OF CO-LEAD PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES
CONSOL. CASE NO.: 3:21-cv-9388-RFL

1 commitment over a five-year period to be devoted to the establishment and operation of a new

2 board-level regulatory and compliance committee, in addition to the ongoing compliance

3 expenditures that the company was spending annually;[40] and (5) a $50 million, multi-year funding

4 requirement to spend for the creation, implementation, and maintenance of reforms of the

5 company's culture through leadership, DEI initiatives, pay equity assessments, and external

6 accountability.[41]

7 **IV.    REASONABLENESS AND FAIRNESS OF THE SETTLEMENT**

8 55.    The Settlement fairly and adequately addresses Plaintiffs' oversight allegations by

9 establishing a comprehensive compliance oversight framework.   It provides meaningful,

10 immediate, and long-term structural and financial improvements that align with best practices and

11 standards of corporate governance.

12 56.    Litigation uncertainties, including the high bar Plaintiffs face in prevailing on

13 *Caremark* claims, further underscore the Settlement's reasonableness as it achieves tangible

14 governance reforms without the protracted uncertainties of litigation.

15 57.    The Settlement directly addresses the oversight failures alleged, demonstrating

16 responsiveness to stockholder concerns and reflecting a meaningful commitment to improved

17 corporate governance.

18 **V.    CONCLUSION**

19 58.    In my opinion the Settlement significantly enhances the Company's governance

20 and compliance structures, addresses the alleged *Caremark* deficiencies, and establishes a strong

21 foundation for future corporate oversight.

22 59.    For all these reasons, I believe the Settlement is fair, reasonable, and in the best

23 interests of the Company and its stockholders.

24

25

26

[40]    *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 331, 341 (S.D.N.Y. Apr. 29, 2011), although in this case the funding was provided by the company's insurers.
[41]    *In re Pinterest Derivative Litig.*, No. 3:20-cv-08331-WHA (N.D. Cal. Nov. 25, 2020) (settlement approved June 9, 2022).

1    I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3    Executed on August 11, 2025, at San Francisco, California

4

5                                        EVAN EPSTEIN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF EVAN EPSTEIN IN SUPPORT OF CO-LEAD PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF
SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on August 15, 2025, I authorized the electronic filing of the foregoing

3    with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4    to the e-mail addresses denoted on the Electronic Mail Notice List.  All parties not so registered

5    will be served via e-mail or U.S. Mail.

6          Executed on August 15, 2025, at New York, New York.

7                                     /s/ Jing-Li Yu
                                  JING-LI YU (CA Bar No. 342985)
8                                  SCOTT+SCOTT ATTORNEYS AT LAW LLP

9                                  *Counsel for Co-Lead Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**EVAN M. EPSTEIN**

+1 (650) 353-0184
epsteinevan@uclawsf.edu

200 McAllister St.,
San Francisco, CA 94102

## EDUCATION

**Stanford Law School,** Stanford, California. Master of Laws (LLM) in Corporate Governance & Practice, May 2005
**Pontificia Universidad Católica de Chile School of Law** Santiago, Chile. Law Degree (LLB) (cum laude) December 2002
**Sciences-Po** Paris, France. Exchange Program "Cycle du Diplôme", January - July 2001

## PROFESSIONAL EXPERIENCE

**University of California College of the Law, San Francisco (formerly UC Hastings).** SF, CA. *April 2020 – Present*.
- Founding Executive Director, Center for Business Law & Adjunct Professor of Law (Teaching Corporate Governance Seminar Law 678*21-25SP since Spring 2021)
Launched the following programs and research projects:
- VC-Backed Board Academy (VCBA) Delivered twice per year in San Francisco and New York City
- Startup Litigation Digest Quarterly publication on private company startup litigation
- CBL Scholars Program
- CBL Roundtable on Financial Policy & Regulation

**Stanford Graduate School of Business**. Stanford, CA. *April 2025-Present.*

- Lecturer in Management (Spring 2025). Managerial Accounting: Performance Measurement, Compensation, and Corporate Governance. ACCT 317. Class for MBA students.

**Boardroom Governance Podcast and Newsletter**. San Francisco, CA.
- Host, Boardroom Governance Podcast (launched 5/2020). Currently 182 episodes, ranked #1 in its category.
- Author, Boardroom Governance Newsletter (launched 6/2020). Currently 67 editions.

**Pacifica Global Corporate Governance.** San Francisco, CA. *October 2017 – Present*.
Founder & Managing Partner. Advisory firm focused on solving complex corporate governance conflicts and challenges.
- Board Training, in partnership with Nasdaq, for IDB Invest (the private sector arm of the IDB Group) Spring 2025
- Counsel to board of a professional services firm on board dispute to renominate independent directors
- Consulting expert in derivative litigation involving major Big Tech Silicon Valley company. N.D. Cal.
- Consulting expert in co-founder dispute in unicorn company. SF Superior Court.
- Advised employees of unicorn company on comp dispute involving stock options.
- Expert witness in corporate governance litigation involving a closely held corporation in CA's Central Valley.
- Advised early-stage investor in recap involving VC-backed Silicon Valley company.
- Consulting expert in co-founder dispute of venture-backed company litigation. Alameda County Superior Court.
- Consulting expert in breach of fiduciary duty case involving major Silicon Valley public company. U.S. District Court
- Consulting expert to founder/CEO in litigation of VC-backed company. SF Superior Court.
- Advised CEO of CORFO in governance dispute with controlling shareholder of major NYSE listed company
- Advisor to MaRS Discovery District (Toronto, Canada) on corporate governance matters for portfolio companies.

