# EXHIBIT D

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
PATRICK COUGHLIN (CA Bar No. 111070)
MAXWELL R. HUFFMAN (CA Bar No. 264687)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
pcoughlin@scott-scott.com
mhuffman@scott-scott.com

*Lead Attorneys for Co-Lead Plaintiff Police and Fire Retirement System of the City of Detroit and Co-Lead Plaintiff Bucks County Employees' Retirement System*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED<br>Case No.: 3:21-cv-9388-RFL<br><br>**DECLARATION OF DARYL F. SCOTT ON BEHALF OF SCOTT+SCOTT ATTORNEYS AT LAW LLP IN SUPPORT OF APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>Hon. Rita F. Lin, U.S.D.J. |

I, Daryl F. Scott, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I am a partner with the law firm of Scott+Scott Attorneys at Law LLP ("Scott+Scott" or the "Firm").[1]  I submit this declaration (the "Declaration") in support of the Firm's application for an award of attorneys' fees and payment of certain litigation expenses and charges ("Expenses") incurred in connection with the proposed Settlement of the above-captioned consolidated action (the "Action").

2.      The Firm serves as counsel for Co-Lead Plaintiffs Police and Fire Retirement System of the City of Detroit ("Detroit") and Bucks County Employees' Retirement System ("Bucks County," and collectively with Detroit, the "Co-Lead Plaintiffs") in the Action.

3.      I respectfully submit this Declaration in support of Co-Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses in connection with the proposed Settlement.

4.      The information contained in this Declaration is taken from time and expense records prepared and maintained by Scott+Scott in the ordinary course of business.  The information was prepared by my staff and reviewed by me.  The purpose of the review was to confirm the accuracy of, and the necessity for, the time and expenses committed to the Action.  In conducting my review, I exercised billing judgment and reduced time entries and expense items. I believe the time (reflected in the Firm's lodestar) and the expenses for which payment is sought, were reasonable and necessary in the effective prosecution and settlement of this Action.

5.      The attorneys and professional staff at Scott+Scott recorded 37,543 hours in connection with the prosecution and settlement of this Action from the inception of the matter through July 7, 2025.

6.      Based upon the number of hours spent on this case by the Firm, the lodestar amount for attorney and professional staff time based on the Firm's current hourly rates is $34,321,973.

7.      A breakdown of the Firm's attorneys and staff who worked on the Action, the hours they expended on this Action from the inception of the matter through July 7, 2025, and their current hourly rates is as follows:

---

[1]      Unless otherwise defined herein, all capitalized terms have the same meaning given to them in the filed Joint Stipulation and Agreement of Settlement dated May 30, 2025 (the "Settlement"). *See generally* ECF No. 87-1.

| PROFESSIONAL | STATUS | HOURLY RATE | TOTAL HOURS | LODESTAR | |
|---|---|---|---|---|---|
| Broggi, Donald | P | $1,900 | 550.10 | $ | 1,045,190.00 |
| Burnett, Michael | P | $1,400 | 45.10 | $ | 63,140.00 |
| Cunningham, Hal | P | $895 | 334.70 | $ | 299,556.50 |
| Huffman, Maxwell | P | $1,150 | 151.20 | $ | 173,880.00 |
| Johnson, Geoffrey | P | $1,575 | 4,242.70 | $ | 6,682,252.50 |
| Medici, Carmen | P | $1,150 | 88.80 | $ | 102,120.00 |
| Reliford, Justin | P | $1,150 | 148.50 | $ | 170,775.00 |
| Yu, Jing-Li | P | $1,145 | 2,697.60 | $ | 3,088,752.00 |
| Coughlin, Patrick | OC | $2,050 | 2,051.50 | $ | 4,205,575.00 |
| Pettigrew, Joseph | OC | $875 | 22.00 | $ | 19,250.00 |
| Jacobsen, Scott | A | $675 | 197.90 | $ | 133,582.50 |
| Outwater, Alex | A | $875 | 990.90 | $ | 867,037.50 |
| Balding, Stephen | SA | $525 | 1,486.90 | $ | 780,622.50 |
| Fay, Alexandra | SA | $525 | 434.70 | $ | 228,217.50 |
| Frenkel, Andrew | SA | $525 | 385.70 | $ | 202,492.50 |
| Groisman, Diego | SA | $650 | 1,661.70 | $ | 1,080,105.00 |
| Kim, Sun | SA | $700 | 2,776.00 | $ | 1,943,200.00 |
| Oh, Esther | SA | $700 | 1,824.60 | $ | 1,277,220.00 |
| Radfar, Naheed | SA | $700 | 1,961.70 | $ | 1,373,190.00 |
| Ryu, Wendy | SA | $720 | 6,627.90 | $ | 4,772,088.00 |
| Sakthivel, Ravi | SA | $700 | 480.00 | $ | 336,000.00 |
| Shankar, Vinod | SA | $700 | 1,531.30 | $ | 1,071,910.00 |
| Shearin, Robyn | SA | $700 | 851.70 | $ | 596,190.00 |
| Sun, Jinghui | SA | $550 | 126.00 | $ | 69,300.00 |
| Weiss, Darrin | SA | $650 | 5,243.60 | $ | 3,408,340.00 |
| Zapf, Brandon | SA | $700 | 218.30 | $ | 152,810.00 |
| Waligurski, Mara | PL | $435 | 64.00 | $ | 27,840.00 |
| West, Allen | PL | $435 | 347.90 | $ | 151,336.50 |
| **TOTAL** | | | **37,543.00** | **$** | **34,321,973.00** |

(P) Partner
(OC) Of Counsel
(A) Associate
(SA) Staff Attorney
(PL) Paralegal


    8.    The above schedule was prepared from contemporaneous daily time records regularly prepared and maintained by the Firm.

2

9.      All of the work performed by Scott+Scott was reasonably necessary in the prosecution of this Action.  Separate declarations by Patrick J. Coughlin, Geoffrey M. Johnson, and Jing-Li Yu have been submitted, describing their work as the primary litigators of this case. Mr. Yu's declaration also describes the work of the team of staff attorneys and professional staff.

10.    The qualifications and backgrounds of the attorneys identified in the previous Paragraph are provided in the Firm's résumé, which is attached as Exhibit 1 hereto.

11.    Scott+Scott's hourly rates are reasonable for several reasons.  ***First***, Scott+Scott's hourly rates are its standard hourly rates.

12.    ***Second***, Scott+Scott's hourly rates are reasonable in light of the Firm's highly specialized skill and experience when it comes to litigating and settling shareholder derivative litigation.   Scott+Scott has extensive experience litigating large and significant shareholder derivative lawsuits.  Several examples include:

- *Irving Firemen's Relief & Ret. Fund v. Lawrence Page*, No. 2019-0355 (Del. Ch.) (shareholder derivative action arising from a culture of sexual harassment at Google, which resulted in a settlement with a $310 million funding component and substantial corporate reforms);

- *In re Altria S'holder Derivative Litig.*, Case No. 3:20-cv-00772 (E.D. Va.) (served as co-lead counsel in shareholder derivative action arising out of alleged scheme to market e-vaping cigarettes to minors); and

- *Rudi v. Wexner*, Case No. 2:20-cv-03068 (S.D. Oh.) (served as lead counsel in a shareholder derivative action arising out of alleged sexual harassment at L Brands, Inc.).

13.    ***Third***, Scott+Scott's hourly rates are consistent with the rates for similar services by lawyers of reasonably comparable skill, experience, and national reputation.

14.    ***Fourth***, Scott+Scott has special expertise when it comes to litigating shareholder derivative cases, and courts across the country have approved the Firm's fees at its standard hourly rates.  *See, e.g.*, *Irving Firemen's Relief & Ret. Fund v. Lawrence Page*, No. 2019-0355 (Del. Ch.) (approving Scott+Scott's fee request based on hours billed at Firm's standard hourly rates, which

3

DECLARATION OF DARYL F. SCOTT IN SUPPORT OF CO-LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATION
CONSOL. CASE NO.: 3:21-cv-9388-RFL

1  ranged from $725 for associates to $1,295 for partners); Transcript of Hearing to Approval

2  Settlement and Award of Fees and Expenses and the Court's Rulings at 18–19, *In re Santander*

3  *Consumer USA Holdings, Inc. Derivative Litig.*, Case No. 11614 (Del. Ch. Feb. 11, 2021)

4  (approving Scott+Scott's requested fee based on Firm's standard hourly rates and stating that "the

5  lodestar amount – though we don't typically rely simply on the lodestar because it may create

6  pernicious incentives – the lodestar figure here and the multiplier it implies is at the very low end

7  and could justify a higher fee") (a true and correct copy of the transcript is attached hereto as

8  Exhibit 2); *Buffalo Grove Police Pension Fund v. Diefenderfer*, No. 2:19-cv-00062 (E.D. Pa. 2019)

9  (approving Scott+Scott's requested fee award based on hours billed at Firm's standard hourly

10  rates); *In re Lannett Corp. S'holder Derivative Litig.*, Case No. 1:19-cv-00888 (D. Del. 2020)

11  (approving Scott+Scott's fee request based on hours billed at Firm's standard hourly rates).

12      15.     *Fifth*, the implied hourly rate based on Scott+Scott's billing rates falls well within

13  the range of those approved by the Delaware Court of Chancery, which has a national recognition

14  for its expertise in corporate and shareholder litigation. Because Scott+Scott actively litigates

15  shareholder derivative and class action litigation in the Delaware Court of Chancery, I believe

16  that the hourly rates approved in this venue serve as a meaningful gauge of the market value for

17  the Firm's services. Indeed, the hourly rates by the Firm, when viewed on an "implied" rate

18  basis, fall well within the range of those that have been approved by the Delaware Court of

19  Chancery. For example, the Delaware Court of Chancery recently approved Scott+Scott's

20  requested fee in *Irving Firemen's Relief & Ret. Fund v. Lawrence Page*, No. 2019-0355 (Del Ch.

21  2020). There, Scott+Scott had a 3.9x multiplier on its lodestar and an implied hourly rate of

22  $4,049. *Page* is particularly analogous because it was a shareholder derivative action arising from

23  a culture of sexual harassment at Google that resulted in a settlement of substantial corporate

24  governance reforms.

