**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
PATRICK COUGHLIN (CA Bar No. 111070)
MAXWELL R. HUFFMAN (CA Bar No. 264687)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
pcoughlin@scott-scott.com
mhuffman@scott-scott.com

*Lead Attorneys for Co-Lead Plaintiff Police and Fire Retirement System of the City of Detroit and Co-Lead Plaintiff Bucks County Employees' Retirement System*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED Case No.: 3:21-cv-9388-RFL  **DECLARATION OF PATRICK J. COUGHLIN IN SUPPORT OF CO-LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATION**  Hon. Rita F. Lin, U.S.D.J. |

I, Patrick J. Coughlin, declare and state as follows:

I am an attorney licensed in the State of California and admitted to the United States District Court for the Northern District of California. I am Of Counsel at Scott+Scott Attorneys at Law LLP, counsel for Co-Lead Plaintiffs Police and Fire Retirement System of the City of Detroit and Bucks County Employees' Retirement System (collectively, the "Co-Lead Plaintiffs") in the above-captioned consolidated matter. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

I began working on the Alphabet, Inc. ("Alphabet")/Google LLC ("Google") matter in September 2023 approximately 21 months after the case was filed in December 2021. I began to review and analyze the documents and other evidence supporting the claims initially set forth in our original complaint as well as other regulatory and litigation actions in the ensuing years. This included, but was not limited to: (1) Alphabet's public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; (2) securities analyst, business, and financial media reports about Alphabet; (3) internal Alphabet documents produced pursuant to mediation privilege; (4) deposition transcripts and exhibits and trial exhibits in the underlying antitrust lawsuits produced pursuant to mediation privilege; and (5) trial transcripts from trials and publicly released trial exhibits or presentations in the underlying antitrust lawsuits. This analysis was undertaken with an eye toward trying the case as it was clear Alphabet had decided to challenge the charges that it was monopolistic and maintained its monopoly position unfairly in several of its main business lines such as Search, Ad Tech and Play. In particular, I was interested in reviewing various red flags reported to the Board of Directors ("Board") and the Board's response, if any, to these reports.

For example, in June 2017 the European Competition Commission concluded that the General Search Market was a distinct product market, Google held a dominant position in General Search Services and that Google had abused its dominant position in that market. Specifically, Google had abused its dominant position by posting and displaying more (favorably) in its general

1

Declaration of Patrick J. Coughlin in Support of Co-Lead Plaintiffs' Counsel's Fee Application
Consol. Case No.: 3:21-cv-9388-RFL

search results pages its own comparison shopping service compared to competing comparison shopping services. ¶17.[1]  Google was fined over $2 billion.

A review of the books and records Delaware General Corporation Law Section 220 documents we sought and received shows that while these findings and others such as the U.S. Department of Justice's ("DOJ") investigation into Google's unfair competition actions were reported to the Board as late as 2020 the Individual Defendants believed nothing needed to be changed or even investigated. ¶ 31.

On October 20, 2020, the DOJ joined by 11 states, filed the *Search* action alleging that Google had unlawfully maintained a monopoly in three distinct product markets – general search services, search advertising and general search text advertising.  According to the DOJ, Google accomplished this by "entering into exclusive agreements to secure default distribution on nearly all desktop and mobile devices in the United States." ¶35.  I started my work on this case just as the *Search* action went to trial in the District of Columbia between September 12 and November 16, 2023, with thousands of exhibits and dozens of lay and expert witnesses.  In August 2024 the court, Judge Amit Mehta, held that Google is a monopoly and unfairly maintained its monopoly position in two of the three relevant markets alleged, i.e., general search services and general search text ads.  The Court found that Google's distribution agreements, such as its default agreement with Apple, are exclusive and have anticompetitive effects and Google had failed to offer any valid pro-competitive justifications for those agreements charging supercompetitive prices for general search text ads.  I spent approximately 50% of my overall time on the Search issues confronting Google in an attempt to understand how Google acquired its search monopoly position, but more importantly, how it maintained it and what steps, if any, did the Individual Defendants take over the years as complaints were raised to investigate and address these issues.

For example, specialized vertical search providers ("SVPs") are search engines that specialize in specific types of content or category such as travel, jobs, shopping, real estate or health

---

[1]     All capitalized terms not herein defined and all "¶_" and "¶¶_" references herein are to the Verified Amended Consolidated Shareholder Derivative Action Complaint and Jury Demand (ECF No. 84) (the "Amended Complaint").

1  rather than general web search engines like Google or Bing.  Top vertical search providers such as
2  Kayak (flights-hotels), Amazon (shopping and Products) eBay (online marketplace) rely on click-
3  through from Google's general search for 30% to 40% of their traffic.  ¶97.

4  It was important for me to investigate such claims and examine what, if any, information
5  about such claims reached the Board and again what, if any, action did the Board take.  Claims such
6  as Yelp's never appeared to generate Board action.  Yelp claimed it formerly had a symbiotic
7  relationship with Google where Google fed traffic to Yelp and Yelp licensed user-generated content
8  for Google's use.  Google saw the value of SVPs/local search providers like Yelp and at one point
9  sought to acquire it.  ¶105.  Yelp rejected Google's offer, Google turned to seeing Yelp as a
10 competitive threat and sought to stifle it as a competitor appropriating its data and creating copycat
11 features ultimately implementing a "OneBox" feature to prioritize Google's own local search—
12 which Yelp claims is inferior.  ¶105.  These activities took place at the executive and product level
13 and do not appear to have been presented to or investigated by the Board except, of course, the
14 potential purchase of Yelp.

