**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
PATRICK COUGHLIN (CA Bar No. 111070)
MAXWELL R. HUFFMAN (CA Bar No. 264687)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
pcoughlin@scott-scott.com
mhuffman@scott-scott.com

*Lead Attorneys for Co-Lead Plaintiff Police and Fire Retirement System of the City of Detroit and Co-Lead Plaintiff Bucks County Employees' Retirement System*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED Case No.: 3:21-cv-9388-RFL |
| | **DECLARATION OF JING-LI YU IN SUPPORT OF CO-LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATION** |
| | Hon. Rita F. Lin, U.S.D.J. |

I, Jing-Li Yu, pursuant to 28 U.S.C. §1746, declare and state as follows:

I am an attorney licensed in the State of California and admitted to the United States District Court for the Northern District of California. I am a partner at Scott+Scott Attorneys at Law LLP ("Scott+Scott" or the "Firm"), counsel for Co-Lead Plaintiffs Police and Fire Retirement System of the City of Detroit ("Detroit") and Bucks County Employees' Retirement System ("Bucks County" and collectively with Detroit, the "Co-Lead Plaintiffs") in the above-captioned consolidated matter (the "Action"). I have personal knowledge of the facts set forth herein and, if called upon as a witness, could and would testify competently to them.

1.    I have been one of the main litigators in this Action since its commencement, and before then in the investigation leading up to the filing of this Action. In November 2020, Scott+Scott was retained by Bucks County (and afterwards, by Detroit) to investigate this action, which included both a review of public documents and confidential documents to be produced following a demand for corporate books and records made under Section 220 of the Delaware General Corporations Act (a "220 Demand" and a "220 production"). I led the investigation of the public record and drafting of the 220 Demand, which Scott+Scott, on behalf of Bucks County, served on Alphabet, Inc. ("Alphabet" or the "Company"), in February 2021. Over approximately two months, I met and conferred with outside counsel for the Company concerning the scope of the 220 production, which we agreed to in April 2021. I further met and conferred with the Company's outside counsel, reviewed the initial 220 production and a follow-up that corrected some redactions, from May to July 2021.

2.    For the remainder of 2021, I shifted my focus to preparing a plenary complaint on behalf of Bucks County, and I also helped prepare a plenary complaint on behalf of Detroit after it retained Scott+Scott to examine anticompetitive conduct by Alphabet and the potential for a derivative suit. On behalf of Bucks County and Detroit, Scott+Scott filed separate plenary complaints in early December 2021.

3.    At the time our plenary complaints were filed, Google was subject to numerous antitrust actions, including three major actions brought by the U.S. Department of Justice ("DOJ") or by states attorneys general ("state AGs"):

a)  In October 2020, the DOJ and one coalition of state AGs filed an action alleging widespread anticompetitive conduct by Google in general search and in general search ads ("DOJ Search Action").  The centerpiece of the DOJ Search Case was Google's use of contracts with various mobile phone carriers and manufacturers, as well as with browser companies, that ensured that Google would be the exclusive default general search engine on every significant access point.

b)  Also in October 2020, the Majority Staff of the House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law, issued a report of its findings following an investigation into anticompetitive conduct by Google and three other digital platform providers (the "House Report").

c)  In December 2020, a coalition of state AGs led by the Colorado AG filed an action alleging widespread anticompetitive conduct by Google in both general and specialized search ("Colorado AG Action").  While the Colorado AG Action overlapped with the DOJ Search Action, it included more extensive allegations concerning Google's self-preferencing conduct and misappropriation of data from vertical search providers, e.g., Yelp or Expedia, which provided search services in specific areas.  The Colorado AG Action and the DOJ Search Action were consolidated for purposes of trial (together, the "Search Actions").

d)  Also in December 2020, a coalition of state AGs led by the Texas AG filed an action alleging widespread anticompetitive conduct by Google in the advertising technology, or "ad tech," industry, including Google's dominance of the entire ad tech stack by owning the dominant entity in each ad tech market (the leading ad server, ad publisher, and ad exchange) (the "Texas AG Action").  One Google executive analogized Google's market control to Goldman Sachs owning the New York Stock Exchange. Many private parties also filed actions concerning ad tech, and after Co-Lead Plaintiffs' complaint was filed, the DOJ filed its own ad tech action in January 2023 (the "DOJ Ad Tech Action").

2

Declaration of Jing-Li Yu in Support of Co-Lead Plaintiffs' Counsel's Fee Application
Consol. Case No.: 3:21-cv-9388-RFL

e) In July 2021, the Utah AG led a coalition of state AGs to file an action alleging that Google violated antitrust laws in the mobile app developer market by preventing rival companies from creating their own app stores and by forcing app developers to use Google's in-app payment ("IAP") services (the "Utah AG Action").  Many private parties also sued concerning anticompetitive conduct by Google in the mobile app developer market, including a suit filed by Epic Games, Inc. ("Epic Games"), that eventually went to trial ("Epic Games Action").

