**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
PATRICK COUGHLIN (CA Bar No. 111070)
MAXWELL R. HUFFMAN (CA Bar No. 264687)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
pcoughlin@scott-scott.com
mhuffman@scott-scott.com

*Lead Attorneys for Co-Lead Plaintiffs*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| IN RE ALPHABET, INC., SHAREHOLDER DERIVATIVE LITIGATION | CONSOLIDATED<br>Case No.: 3:21-cv-9388-RFL<br><br>**CO-LEAD PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>DATE: Tuesday, September 30, 2025<br>TIME: 1:30 p.m.<br>JUDGE: Hon. Rita F. Lin, U.S.D.J.<br>DEPT: Courtroom 15 – 18th Floor |
|---|---|

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 3

A. The Enhanced Compliance Structure Established in This Case Will Allow Google to Implement the Remedies Imposed in *Search* .......... 3

B. The RCC and RegReady Will Ensure That Alphabet Complies with *Epic* .......... 4

C. No Shareholders Have Objected to the Settlement or the Proposed Fee .......... 6

D. The $80 Million Fee Request Is Reasonable and Should Be Approved .......... 7

1. The Fee Is Modest in Light of the Extraordinary Results .......... 7

2. The Results Were Achieved Through Extraordinary Effort and Risk .......... 7

3. The Fee Was the Product of an Independent, Arm's-Length Process .......... 8

4. The Request Is Conservative Compared to Comparable Litigation .......... 9

5. The Fee Will Not Diminish the Company's Recovery .......... 9

6. The Absence of Objections Confirms Reasonableness .......... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Helfler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ........ 6

*In re Google Play Store Antitrust Litig.*,
147 F.4th 917 (9th Cir. 2025) ........ 5

*In re Google Play Store Antitrust Litigation*,
No. 3:21-md-02981-JD (N.D. Cal. Aug. 22, 2025) ........ 3

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ........ 9

*In re McKesson Corp. Derivative Litigation*,
2020 WL 13577438 (N.D. Cal. Apr. 22, 2020) ........ 8

*In re Pfizer Inc. S'holder Derivative Litigation*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011) ........ 8

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
445 F. Supp. 3d 508 (N.D. Cal. 2020) ........ 6, 10

*Lane v. Page*,
862 F. Supp. 2d 1182 (D.N.M. 2012) ........ 10

*Rudi v. Wexner*,
2022 WL 1682297 (S.D. Ohio May 16, 2022) ........ 3, 7

*United States v. Google LLC*,
2025 WL 2523010 (D.D.C. Sept. 2, 2025) ........ 1, 3, 4

## I. INTRODUCTION

This Settlement delivers a governance reform package and a binding financial commitment of unprecedented scale and value in a derivative action. It creates a stand-alone, Board of Directors ("Board")-level Risk & Compliance Committee ("RCC") with direct responsibility for overseeing Alphabet, Inc.'s ("Alphabet" or the "Company") most significant regulatory and litigation risks. It requires the adoption and implementation of "RegReady," a company-wide compliance framework that creates sustained monitoring and accountability across the enterprise. And it secures an enforceable $500 million commitment over 10 years to fund those reforms. No prior derivative settlement has paired structural reforms of this breadth with a half-billion-dollar financial obligation. Taken together, these measures fundamentally transform Alphabet's governance and position the Company to confront regulatory challenges with the rigor and oversight stockholders are entitled to expect.

Recent developments in Alphabet's antitrust cases demonstrate that the RCC and RegReady governance reforms and $500 million funding commitment are of extreme importance. In *United States v. Google LLC* (the "*Search*" case) and *Epic Games, Inc. v. Google LLC* (the "*Epic*" case), courts and juries confirmed that Google LLC ("Google") unlawfully maintained its monopolies through exclusionary conduct, and sweeping remedies are now being imposed to restore competition. These obligations include requirements to share data with rivals, curb exclusivity agreements, increase transparency in advertising markets, and dismantle the network effects of its Play Store monopoly.

The Settlement directly equips Alphabet to meet and sustain the remedies imposed in *Search* and *Epic*. The new RCC ensures that court-ordered mandates—such as limiting exclusivity agreements, increasing transparency in ad auctions, and opening Android to rival app stores—are elevated to the Board and monitored at the highest level. The RegReady program embeds compliance review into daily operations, enabling Alphabet to test business decisions in real time against the restrictions and transparency obligations courts have now required. And the $500 million, 10-year funding commitment guarantees that these reforms are not symbolic but durable,

providing the resources and infrastructure needed to carry out and maintain compliance with these structural remedies over the long term.

