Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

```
IN RE ALPHABET, INC.            )
SHAREHOLDER DERIVATIVE          )     NO. 21-CV-09388-RFL
LITIGATION                      )
                                )
_____)
```

San Francisco, California
Tuesday, September 30, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

        SCOTT + SCOTT ATTORNEYS AT LAW LLP
        600 W. Broadway, Suite 3300
        San Diego, CA 92101
  BY:  **PATRICK J. COUGHLIN, ATTORNEY AT LAW**

        SCOTT + SCOTT ATTORNEYS AT LAW LLP
        12434 Cedar Road, Suite 12
        Cleveland Heights, OH 44106
  BY:  **GEOFFREY M. JOHNSON, ATTORNEY AT LAW**

        SCOTT + SCOTT ATTORNEYS AT LAW LLP
        The Helmsley Building
        230 Park Avenue, 24th Floor
        New York, NY 10169
  BY:  **DONALD A. BROGGI, ATTORNEY AT LAW**
      **JING-LI YU, ATTORNEY AT LAW**

For Defendants:

        FRESHFIELDS US LLP
        855 Main Street
        Redwood City, CA 94063
  BY:  **BORIS FELDMAN, ATTORNEY AT LAW**
      **REBECCA LOCKERT, ATTORNEY AT LAW**

Also Present:      Ronald King

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                  Official United States Reporter

<u>**Tuesday - September 30, 2025**</u>                                    <u>**1:34 p.m.**</u>

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:**  All rise.  Court is now in session, the Honorable Rita F. Lin is presiding.

Please be seated.

Calling Civil Action 21-9388, In Re Alphabet, Inc. Shareholder Derivative Litigation.

Counsel, please approach the podium and state your appearances for the record, beginning with counsel for plaintiffs.

**MR. COUGHLIN:**  Thank you.

May it please the Court, Patrick Coughlin, Geoff Johnson, Jing-Li Yu, and Don Broggi from Scott + Scott representing the plaintiffs in this derivative action, the Detroit Police and Fire Retirement Fund and the Bucks County Fund here today.  And we also have Ronald King, the general counsel of the Police and Fire Detroit Fund.  And, there, a shareholder --

**MR. KING:**  Good afternoon, Your Honor.

**THE COURT:**  Good afternoon.

**MR. COUGHLIN:**  -- with over 40,000 shares.  So that's our line-up today, Your Honor.

**THE COURT:**  Good afternoon.  Welcome.

**MR. FELDMAN:**  May it please the Court, Boris Feldman and Rebecca Lockert for the defendants.

1      **THE COURT:**  Good afternoon to all of you.

2      I wanted to start -- obviously we're here for a final

3   approval hearing.  I wanted to start and make sure that anyone

4   who had an objection and was present in the courtroom had an

5   opportunity to say something.

6      Is there anyone here who wanted to lodge an objection?  I

7   see one person in the gallery, but I don't know if that person

8   is here for that purpose.

9      That person is shaking their head.  So we don't have

10  anyone who's present here in the courtroom for the purpose of

11  stating an objection.

12     I asked my courtroom deputy, before we started, which was

13  after the 1:30 hour, to check and see if there was anyone on

14  Zoom who was interested in raising an objection or being heard

15  as to the question of final approval.  And no one raised their

16  hand.

17     I'll just ask those on Zoom again, if you have an

18  objection or have something you'd like the Court to know about

19  your view of the final approval of the settlement, will you

20  please raise your hand?

21     **THE COURTROOM DEPUTY:**  No hands have been raised, Your

22  Honor.

23     **THE COURT:**  Thank you.

24     So then I'll start off by letting you all know my view of

25  both the issue of final approval and then also the issue of

attorneys' fees.  And then I can give the parties an
opportunity to tell me anything else I need to know before I
enter my ruling.

     I do think the reaction from the shareholders is quite
telling.  We have had no objections filed in advance and we had
no objections at the hearing.  I'll incorporate some of the
comments I made at the preliminary approval hearing.