**The Rock Center for Corporate Governance, Stanford University,** Stanford, CA. *2009-2018.*
Executive Director – *Apr 2012- Sept 2017:* Managed a portfolio of executive education programs, fellowships, affiliate programs, seminars, classes, and conferences in the U.S. and internationally. Co-founded and co-directed:
- Stanford/NVCA Venture Capital Symposium
- Guide to VC-backed Board Membership, co-developed with Andreessen Horowitz
- Directors' College for Venture-Backed Company Directors (VCDC)
- Stanford's Cyberday: Cybersecurity for Directors & Senior Executives
- Rock Center International Programs, including in China (NASDAQ), Hong Kong (CEG), Singapore (Temasek), Canada (Rotman School of Management), Mexico (ITAM & EGADE), Chile (PUC) and Brazil (FGV & IBGC).
- Co-Chair of Rock Center International Advisory Council.
Also significantly contributed to the development of other programs such as Directors' College, Directors' Consortium (jointly with the Stanford Graduate School of Business), the Stanford Institutional Investors' Forum (SIIF) and Fiduciary College.
Associate Director – *Sept 2009- Apr 2012.*

**Stanford Law School,** Stanford, CA.
Lecturer-in-Law. *"Deals in Latin America"* LAW 755 Stanford Law School.

**Pontificia Universidad Católica de Chile Law School**, Santiago, Chile. *2011-2022.*
Professor. *"Global Corporate Governance and Business Strategy"* class taught at PUC Law School

**Girvan Institute of Technology** Santa Clara, CA. *March 2006- Sept 2009.*
Chief Operating Officer: Girvan was a high-tech business incubator and consulting firm chartered to facilitate the transfer, development and commercialization of technologies and to foster the growth of early-stage high-tech companies.

**Morales, Noguera, Valdivieso & Besa,** Santiago, Chile. *November 2002 – July 2004.*
<u>Associate.</u> Corporate practice including M&A and corporate governance legal representation.

**Allen & Overy LLP,** Paris, France.  *July 2001 - November 2001.*
<u>Trainee (*Stagiaire*)</u> Latin America Projects Group.

<u>**LANGUAGES**</u>: Spanish (fluent), English (fluent), French (fluent).

<u>**PROFESSIONAL LICENSE:**</u> Admitted to practice law in Chile (2003) and California (2008).

<u>**ADDITIONAL INFORMATION**</u>:

- Authored "<u>Navigating Startup Litigation: Essential Lessons for Board Members,</u>" Board Recruitment Magazine (Board Prospects), July 2025.
- Co-authored "<u>What It Takes to Lead in the Boardroom: Insights for Prospective Directors</u>" *The Harvard Law School Corporate Governance Forum* (July 2025)
- Guest Speaker, Santa Clara University Black Corporate Board Readiness Program (June 2025)
- Presenter, "Corporate Governance Trends from Silicon Valley," CESA, Chapter Mexico. Mexico City (June 2025)
- Moderator, <u>Who Governs AI? Inside the Rise of a New Empire</u> with author Karen Hao at Stanford GSB (May 2025)
- Guest Speaker, Nasdaq + Wharton Alumni for Boards, "Board Culture and Effectiveness Session" (April 2025)
- Speaker, Global Governance Pulse Forum, Nasdaq MarketSite, New York City (October 2024)
- Keynote Speaker, 25th Annual Summit, IBGC, São Paulo, Brazil (October 2024)
- Keynote speaker, EY Board Strategy Summit, Nasdaq MarketSite, New York City (May 2024)
- Honoree, Named one of the most influential leaders in corporate governance, <u>NACD Directorship 100™</u>, National Association of Corporate Directors (2023)
- Featured Guest, Diligent Institute' *Corporate Director Podcast*: <u>Trends in VC-backed company governance</u> (June '23)
- Faculty, <u>Independent Director Initiative</u>, Berkeley Law (August 2022)
- Co-Chair, Board of <u>Chile California Council</u> (since June 2022)
- Board Member, <u>Best Practice Principles (BPP) Oversight Committee</u>, Proxy Advisory Industry (January 2022)
- Faculty, Latino Corporate Director Association (<u>LCDA</u>) BoardReady Institute (BRI)
- Featured Guest, *Boardroom Bound Podcast*, <u>Episode #173 Board Governance & Composition</u>
- Guest Speaker, OECD Latin America Roundtable on Corporate Governance and OECD Blockchain Forums
- Guest Speaker, National Association of Corporate Directors (<u>NACD</u>), Northern California Chapter
- Guest Lecturer, Colegio de Estudios Superiores de Administración (<u>CESA</u>), Bogotá, Colombia
- Guest Lecturer, European Confederation of Directors' Associations (<u>ecoDa</u>) EU Director Training
- Member of Advisory Board, Silicon Valley Directors' Exchange (<u>SVDX</u>) (2013-2017)

<u>**LIST OF CASES:**</u> Retained as expert in U.S. corporate governance litigation.

- In re Alphabet Inc. Shareholder Derivative Litig., Consol. C.A. No. 5:21-cv-09388 (N.D. Cal.)
- Erica Johnson v. Alyson Friedensohn, et al. CGC-19-580960 (Ca. Sup. Ct.)
- Dompe v. Stewart & Jasper Orchards, et al., Case No. CV-20-004626, Stanislaus County Superior Court.
- Albietz v. One More Cloud, Inc., Case No. RG17853569, Alameda County Superior Court.
- Atinar Capital II, LLC, et al. v. Aida Alvarez, et al., No. CGC-17-559515, San Francisco County Superior Court.
- In re Facebook Shareholder Derivative Privacy Litigation, U.S. District Court Case No.18-cv-1792-HSG.
- Kerrigan Capital, et al. v. David Strohm, et al. Case No. CIV53443, San Mateo Superior Court.