25      16.     Based on records maintained by the Firm, Scott+Scott incurred a total of

26  $448,645.47 in unreimbursed expenses in connection with the prosecution and settlement of this

27  Action, which are being paid from the total Fee and Expense Award. The expenses are broken

28  down as follows:

4

DECLARATION OF DARYL F. SCOTT IN SUPPORT OF CO-LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATION
CONSOL. CASE NO.: 3:21-cv-9388-RFL

| EXPENSE | AMOUNT |
|---|---|
| Filings, Court, & Service of Process | $3,670.00 |
| Courier, FedEx, UPS | $875.87 |
| Deposition Reporting & Transcripts | $21,242.84 |
| Experts | $106,237.08 |
| Electronic Discovery Platform | $108,921.11 |
| Online Legal Research | $3,900.08 |
| Photocopies & Printing | $9,227.39 |
| Transportation, Hotels, & Meals | $63,738.94 |
| Mediation | $130,335.00 |
| Telephone | $497.16 |
| **TOTAL** | **$448,645.47** |

17.    The expenses incurred in this Action are reflected in the books and records of the Firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  These expenses were reasonably necessary in the prosecution and settlement of this Action.

18.    Courts have typically found that these kinds of expenses are payable to counsel who create a benefit for shareholders.

19.    The Firm undertook this litigation on an entirely contingent basis and has not been paid for any of its work, nor have any of its costs or Expenses been reimbursed.   The Firm undertook this Action with the expectation that it would devote significant time and resources to complex factual and legal issues, without any guarantee of success or compensation.  The prosecution of this Action required substantial attorney and staff time as well as significant litigation expenses, for which the Firm received no compensation during the course of litigation.

20.    This Declaration provides the Court with time only through July 7, 2025. Accordingly, this Declaration does not encompass time incurred from July 8, 2025 through present.  Also, this Declaration does not include time spent on preparing this application for an award of attorneys' fees.

I declare under penalty of perjury, that to the best of my knowledge, the foregoing is true and accurate.  If required by the Court, I am fully prepared to testify and confirm the accuracy of these facts.

1

Executed in Richmond, Virginia, on August 15, 2025.

2

3

DARYL F. SCOTT

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2   I hereby certify that on August 15, 2025, I authorized the electronic filing of the foregoing

3 with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4 to the e-mail addresses denoted on the Electronic Mail Notice List.  All parties not so registered

5 will be served via e-mail or U.S. Mail.

6   Executed on August 15, 2025, at New York, New York.

7          /s/ Jing-Li Yu

           JING-LI YU (CA Bar No. 342985)

8           SCOTT+SCOTT ATTORNEYS AT LAW LLP

9           *Counsel for Co-Lead Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DARYL F. SCOTT IN SUPPORT OF CO-LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATION
CONSOL. CASE NO.: 3:21-cv-9388-RFL

# EXHIBIT 1



# FIRM RESUME

SCOTT
+
SCOTT

Scott+Scott specializes in the investigation and prosecution of complex actions across the globe – recovering billions for its clients.  The Firm has extensive experience litigating securities fraud, antitrust, consumer and other complex cases and is a pioneer in structured finance monitoring for client portfolios. We represent individual, institutional, and multinational clients in the United States, United Kingdom, and European courts, offering a one-stop shop for international recoupment.

SCOTT
+
SCOTT

# THE FIRM

Scott+Scott was founded in 1975 and began its securities litigation practice in 1997.  The Firm has since grown into one of the most respected U.S.-based law firms specializing in the investigation and prosecution of complex securities, antitrust and other commercial actions in both the United States and Europe.  Today, the Firm is comprised of more than 135 team members, including more than 100 attorneys supported by a seasoned staff of paralegals, IT and document management professionals, financial analysts, and in-house investigators.

Scott+Scott's largest offices are in New York, N.Y. and San Diego, C.A., with additional U.S. offices located in Connecticut, Arizona, Delaware, Nebraska, Ohio, Texas, and Virginia.  The Firm's European offices are currently located in London, Amsterdam, and Berlin.

Scott+Scott has extensive experience litigating cases on behalf of our institutional and individual clients throughout the United States, having served as court-appointed lead or co-lead counsel in numerous securities, antitrust, and consumer class actions, as well derivative and other complex proceedings, in both state and federal courts.  The Firm also represents large investors and numerous corporations in commercial and other litigation in courts within the European Union (EU) and the United Kingdom.

Scott+Scott's attorneys are recognized experts and leaders in complex litigation and corporate governance.  They have been regular speakers on CLE panels as well as at institutional investor educational conferences around the world and before boards of directors and trustees responsible for managing institutional investments.  Scott+Scott attorneys educate institutional investors and governmental entities on the importance of fulfilling fiduciary obligations through the adoption of appropriate asset recovery services, as well as through the development and enforcement of corporate governance initiatives.  The Firm's vast experience in structured debt financial litigation has also enabled us to provide clients with in-depth monitoring of their structured finance products, which often come with substantial undisclosed risks due to investors' limited ability to assess what they are acquiring.  The Firm also has experience evaluating and monitoring for our clients' debt and debentures originating from private placements and non-public companies, including municipal bonds and derivatives.



# SECURITIES AND CORPORATE GOVERNANCE

Scott+Scott has extensive experience litigating claims for violations of the federal securities laws on behalf of our municipal, institutional, and individual investor clients, serving as lead counsel in numerous securities class actions brought under the Securities Act of 1933, the Securities Exchange Act of 1934, and other statutes.

Scott+Scott recognizes that, particularly since the passage of the Private Securities Litigation Reform Act of 1995, bringing successful claims for violations of the federal securities laws requires not only significant litigation experience, but also the ability to bring to bear the skills of its in-house investigators and financial analysts (and often outside consultants) to build a case that can survive both early-stage motions to dismiss and later stage motions for summary judgment. Our philosophy is also based on our view that efforts to negotiate a successful settlement are typically built on the quality of pre-filing investigation diligence, and our willingness to litigate deep into discovery and, if necessary, through summary judgment and trial.

Our securities litigators have experience practicing in state and federal courts across the country. The Firm's attorneys have regularly retained and worked with leading accounting experts, damages experts, and relevant industry experts to build their clients' cases against defendants involved in virtually every type of industry, from pharmaceuticals to dot.coms, from retailers to manufacturers, and from investment banks to accounting firms. The Firm has also submitted *amicus curiae* briefs to the United States Supreme Court on behalf of its clients on important securities laws issues, including in support of the plaintiffs in *California Public Emps.' Ret. Sys. ANZ Securities, Inc.*, 137 S. Ct. 2042 (2017) and *Cyan Inc. v. Beaver County Emp. Ret. Fund*, 138 S. Ct. 1061 (2018).

When appropriate, Scott+Scott prosecutes actions on a class or individual basis. Through our commitment to the best interests of those the Firm represents, Scott+Scott has successfully obtained exceptional monetary results and precedent-setting corporate governance reforms on behalf of investors.

# SECURITIES CASE EXAMPLES

**Securities class actions where Scott+Scott currently serves as lead or co-lead counsel include**:

• *Severt v. UiPath, Inc*., No. 1:23-cv-07908 (S.D.N.Y.);

• *In re Yatsen Holding Limited Sec. Litig.*, No. 1:22-cv-08165 (S.D.N.Y.);

• *City of Southfield Fire and Police Retirement System v. Hayward Holdings, Inc.*, No. 2:23-cv-04146 (D.N.J.);

• *White v. Brooge Energy Limited*, No. 2:24-cv-00959 (C.D. Cal.);

• *Marselis v. Fox Factory Holding Corp.*,No. 1:24-cv-00747 (N.D. Ga)

• *In re SentinelOne, Inc. Sec. Litig.*, No. 4:23-CV-02786 (N.D. Cal.);

• *Sundaram v. Freshworks, Inc.*, No. 3:22-cv-06750 (N.D. Cal.);

• *Strezsak v. Ardelyx Inc.*, No. 4:21-cv-05868 (N.D. Cal.);

• *Golubowski v. Robinhood Mkts.*, No. 3:21-cv-09767 (N.D. Cal.);

• *In re Vaxart, Inc. Sec. Litig.*, No. 3:20-cv-05949 (N.D. Cal.);

• *City of Birmingham Relief and Ret. Sys. v. Acadia Pharms. Inc.*, No. 3:21-cv-00762 (S.D. Cal.);

• *Frouws v. Edgio, Inc.*, et al., No. 2:23-CV-00691 & No. 2:23-CV-01170 (D. Az.);

• *In re Infinity Q Divers. Alpha Fund Sec. Lit.*, No. 651295/2021 (N.Y. Supr. Ct. N.Y. Cnty.);

• *Patel v. Viatris, Inc.*, No. GD-21-13314 (Pa. Ct. Com. Pl.)

• *In re Cloudera, Inc. Secs. Litig.*, No. 19CV348674 (Cal. Super. Ct. Santa Clara Cnty.);

• *In re Slack Techs., Inc. S'holder Litig.*, No. 19CIV05370 (Cal. Super. San Mateo Cnty.);

• *Mancour v. SmileDirectClub, Inc.*, No.: 19-1169-IV (Tenn. Chancery Ct, Davidson Cnty.);

• *Rondini v. Kyverna Therapeutics, Inc.*, No.: 24-cv-08869 (N.D. Cal.);

• *Giraudon v. Innovative Industrial Properties, Inc.*, No. 1:25-cv-00182 (D. MD.);

• *Jewik v. TransMedics group, Inc.*, No. 1:25-cv-10385 (D. Mass.); and

• *In re Actinium Pharmaceuticals, Inc.*, No. 1:25-cv-02553 (S.D.N.Y.).