15 The new Board-level Risk & Compliance Committee would be in a position to better
16 evaluate and investigate such claims than the Audit Committee previously tasked with this
17 responsibility.

18 The next significant issue facing Google was an assertion that Google engaged in
19 anticompetitive practices regarding its Android Operating System, App Distribution, and in
20 Application Payment processing.  Specifically, Google recognized the size and margins for the
21 market for apps and app stores were making it attractive for entrants and if competition were to
22 develop, Google Play would have to "deliver[] superior user and dev[eloper] outcomes[]."  ¶117.

23 Instead of competing, it appears Google sought to employ a combination of tactics to
24 prevent competition among App stores and payment systems.  ¶117.  Google introduced "function"
25 to make it difficult for consumers to download Apps directly from the web, restricted OEMs in
26 contracts, started "Project Hug" to forestall "contagion" of Epic Games seeking its own App Store
27 and finally required Apps distributed through Google Play to use Google Play billing.  ¶¶117–19.
28

The questions I had to investigate were what did the Board know of these activities and action taken. Epic Games, Inc., went to trial as the attorney generals' settled for $700 million and certain reforms. I spent about 20% of my time examining and understanding Google's activities in the area.

In June 2023 the third shoe dropped on Google's monopolistic behavior as the DOJ and a number of States asserted that Google illegally monopolized key parts of the Digital Advertising Market. The suit accused Google of controlling and manipulating every major component of the Ad Tech pipeline:

1.     The Ad Server (for Publishers);

2.     The Ad Exchange—Google Adx—Real-time digital marketplace for buying and selling display ads; and

3.     Demand-Side Platform (DSP)—Google Display and Video 360 (DV360) used by advertisers to bid on and buy ad space.

The DOJ charged Google with Self-Preferencing and Rigging Auctions, Exclusionary conduct acquiring rivals (e.g., DoubleClick and AdMeld and blocking interoperability). The DOJ claimed this conduct reduced revenue for publishers, increased ad prices for advertisers and stifled innovation. Again, these practices occurred at the product level. With Board oversight many of these issues could have been addressed earlier. I spent about 20% of my total time on these issues to understand the issues and create a process and oversight to address these issues.

In addition to the above, I examined other anticompetitive conduct that had surfaced as a result of these main litigation cases—to determine if there was evidence that supported some of these claims, at what level had this conduct taken place. This examination included Google's Generative Artificial Intelligence services that were just getting off the ground. Finally, I examined the evidence that Google had failed to maintain chats setting an internal 24-hour automatic deletion deadline and marked non-attorney client privilege documents with this description simply to prevent discovery of these communications. We made sure our agreement covered these areas. Examination of these other issues accounted for approximately 10% of my time.

4

Declaration of Patrick J. Coughlin in Support of Co-Lead Plaintiffs' Counsel's Fee Application
Consol. Case No.: 3:21-cv-9388-RFL

The reforms will ensure that Alphabet will have Board-level oversight into all risk and compliance issues. Currently, Alphabet's Board has one committee that oversees both financial reporting and accounting compliance, as well as regulatory and legal compliance, in its Audit and Compliance Committee. But as the antitrust actions, as well as numerous other litigations, illustrate, Alphabet faces a wide variety of regulatory, compliance, and enterprise risks that require more in-depth and regular oversight that can best be achieved through a standalone committee. To that end, the Settlement specifies that the Board shall charter a new committee devoted solely to overseeing regulatory, compliance, and enterprise-risk issues, to be called the Risk & Compliance Committee ("RCC"). Joint Stipulation and Agreement of Settlement (ECF No. 87-1) (the "Stipulation") ¶1.4.

As the antitrust actions and Co-Lead Plaintiffs' Amended Complaint illustrate, many anticompetitive decisions were led at the executive level.

The Settlement will prevent future such problems from recurring because it will ensure that Alphabet and Google executives will take a more active role in overseeing regulatory and compliance issues. To that end, the Settlement establishes a new senior-VP-level committee that will handle regulatory and compliance issues Company-wide, which will report directly to the CEO and the new Board compliance committee. Emphasizing its broader compliance and risk oversight role, the new committee will be called a "Trust & Compliance Council" ("TCC") to "assist the RCC to oversee and monitor the Company's compliance with regard to Google LLC (including its subsidiaries), by providing a forum to discuss specific high-impact Trust and Compliance initiatives, to provide recommendations as needed related to prioritization risks and associated resource allocations, and to discuss areas of risk identified as high or critical." *Id.* ¶1.5(a). The TCC's membership "shall include multiple Senior Vice Presidents who report directly to the Company's CEO, and who meet (at a minimum) quarterly." *Id.*

In total, I spent 2,051.50 hours' time reviewing, analyzing and drafting reforms. My hourly rate of $2,050.00 an hour is in line with all the major firms with partners at my level. Attached hereto as Exhibit A is a true and correct copy of my detailed billing records on this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 15, 2025, at San Diego, California.

          /s/ Patrick J. Coughlin
        PATRICK J. COUGHLIN

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. All parties not so registered will be served via e-mail or U.S. Mail.

Executed on August 15, 2025, at San Diego, California.

       /s/ Patrick J. Coughlin
PATRICK J. COUGHLIN (CA Bar No. 111070)
SCOTT+SCOTT ATTORNEYS AT LAW LLP

*Counsel for Co-Lead Plaintiffs*