4.      To prepare the plenary complaint, I reviewed and analyzed the 220 production to show what the Board knew or did not know about Google's exposure to antitrust problems, as well as the underlying antitrust actions listed above to determine Google's underlying misconduct, and incorporated my analysis into a plenary complaint for Bucks County.

5.      For my work investigating the public record, reviewing 220 documents, and drafting a plenary complaint for Bucks County, as well as some follow-up filings afterwards, I spent approximately 250 hours of time through the end of 2021.

6.      In 2022, I helped draft a consolidated complaint for Co-Lead Plaintiffs.  In addition, I investigated additional facts concerning antitrust misconduct at Google, including an action filed by a coalition of states' attorneys general led by Utah, concerning Google's anticompetitive conduct regarding the Google Play Store.

7.      Furthermore, review and analysis of non-public documents picked up pace at Scott+Scott, when, in July 2022, the Company also re-produced to us, under a confidentiality agreement asserting the mediation privilege, the production Google made to the Texas AG before the latter filed its lawsuit concerning Google's anticompetitive conduct in the ad tech space.  I conducted some of the initial review of that production—consisting of approximately 1 million pages of documents—as well as supervised a team of staff attorneys who reviewed the bulk of that production.  Our staff attorney team ranged from two attorneys to four attorneys.  We held weekly calls to discuss key findings, and the staff attorneys also circulated individual noteworthy documents and outlines or memoranda explaining in further detail the noteworthy documents they were finding.  In addition to myself as the overall supervisor of our staff attorney team, Alexander

1   Outwater, then an associate at the Firm, supervised the staff attorney team day-to-day, and that

2   continued to be his primary role in this Action until his departure from the Firm in the spring of

3   2025.

4          8.      In total, the Company produced three sets of documents under the mediation

5   privilege:

6          • In July 2022, it produced documents produced to the Texas AG, which was the largest

7            production, consisting of over 1.1 million pages of documents.

8          • In June 2023, it produced hundreds of deposition transcripts and exhibits from various

9            underlying antitrust actions against Google.

10         • In November 2024, it produced 1,842 documents totaling approximately 43,000 pages,

11           which consisted of documents from underlying antitrust actions against Google.

12         9.      These mediation productions took an especially long time to review because they

13  included contracts, communications, presentations, and testimony that relied heavily on technical,

14  advertising technology terms.  The staff attorney team also grappled with a complex and expansive

15  cast of different company names, product names, project names—which were sometimes in

16  code—and a large number of different employees from both Google and its competitors.  Thus,

17  even with the aid of artificial intelligence programming to prioritize the more relevant documents

18  for review, the staff attorney team still had to devote a great deal of time to analyzing these

19  documents.

20         10.     In 2022, I also began to keep myself more regularly up to date with factual

21  developments concerning Google, the underlying antitrust litigation, Google's potential

22  competitors, and technological developments—which accelerated with the release of ChatGPT in

23  November 2022.  I also occasionally read scholarship or other deeper analyses on antitrust issues

24  affecting technology companies, or on more general technology issues, to familiarize myself with

25  the state of the industry and with legal theories so that I could more effectively prosecute this

26  Action, which is based on underlying anticompetitive conduct at Google.

27         11.     Furthermore, I helped prepare for and draft a mediation statement for the first in-

28  person mediation on December 15, 2022, though I did not personally attend because several other

4

DECLARATION OF JING-LI YU IN SUPPORT OF CO-LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATION
CONSOL. CASE NO.: 3:21-cv-9388-RFL

1   lawyers from the Firm would be attending.  These additional activities all resulted in a significantly
2   higher expenditure of time devoted to this Action in 2022.  Thus, in 2022, I spent a total of
3   approximately 600 hours on this Action.

4          12.    In 2023, Mr. Outwater and I continued to supervise the staff attorney team, who
5   continued to review the million-page production made by the Texas AG.  I also continued to devote
6   significant time to keeping abreast of current developments, as the development of generative
7   artificial intelligence ramped up throughout the tech industry and in Google in particular.  I and
8   others could surmise that generative artificial intelligence ("AI") could become an important issue
9   in determining Google's liability for antitrust violations, as well as potential remedies, or future
10  antitrust issues, since tech industry players and commentators were making claims concerning
11  whether generative AI would displace Google's dominance in search, or, conversely, whether
12  Google's dominance in search would also allow it to dominate the nascent generative AI field.
13  Moreover, in January 2023, Google faced even more antitrust liability the DOJ Ad Tech Action
14  was filed.  I reviewed the DOJ's complaint as well as related developments on the docket and in
15  the news.  By fall of 2023, Google also faced two antitrust trials—the Search Actions (consolidated
16  and proceeding in one trial) and the Epic Games Action.  Thus, I also spent a significant amount
17  of time following these trials, which directly impact the potential liability in this Action.  In 2023,
18  I spent approximately 520 hours on this matter.