These rulings confirm what stockholders have long feared: Alphabet's regulatory exposure is both real and ongoing. The Settlement is the only comprehensive, internal solution to address that exposure, making the reforms and funding achieved here indispensable to the Company's ability to comply with external mandates and safeguard its future.

The reaction of Alphabet's stockholders further confirms the Settlement's fairness. More than a month has passed since the final approval briefing and more than two months since the Court's preliminary approval hearing, yet not a single stockholder has objected—despite widespread notice and ample opportunity. At preliminary approval, the Court conducted an extensive vetting of the Settlement and the fee request, pressed counsel on the record, and expressly invited shareholders to raise objections if they believed the relief or the fee was unwarranted. The absence of any objections to either the settlement or the proposed fee creates a powerful presumption of fairness that is only reinforced by the Court's careful scrutiny. The absence of opposition here—combined with extraordinary governance benefits and a modest, mediator-recommended fee—compels final approval.

Finally, the requested $80 million fee is reasonable by every standard and should be approved. The results in this case were achieved only because of the extraordinary effort, persistence, and judgment of Plaintiffs' counsel. Over nearly five years, counsel prosecuted this case as if it were headed to trial—developing *Caremark* claims capable of surviving dismissal, digesting millions of pages of documents and testimony from three overlapping antitrust proceedings, and building a trial-ready evidentiary record of fiduciary breach. At the same time, counsel designed and secured a governance reform package uniquely calibrated to Alphabet's risks: creation of an independent Board-level Risk & Compliance Committee, adoption of the RegReady compliance framework, and a binding $500 million, 10-year funding commitment. These are extraordinary, forward-looking results that no other proceeding has delivered.

Measured against those results, the fee request is modest. Epic Games, Inc.'s counsel in *Epic*, for example, has sought $205 million after its trial win against Google—more than double the request here—even though that case imposed no governance funding. *See* Plaintiff Epic Games, Inc.'s Notice of Motion and Motion for Attorneys' Fees and Costs at 24, *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal. Aug. 22, 2025), ECF No. 725. By contrast, the $80 million fee sought here represents just 16% of the $500 million compliance funding commitment, a percentage well below the range courts routinely approve for derivative and governance settlements of this magnitude. *See, e.g.*, *Rudi v. Wexner*, 2022 WL 1682297, at *4–5 (S.D. Ohio May 16, 2022) (approving fee equal to 23% of governance funding commitment).

Equally important, the fee here will not come at the expense of Alphabet or its stockholders. It will be paid entirely by the Company's D&O insurers, and it was negotiated with Alphabet and the D&O carriers only after all substantive settlement terms had been finalized. The process was hard-fought, arm's-length, and supervised by former U.S. District Judge Layn Phillips, who after extensive mediation issued a mediator's proposal that all sides, including the D&O carriers, accepted. That independent validation further confirms the fairness of the requested award. The combination of unprecedented governance benefits, extraordinary effort and risk, appropriate proportionality to the relief obtained, and independent confirmation by an experienced mediator collectively show that the $80 million fee is fair, reasonable, and should be granted in full.

## II. ARGUMENT

### A. The Enhanced Compliance Structure Established in This Case Will Allow Google to Implement the Remedies Imposed in *Search*

Since the filing of the opening brief, the D.C. District Court has entered its remedies order in the Google *Search* antitrust action. The Court emphasized that while "[t]he ordinary starting point is an injunction terminating the anticompetitive conduct . . . relief, to be effective, must often go beyond the narrow limits of the proven violation." *United States v. Google LLC*, 2025 WL 2523010, at *29 (D.D.C. Sept. 2, 2025) (citation modified). The Court further explained that it was "empowered to fashion appropriate restraints on [the defendant's] future activities both to

avoid a recurrence of the violation and to eliminate its consequences" and "may even impose affirmative obligations on the defendant." *Id.* at *29–30 (alteration in original). Consistent with that principle, the Court required Google to adopt forward-looking remedies: a Technical Committee, mandatory data-sharing with rivals, limits on exclusivity contracts, and transparency in ad auctions—measures intended to restore competition and prevent Google from extending its dominance into GenAI. These obligations are designed not only to stop exclusionary conduct but also to deny Google the "fruits" of its violations, including "freedom from threats"; "scale"; and "revenue." *Id*. at *40.