     These are obviously troubling allegations concerning
Alphabet's board and senior executives and the alleged failure
to monitor or mitigate the escalating exposure to antitrust
risk, despite a number of red flags and regulatory scrutiny.
At the same time, taking the case to trial would be extremely
expensive and result in significant risk, given the complexity
of the issues.

     I do think the structural reforms, particularly the Risk
and Compliance Committee, and the RegReady compliance program
are effectively aimed at addressing Alphabet's legal and
regulatory vulnerabilities, and that they will deliver a value
to shareholders.  It will be much harder for a board to look
the other way when faced with direct information from a
subcommittee that raises specific and clear compliance issues.
So I do think the settlement delivers significant value.

     It also secures a $500 million commitment to ensure a
baseline in terms of the amount of resources that are devoted
to compliance and implementation of the reforms.  So I do think

1    the settlement is fair, reasonable, and adequate.  And I do

2    think that certification of the settlement class is appropriate

3    for all the reasons I previously stated at the preliminary

4    approval hearing, particularly in light of the fact that there

5    are not objections to the settlement terms.

6        With respect to the issue of attorneys' fees, I do think

7    lodestar is the best way to measure the attorneys' fees rather

8    than a common benefit fund analysis.  It is very difficult to

9    put a monetary value on the Risk and Compliance Committee.  I

10   don't think $500 million is the right estimate of the value of

11   the settlement.

12       As we discussed at preliminary approval, Google's estimate

13   is that it really already spends well in excess of that amount,

14   even prior to this settlement, on compliance functions.  The

15   high number of that amount really reflects the scope and size

16   of Google's business, as well as the complexity and number of

17   its compliance issues.  So I don't think that we can say that

18   $500 million is an effective measure of how much value this

19   settlement has brought to the table.

20       So I think a better measure of attorneys' fees is a

21   lodestar measure.  I know that the plaintiffs submitted an

22   estimated $34 million as to the fees they have spent to date.

23   I calculate a lower lodestar than plaintiffs have after having

24   reviewed the materials that plaintiffs submitted.  I believe

25   the reasonable fees that plaintiffs have incurred so far to be

closer to $18.5 million.  I will go through a couple of the categories so the parties can understand the math.

I asked plaintiffs to break down their bills into a certain number of categories.  Category 1 was reviewing and analyzing documents from other lawsuits.  The blended hourly rate for what plaintiffs claimed in terms of those hours was $700 an hour.  I think that's excessive.  Much of that work ought to be done by contract attorneys.  And as I understand it from plaintiffs, a lot of it was done by contract attorneys.  I think that that rate should be somewhere more like $350 an hour.  That would reflect the combination of contract attorneys, plus a small number of documents being reviewed by those who are at a higher level of experience and are more involved in the case.

With respect to Category 2, which would be looking at the books and records, I think the blended rate that was requested, which is 1,297, is more appropriate, because those are new documents.  They're only for this litigation.  They're critical to understand.  So I'm okay with Category 2.

The blended rate on Category 3 I calculated at $1,602 an hour.  That's for reading news and regulatory information that doesn't have anything to do with any particular litigation.  That is way too high a level.  It's the type of thing a paralegal could do.  They can flag, they can summarize, and then can be reviewed at a much condensed level by someone who

is at a higher level experience.  So I'm awarding $250 an hour for that category.

Then we get to blend -- the blended rate on Category Number 4, which is other document review.  That rate is $1,862 an hour from plaintiffs' submission.  Again, I think that's too high for the same reasons I said for Category 1.  So I'm awarding somewhere closer to $350.

I also think that the rates on preparing the complaint and preparing for mediation and settlement were very high.  The estimate was $7.3 million to prepare the complaint, exclusive of document analysis and review.  I understand that plaintiffs needed to work with experts, put information together, but that is really a level too far.  We're talking about somewhere in the range of -- if you had an attorney who billed $1,000 an hour, that person would be working on the complaint for 3.5 years, if that person worked every day, 40 hours a week, on the complaint, doing nothing else.