**Securities class actions which have been resolved where Scott+Scott served as lead or co-lead counsel include:**

• *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-cv-01519 (D.N.J.) ($164 million settlement);

• *Thurber v. Pharmacia, Inc.*, No. 2:99-cv-10368 (C.D. Cal.) ($122 million);

• *In re LendingClub Corp.S'holder Litig.,* No. CIV 537300 (Cal. Super. Ct, San Mateo Cnty.) (part of $125 global settlement);

• *In re Micro Focus Int'l plc Sec. Litig.*, Lead Case No. 18CIV01549 (CA Super. Ct. San Mateo Cnty.) ($107.5 million settlement);

• *Okla. Firefighters Pens. vs. Newell Brands Inc.*, No. L-003492-18 (N.J. Sup. Ct. Hudson Cnty.) ($102.5 million settlement);

• *In re Priceline.com, Inc. Sec. Litig.*, No. 00-cv-01884 (D. Conn.) ($80 million settlement);

• *Irvine v. ImClone Sys., Inc.*, No. 02-cv-00109 (S.D.N.Y.) ($75 million settlement);

• *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (S.D.N.Y.) ($70 million settlement);

• *Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., N.A.*, No. 12-cv-02865 (S.D.N.Y.) ($69 million settlement);

• *In re Nw. Corp. Sec. Litig.*, No. 4:03-cv-04049 (D.S.D.) ($61 million);

• *In re SanDisk LLC Sec. Litig.*, No. 15-cv-01455 (N.D. Cal.) ($50 million settlement);

• *In re Sprint Sec. Litig.*, No. 00-230077 (Mo. Cir. Ct., Jackson Cnty.) ($50 million);

• *In re Emulex Corp. Sec. Litig.*, No. 8:01-cv-00219 (C.D. Cal.) ($39 million);

• *Weston v. RCS Cap. Corp.*, No. 14-cv-10136 (S.D.N.Y.) ($31 million settlement);

• *In re Greensky Sec. Litig.,* No. 1:18 Civ. 11071 (S.D.N.Y.) ($27.5M settlement);

• *Schnall v. Annuity & Life Re (Holdings) Ltd.*, No. 3:02-cv-02133 (D. Conn.) ($27 million);

• *In re Wash. Mut. Mortg.-Backed Sec. Lit.*, No. 2:09-cv-00037 (W.D. Wash.) ($26 million recovery);

• *ATRS v Insulet Corp.*, No. 15-12345 (D. Mass.) ($19.5 million settlement);

• *In re King Digit. Ent. PLC S'holder Litig.*, No. CGC-15-544770 (Cal. Sup. Ct. San Francisco Cnty.) ($18.5 million settlement);

SCOTT
+
SCOTT

• *In re Evoqua Water Corp. Sec. Litig.*, No. 1:18-cv-10320 (S.D.N.Y) ($16.65 million settlement);

• *In re Conn's, Inc. Secs. Litig.*, No. 4:14-cv-00548 (S.D. Tex.) ($22.5 million settlement);

• *In re DouYu Int'l Hold'gs Ltd. Sec. Litig.*, No. 651703/2020 (N.Y. Supr. Ct. N.Y. Cnty.) ($15 million settlement);

• *Abadilla v. Precigen, Inc.*, No. 5:20-cv-06936 (N.D. Cal.) ($13 million settlement);

• *Collins v. Oilsands Quest Inc.*, No. 11 Civ. 1288 (S.D.N.Y.) ($10.235 million settlement);

• *Kaplan v. S.A.C. Cap. Advisors, L.P.*, No. 1:12cv-9350 (S.D.N.Y.) ($10 million settlement);

• *Rosenberg v. Cliffs Natural Res. Inc.*, No. CV 14 828140 (Ct. Common Pleas Cuyahoga Cnty. Ohio) ($10 million settlement);

• *Erie Cnty. Empl. Ret. Sys. v. NN, Inc*., No. 656462/2019 (N.Y. Supr. Ct. N.Y. Cnty.) ($9.5 million settlement);

• *In re Endochoice Holdings, Inc., Sec. Litig.*, No. 2016 CV 277772 (Ga. Sup. Ct. Fulton Cnty) ($8.5 million settlement);

• *Okla. Police Pension Fund & Ret. Sys. v. Jagged Peak Energy, Inc.*, No. 2017 CV 31757 (Colo. Dist. Ct., Denver Cnty.) ($8.25 million settlement);

• *In re Netshoes Secs. Litig.*, No. 157435/2018 (N.Y. Sup. Ct. N.Y. Cnty.) ($8 million settlement);

• *City of Omaha Police & Fire Ret. Sys. v. LHC Grp, Inc.*, No. 6:12-CV-01609 (W.D. La.) ($7.85 million settlement);

• *In re Pac. Coast Oil Trust Secs. Litig.*, No. BC550418 (Cal. Sup. Ct. Los Angeles Cnty.) ($7.6 million settlement);

• *In re Pacific Biosci. of C.A., Inc. Sec. Litig.* (Cal. Sup. Ct. San Mateo Cnty.) ($7.6 million recovery);

• *Plymouth Cnty. Contributory Ret. Sys. v. Adamas Pharms., Inc.*, No. RG19018715 (Cal. Sup. Ct. Alameda Cnty.) ($7.5M settlement);

• *St. Lucie Cnty. Fire Dist. Firefighters' Pens. Trust v. Southwestern Energy Co.*, No. 2016-70651 (Tex. Dist. Ct. Harris Cnty.) ($7 million settlement);

• *Jochims v. Oatly Group AB*, No. 1:21-cv-06360 (S.D.N.Y.);

• *Pompano Beach Police and Firefighters Ret. Sys. v. Olo Inc.*, No. 1:22-cv-08228 (S.D.N.Y.); and

• *Mo-Kan Iron Workers Pension Fund v. Teligent, Inc.*, No. 1:19-cv-03354 (S.D.N.Y.) ($6 million settlement).

SCOTT
+
SCOTT

# SHAREHOLDER DERIVATIVE CASE EXAMPLES

**Shareholder derivative actions where Scott+Scott currently serves in a sole or leadership role include**:

• *In re Facebook Derivative Litig.*, Consol. No. 2018-0307 (Del. Ch.);

• *Evergreen Capital Mgmt. LLC v. Pacific Coast Energy Co. LP*, No. 20STCV26290 (Cal. Sup. Ct.);

• *In re Alphabet, Inc., S'holder Derivative Litig.*, No. 3:21-cv-09388-RS (N.D. Cal.);

• *Lindsey v. Immelt*, Index No. 2020/19718 (N.Y. Sup. Ct.);

• • *Okla. Firefighters Pension and Ret. Sys. v. Calhoun*, No. 1:24-cv-01200 (E.D. Va.);

• *In re Exelon Corp. Derivative Litig.*, No. 1:21-cv-03611 (N.D. Ill.);

• *Presura v. Casey*, (Del. Ch.);

• *Trimm v. Schultz*, (Wash. Sup. Ct., Kings County); and

• *In re Abbott Lab'ys Infant Formula S'holder Derivative Litig.*, No. 1:22-cv-05513 (N.D. Ill.).

**Representative shareholder derivative actions litigated by Scott+Scott which have been successfully resolved include**:

• *Irving Firemen's Relief & Ret. Fund v. Page*, C.A. No. 2019-0355-Sg (Del. Ch. 2020) ($310 million in funding for corporate governance reform programs over 10 years);

• *In re DaVita Healthcare Partners Derivative Litig.*, No. 13-cv-01308 (D. Colo.) (corporate governance reforms valued at $100 million);

• *Buffalo Grove Police Pension Fund v. Diefenderfer*, No. 19-cv-00062 (E.D. Pa.) (claims vs. Navient Corp. officers & directors settled for corporate governance reforms valued at $139 million);

• *Tharp v. Acacia Commc'ns, Inc.*, No 1:17-cv-11504 (D. Mass.) (claims vs. company and corporate officers & directors settled for corporate governance reforms valued at $57-$71 million);

• *N. Miami Beach Gen. Emps. Ret. Fund v. Parkinson*, No. 10-cv-06514 (N.D. Ill.) (corporate governance reforms valued between $50 and $60 million);

• *In re Marvell Tech. Grp. Ltd. Derivative Litig.*, No. 06-cv-03894 (N.D. Cal.) ($54.9 million settlement and corporate governance reforms);

•*Rudi v. Wexner*, No. 2:20-cv-3068 (S.D. Ohio) ($90 million in funding for corporate governance reform programs over at least 5 years);

•*In re Universal Health Servs., Inc. Derivative Litig.*, No. 2:17-cv-02187 (E.D. Pa.) (Settled for corporate governance reforms conservatively valued at $110 million);

• *In re Altria Group, Inc. Deriv. Litig.*, Consol. No. 3:20-cv-00772 (E.D. Va.) (successfully resolved for corporate governance reforms with multi-year funding commitment of $117 million);

• *In re Symantec Corp. S'holder Deriv. Litig.*, Consol. C.A. No. 2019-0224-JTL (Del. Ch.) (successfully resolved for $12 million cash payment to company and corporate governance reforms);

• *Bottoni v. Hernandez*, No. 20-cv-01442 (S.D. Tex.) (claims vs. Fluor Corporation officers & directors settled for corporate governance reforms with four years of funding estimated at $10 million); and

• *In re World Wrestling Ent., Inc. Derivative S'holder Litig.*, Consol. C.A. No. 2023-0039-JTL (Del. Ch.).



# ACCOLADES

**U.S. News & World Report "Best Law Firms"**

The Firm is currently ranked by U.S. News & World Report as a "Best Law Firm" in commercial litigation in the New York region.

**American Antitrust Institute**

The 2018 Antitrust Annual Report recognized *In re Foreign Currency Benchmark Rates Antitrust Litigation* as the #1 settlement of 2018, as well as ranking the Firm #1 nationally for aggregate settlements: 2013-2018.

**Global Competition Review**

At the 6th Annual Global Competition Review ("GCR") Awards, Scott+Scott won for Litigation of the Year – Cartel Prosecution, which recognized the Firm's efforts in the foreign exchange settlements in the United States, a landmark case in which major banks conspired to manipulate prices paid in the $5.3 trillion-per-day foreign exchange market and have thus far settled for more than $2 billion.

**Law 360 Glass Ceiling Report**

Scott+Scott is recognized as one of the top law firms in the nation for female attorneys by the legal publication Law360.  The Glass Ceiling Report honors firms that "are demonstrating that the industry's gender diversity goals can turn into a measurable result, and boost the number of women at all levels of a law firm."[1,2]  This selection highlights the importance Scott+Scott places on diversity and inclusion within the Firm.

**Center for Constitutional Rights**

Scott+Scott was the recipient of the 2010 Center for Constitutional Rights' Pro Bono Social Change Award for its representation of the Vulcan Society, an association of African-American firefighters, in challenging the racially discriminatory hiring practices of the New York City Fire Department.

[1] https://www.law360.com/articles/1310926
[2] https://www.law360.com/articles/1162859/the-best-law-firms-for-female-attorneys.










# WORLD-CLASS ATTORNEYS

We pride ourselves on the caliber of legal talent on our team. In addition to some of the best and brightest rising stars, we have attorneys who have served with distinction in the U.S. Department of Justice, been admitted to the U.S. Supreme Court, served in OAGs at the state level, argued before the UK's CAT and High Courts, and received virtually every accolade offered in our profession.