19         13.    In 2024, my workload on this Action remained high.  Google had been found liable
20  in the Epic Games Action, which I believe significantly increased the pressure and the impetus for
21  the Company to seriously approach resolving this Action, now that antitrust liability was concrete
22  rather than inchoate, as evident by how a second in-person mediation session was scheduled for
23  February 7, 2024.  In advance of that mediation, which I did attend, I prepared a mediation
24  statement as well as an update for the mediators on the numerous antitrust developments
25  concerning Google.

26         14.    After the February 2024 mediation, Scott+Scott also hired a larger staff attorney
27  team to review and analyze the remaining documents produced by the Company under the
28  mediation privilege, as well as review and analyze the trial transcripts, exhibits, and arguments for

Epic Games and the DOJ search case that had occurred in 2023. I remained in charge of overall supervising of that larger staff attorney team, while Mr. Outwater continued to supervise the team day-to-day. Our staff attorney team, at its height, reached approximately 10 attorneys.

15. In addition to completing the review of the Company productions, the staff attorneys devoted a significant amount of time to examining the public factual record, including reviewing all the trial transcripts for the Search Actions and Epic Games Action, which were both multi-month trials that occurred in 2023, and for the DOJ Ad Tech Action, which occurred in September 2024. Each trial transcript could total hundreds of pages, and together, all three trials took approximately five to six months to complete. The trial transcripts took a significant amount of time to review and analyze, because the staff attorneys had to familiarize themselves with the terminology, the witnesses, the people the witnesses referred to, and follow often deeply technical subjects that used a lot of jargon. In addition, the staff attorneys also reviewed and analyzed any public trial or argument exhibits, as well as the more fact-intensive briefing such as proposed findings of fact.

16. In 2024, I also spent a significant amount of time on bolstering my factual and industry understanding by keeping abreast of industry developments, especially those concerning generative AI. Furthermore, in August 2024, Google was found liable for antitrust violations in the DOJ's search case, in an opinion that took a long time to read and analyze because it numbered several hundred pages in its slip copy. Furthermore, the DOJ Ad tech Action proceeded to trial in autumn of 2024.

17. Toward the middle of 2024, I also began to prepare an amended complaint when progress on settlement negotiations appeared to slow. But toward autumn 2024, as a third mediation was scheduled (which I did not attend), I also began to once again prepare materials relating to a potential settlement. At the same time, I continued to prepare an amended complaint that would include all the major developments that have occurred in the underlying antitrust actions since the last operative complaint was filed in early 2022.

1    18.    My increasing involvement in the settlement process, management of a larger staff

2    attorney team, continued need to keep abreast of developments, and work on preparing an amended

3    complaint led to my spending approximately 820 hours on this matter in 2024.

4    19.    In 2025, up to July 7, 2025—the date before preliminary approval of the settlement

5    was granted on July 8, 2025—I spent a proportionally greater amount of time on this Action as I

6    spent more time preparing the amended complaint, which was filed on May 30, 2025, keeping

7    abreast of technological developments, continuing to manage the staff attorneys, reviewing

8    developments in the underlying antitrust actions, and preparing settlement-related and preliminary

9    approval papers.  Thus, in a little over six months, I spent approximately 500 hours on this matter.

10    20.    My billing rate of $1,145 per hour is commensurate with lawyers at similar levels

11    of seniority in New York City, where I practice, and in San Francisco, where this Action is being

12    adjudged.

13    21.    Attached hereto as Exhibit A is a true and correct copy of my detailed billing

14    records on this matter.

15    I declare under penalty of perjury under the laws of the United States of America that the

16    foregoing is true and correct.

17    Executed on August 15, 2025, at New York, New York.

18    _/s/_ Jing-Li Yu
      JING-LI YU

19

20

21

22

23

24

25

26

27

28

7

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on August 15, 2025, I authorized the electronic filing of the foregoing

3    with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4    to the e-mail addresses denoted on the Electronic Mail Notice List.  All parties not so registered

5    will be served via e-mail or U.S. Mail.

6        Executed on August 15, 2025, at New York, New York.

7                                             /s/ Jing-Li Yu
                                             _____
8                                             JING-LI YU (CA Bar No. 342985)
                                             SCOTT+SCOTT ATTORNEYS AT LAW LLP
9
                                             *Counsel for Co-Lead Plaintiffs*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28