The reforms secured in this derivative settlement provide the governance infrastructure necessary to make those remedies effective in practice. The RCC, supported by the RegReady framework, ensures that the data-sharing mandates, exclusivity limits, and auction transparency requirements ordered in *Search* are implemented consistently across Alphabet's business lines. RegReady incorporates DOJ-modeled compliance elements—risk assessment, policy development and training, internal reporting, controls, and risk management—so that obligations imposed by the court are integrated into everyday business decision-making. The RCC is charged with elevating compliance issues directly to the Board, ensuring that product and business strategies are subject to real-time legal review, and embedding compliance professionals within product teams to prevent commercial decisions that conflict with court-ordered remedies. The $500 million, 10-year enforceable funding commitment—the largest governance-focused monetary obligation ever secured in derivative litigation—further guarantees that Alphabet will have the resources to monitor data-sharing, oversee auction disclosures, and enforce limits on exclusivity for the next decade. Together, these provisions ensure that the *Search* remedies are not left to chance but are supported by a durable, company-wide compliance architecture and direct Board-level oversight at the moment when rigorous implementation is most critical.

**B. The RCC and RegReady Will Ensure That Alphabet Complies with *Epic***

The settlement further provides the internal governance and compliance infrastructure necessary to ensure that Alphabet faithfully implements—and cannot evade—the sweeping

injunction affirmed by the Ninth Circuit in *Epic*. The Ninth Circuit described the district court's order as "prohibiting anticompetitive arrangements that insulated the Play Store and Google Play Billing from competition" by "prohibit[ing] Google from sharing Play Store revenue with actual or prospective entrants in the Android app-distribution market" and by "prohibit[ing] Google from engaging counterparties in restrictive deals" that conditioned access on exclusivity. *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 945 (9th Cir. 2025). The injunction also required Google to open the Play Store catalog to rival app stores and to permit those stores to be distributed through the Play Store itself, with a Technical Committee overseeing implementation. *Id.* In affirming this relief, the Ninth Circuit stressed that district courts are "clothed with large discretion to fit the decree to the special needs of the individual case"—not only to "unfetter a market from anticompetitive conduct," but also to "pry open to competition a market that has been closed by defendants' illegal restraints." *Id.* at 946 (citation modified). It upheld the catalog-access remedy as a "reasonable method of counteracting the Play Store's dominance and reducing the network effects it enjoys by temporarily lowering barriers to entry." *Id.* at 947 (citation modified).

The derivative settlement ensures Alphabet has the internal governance and compliance mechanisms necessary to carry out and sustain those remedies. The RCC gives the Board direct oversight of antitrust and regulatory risks, providing a governance body specifically charged with monitoring Alphabet's compliance with the prohibitions affirmed in *Epic*. The RegReady framework builds DOJ-modeled compliance processes into Alphabet's operations—risk assessment, policy development, training, legal review, and monitoring—so that contracting and distribution decisions are no longer driven solely by business incentives, but are subjected to rigorous, real-time compliance review. Under this framework, exclusivity deals, revenue-sharing arrangements, and distribution contracts of the type at issue in *Epic* will face mandatory compliance checks before approval. Embedded compliance officers will escalate issues to the RCC when risks arise, ensuring that violations are addressed at the highest level of oversight.

Equally important, the Settlement locks in a $500 million, 10-year funding obligation to support these structures. That commitment ensures the reforms are fully resourced, durable, and

enforceable, preventing Alphabet from scaling back oversight once judicial scrutiny wanes. In short, just as the Ninth Circuit approved extraordinary remedies to "pry open to competition" a market unlawfully closed, this Settlement provides the internal guardrails to ensure Alphabet complies with those remedies and does not revert to the practices a jury already found unlawful.

### C. No Shareholders Have Objected to the Settlement or the Proposed Fee

In the more than one month since the filing of the final approval brief, and more than two months since the Court held the preliminary approval hearing, no stockholders have filed an objection to the Settlement or to the requested $80 million fee award, despite having ample notice and opportunity to do so. The absence of objections strongly supports a presumption that the Settlement and the fee request are fair and reasonable. *See, e.g.*, *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 518 (N.D. Cal. 2020) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members[]") (citation modified); *Helfler v. Wells Fargo & Co.*, 2018 WL 6619983, at *15 (N.D. Cal. Dec. 18, 2018) ("[T]he lack of objections from institutional investors who presumably had the means, the motive, and the sophistication to raise objections weighs in favor of approval[]") (citation modified). That presumption is even stronger here, where there are likewise no objections to the requested fee.