That seems to me to be extraordinary and clearly beyond the bounds of what is reasonable for preparation of a complaint.  I'm going to calculate that at closer to a blended rate of $1,000 an hour for about a year.  That's one person working for a year, every day, all day, on the complaint. That's already pretty high.  But I can understand that, given the complexity of the case.

And then with respect to the mediation, the claim was

1  $4.5 million to prepare the mediation statement, do two

2  mediations, engage in negotiations, and draft the agreement.

3  Blended rate was $1,473 an hour for 3,070 hours.  That is an

4  attorney working 1.5 years, all day, every day, on mediation

5  issues.

6      Again, that seems to me to be just way beyond what the

7  reasonable level would be.  I'm going to reduce that to around

8  1,000 hours, which would be the same attorney working six

9  months exclusively on the mediation.  I think that's much more

10  in the reasonable range.

11      So I peg the reasonable attorneys' fees amount incurred to

12  somewhere closer to $18.5 million.  I'm okay with applying a

13  double lodestar to that.  I recognize the risk that the

14  attorneys took on in the case.  The case settled at an early

15  stage.  But, at the same time, this was a significant outlay to

16  hire experts, to hire contract attorneys, to analyze these

17  issues.  So my tentative is to award $37 million in attorneys'

18  fees.  That's a lot of money.  And I think it more reasonably

19  reflects the level of the work that was done.

20      With respect to the expenses, my tentative would be to

21  award the expenses requested except for transportation, hotel,

22  and meals, which was around $63,000.  That amount seemed to me

23  to be inadequately supported by the materials that I received.

24  I just didn't have receipts, so I don't understand what that's

25  for.  All I have is the line item.

1          Then with respect to the service award, typically I award

2     service awards in the level of $5,000.  I'm sure you all know

3     that's the presumptively reasonable amount.  It's for work

4     done.  And for recognition of financial reputational risk, I

5     don't see anything in here that indicates a significant

6     reputational or financial risk.  The plaintiffs did not sit for

7     deposition or engage in meaningful written discovery.  At the

8     same time, I know the case was pending for a while.  So there

9     was back-and-forth about the settlement.  I do think that a

10    departure above $5,000 is appropriate.  But my tentative is

11    10,000 rather than the 50,000 requested.  That would be for

12    each of the named plaintiffs.

13         So I'm sure the parties would like an opportunity to

14    comment on the Court's tentative.  I'll give plaintiffs the

15    first opportunity.  And defendants may have the option to say

16    something if they would like.

17         **MR. COUGHLIN:**  Thank you, Your Honor.  And thank you

18    for spending the time that you did going through the settlement

19    itself and then our attorney fees.

20         So let me talk a minute about the settlement itself,

21    because I think that Your Honor recognizes the value that it

22    brings in this case to this company.  Because as we talked

23    about earlier at the preliminary approval stage, we talked

24    about how there's no big high tech company -- certainly not of

25    the size of Alphabet/Google -- that has a board-level risk

1    compliance committee.  And so this is kind of an extraordinary

2    get.

3         And, really, we had to argue about it for nearly two years

4    before they finally said -- because they said, no, no, no.

5    We're not going to be bound by that way.  We're not going to

6    have somebody on the board looking at the risks, evaluating the

7    risks of the compliance.

8         And then we finally persisted, and we got that.  And it

9    was -- so it's really something really unusual and supported by

10   the RegReady structure, as you noted.  The -- you know --

11   the -- the two -- Trust & Compliance Council and the Trust &

12   Compliance Steering Committee -- you know, that has to have

13   VP-level people reporting up to other vice presidents and, you

14   know, finally bringing the product level together.

15        And so I think it's -- I think it's an extraordinary

16   result.  And I understand what Your Honor was doing in taking a

17   look at the categories and saying, no, I think this should have

18   been contract attorneys.  But they weren't contract attorneys.