# ADMISSIONS

**U.S. Admissions:** United States Supreme Court; United States Courts of Appeal for the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits; United States District Courts for the Districts of California (Northern, Southern, Eastern, and Central), Colorado, Connecticut, Florida (Northern), Illinois (Northern), Massachusetts, Michigan (Eastern), Missouri (Eastern), New Jersey, New York (Southern, Eastern, and Western), Ohio (Northern and Southern), Pennsylvania (Eastern and Western), Texas (Northern, Western, and Southern), Wisconsin (Eastern and Western), and the District of Columbia; and the courts of the States of Arizona, California, Connecticut, Delaware, Florida, Maryland, Pennsylvania, Massachusetts, Nebraska, New Jersey, New York, Ohio, West Virginia, Wisconsin, Texas, and the District of Columbia.



# ATTORNEY BIOGRAPHIES

## DAVID R. SCOTT



**PRACTICE EMPHASIS**

Managing Partner David R. Scott represents multinational corporations, hedge funds, and institutional investors in high-stakes, complex litigation, including antitrust, commercial, and securities actions.

**ADMISSIONS**

States of New York, Pennsylvania, and Connecticut; United States Tax Court; United States Courts of Appeal: Second, Third, and Fifth Circuits; United States District Courts: Southern District of New York, Connecticut, Eastern District of Pennsylvania, Northern and Southern Districts of Texas, and Colorado

**EDUCATION**

New York University School of Law (LL.M. in taxation); Temple University School of Law (J.D., Moot Court Board, 1989); St. Lawrence University (B.A., cum laude, 1986)

**HIGHLIGHTS**

Mr. Scott is the Managing Partner of Scott+Scott with offices in New York, Amsterdam, London, Berlin, California, Connecticut, Virginia, Delaware, and Ohio.

In addition to managing the firm's lawyers worldwide, Mr. Scott advises some of the world's largest multinational corporations in cartel damages and other complex matters. He has been retained to design corporate policies for the global recoupment of losses, and transatlantic private enforcement programs.

He currently represents multinational companies and hedge funds in cases involving, among other things, price-fixing in the trucks, foreign exchange, high voltage power cables, cardboard, and payment card sectors.

Mr. Scott's antitrust cases in the United States have resulted in significant recoveries for victims of price-fixing cartels. Among other cases, Mr. Scott served as co-lead counsel in *Dahl v Bain Cap. Partners*, No. 1:07-cv-12388 (D. Mass.), an action alleging that the largest private equity firms in the United States colluded to suppress prices that shareholders received in leveraged buyouts and that the defendants recently agreed to settle for $590.5 million. He was lead counsel in *Red Lion Med. Safety v. Ohmeda*, No. 06-cv-1010 (E.D. Cal.), a lawsuit alleging that Ohmeda,



one of the leading manufacturers of medical anesthesia equipment in the United States, excluded independent service organizations from the market for servicing its equipment. The case was successfully resolved in settlement negotiations before trial.

Mr. Scott has received widespread recognition for his antitrust and competition law work. He has been elected to Who's Who Legal: Competition 2015- 2020, which lists the world's top antitrust and competition law lawyers, selected based on comprehensive, independent survey work with both general counsel and lawyers in private practice around the world. He has also received a highly recommended ranking by Benchmark Litigation for each of the years 2013-2015. In addition, Mr. Scott is continually recognized in the U.S. by Best Lawyers and Super Lawyers.

In addition to his extensive competition law work, Mr. Scott has also taken the lead in bringing claims on behalf of institutional investors, such as sovereign wealth funds, corporate pension schemes, and public employee retirement funds. For example, he has been retained to pursue losses against mortgaged-backed securities trustees for failing to protect investors. He also represented a consortium of regional banks in litigation relating to toxic auction rate securities ("ARS") and obtained a sizable recovery for the banks in a confidential settlement. This case represents one of the few ARS cases in the country to be successfully resolved in favor of the plaintiffs.

Mr. Scott is frequently quoted in the press, including in publications such as The Financial Times, The Economist, The Guardian, The Daily Telegraph, The Wall Street Journal, and Law360. He is regularly invited to speak at conferences around the world and before Boards of Directors and trustees responsible for managing institutional investments.

SCOTT
+
SCOTT

# PATRICK COUGHLIN

**PRACTICE EMPHASIS**

Patrick Coughlin is "of counsel" to the Firm in the Firm's San Diego office.  His primary practice focuses on securities and competition law.

**ADMISSIONS**

State of New York; New York State Supreme Court, Appellate Division, Third Judicial Department; State of California; District of Columbia; United States District Courts: Northern, Eastern, Southern, and Central Districts of California; United States District Court for the District of Columbia, the Northern District of Illinois, the Southern and Eastern Districts of New York; United States Court of Appeals for the Second, Fifth, Sixth, Seventh, Nineth, Eleventh Circuits, and D.C. Circuit; United States Supreme Court

**EDUCATION**

Golden Gate University School of Law (J.D., 1983); Santa Clara University (B.S., 1977)

**HIGHLIGHTS**

Mr. Coughlin started his law career with the DOJ Criminal Division Appellate Section in the Honors Program handling numerous appeals in a number of circuits.  From there, he moved on as an Assistant United States Attorney in the District of Columbia and the Southern District of California, handling complex white-collar fraud matters.  During this time, he helped try one of the largest criminal RICO cases ever prosecuted by the United States.  *United States v. Brown*, No. 86-3056-SWR (D.D.C.), as well as an infamous oil fraud scheme resulting in a complex murder-for-hire trial, *United States v. Boeckman*, No. 87-cr-00676 (S.D. Cal.).

In 2025, Mr. Coughlin was recognized with the National Law Journal Lifetime Achievement Award for his outstanding contributions to the legal profession.

Over his career, Mr. Coughlin has tried more than 50 cases, including some of the most complex civil matters to go to trial against some of the largest companies in the World such as:  Apple, Nationwide, the large tobacco companies, Wells Fargo, and Credit Suisse.  He was pivotal in the case against RJ Reyolds for using its Joe Camel cartoon mascot to target children and secured a multibillion-dollar payout for California cities and counties in the State's landmark 1998 settlement with the tobacco companies.

Earlier this year, Mr. Coughlin and a team of Scott+Scott attorneys as Plaintiffs Co-Lead Counsel, obtained a significant settlement in a massive derivative case securing a new Board level Committee to better evaluate antitrust risks and 500 million to fund the settlement. This settlement was preliminarily approved in June 2025.  *In re Alphabet, Inc. S'holder Deriv. Litig.*, N.D. Cal. No. 3:21-cv-09388.



In addition, he is on the Co-Lead Counsel in the large shale antitrust action pending in federal Court here in Albuquerque, New Mexico. *In re: Shale Oil Antitrust Litigation*, No. 3119 (D. N.M.).

Mr. Coughlin has extensive federal appellate class action experience having argued dozens of appeals including a number of significant class cases such as **Enron**. *Regents of the Univ. of Cal v. Credit Suisse First Boston*, 482 F.3d 372 (5th Cir. 2007) (the largest securities Class recovery – $7.2 billion); **Aluminum**, *hn*, 935 F.3d 86 (2d Cir. 2019) (the most recent antitrust standing case out of the Second Circuit); **America West**, *No. 84 Employee Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) (first securities case in the Ninth Circuit reversing a dismissal under the PSLRA); **AT&T**, *In re: Text Messaging Antitrust Litigation Aircraft Check Services Co. v. Verizon Wireless*, 782 F.3d 867 (7th Cir. 2015) (Seventh Circuit antitrust case dealing with conscious parallelism versus an express agreement); and *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 62 F.4th 704 (2d Cir. 2023) (the largest antitrust recovery – $6.2 billion). Patrick has argued in both the California and United States Supreme Courts. *See Harris v. Superior Court of California*, California Supreme Court Nos. S156555 and S205097 and *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

A talented athlete, Mr. Coughlin received multiple scholarship offers to play football in his home State of Arizona including from the University of Arizona and Arizona State, ultimately choosing to go out of State to the University of Santa Clara where he played football and ran track. Just after college, he traveled to Puebla, Mexico to coach football and attend medical school for a year before law school.



# GEOFFREY M. JOHNSON

**PRACTICE EMPHASIS**

Geoffrey M. Johnson's practice focuses on shareholder derivative, corporate governance, and securities class action litigation.

**ADMISSIONS**

United States District Court for the Northern and Southern Districts of Ohio, Eastern District of Michigan, and Western District of Texas; United States Courts of Appeal: Second, Third, Sixth, Seventh, Eighth and Ninth; State Supreme Courts: Ohio

**EDUCATION**

University of Chicago Law School (J.D., with Honors, 1999); Grinnell College (B.A., Political Science, with Honors, 1996)

**HIGHLIGHTS**

Mr. Johnson is Chair of the Firm's Corporate Governance + Shareholder Rights Group and is a Partner in the Firm's Ohio office.  Over the past 25 years, Mr. Johnson has litigated numerous high-profile securities, corporate governance and shareholder rights cases all across the country.  He has represented institutional investors, state and local pension funds, corporations, hedge funds and individual investors.  His efforts have resulted in substantial monetary recoveries and significant corporate governance improvements on behalf of his clients.

Mr. Johnson is the lead attorney in *In re Alphabet Inc. Shareholder Derivative Litig.,* No. 21-cv-09388-RFL (N.D. Cal.), a case in which Alphabet agreed to spend $500 million to overhaul its global compliance structure, agreed to switch its oversight from its Audit Committee to a new Risk and Compliance Committee and agreed to adopt sweeping internal reforms.   This is one of the largest recoveries in a shareholder derivative case.

Prior to joining Scott+Scott, Mr. Johnson litigated complex securities and shareholder cases at Jones Day.  Mr. Johnson also clerked for the Honorable Karen Nelson Moore, United States Court of Appeals for the Sixth Circuit.  In law school, Mr. Johnson was a member of the University of Chicago Law Review.

**REPRESENTATIVE CASES**

- *In re Altria Group, Inc. Derivative Litig.,* No. 20-cv-772 (U.S. Dist. Ct., Eastern District of Virginia) (establishing a $117 million fund and adoption reforms relating to company's mishandling of Altria's $12.8 billion JUUL acquisition);



# MAXWELL R. HUFFMAN

**PRACTICE EMPHASIS**

Maxwell R. Huffman's practice focuses on corporate governance, shareholder rights, and security litigation.

**ADMISSIONS**

State of California; United States District Courts: Eastern District of California, Northern District of California, Southern District of California, and Central District of California; United States Court of Appeal: Ninth Circuit

**EDUCATION**

Gonzaga University School of Law, (J.D., 2009); California State University, Sacramento, (B.A., 2005)

**HIGHLIGHTS**

Mr. Huffman is a partner in the Firm's Corporate Governance and Shareholders Rights practice group.