The weight of this factor is amplified by the Court's own extensive vetting of the Settlement and fee request at the preliminary approval stage. In advance of the hearing, the Court issued detailed written questions, requiring the parties to address Alphabet's historic compliance spending, the valuation of the governance reforms, and other core aspects of the Settlement. At the July 8, 2025 hearing, the Court rigorously questioned counsel for nearly an hour, scrutinizing both the merits of the $500 million compliance funding commitment and the establishment of the new RCC, as well as whether the requested $80 million fee was justified given the scope of the work performed. After this thorough examination, the Court preliminarily approved the Settlement and took the fee issues under advisement, inviting shareholder feedback.

Here, no stockholders have objected. That includes no objections to the $80 million fee request. The complete absence of stockholder opposition, coupled with the Court's careful scrutiny at the preliminary approval stage, provides compelling support for granting final approval of the Settlement and awarding the requested fees.

**D. The $80 Million Fee Request Is Reasonable and Should Be Approved**

The requested $80 million award is fair, reasonable, and fully justified under Delaware and Ninth Circuit standards. Every relevant consideration—the magnitude of the results achieved, the extraordinary effort and risk undertaken by Plaintiffs' counsel, the contingent nature of the case, the standing and ability of counsel, the independent mediation process, and the absence of any objections—supports granting the fee in full.

**1. The Fee Is Modest in Light of the Extraordinary Results**

This Settlement secures governance reforms and financial commitments of unprecedented scope in a derivative action. The creation of a Board-level Risk & Compliance Committee, adoption of the RegReady compliance framework, and a binding $500 million, 10-year funding commitment collectively reshape Alphabet's compliance infrastructure and directly address the oversight failures that exposed the Company to systemic antitrust risk. Against this backdrop, the requested $80 million fee amounts to just 16% of the compliance funding commitment. Courts routinely approve higher percentages in derivative and governance settlements. *See Rudi v. Wexner*, 2022 WL 1682297, at *4–5 (S.D. Ohio May 16, 2022) (23%). The requested award is thus modest by comparison and well within the range of reasonableness.

**2. The Results Were Achieved Through Extraordinary Effort and Risk**

Plaintiffs' counsel devoted nearly five years and more than 37,000 hours to prosecuting this case, investing over $34 million in lodestar on a fully contingent basis. Counsel pursued the case as though it were headed to trial—reviewing millions of pages of documents, analyzing testimony and evidence from three overlapping federal antitrust cases, and building a trial-ready evidentiary record of fiduciary breach. These efforts were undertaken in the face of considerable legal risk. *Caremark* oversight claims are among the most difficult in corporate law, and Plaintiffs

faced the constant threat of dismissal or adverse rulings against one of the most powerful corporations in the world. The requested fee appropriately compensates counsel for achieving a record-breaking governance outcome in the face of these risks.

A portion of this effort involved reviewing documents, pleadings, and trial transcripts from the parallel federal antitrust proceedings. Much of that work was performed by staff attorneys, whose review was indispensable to building the case. There was no way to understand the fiduciary oversight failures at issue, or to prepare effectively for mediation and trial, without mastering the factual record developed in those enforcement actions. Courts have routinely approved the inclusion of such time in shareholder derivative cases where the claims are based on the same wrongful conduct at issue in the parallel proceedings. *See, e.g.*, *In re Pfizer Inc. S'holder Derivative Litigation*, 780 F. Supp. 2d 336, 344 (S.D.N.Y. 2011) (order approving plaintiffs' full fee request based in part on review of voluminous productions from underlying DOJ action); *In re McKesson Corp. Derivative Litigation*, 2020 WL 13577438, at *4 (N.D. Cal. Apr. 22, 2020) (order approving full fee request where plaintiffs' counsel reviewed approximately one million pages of documents, including deposition transcripts and documents from related nationwide opioid multi-district litigation). Here, that work was essential to distilling the evidence of Alphabet's antitrust misconduct and translating it into a trial-ready record that drove the historic governance reforms and funding commitment.

**3. The Fee Was the Product of an Independent, Arm's-Length Process**

The $80 million fee request was negotiated only after all substantive settlement terms were finalized, and only then in a hard-fought process overseen by former U.S. District Judge Layn Phillips. Judge Phillips explained that fee negotiations "involved an additional party—the insurers, as Co-Lead Plaintiffs' counsel's fee is coming from Defendants' director and officer liability insurance." *See* ECF No. 108-1 ¶19. Because the D&O carriers are responsible for paying the full fee, they were at the table and actively contested the amount.