19   They really were staff attorneys.  So the rates are higher.

20   And they were with us for a number of years.  And so that's in

21   part.

22        And I don't know if we'll go through those categories in a

23   minute, but I -- I kind of wanted to highlight what this does

24   and what it could do in a real-world context and how -- why

25   this settlement is really extraordinary.

1          So, as you know, we -- there's been a focus on the three

2     main areas of Alphabet/Google.  And that's the search, the ad

3     tech -- right? -- and we call it the "play," but it's really

4     the app division of the company.  And we noted different

5     problems in each.

6          If it was the search, maybe it was the exclusive

7     contracts.  We pointed out in the ad tech that what you had

8     was -- you know -- they did the ad stack.  And we complained

9     that hey -- even a senior executive noted that that was like

10    owning the New York -- for Citibank and Goldman Sachs owning

11    the New York Stock Exchange by having the publishers, the

12    advertisers, and, in the middle, the ad exchange.

13         And so being a monopoly by itself isn't necessarily a

14    problem.  But, of course, we know that there were different

15    things happening.  And I know Your Honor knows that, because if

16    you have that securities case -- the AMI case -- different

17    things happening in and around what was happening with the

18    advertisers and the publishers that really are some unfair

19    business practices.

20         And so when we were negotiating, we were aware of those

21    practices.  We reviewed them, and we really had to do a lot

22    of -- we really thought we were going to trial in this case.

23    So we really staffed it up.  And we spent our own money to --

24    to do this -- to get that -- you know, it wasn't like your --

25    when you reduce it down to 18, it's not like we didn't spend

1    34.  We spent $34 million, basically, out of pocket, at those

2    rates, to get that lodestar.  And the lodestar was a 2.4.  So

3    we didn't think it was -- it was certainly within the realm of

4    reason.

5         And I'm going to apply what we got to some specific facts

6    in a second, but I want to say, just as we go along here, I

7    think Your Honor kind of thinks that, well, we put in these

8    hours, or billed these hours, and then we requested, you know,

9    an $80 million fee at a 2.4 multiplier.  That's not the way

10   this happened at all.

11        There was a long negotiation over this fee.  Okay?  And

12   the insurance company was involved in those negotiations.  They

13   were right in there negotiating.  So when Your Honor -- and I

14   appreciate you going through each category, asking us to put it

15   in categories, and then evaluating it.  But I think what is

16   happening is that you're kind of second-guessing the way that

17   we litigated the case.  And that's your prerogative to do that.

18        But I think that that's -- that's not okay in the

19   situation where we achieved a tremendous result.  You know?

20   And we didn't have an unreasonable multiplier.  And it wasn't

21   only the insurance company -- insurance companies didn't want

22   to pay us anything like that at all.  And it was not only the

23   insurance companies that were involved in negotiation, but

24   Google/Alphabet was also involved in that negotiation.

25        And it wasn't like, okay, well, we'll pay you and you can

1  maybe go -- no -- they accepted the mediator's recommendation.

2  They accepted it.  They knew what we had done on the other

3  side, and they accepted that they would not object to a fee

4  request of up to $80 million.  And they knew that our

5  multiplier was not that great, because we had to submit it to

6  the mediator before we finally got down to the $80 million.

7      So it was a negotiated fee with the other side here.  And

8  I just don't think that you're giving that enough deference.

9  And so I want to apply what we got to some facts that you know

10 very well.  So let's take the ad tech case that you're very

11 familiar with because of the AMI situation.

12     So in the ad tech case, we complained about the ad stack.

13 But there's nothing wrong necessarily with being a monopolist.

14 You know?  It's just if you maintain that position unfairly;

15 right?  So in the ad tech, they became, you know, the

16 monopolist, you know, and the channel, so to speak, to go to

17 for ads, and then Facebook was the second one behind them;

18 right?