Mr. Huffman is a seasoned litigator with significant trial experience and a proven track record of achieving unprecedented results in stockholder class and derivative actions.  For example, Mr. Huffman was a member of the trial team for *In re Dole Food Co., Inc. S'holder Litig.*, where the Delaware Court of Chancery awarded over $148 million in damages, making it the largest post-trial judgment ever in a merger-related stockholder class action.  Over the last decade, Mr. Huffman's cases have resulted in more than $350 million in cash recoveries for stockholders and corporate restitution.

Mr. Huffman's work includes the following cases: *In re Dole Food Co., Inc. S'holder Litig.*, C.A. No. 9079-VCL (Del. Ch.) ($148 million post-trial damages award); *In re Tesla Motors, Inc. S'holder Litig.*, C.A. No. 12711-VCS (Del. Ch.) ($60 million settlement); *In re Garner Denver S'holder Litig.*, C.A. No, 8505-VCN (Del. Ch.) ($29 million settlement); *In re PLX Technology, Inc. S'holder Litig.*, C.A. No. 9880-VCL (Del. Ch. ($14.125 million settlement); and *In re BMC Software, Inc. S'holder Litig.*, C.A. No. 8544-VCG (Del. Ch.) (12.4 million settlement).

Mr. Huffman has received the following recognitions:

- Titan of the Industry by The American Lawyer

- Winning Litigator by The National Law Journal

- Member of the Daily Journal's "Top 40 Under 40" list

Mr. Huffman is also actively involved with legal education and regularly teaches courses on stockholder litigation

# CARMEN A. MEDICI

## PRACTICE EMPHASIS

Carmen Medici is a partner in Scott+Scott's San Diego office who specializes in antitrust class action litigation focused on the technology, pharma, financial, and energy and commodities sectors.  He represents businesses and consumers who are the victims of price-fixing, monopolization, collusion, and other anticompetitive and unfair business practices.  He has worked on multiple complex class action and other cases to jury verdicts.

In addition to his current leadership roles, Carmen is known as a collaborative member of the worldwide competition team, working on and providing insight into various other cases across the world.  He is passionate about investigating and generating several of the Firm's other major antitrust and consumer actions, including cases against Big Tech, commodities manufacturers, Wall Street, pharma and others.

## ADMISSIONS

California, Arizona, Colorado, United States Court of Appeals for the Second and Ninth Circuits, United States District Courts for the Northern, Eastern, Central and Southern Districts of California, United States District Court for the Northern District of Illinois (General Bar).

## EDUCATION

University of San Diego School of Law (J.D.); Arizona State University (B.S.)

## HIGHLIGHTS

Carmen is co-lead counsel in *In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, No. 23-md-03071 (M.D. Tenn.), a groundbreaking case alleging that major property owners and managers across the country used advanced data collecting techniques and artificial intelligence to inflate the cost of living to millions of renters nationwide.  He is also co-lead counsel in *Klein et al v. Meta Platforms, Inc.*, 20-cv-08570 (N.D. Cal.) where he represents advertisers who allege they overpaid for advertising purchased from Meta Platforms (f/k/a Facebook).  Carmen also leads the Scott+Scott team heading up *Oklahoma Firefighters Pension and Retirement System v. Deutsche Bank Aktiengesellschaft et al.*, No. 23-cv-05095 (S.D.N.Y.), a case against Citi, Deutsche Bank, HSBC, RBC, and Morgan Stanley through real-time Bloomberg instant messaging, conspired to and did manipulate the market for UK government bonds (known as Gilts) to benefit their own spreads and trading books to the detriment of their clients.  He led the team in researching and developing *In re: Shale Oil Antitrust Litig.*, No. 24-md-3119 (D.N.M.) the first case alleging the shale frackers in the United States were working with OPEC to reduce worldwide oil production to inflate their profits directly harming U.S. gasoline purchasers during and coming out of the COVID pandemic.  This case was followed by a raft of government inquiries, including a Federal Trade

Commission complaint which determined that a certain participant in the industry was working to coordinate production levels with parties overseas.

Prior to joining Scott+Scott, Mr. Medici's representative cases include:

- ***In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.***, No. 05-md-01720 (E.D.N.Y.) ($5.5 billion settlement)

- ***In re Foreign Exchange Benchmark Rates Antitrust Litig.***, No. 13-cv-07789 (S.D.N.Y.) ($2.3 billion in settlements)

- ***In re Aluminum Warehousing Antitrust Litig.***, No. 14-cv-3116-PAE (S.D.N.Y.)

- ***In re Remicade Antitrust Litig.***, No. 2:17-cv-04326-KSM (E.D. Pa.)

- ***Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's***, No. 2:08-cv-00235 (D. N.J.)

SCOTT
+
SCOTT

# JUSTIN O. RELIFORD

**PRACTICE EMPHASIS**

Justin O. Reliford is a partner in the Firm's Corporate Governance and Shareholders Rights practice group and the Managing Partner of Scott+Scott's Wilmington, Delaware office.

Mr. Reliford is one of the nation's leading corporate governance and M&A litigators, with extensive experience prosecuting claims in state and federal courts across the country. Mr. Reliford is a true believer in the value of strong corporate governance, accountability, and a fair market. Throughout his career, Mr. Reliford has helped recover nearly a billion dollars for stockholders and corporations to remedy misconduct by corporate directors and officers. Having previously worked as a labor and employment litigator, Mr. Reliford has counseled sophisticated clients through a wide range of class and collective actions in high-stakes litigation. Mr. Reliford's background provides a unique insight into the concerns and motivations of corporate constituents at all levels, which Mr. Reliford relies upon to secure significant litigation outcomes and sound business solutions.

**ADMISSIONS**

States of Pennsylvania, New York, Delaware, and New Jersey; United States District Courts: District of New Jersey, Eastern District of Pennsylvania, Middle District of Pennsylvania, Western District of Michigan; United States Court of Appeals: Third Circuit

**EDUCATION**

University of Pennsylvania Law School (J.D., 2007); Williams College (B.A., 2003)

**HIGHLIGHTS**

- *In re Cardinal Health Inc. Derivative Litig.*, No. 2:19-cv-02491 (S.D. Ohio) ($124 million settlement of opioid-related director oversight claims)

- *In re Tesla Motors, Inc. S'holder Litig.*, C.A. No. 12711-VCS (Del. Ch.) ($60 million settlement of breach of fiduciary duty claims in connection with a corporate transaction)

- *Ark. Teacher Ret. Sys. v. Alon USA Energy Inc.*, C.A. No. 2017-0453-KSJM (Del. Ch.) ($44.75 million settlement of merger-related breach of fiduciary duty claims)

- *Weiss v. Burke, et al.*, C.A. No. 2020-0364-PAF (Del. Ch.) ($17.5 million settlement of stockholder claims in connection with HGGC's acquisition of Nutraceutical Inc.)



- ***In re Allergan Inc. Proxy Violation Sec. Litig.***, No. 8:14-cv-02004 (C.D. Cal.) ($250 million settlement of insider trading claims under the Williams Act)

- ***In re Dole Food Co., Inc. S'holder Litig.***, C.A. No. 8703-VCL (Del. Ch.) ($148 million settlement following post-trial ruling in plaintiffs' favor on breach of fiduciary claims in connection with a take-private transaction)



# JING-LI YU

**PRACTICE EMPHASIS**

Jing-Li Yu practices in the areas of shareholder derivative, fiduciary duty, alternative entity, and securities litigation.

**ADMISSIONS**

States of New York, California, and Delaware; United States Court of Appeals: Ninth Circuit; United States District Courts: Southern and Eastern Districts of New York

**EDUCATION**

University of Chicago Law School (J.D., 2010); University of Chicago (Master of Arts, Social Sciences, 2005); University of Pennsylvania (B.A., Economics, *cum laude*, 2001)

**HIGHLIGHTS**

Mr. Yu is a partner in the New York office where he focuses on shareholder derivative litigation. Some of his recent resolved cases include:

- ***Irving Firemen's Relief and Ret. Fund v. Page***, C.A. No. 2019-0355 (Del. Ch.): Settlement included significant corporate reforms bolstering compliance and oversight to prevent discrimination and retaliation, plus a commitment by the company to spend $310 million to implement the reforms.

- ***Rudi v. Wexner***, No. 2:20-cv-03068 (S.D. Oh.): Settlement included significant corporate reforms bolstering compliance and oversight to prevent sexual harassment, discrimination, and retaliation, plus a commitment by the company to spend $90 million to implement the reforms.

- ***In re Altria Group, Inc. Derivative Litig.***, No. 3:20-cv-0772 (E.D. Va.): Settlement included significant corporate reforms bolstering compliance and oversight to prevent youth vaping, as well as a court-designated corporate monitor, and a commitment by the company to spend $117 million to implement the reforms and compensate the monitor.

Prior to joining Scott+Scott, Mr. Yu was a litigation associate based in Wilmington, Delaware at an international litigation firm that primarily represented institutional plaintiffs. Before then, he was a litigation and investigations associate based in New York, New York at two international law firms that primarily represented institutional defendants.



**COMMUNITY INVOLVEMENT**

Mr. Yu is on the board of directors of the 80-20 Initiative, an Asian American political advocacy organization led by a former lieutenant governor of Delaware.



# JOSEPH A. PETTIGREW

**PRACTICE EMPHASIS**

Joseph A. Pettigrew's practice areas include securities, shareholder derivative litigation, consumer, and other complex litigation.

**ADMISSIONS**

States of California and Maryland; United States District Courts: Central, Northern, and Southern Districts of California, District of Maryland; United States Supreme Court

**EDUCATION**

University of San Diego School of Law (J.D., 2004); Carleton College (B.A., Art History, *cum laude*, 1998)

**HIGHLIGHTS**

Mr. Pettigrew is of counsel who works across multiple Scott+Scott offices.  His work includes the following cases: ***Dahl v. Bain Capital Partners, LLC***, No. 07-cv-12388 (D. Mass.); ***In re Tile Shop Holdings, Inc. Stockholder Deriv. Litigation***, C.A. No. 10884-VCG (Del. Ch.); ***Rudi v. Wexner***, No. 20-cv-3068 (S.D. Ohio) and ***In re TikTok, Inc. Consumer Privacy Litig.***, 20-cv-04699 (N.D. Ill.), MDL No. 2948.