Judge Phillips noted that "[t]he Parties had differing views as to what an appropriate amount of attorneys' fees should be. After considering the arguments presented, and significant

back-and-forth between the parties, I made a mediator's recommendation in the amount of $80,000,000 in attorneys' fee and expenses. Both sides accepted this proposal, i.e., Alphabet agreed not to object to a request at this level and counsel for the Plaintiffs agreed not to ask for more." *Id.* Judge Phillips further explained: "In addition to agreeing to my recommendation, it was agreed that any attorneys' fees and expenses awarded will be paid by Defendants' director and officer liability insurance carriers. This agreement, too, was the product of arm's-length negotiations." *Id.*

Courts routinely give substantial weight to such independent recommendations, which confirm that a fee is the product of genuine adversarial negotiation rather than collusion. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 569–70 (9th Cir. 2019) (rejecting argument of collusion between class and defense counsel when "[t]he settling parties agreed on the amount of class compensation . . . over multiple mediation sessions with a respected and experienced mediator, the reasonable attorney's fees provided in the settlement agreement") (citation modified). That the proposed fee was vetted and approved by Judge Phillips—an experienced neutral mediator with decades of practice in high-stakes derivative and securities cases—provides strong evidence of its fairness.

**4. The Request Is Conservative Compared to Comparable Litigation**

In *Epic*, counsel has sought $205 million in fees following its trial victory—more than double the request here—even though that case imposed no governance funding or long-term compliance oversight. By contrast, the $80 million request in this case is tied directly to a $500 million governance funding commitment and transformative structural reforms. This contrast underscores that the requested fee is not only proportionate, but restrained given the scope of relief.

**5. The Fee Will Not Diminish the Company's Recovery**

Importantly, the requested $80 million fee will be paid entirely by Alphabet's D&O insurers, not the Company or its stockholders. The reforms and the $500 million funding commitment secured through the Settlement will therefore remain wholly intact and undiminished. Courts consistently recognize that where fees are borne by insurers, concerns about any burden on

the company and its investors are greatly reduced, further supporting approval. *See Lane v. Page*, 862 F. Supp. 2d 1182, 1256 (D.N.M. 2012) (approving fee because class counsel achieved significant results and because separately negotiated fee with insurance carrier meant "the attorney's fees do not reduce the amount available to the class and any judicial reduction to the attorney's fees does not increase the funds available to the class"). Moreover, the D&O carriers themselves participated directly in the fee mediation and accepted Judge Phillips' mediator's proposal. Their agreement—after adversarial negotiation with Plaintiffs' counsel—provides additional independent validation that the $80 million request is fair and reasonable.

**6. The Absence of Objections Confirms Reasonableness**

Despite widespread notice and ample opportunity, no Alphabet stockholder has objected to the requested $80 million fee. At preliminary approval, this Court rigorously questioned counsel on the record about the justification for the fee and invited objections. None were submitted—not even from sophisticated institutional investors. As courts have recognized, such silence creates a powerful presumption of fairness. *See Wells Fargo*, 445 F. Supp. 3d at 518. That presumption is especially strong here, where the fee was independently validated by Judge Phillips and is modest in relation to the relief achieved.

In sum, the requested $80 million fee is fair and reasonable by every measure: it reflects extraordinary results achieved through extraordinary effort, it is conservative in relation to the relief obtained, it was independently validated by an experienced mediator, it imposes no cost on the Company or stockholders, and it has drawn no objection from any investor. Under Delaware's *Sugarland* factors and Ninth Circuit standards, the Court should approve the request in full.

Dated: September 23, 2025

Respectfully submitted,
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Jing-Li Yu*

Patrick Coughlin (CA Bar No. 111070)
Maxwell R. Huffman (CA Bar No. 264687)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
pcoughlin@scott-scott.com
mhuffman@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson (*pro hac vice*)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Donald A. Broggi (*pro hac vice*)
Jing-Li Yu (CA Bar No. 342985)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
dbroggi@scott-scott.com
jyu@scott-scott.com

*Lead Attorneys for Co-Lead Plaintiff Police and Fire Retirement System of the City of Detroit and Co-Lead Plaintiff Bucks County Employees' Retirement System*

**BONI, ZACK & SNYDER LLC**
Michael J. Boni (*admitted N.D. Cal.*)
Joshua D. Snyder (*pro hac vice*)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0203
mboni@bonizack.com
jsnyder@bonizack.com

*Additional Attorneys for Co-Lead Plaintiff Bucks County Employees' Retirement System*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. All parties not so registered will be served via e-mail or U.S. Mail.

Executed on September 23, 2025, at New York, New York.

*s/ Jing-Li Yu*
JING-LI YU (CA Bar No. 342985)
SCOTT+SCOTT ATTORNEYS AT LAW LLP

*Counsel for Co-Lead Plaintiffs*