19     And they maintained that monopoly, we would say.  This

20 case -- and I'm not talking about falsity or any statements --

21 they maintained that monopoly, we would say, by engaging in

22 some unfair business practices, whether it was, you know, their

23 speed, their ability to analyze other bidders over time and

24 underbid them, whether they did a first look or a last look,

25 you know, and then charged a penny more on the last look.  All

1   of these things we would say, hey, those are unfair business

2   practices.

3        And the problem was, is that each of these divisions in

4   Alphabet/Google are almost like separate silos.  Now, you

5   wanted to do your ad tech business with Google because of their

6   prowess in the search.  You wanted to be next to that search

7   engine; right?  So there was some overlap between the three

8   areas and the billing, you know, in play.  But for pretty

9   much -- they would make these decisions in these different

10  divisions, you know, almost like, okay, hey, we could do this

11  here, and we'd do better.  We can raise the price of our ads

12  and not tell, you know, the advertisers that they're paying

13  literally sometimes 90 percent more, or we could do this or

14  that and, you know, you wouldn't know it.

15       And when we got the 220 documents, and when we got the

16  documents from, you know, the Texas case, the AG case, and

17  literally when we got the 53,000 pages of exhibits in those

18  trials and had to go through those, you know, it wasn't -- you

19  know -- it wasn't like you could get a contract attorney and

20  just say, oh, well, this might be interesting.  This might --

21  you really had to kind of understand what was going on in these

22  divisions.

23       And these were complicated areas.  I mean, these -- the

24  things like ELMO and different, you know, projects that they

25  engaged in to reallocate spend, you know, and throttle rival

1    markets.  You can't just look at a document and understand

2    what's happening.  You really had to get to know -- get your

3    hands in and get to know what was going on there.  So I think

4    that that's why we needed the resources that we applied to this

5    case.  Because they were taking everything to trial.  They

6    took -- they went to trial in these three areas.

7        Now, I think maybe they're being smart and playing the

8    long game like Microsoft did in the '90s and just say, hey,

9    we're going to fight it on the remedy side.  I don't know.  But

10   whether they do that or not, now there's a structure in place

11   here -- and I'm going to apply it to something you know very

12   well -- it's the deal that Google did with Facebook.

13       Now, I happen to have a little more knowledge, like you

14   say -- what -- the review of other documents and you had cut

15   that, you know, way down.  Well, yeah, I was reviewing Meta

16   documents, too, to see what was going on with the -- we call it

17   the GNBA, the Google Network Bidding Agreement, you know, with

18   Facebook, or Jedi Blue, as Google called it.  And so we had to

19   understand it.  You know?  I took Sheryl Sandberg's deposition,

20   so I know actually quite a bit about the negotiations, you

21   know, that went on behind that.

22       What we didn't find -- okay? -- is anything in the board

23   record about that deal.  How it came about, you know, that they

24   thought, you know, header bidding was an existential, you know,

25   threat to their own open bidding project, and how they had --

1    and then once Facebook came out and said, hey, we're going to

2    back header bidding, then they really became concerned, you

3    know?  And Facebook wrote, internally, hey, they want to kill

4    header bidding, but the only way they can do it is to get us on

5    board.

6        The documents over here that we reviewed from another case

7    helped to inform us of the things that you know about.  You

8    know about maybe the speed -- the extra speed -- that Facebook

9    was given from 160 milliseconds to -- they got 300.  That's

10   like a lifetime.  It's double the speed other people get.

11       You know that the customers were identified to Facebook.

12   And you said, you know, something about identified for them so

13   they could know, and also the bots were identified.  But what

14   was identified to Facebook were actually Facebook customers,

15   which made those identifications so much more valuable, and

16   they could charge so much more, because they were identifying

17   Facebook customers that they knew had a target with the ads.

18   So it's so much more valuable than the facts so far developed

19   that I can see in your case.