- ***In Re Facebook Inc. Derivative Litigation***, Consolidated C.A. No. 2018 0307 JTL (Del. Ch.) (Breach of fiduciary duties claims and insider trading claims in connection with business practices to promote profit to the detriment of users' data privacy.)

SCOTT
+
SCOTT

# ELIZABETH DRAGOVICH

**PRACTICE EMPHASIS**

Ms. Dragovich is deeply experienced in the areas of corporate governance, shareholder rights, federal and international securities laws, and appraisal litigation. Prior to going into private practice in 2015, Ms. Dragovich represented dependent children as a child advocate attorney and the Department of Human Services as an assistant city solicitor in Philadelphia, Pennsylvania, and she clerked for the Honorable William L. Chapman, Jr. of the Delaware Family Court of New Castle County.

**ADMISSIONS**

State of Pennsylvania; United States District Court for the Eastern District of Pennsylvania

**EDUCATION**

University of Pennsylvania Law School (J.D., 2002); Carnegie Mellon University (B.A. in English and Creative Writing, 1999)

# KAREN KAM

**PRACTICE EMPHASIS**

Karen Kam is an associate in the Firm's Corporate Governance and Shareholders Rights practice group.

**ADMISSIONS**

Pennsylvania

**EDUCATION**

Temple University Beasley School of Law (J.D., 2021); Courant Institute of Mathematical Sciences (M.S. in Mathematics in Finance, 2005); University of Pennsylvania (B.A. in Mathematics and Economics, 2001)

**HIGHLIGHTS**

Karen Kam is an attorney in Scott+Scott's New York office. Prior to Scott+Scott, Ms. Kam worked in another firm also as a corporate governance and M&A litigator.

Prior to attending Temple Law School, Ms. Kam worked in finance as a portfolio strategist at SEI Investments; Risk Management Analyst at Merrill Lynch; and a Risk Management Intern at S.A.C. Capital Advisors. In these roles, Ms. Kam utilized her mathematics degree to program and solve complex financial models and review risk models related to both personal and companywide portfolios.

Her experience as a litigator and her background in finance gives her a good eye in detecting alleged misconduct by corporate directors and officers.

While at Temple Law School, Ms. Kam was a PDLG (Philadelphia Diversity Law Group) Fellow. She received the Richard J. Noonan Scholarship in 2020-2021 academic year and won the Catherine Donahue Memorial Award at graduation.

Ms. Kam is a member of the Philadelphia Bar Association.

**REPRESENTATIVE CASES**

- ***Cahnman v. Sterling***, No. 22-10124 (E.D. Mich.) (The settlement agreement provides for Sterling's adoption and implementation of certain corporate governance reforms.)

SCOTT
+
SCOTT

# ORA LAINE LUPEAR

**PRACTICE EMPHASIS**

Ora Laine Lupear focuses on corporate governance and shareholder rights, representing institutional and individual shareholders in major business disputes, including stockholder class actions and derivative actions.

**ADMISSIONS**

States of California and New York; U.S. District Courts: Northern and Central Districts of California

**EDUCATION**

Brooklyn Law School (J.D.); University of Nevada, Reno (B.A., Division I football athlete)

**HIGHLIGHTS**

Mr. Lupear is an attorney at Scott+Scott, working within the firm's Corporate Governance and Shareholder Rights practice group.

Mr. Lupear has substantial trial experience, including serving as a key member of the trial team in a shareholder derivative action against the fiduciaries of a major technology company in the Delaware Court of Chancery.

Before joining Scott+Scott, Mr. Lupear practiced at a national securities litigation firm, where he prosecuted cases involving breach of fiduciary duty, fraud, and insider trading, helping investors recover significant losses.  Additionally, he served as Counsel at a Southern California law firm, handling complex business, commercial, real estate, and white-collar disputes.  Early in his career, Mr. Lupear worked as a prosecutor in New York City and represented Fortune 500 insurance carriers in fraud-related lawsuits.

**REPRESENTATIVE CASES**

- ***Stewart N. Goldstein, M.D. v. Alexander J. Denner, et al.***, No. 2020-1061-JTL (Del. Ch. Ct.) ("Bioverativ") ($84 million partial settlement)
- ***In re Tesla Motors, Inc. Stockholder Litigation***, No.12711 (Del. Ch. Ct.)

SCOTT
+
SCOTT

# MELISSA MAY

**PRACTICE EMPHASIS**

Melissa May is a Litigation Associate in the Firm's Corporate Governance and Shareholders Rights practice group.

Ms. May initiated her career as a paralegal, focusing on class actions, multi-district litigations, and personal injury cases. Her support of efforts that led to significant client recoveries equipped her with a true awareness of institutional misconduct and its individualized repercussions – a perspective she continues to follow in practice.

Prior to joining the Firm, Ms. May developed a strong business acumen through extensive corporate experience with prominent financial institutions, both domestically and abroad. Her education culminated with a prestigious externship at the Delaware Court of Chancery during her final year in law school, where she honed her capabilities in corporate governance matters and complex litigation under Delaware law.

Ms. May focuses on shareholder derivative litigation in the Firm's New York office. Her practice also centers on alternative entities and corresponding fiduciary duty claims.

**ADMISSIONS**

Admitted to practice in the State of New York

**EDUCATION**

Washington and Lee University School of Law (J.D., 2023); St. Mary's University College, London (Postgraduate Certificate in International Business Practice, 2016)



- ***In re L Brands Derivative Litig.,*** No. 20-cv-3068 (U.S. Dist. Ct., Southern District of Ohio) (establishing a $90 million fund and adopting workplace reforms in connection with a shareholder derivative action alleging serious workplace misconduct);

- ***In re Alphabet Inc. Shareholder Derivative Litig.,*** No. 19cv341522 (Superior Court of California, Santa Clara County) (establishing a $310 million fund and adopting board and executive level reforms relating to the company's mishandling of sexual harassment allegations against senior executive); and

- ***In re King Digital Entertainment plc S'holder, Litig.***, No. 15-544770 (Superior Court of California, San Francisco County) ($18.5 million settlement – surviving two motions to dismiss).

**SCOTT + SCOTT**

+ New York
+ London
+ Amsterdam
+ Berlin
+ California
+ Connecticut
+ Virginia
+ Ohio
+ Delaware

© 2020 Scott+Scott Attorneys at Law LLP

# EXHIBIT 2

EFiled:  Feb 11 2021 11:54AM EST
Transaction ID 66330866
Case No. 11614-VCG

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE SANTANDER CONSUMER    : Consolidated
USA HOLDINGS, INC. DERIVATIVE : Civil Action
LITIGATION                  : 11614-VCG


- - -


                         Chambers
                         Court of Chancery Courthouse
                         34 The Circle
                         Georgetown, Delaware
                         Wednesday, January 20, 2021
                         11:00 a.m.



- - -


BEFORE:  HON. SAM GLASSCOCK III, Vice Chancellor

- - -




HEARING TO APPROVAL SETTLEMENT AND AWARD OF FEES AND
        EXPENSES AND THE COURT'S RULINGS




------------------------------------------------------
              CHANCERY COURT REPORTERS
                 500 North King Street
              Wilmington, Delaware 19801
                    (302) 255-0521

2

```
 1   APPEARANCES: (via telephone)

 2           P. BRADFORD DELEEUW, ESQ.
             deLeeuw Law LLC
 3                -and-
             GEOFFREY M. JOHNSON, ESQ.
 4           of the Ohio Bar
             Scott + Scott Attorneys at Law LLP
 5                -and-
             KENNETH VIANALE, ESQ.
 6           of the Florida Bar
             Vianale & Vianale LLP
 7                -and-
             RONEN SARRAF, ESQ.
 8           JOSEPH GENTILE, ESQ.
             of the New York Bar
 9           Sarraf Gentile LLP
                  -and-
10           ROBERT D. GOLDBERG, ESQ.
             Biggs & Battaglia
11             for Plaintiffs

12           KEVIN R. SHANNON, ESQ.
             CHRISTOPHER N. KELLY, ESQ.
13           Potter, Anderson & Corroon LLP
                  -and-
14           STEPHEN R. DIPRIMA, ESQ.
             NATHANIEL D. CULLERTON, ESQ.
15           of the New York Bar
             Wachtell, Lipton, Rosen & Katz LLP
16             for Defendants and Nominal Defendant

17

18                        – – –

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