20       And so then of course they agreed not to use what they

21   learned from the bidding, you know, against -- against

22   Facebook.  You know, that they would know -- you know -- you

23   know, because they had the smart bidding -- they could tell

24   kind of what you were going to bid before and outbid you --

25   right? -- and get the impression, you know, for Google.

1    So some of those things, you know, you point out and note,

2    but what you didn't note in that -- in your opinion -- and

3    maybe it's not even part of the securities case and it doesn't

4    need to be -- there is a clause in that contract that says that

5    either side, Google or Facebook, will notify the other if

6    there's a governmental inquiry about this contract -- about

7    this deal.

8    So not only were they supposed to keep it secret, they

9    were supposed to coordinate any antitrust inquiry -- okay? --

10   into either company and give the other company time to decide

11   and approve or not approve -- work together -- in a response.

12   That is so outrageous, you know, that that is an agreement

13   between the two biggest ad, you know, channels, you know, to

14   coordinate our response to governmental investigation.  Okay?

15   Well, so you not only had to understand what these

16   contracts were and have people that were higher up review them,

17   but to identify -- you know, it might have been easy enough to,

18   you know, identify some of the speed difference and things like

19   that, and some of the disclosures or, you know, that they

20   wouldn't take advantage of Facebook and things like that -- but

21   to really understand, you know, from an antitrust perspective,

22   what was the failure here?  Why did not -- frankly, why did not

23   either company's board get a full report about this contract;

24   right?

25   I mean, you have the top people negotiating.  Sheryl

signed it, you know, for Facebook.  You know, you've found that
the CEO -- you know, I don't know how to say it -- at least
recklessly disregarded -- whether he knew about it or not --
and prepared for converse, you know, when he testified.

But you won't have that problem anymore at this company.
A contract like that -- that's one of the most valuable
contracts that had a $500 million spend from Facebook, you
know, by year four -- you know -- now the board is going to
know about that contract.  And they're going to know about all
the terms.  You know, like the term that said Facebook is
guaranteed to win 10 percent; right?  So that's a thing that
was highlighted in the securities case.

What we thought was more important is they got to look at
90 percent of the ads ahead of time.  Okay?  That's better --
when you look at 90 percent, Facebook's going to win a much
bigger portion than 10 percent, you know, with that look.  It's
those kind of things that the risk compliance committee now
being reported up from the two lower committees up through the
products -- the products are so siloed over there -- or have
been -- right? -- that that's why this settlement is so
important.

So when you go through line by -- I think you guys spent
too much here.  You know, a contract attorney could have looked
at this and done this or that.  I just think that -- that
that's wrong for the value that we got and what we had to do

1    and decide, you know, to do this case.  And we -- and we put

2    the resources in.

3        And it's not like we were representing, you know,

4    mom-and-pop shareholders that had, you know, 20 shares, 30

5    shares, how about 200 shares.  No.  We're talking about two

6    shareholders that had nearly $20 million of this stock.  I

7    mean -- and so they were sophisticated and they are

8    sophisticated.

9        And so as this case went along, and it was explained what

10   we were doing, and why we were doing, and why we kept going, we

11   didn't just prepare one complaint here and then the final here.

12   We prepared complaints along the way.  And we went to the

13   mediations.  We had to basically argue the case:  Where we were

14   going, what we were doing, what we had discovered, and why we

15   thought these changes and the implementation of these things

16   were so necessary.

17       Because you take a look at the 220 documents or even --

18   and we only got -- went back a certain way with 220 documents.

19   And it was just when the Facebook deal was happening.  You

20   know, they started talking in 2017.  It happened in 2018.

21   There's nothing getting up to the board.  You talk about -- we

22   talked about the red flags that now it's going to filter up and

23   go on up and through.

24       And so whether you've got, you know, Project Hug, you

25   know, in the app area, or, you know, getting rid of the

1    exclusive contracts in the search area, that's going to be

2    discussed at the board level now.  There's going to be

3    responsibility there.  Okay?