```
 1                    THE COURT:  Counsel, this is Sam
 2   Glasscock.  Who do I have on the loan, please?
 3                    MR. deLEEUW:  Good morning,
 4   Your Honor.  This is Brad deLeeuw on behalf of
 5   plaintiffs.  On the phone with me today are Geoffrey
 6   Johnson of Scott + Scott and also Ken Vianale, and
 7   Joseph Gentile of Sarraf Gentile.  With the Court's
 8   permission, Mr. Johnson will speak on behalf of
 9   plaintiffs today.
10                    THE COURT:  I'll be happy to hear from
11   Mr. Johnson.
12                    MR. SHANNON:  Good morning,
13   Your Honor.  Kevin Shannon on behalf of defendants.
14   My colleague from Potter Anderson & Corroon, Chris
15   Kelly, is on the line, as well as my co-counsel from
16   Wachtell Lipton, Stephen DiPrima and Nathaniel
17   Cullerton.  Good morning, Your Honor.
18                    MR. DiPRIMA:  Good morning, Your
19   Honor.
20                    THE COURT:  Good morning, all.
21                    MR. GOLDBERG:  Good morning,
22   Your Honor.  This is Rob Goldberg.  I'm here also on
23   behalf of Jackie888, Inc.  And I believe I have Ronen
24   Sarraf is also on the line here with me, my
```

4

1  co-counsel.  Thank you, Your Honor.

2                    THE COURT:  Welcome.

3                    Mr. Johnson, would you like to go

4  ahead and present the settlement?

5                    And first I should ask you, I suppose,

6  to tell me whether there have been any additional

7  objections received since we continued this matter

8  based on the City of Seattle's objection.

9                    MR. JOHNSON:  No, Your Honor, we have

10  not received any objections in the case.  And we

11  didn't receive any before the objection deadline back

12  in May.  And we have worked with Seattle City, we

13  worked with them over the summer and the fall, and

14  they indicated they weren't objecting.  And then we

15  haven't received any objections from any stockholders

16  kind of in the interim period at all since Seattle

17  City said that they were not going to object.

18                    THE COURT:  All right.  Well, then,

19  would you like to present the settlement?

20                    MR. JOHNSON:  I would, Your Honor.

21                    Thank you, Your Honor.  And good

22  morning.

23                    THE COURT:  Good morning.

24                    MR. JOHNSON:  We're here today to ask

CHANCERY COURT REPORTERS

1  the Court to approve what we believe is a very strong

2  settlement.  It will provide the company with a

3  substantial benefit in the form of meaningful

4  corporate governance reforms.

5            As we explained in our papers, Your

6  Honor, the parties reached the settlement after two

7  separate extremely hard-fought mediation sessions with

8  Robert Meyer of JAMS, who is an experienced and

9  well-respected mediator in stockholder derivative

10  cases.

11            In total, the negotiations lasted 16

12  months.  And we went to mediation in June 2018.  That

13  was unsuccessful.  Again, in December 2018.  That was

14  unsuccessful.  And then after five additional months

15  of work with Mr. Meyer, we were able to sign a term

16  sheet in the summer of 2019.

17            The parties have crafted a settlement

18  that will require Santander to create a new

19  executive-level accounting and credit-loss committee.

20  This committee will consist of four senior accounting

21  and financial officers at Santander.  The committee is

22  required to perform quarterly audits to ensure that

23  the financial controls are effective.  And they're

24  required to focus particularly on controls for

1    reporting auto and lease loan losses, which was what

2    we viewed as the main underlying issue in our

3    derivative case.

4           The committee is also required to

5    document the effectiveness to the audit committee via

6    a quarterly report and ensure that the reforms are

7    tested, controls are tested, by an independent party

8    annually.

9           In addition to the new executive-level

10    committee, the company is going to be required to

11    prepare a quarterly accounting memo that explains how

12    the allowance for loan and lease losses complies with

13    GAAP and also details the methodology to calculate

14    loan and lease losses and describes any changes to

15    that methodology.

16           In addition, the company is going to

17    be required to provide comprehensive monitoring of

18    accounting for credit-loss allowances and adopt

19    numerous other important reforms, such as improved

20    training on financial controls, improvements to the

21    code of conduct, improvements to the whistleblower

22    program, change to the compensation committee charter,

23    and also they've agreed to adopt a board diversity

24    provision that requires them to interview one woman

1    anytime a board opening comes up.

2              So in sum, Your Honor, we believe that

3    the settlement provides a framework for Santander to

4    improve controls for financial accounting,

5    particularly controls for its accounting for loan and

6    lease losses.  And we think that this will provide --

7    is of paramount importance to Santander and its

8    stockholders, particularly given that the company has

9    experienced two separate restatements relating to its

10   financial accounting.

11             So we think that we've made a strong

12   showing both in our papers and just walking through

13   the settlement today that the settlement provides

14   substantial benefit to the stockholders in the company

15   and should be approved.

16             And then there are just a couple other

17   things I think I'd like to mention.  One, we believe

18   that the Court can take comfort here in the fact that

19   we had a sophisticated institutional investor come in

20   and kick the tires on the settlement.  We provided

21   Seattle City with a tremendous amount of documents on

22   the settlement.  We provided them with all of the

23   mediation statements, all of the settlement

24   communications between the parties, draft and redline

8

1  term sheets and settlement docs.  We provided them

2  with all of our 220 materials.  We answered I think

3  over 25 interrogatories.  They took fairly extensive

4  discovery, Your Honor, over the course of the summer.

5  And ultimately, they decided not to object.

6              And in preparing for the hearing, I

7  went back and read the transcript of the hearing we

8  had right after Seattle City filed their request to

9  continue the earlier settlement conference, and Your

10  Honor stated that you hoped that we would work with

11  them and they'd ultimately come to the decision not to

12  object.  And that's what has happened here.

13              And, finally, both of the federal

14  security cases that formed the basis for this action

15  have settled.  Those settlements were funded entirely

16  with insurance money.  And both cases have now been

17  approved and dismissed.  And Santander also has

18  settled its liability for predatory lending practices

19  with numerous state AGs.  That resulted in a

20  $72 million cash settlement.  And they also agreed to

21  write off bad loans.  And the company has filed an 8-K

22  notifying investors that the $72 million cash

23  settlement with the State AGs is fully covered by a

24  litigation reserve.

CHANCERY COURT REPORTERS

1              So, Your Honor, we think it's a strong

2    settlement and we think that there's numerous reasons

3    why it should be approved.  And I'm happy to move on

4    to the fee and expense award unless Your Honor has

5    questions about the settlement itself.

6              THE COURT:  I don't.

7              Mr. Shannon, I know you support the

8    settlement.  Is there anything you or your client

9    wants to add to me?

10             MR. SHANNON:  No, Your Honor.  We do

11   support the settlement for all the reasons set forth

12   in the papers.

13             THE COURT:  All right.

14             Mr. Johnson, the release is a broad

15   general release.  Correct?

16             MR. JOHNSON:  It is, although it's

17   cabined to shareholder derivative cases that were or

18   could have been alleged in the action.  So it's a

19   relief --

20             THE COURT:  I'm sorry.  I didn't mean

21   to speak over you.  I'm looking at page 14 of the

22   original motion.  And I'm just trying to understand

23   the heading, which says, "The General Lease Does Not

24   Extend to Claims That the Creditor or Releasing Party

CHANCERY COURT REPORTERS

 1    Does Not Know or Suspect to Exist ...."  That doesn't

 2    seem to me to be -- the release does extend to those,

 3    does it not?

 4                    MR. JOHNSON:  I'm sorry.  I'm taking a

 5    look at the release now.

 6                    THE COURT:  Sure.  Take your time.

 7                    I'm talking about page 14 of your

 8    stipulation to settlement.

 9                    MR. JOHNSON:  Right.  I think it's a

10    good point because the release itself does include

11    unknown claims.  Means any -- yeah, I think this is

12    pretty -- sorry.  This is pretty standard language in

13    that the release does include unknown claims.  And

14    then it kicks over and we define "'Unknown Claims'

15    means any Released Claims that a Person granting a

16    Release hereunder does not know or suspect to exist in

17    his, her, or its favor ...."

18                    But then we have the carve-out under

19    the California carve-out.  So it's sort of a carve-out

20    from the definition of "Unknown Claims."  "A General

21    Release Does Not Extend to Claims that the Creditor or

22    Releasing Party Does Not Know or Expect to Exist in

23    His or Her Favor at the time of Executing the Release

24    That, If Known By Him or Her, Would Have Materially

1  Affected His or Her Settlement with the Debtor or

2  Released Party."

3            Actually, I've never had this question

4  come up before.  This is really standard language.

5  But I think your point is that it's sort of a -- the

6  language is a little bit in conflict in that the

7  unknown claims are included in the general release,

8  but the California Civil Code carve-out seems to say

9  that if you don't know about the claims at the time

10  and it would have materially affected your ability --

11  maybe the defendants can speak to this.

12            You know, I think the California

13  carve-out deals with some type of misrepresentation

14  that happened during the settlement process.  So that

15  the general release covers unknown claims, but if

16  there was like some sort of misrepresentation that

17  would have materially affected your decision to enter

18  into the settlement, then those would not be included.

19            THE COURT:  My only question, I just

20  want to make sure that the order I sign that supports

21  the release is clear to interested parties.  That was

22  my only concern.

23            MR. JOHNSON:  Right.

24            THE COURT:  I don't have concerns

1   about the settlement itself.

2                    MR. JOHNSON:  Okay.

3                    THE COURT:  Mr. Shannon, can you

4   address that?

5                    MR. SHANNON:  Maybe I can, Your Honor.

6                    The language you're referring to,

7   which is on page 14 of the stipulation, is actually

8   purporting to quote the California Civil Code.  And

9   that language basically says under California law, a

10  general release will not cover unknown claims.  That's

11  why we incorporate provisions in the settlement to

12  specifically say we are extending it to cover it,

13  because it would not otherwise, and saying it was

14  specifically negotiated and consideration was given

15  for it.  That is simply a quote --

16                    THE COURT:  And what is --

17                    MR. SHANNON:  As the language says,

18  that's a quote of that provision.

19                    THE COURT:  I'm just trying to -- what

20  would happen if -- let's assume an unknown claim comes

21  up.  Is it barred by the release or is it not?

22                    MR. SHANNON:  Our view is it is, and

23  that we've made clear that it is included, and we've

24  specifically negotiated for the exception under the

1   California law.

2                   THE COURT:  All right.

3                   And Mr. Johnson, that's your view as

4   well?

5                   MR. JOHNSON:  It is.  You know, I

6   think it sort of begs the question whether it makes

7   sense to include this California statute in future

8   releases, because I think Mr. Shannon's view -- our

9   view is that this release was certainly covering

10  unknown claims.  And I think what Mr. Shannon is

11  saying is that, basically, this California Civil Code

12  language says that unless you otherwise explicitly

13  state that it covers unknown claims, the general

14  release isn't going to cover it.  So that's the

15  purpose --

16                  THE COURT:  Yeah, it's a little hard

17  to understand because that bold heading, if that's

18  what it is, seems to say that unknown claims are not

19  covered.  And then the text itself very clearly

20  informs the reader that the parties have negotiated

21  for unknown claims to be covered by the release.

22                  I am not concerned enough about it to

23  hold up the settlement, which has already been pending

24  for a long time, but I would strongly urge counsel in

1  future releases to clear this up.

2              If what is meant is we acknowledge

3  that there is a California Code provision that