4        And I think that you, with all due respect, do us a

5    disservice when you go through, line by line, and do two

6    things:  You don't discuss, at all, that this was an agreed-to

7    fee with the company and the insurance carriers.  They're

8    not -- they don't part with their money easily.  You know?  And

9    when Google thinks they should go to trial, they go to trial.

10   Okay?  And they weren't shy about it.  And we thought that

11   that's where we were probably headed, so we got ready like

12   that -- to do that.

13       And I've tried some of the biggest of the securities and

14   antitrust cases in the country.  And I -- this was -- this was

15   a big, complicated matter, and we needed good attorneys taking

16   a look at the underground stuff so I knew, when I was putting

17   together the strategy, you know, what the trial was going to

18   look like.

19       And so then when we negotiate this fee with these -- with

20   these counsel and with the insurance companies -- they knew

21   that we were ready.  They had been with us in the mediations.

22   They knew that we knew what we were talking about and what we

23   were going to put on and what it was going to look like.  Okay?

24       And so when we demanded the board level -- you know, we

25   demanded that that had to happen -- we said if that doesn't

1   happen, there's no settlement.  If it can't get up to the

2   board -- because -- because that Facebook settlement with that

3   clause in it is -- that should have been the red flag, you

4   know, number one.

5       So, you know, nobody reported -- the two highest people

6   over at Facebook?  No.  A couple of highest people over here --

7   you know -- the CEO over here, at least -- as well as the

8   product guy?  No.  They didn't -- there's nothing being

9   reported.  They don't take it into account.

10      So that's why I think if you apply what we did to what

11  really actually -- some real-life facts that did not make it up

12  to the reporting levels that were required, then you see

13  that -- I don't think you should just go down the categories

14  and chop them like that.  You know?  It's -- I don't think it's

15  fair to our judgment of where to put our time and resources.

16      And so I think that if the Court thinks about that it was

17  a negotiated fee, that they agreed not to object up to this

18  level of 80 million, it's a much better context, and that we

19  had to put in this time with these attorneys to do the job that

20  we did.

21      And you can tell that we're ready.  That we know actually

22  what we're talking about.  We actually know, like, five facts

23  that are not in your opinion that the securities people

24  haven't, you know, put forward because of the work that we've

25  done -- the underground, underlying work -- and whether it's

1    the play, you know, or the ad tech, and/or the search.

2          And so I would hope that you would revisit your decision

3    on the fee number.  And reconsider -- and consider, when you're

4    doing it, really, the results obtained.  You know?  And

5    everybody pooh-poohs 500 million, but it's a half a billion

6    dollars devoted to ensure that these compliance things go in.

7    It's four times what they spent in the previous three years.

8          I thought you said -- and maybe I misheard you -- that it

9    was -- they had spent in excess of that earlier.  No.

10          **THE COURT:**  At the preliminary approval hearing, I

11    asked Mr. Feldman if I was correct in understanding that Google

12    spends -- over the time period that the $500 million commitment

13    would take place, which, if I'm remembering right, is over the

14    next ten years -- that in the last -- on a year-by-year basis,

15    Google spent -- which is $50 million a year -- Google spends

16    way more than that already on compliance.  And he said --

17          **MR. COUGHLIN:**  I think he said --

18          **THE COURT:**  -- yes.

19          **MR. COUGHLIN:**  -- 23 million in one year.  He said

20    like 46 in the thing.  And the third year was 70 million or

21    something.  So the --

22          **THE COURT:**  He said those numbers were the amount that

23    it would take to get -- to prepare the RegReady part of the

24    project.  But it doesn't account for the other compliance spend

25    that Google has that would count towards this $500 million

 1    total.  So he was giving me the numbers for the RegReady

 2    transition, as I understand it.

 3         **MR. COUGHLIN:**  I thought -- I took it a little

 4    differently than that.  It's -- and, if you could, maybe call

 5    the mediator and find out.  I mean, we were negotiating for

 6    what we certainly believed was new spend.  As he said at the

 7    preliminary approval hearing -- Mr. Feldman -- he said, well,

 8    none of this stuff is in place.  And so that's where this money

 9    is going to be going.  It's all new.