4  requires an explicit adoption of a release of unknown

5  claims which we're here purporting to satisfy, that

6  would be much easier to understand.

7              But at any rate, anything else on that

8  from either Mr. Shannon or Mr. Johnson before I move

9  on?

10             I'm not hearing anything.

11             MR. JOHNSON:  Yeah.  I have nothing,

12  Your Honor, other than we will clear it up in the

13  future.

14             THE COURT:  If you read the text, no

15  one could read this text and come away thinking, gee,

16  I don't need to object to this because it is not a

17  release of unknown claims, which is my main concern.

18  I don't think that's a real irrational problem, but I

19  do think it's something to avoid in the future.

20             Let me just say that, you know, it is

21  my responsibility on behalf of the stockholders to

22  bring my independent judgment to bear on the

23  sufficiency of the settlement.  I have to look at what

24  was given up.  And as the foregoing conversation makes

1    clear, what is being given up are all outstanding

2    claims and, particularly, the claims of the complaint.

3    However, I note that those claims, which are oversight

4    claims, are very difficult claims.  And it would have

5    been I think a very difficult litigation to achieve a

6    positive result in.

7              So I think that the give is relatively

8    minor in relation to the get.  And the get, as

9    Mr. Johnson has pointed out -- and I'm not going to go

10   through each of them; there are a variety of them --

11   but it is one of the more robust therapeutic

12   recoveries that I have seen in a corporate case that

13   really strongly addresses the shortcomings that the

14   litigation exposed.

15             I am also -- favorable to the

16   acceptance of the settlement is the fact that there

17   was a 220 action and there was an attempt before the

18   litigation to get documents to understand the

19   situation.  There was a robust mediation with a

20   well-known mediator, with excellent counsel on both

21   sides.  And finally, as Mr. Johnson has already

22   pointed out, my job is made particularly easy by the

23   fact that a sophisticated investor, the City of

24   Seattle Retirement Pension Fund -- and I may have

16

1   mangled that name but I think it's close enough for

2   interested parties to know the entity I'm talking

3   about -- initially filed an objection; the matter was

4   continued; that entity had ample opportunity to look

5   at the documents underlying the plaintiffs' claim; and

6   ultimately decided to withdraw any objection or not to

7   make any objection.

8                And so for all those reasons, I find

9   that it is in the interests of the plaintiff

10  derivative class, or the stockholders of the entity,

11  to accept this settlement, and I do so.

12                Would you like to move along, then, to

13  the fee request, Mr. Johnson?

14                MR. JOHNSON:  I would, Your Honor.

15                As Your Honor knows, also before the

16  Court is counsel's request for a fee and expense award

17  for their work in this case.  We believe that all of

18  the *Sugarland* factors weigh heavily in favor of

19  approving the fee.

20                The parties reached a $1.5 million

21  agreed fee here, again, after arms-length negotiation

22  with Mr. Meyer.  The parties didn't begin negotiating

23  the fee until after we signed the settlement term

24  sheet, setting forth the terms of the settlement.  And

CHANCERY COURT REPORTERS

1     the fee mediation, like the settlement, was also

2     hard-fought and involved sophisticated parties.

3              Notice has been given of the fee

4     request, and we received no objections from any

5     stockholder.  And as with the settlement, Seattle City

6     did receive the materials, the mediation statements on

7     the fee, the parties' communications on the fee, the

8     mediator's recommendation on the fee, and they did not

9     object to the fee.

10             The most important factor under

11     *Sugarland*, of course, is the value of the benefit

12     conferred.  And we believe this is an extremely

13     valuable settlement for all of the reasons I described

14     in my earlier argument.

15             And then, finally, Your Honor, on the

16     lodestar, our lodestar is 1.442 million.  We cut that

17     off as of the date when we signed the settlement stip,

18     so it didn't include any of the time we spent

19     preparing the fee app or the fairness papers or any of

20     the time we spent with Seattle City this summer.

21             That comes out to a multiplier of

22     basically 1., I think it's 1.04, and then an implied

23     hourly rate of $673.  And that's really at the extreme

24     low range of what is typically acceptable in

1   contingency fee derivative litigation.

2                So, to sum up, Your Honor, we believe

3   that the settlement has conferred a substantial

4   benefit.  We've gotten no objections on the fee.

5   Seattle City reviewed the fee and didn't object.  It

6   was a result of a hard-fought mediation process.  And

7   its contingency fee litigation, and the lodestar is at

8   the low end of the range.

9                THE COURT:  Thank you, Counsel.

10               Mr. Shannon, anything you want to add?

11               MR. SHANNON:  Nothing on the fee, Your

12  Honor.

13               THE COURT:  All right.  As Mr. Johnson

14  has pointed out, the factors set forth by the Supreme

15  Court in *Sugarland* apply to the exception to the

16  American Rule represented by the corporate benefit

17  doctrine.  Here, I believe you've described the

18  therapeutic benefits, which are corporate benefit

19  reforms that both specifically address the problems

20  raised in the litigation and, as I've already found,

21  are substantial and valuable to the corporation.

22               Also important to me is that this is

23  contingent fee litigation, and that the lodestar

24  amount -- though we don't typically rely simply on the

1  lodestar because it may create pernicious

2  incentives -- the lodestar figure here and the

3  multiple it implies is at the very low end and could

4  justify a higher fee.  This was extensively mediated

5  litigation.  There was, as I've already noted, 220

6  requests.  The fee itself was mediated.

7           I'm not going to go through all the

8  *Sugarland* factors.  I will note that the attorneys

9  here on both sides have a very high reputation.  And

10  the issues here, while they were not unique, represent

11  a difficult field of litigation for any corporate

12  litigator.  All those together indicate to me that the

13  fee is reasonable.

14           And once again, it further sets my

15  mind at ease that a sophisticated investor who had the

16  interest in objecting has looked at this and decided

17  not to object.  In addition, I note that no other

18  stockholder has come forward to object to either the

19  settlement itself or the fee request.

20           So in light of all those factors, I

21  think a $1.5 million fee all-in is appropriate.

22           The fee request, Mr. Johnson, also

23  includes incentive awards.  Have you withdrawn those

24  or do you want to present those?

1          MR. JOHNSON:  I'd like to present on

2    the incentive awards, Your Honor.

3               So the final thing before the Court is

4    the incentive award.  We're requesting nominal $5,000

5    incentive awards for each of the two plaintiffs.  And

6    the reason why we've asked for the incentive award in

7    this case is that the plaintiffs really were actively

8    involved in all phases of the case, and the case

9    lasted an extremely long time.

10              We sent out the 220 demand in 2014,

11   and so they were -- I guess one of the plaintiffs

12   Mr. Feldman, was the plaintiff that sent out the 220

13   demand.  The other plaintiff came in in 2015.  But

14   they both were involved in this case between five and

15   six years.

16              We've submitted declarations saying

17   that they spent approximately 50 hours on the

18   litigation.  They reviewed pleadings, consulted with

19   counsel.  It was important that they maintain

20   continuous ownership of their stock throughout the

21   pendency of this suit.

22              And the $5,000 incentive award is in

23   line with similar cases.  We cited numerous cases in

24   our brief where a $5,000 award was awarded.  And we

1   think that it is appropriate in this particular case.

2                   THE COURT:  All right.  And is that to

3   come from the 1.5 million fee award?

4                   MR. JOHNSON:  It is, Your Honor.

5                   THE COURT:  All right.  Thank you.

6   Anyone else wish to speak?

7                   I'm not hearing anything.

8                   Counsel, I am going to approve the

9   incentive awards.  In doing so, I think it's fair to

10  point out that in every case where an incentive award

11  is sought, it has to be justified.  And the reason I

12  think is probably obvious.  But we do not want to have

13  an unwholesome incentive for stockholders to

14  participate in particularly contingent fee litigation

15  simply in anticipation of a fee award.

16                  That's not a concern here, obviously.

17  I don't think anybody would sign up as plaintiff to a

18  five-year litigation as a gamble on whether a $5,000

19  fee award might come to them down the line.  That

20  seems absurd.  But I do think it is important as a

21  matter of policy that we continue to have any

22  incentive award be specifically addressed by counsel

23  and supported by the record.

24                  I find, for all the reasons stated in

22

1   the record, that it does not create an unwholesome

2   incentive and is appropriate under the circumstances,

3   and that the plaintiffs have reaped a benefit for

4   their fellow stockholders here through efforts that

5   exceed what is normal in derivative litigation.  So

6   for all those reasons, I am going to include the

7   award.

8                    What else can we do here, Mr. Johnson?

9                    MR. JOHNSON:  I have nothing further,

10  Your Honor.  Thank you.

11                   THE COURT:  Thank you.

12                   Mr. Shannon, anything from your point

13  of view?

14                   MR. SHANNON:  Nothing further.  Thank

15  you, Your Honor.

16                   THE COURT:  All right.

17                   Anyone else wish to speak?

18                   MR. deLEEUW:  Your Honor, this is

19  Brad deLeeuw.  I did prepare an updated form of

20  final order and judgment.  I don't know if Your Honor

21  needs that, but I am prepared to submit that to

22  chambers if you do.

23                   THE COURT:  Would you do that, please?

24  For reasons that are not pertinent here, our Chambers

23

1  are closed today.  They will reopen tomorrow.  If you

2  can get that to me by tomorrow, Mr. deLeeuw, I will

3  enter it as an order of the Court forthwith.

4              MR. deLEEUW:  Thank you, Your Honor.

5  May I email that to Ms. Roach?

6              THE COURT:  Yes.  Why don't you do

7  that.  Just know that she won't get it until tomorrow

8  morning.

9              MR. deLEEUW:  Okay.  And I'll just

10 point out one other thing, which is that the form of

11 final order and judgment is the same as we originally

12 submitted to the Court except that aside from hanging

13 dates, I referred to both scheduling orders because

14 those orders, they're on the form of notice provided,

15 but originally in that supplemental notice.

16             THE COURT:  I'm grateful for your

17 bringing this up-to-date and that we get an accurate

18 and complete form of order as a result.  So thank you,

19 Mr. deLeeuw.

20             MR. deLEEUW:  You're welcome, Your

21 Honor.

22             THE COURT:  Anyone else?

23             Thank you, all.  And it's getting late

24 in the year, I guess, to wish people a happy new year.

CHANCERY COURT REPORTERS

24

1   Nonetheless I'll say happy new year and note that this

2   is my last hearing during the Trump Administration.  I

3   think it has 31 minutes left in it.

4                   So I do appreciate your attention and

5   your efforts, and I think this is a very fine result.

6   The attorneys involved and the mediator ought to be

7   pleased with their efforts on behalf of their clients

8   and the solid result that was obtained.  So I thank

9   you all.  Happy new year and good-bye.

10                  VARIOUS COUNSEL:  Thank you, Your

11  Honor.

12                  (Proceedings concluded at 11:30 a.m.)

13

14                          – – –

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATE

2

3              I, JEANNE CAHILL, RDR, CRR, Official

4  Court Reporter for the Court of Chancery of the State

5  of Delaware, do hereby certify that the foregoing

6  pages numbered 3 through 24 contain a true and correct

7  transcription of the proceedings as stenographically

8  reported by me at the hearing in the above cause

9  before the Vice Chancellor of the State of Delaware,

10  on the date therein indicated.

11              IN WITNESS WHEREOF I have hereunto set

12  my hand at Wilmington, Delaware, this 5th day of

13  February, 2021.

14

15

16                     /s/ Jeanne Cahill
                       ----------------------------
17                     Jeanne Cahill, RDR, CRR
                     Official Chancery Court Reporter
18                    Registered Diplomate Reporter
                      Certified Realtime Reporter
19

20

21

22

23

24

                    CHANCERY COURT REPORTERS