10         And anything that had even been done ahead of time was a

11    result of the filing of this lawsuit and the -- what we were

12    doing to litigate it.  We didn't just sit back and wait for

13    these actions to go forward and then get their exhibits.  No.

14    We immediately did the 220 request.  We went down and we got

15    ahold of the Texas AG documents.  Nobody else got those.  They

16    were all confidential.  We looked at all the exhibits and all

17    the transcripts of all the depos in each of these things.  We

18    got 53,000 pages of exhibits that were actually introduced at

19    these different trials.

20         You know, we have different cases that meld into this,

21    like the Meta case I was supposed to be in trial right now

22    with, about their ad -- their ad tech business.  And then the

23    GNBAs is one of the things at issue in that case.  So there was

24    a lot of things going on that we put together.  And so I think

25    that if you take into account how sophisticated some of these

1   issues are, that we needed more than just contract attorneys.

2   And that's what you've essentially given us, $250, you know,

3   $300 an hour.  And that's not who we used or how we could use

4   them.  And we had to keep ahold of them.  Because it didn't do

5   any good to hire them for six months and lose them and have to

6   retrain somebody.

7        So if you take that into account, and the fact that this

8   was a negotiated fee, I think that -- and you couple that with

9   the value that we think we got and that a really large

10  shareholder believes we brought to the table -- you know, I

11  think that if you could reconsider that amount, we'd really

12  appreciate it.

13       You know, I hesitate to say where I think -- at least in

14  light of your comments -- where I think you should go, but

15  after -- if after Mr. Feldman talks, you want me to, I will.

16            **THE COURT:**  Thank you.

17       It's Google's opportunity to say anything if you believe

18  there's anything else you have to add.  If you don't have

19  anything to add, you're not obligated to.

20            **MR. FELDMAN:**  Nothing to add, Your Honor.  Thank you.

21            **THE COURT:**  Thank you for the additional argument.  I

22  recognize the concerns that plaintiffs' counsel raises.  And I

23  did consider the complexity and the scope of what had to be

24  reviewed in pegging what I believe to be the reasonable fee

25  number.

I recognize that this was a negotiated settlement.  At the same time, the Court's obligation is to have an eye towards what is the reasonable spend and then to give a multiplier to recognize the risk, the possibility that this would go to trial, and the need to invest more resources beyond what might have seemed reasonable.

I do think that $18.5 million essentially to look at other people's documents in another -- in other litigation -- where other people were already preparing the case for trial is more than enough.

I recognize that counsel may have found new pieces and new facts and gems that were undiscovered in some of the document review.  But in a situation in which experienced trial counsel are already preparing the other litigation on their own, and have predigested a lot of that material, have presented it to a jury, have gone through depositions, and you have trial transcripts from the case, it significantly -- or it should significantly reduce the burden on plaintiffs' counsel, in terms of case preparation, and allow you to streamline some of that process.

So -- but I appreciate the concerns raised and the -- the reasoning that plaintiffs' counsel had for their fee request. I am coming out still that the reasonable fees are 18.5 million.  I am still giving the two-time lodestar.  So I'm going to enter the tentative ruling that I laid out at the

1  start of the hearing.

2        Thank you, all, for your hard work on the case.

3  Regardless of the fee number, I do think that this reflects on

4  both sides the hard work that you have put into this

5  settlement.  And the shareholder response reflects the value

6  that you all have provided to Alphabet's shareholders in this

7  case.

8        Thank you.  Be well.

9             **THE COURTROOM DEPUTY:**  Court is adjourned.

10                (Proceedings adjourned at 2:12 p.m.)

11                      ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Wednesday, October 1, 2025

8

9

10   
_____

11         Kendra A. Steppler, RPR, CRR

12       Official Reporter, U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25